UNITED STATES BANKRUPTCY COURT                    **NOT FOR**
                                                 **PUBLICATION**


SOUTHERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                    :      Chapter 11

FOOTSTAR, INC., <u>et al.</u>,             :      Case No. 04 B 22350 (ASH)

                        Debtors.      :      (Jointly Administered)


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**WACHTELL, LIPTON, ROSEN & KATZ**
**Attorneys for Kmart Corporation**
**By:  Amy R. Wolf, Esq.**
      **Robert B. Mazur, Esq.**
      **Michael A. Charish, Esq.**
      **Emil A. Kleinhaus, Esq.**
**51 West 52 Street**
**New York, NY 10019**

**WEIL, GOTSHAL & MANGES LLP**
**Attorneys for Debtors**
**By:  Martin J. Bienenstock, Esq.**
      **Paul M. Basta, Esq.**
      **Stephen D. Kahn, Esq.**
      **Penny P. Reid, Esq.**
**767 Fifth Avenue**
**New York, NY 10153**

**KRONISH LIEB WEINER & HELLMAN LLP**
**Attorneys for the Official Committee of Unsecured Creditors**
**By:  Lawrence C. Gottlieb, Esq.**
      **Jay R. Indyke, Esq.**
      **Richard S. Kanowitz, Esq.**
      **Brent Weisenberg, Esq.**
**1114 Avenue of the Americas**
**New York, NY 10036**

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
**Attorneys for the Official Committee of Equity Security Holders**
**By: Philip Bentley, Esq.**
      **David M. Feldman, Esq.**
      **Matthew J. Williams, Esq.**
**919 Third Avenue**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## DECISION ON KMART'S MOTION TO LIFT THE STAY
## WITH RESPECT TO CERTAIN STORES

Kmart Corporation ("Kmart") has moved for relief from the automatic stay in order to terminate its agreements with Footstar, Inc. ("Footstar") and relevant subsidiaries with respect to certain stores which were sold to Sears, Roebuck & Co. ("Sears") in September 2004. The stores in question are to be converted from Kmart stores to Sears Essentials stores. For the reasons set forth below, the motion is granted.

### Jurisdiction

This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

### Background

In June 2004 Kmart owned or leased more than 1,500 stores. Footstar and its subsidiaries operate shoe departments in Kmart stores pursuant to a "Master Agreement" and "Sub-Agreements." In a Decision dated February 16 and a Supplemental Decision dated March 31, 2005 this Court denied Kmart's legal objection under Section 365(c)(i) to Footstar's motion to assume the Master Agreement and the Sub-Agreements, leaving unresolved other, fact-based objections.

In or about June 2004 Kmart agreed to sell up to fifty-four stores to Sears, and in September 2004 the sale of fifty stores to Sears closed for a purchase price of $575.9 million. Kmart continues to occupy the fifty stores pursuant to short-term take-back leases from Sears. Prior to filing the instant motion, Kmart notified Footstar that Sears planned to take over twenty-five of the fifty stores upon the expiration of the take-back leases in April and May of this year, and that the debtors' rights to operate in those stores would expire. Sears subsequently announced that it will close briefly and reopen the

twenty-five stores with a new format under the new name "Sears Essentials."[1]   After the motion was

filed, it was decided that one of the twenty-five stores would remain a Kmart store, and that six more of

the fifty stores purchased by Sears in September 2004 would be converted to Sears Essentials stores.

Hence, this motion concerns thirty of the fifty stores that were sold to Sears.

   Had Kmart and Sears remained independent companies, Footstar would not have con-

tested the termination of its Agreements with Kmart and its removal from the Sears Essentials stores,

since the debtors have no agreements with Sears and no rights to operate footwear departments in Sears

stores.  However, in October 2004 Kmart and Sears commenced discussions that led to the signing of a

merger agreement on November 16, 2004 that would combine Sears and Kmart under a new holding

company to be called Sears Holdings Corporation ("Sears Holdings").  The shareholders of both

companies approved the transaction, and the merger closed in April 2005.  Former Kmart shareholders

own approximately 63% of Sears Holdings and former Sears shareholders own approximately 37% of

Sears Holdings.  The corporate structure of the merged enterprise will consist of two distinct chains of

subsidiaries.  The Kmart chain of subsidiaries will continue to operate the Kmart stores using existing

Kmart corporate headquarters, staffing, computer facilities, recording and reporting facilities and

accounting.  The Sears subsidiary named Sears, Roebuck & Co. will operate all Sears stores and Sears

Essentials stores using existing Sears corporate headquarters, staffing, computer facilities, recording and

reporting facilities and accounting.

   As described in the Kmart motion (paragraphs 26-31), the conversion from Kmart stores

to Sears Essentials stores will proceed in accordance with plans described in an affidavit accompanying

the motion, as follows:

   26.  . . .   These plans involve substantial remodeling, change-over of inventory,
and turnover of control and store operations in virtually all respects to Sears.   . . .

---

[1]  One of the twenty-five stores located in Florida has been closed since November 2004 due to hurricane
damage.

- 3 -

27.   The conversions are taking place while Kmart continues to operate the stores.  Instead of liquidating inventory in "Going Out of Business" sales, Kmart has stopped shipping new inventory into the stores, is managing its existing inventory down, and is shipping out any excess inventory to sister stores.  . . .  (The relevant dates and the identities of sister stores have previously been provided to the Debtors in response to their request.)  At the same time, Sears is stocking the stores with traditional Sears brands, such as Kenmore, Craftsman, Die Hard, and Lands' End, which will constitute approximately 75% of the new stores' inventory.  Until Sears reopens the stores, this inventory will be covered with heavy plastic coverings.  . . .  Approximately 25% of the Sears Essentials stores will consist of categories of merchandise traditionally found in Kmart stores, such as health and beauty care products, consumables, edibles, toys, pantry items, and detergents, which will be supplied by Kmart to Sears.  . . .  The only areas in which it is expected that Kmart will conduct operations in Sears Essentials stores are the pharmacies, for which Kmart is licensed and Sears is not, and restaurants.  Kmart will operate these departments pursuant to a license agreement which likely will be recoverable at will (to permit Sears to take over those operations when it chooses) after August of 2005.  . . .

28.   At the agreed-upon dates for conversion, the Kmart stores will close for business that night, and their operation as Kmart stores will permanently cease.  Kmart's proprietary point-of-sales system will be deactivated.  As a result, Kmart Corporation will cease receiving sales data from the converted stores.  Two days later, the plastic coverings around the Sears merchandise and signage will be removed, the Kmart sign on the front of the store will be removed and replaced with a Sears Essentials sign, and the store will reopen as a Sears Essentials store.  . . .  Sears' proprietary system to track store sales will be activated and begin transmitting point-of-sale data to Sears' headquarters in Hoffman Estates, Illinois.  Sears' point-of-sale systems will be incapable of scanning Kmart merchandise.  . . .  Sears, not Kmart, will recognize the profits generated by Sears Essentials stores and will be responsible for paying taxes on those profits, under its own taxpayer identification number.  . . .

29.   Kmart's employees in the stores will cease to be Kmart employees and will become Sears employees.  In order to remain as Sears employees, they will be required to undergo the same vetting and training as would any prospective employee of Sears.  . . .  Sears will exercise complete control over hiring, firing, promoting, and training decisions, as well as wages and workplace rules and regulations within each Sears Essentials store.  . . .

30.   Finally, Sears will control all advertising for promotions in the Sears Essentials stores, will be responsible for all legal claims arising from the stores' operations, and will establish Sears-specific programs such as merchandise pick-up, home delivery, expanded warranty, and service agreements in each store at issue.  . . .  There will be no Kmart rotos or other advertising for these stores.  . . .

31.   During the period of remodeling and remerchandising, Kmart will continue to operate the stores pursuant to the Take-Back Leases, which will be briefly beyond their March 15 or April 15 termination dates.  . . .  However, as a store is converted to a Sears Essentials store, the applicable Take-Back Lease will be allowed to expire and the

Kmart store will close.  At that point, Kmart will have no remaining interests in or rights to occupy or operate these stores.

## Positions of the Parties

Footstar's right to operate shoe departments in Kmart stores is set forth in the 1995 Master Agreement between Kmart and Melville Corporation, the predecessor in interest of Footstar.  The governing provision of the Master Agreement is Article III, entitled "LICENSE," and specifically Section 3.1, entitled "Grant of License."

Section 3.1 provides, in its entirety:

3.1 Grant of License.

Licensor grants to each Licensee and each Licensee accepts from Licensor, for the Term and any renewal Term only, upon the terms and conditions specified herein, the non-transferable exclusive right and license in the Territory only, to operate a Footwear Department in the applicable Store, and the non-transferable non-exclusive right to use the Marks on and in connection with the operation of the applicable Footwear Department and on and in connection with authorized Materials only, if and only if, **[sic]** such use complies with the terms and conditions of this Agreement, including, without limitation, Licensor's quality standards as set forth herein and the authorization and approval process set forth below.  All use of the Marks by Licensee as permitted hereunder shall conform to the requirements of Exhibit E and to the quality control requirements of the License Agreement between Licensor and KPI.  Licensor shall be entitled to change Exhibit E by giving Meldisco not less than 30 days advance written notice of any such change; however, to the extent any Licensee cannot reasonably change any use of the Marks on authorized Materials by the end of such 30 day period, Licensor shall reasonably extend such date until any such Licensee(s) can comply with such new requirements.  Licensor may notify Meldisco in writing of any uses of the Marks by any Licensee(s) which are not in accordance with Exhibit E and Licensee(s) shall promptly make any required change.  No other, further or different license is granted or implied and no assignment of any right or interest in the Marks is made or intended herein.  In particular, no license is granted to permit any third party to use the Marks, and each Licensee may only use the Marks on or in connection with the Materials.  Licensor and KPI represent, warrant and agree that Licensor is and shall be authorized to grant each Licensee such right to use the Marks during the Term and any renewal Term of this Agreement.

As used in the Master Agreement, the term "Licensor" is defined in Article II as Kmart Corporation, and "Licensee(s)" is defined, in substance, as the Footstar subsidiaries "formed for the purpose of operating a Footwear Department(s) in Store(s)."

Since Section 3.1 grants to each Licensee the right "to operate a Footwear Department in the applicable <u>Store</u>" [emphasis supplied], one must look to the definition of "Store(s)" in Article II of the Master Agreement. Article II provides that "Store(s)"

> shall mean discount retail outlet(s) consisting (currently) of approximately 30,000 to 120,000 square feet of gross indoor floor space operated by Licensor under the service mark KMART (or some other service mark incorporating KMART in whole or in part or under which the Stores are operated) and primarily devoted to the sale of a broad assortment of general merchandise, or a discount retail outlet consisting (currently) of approximately 120,000 to 250,000 square feet of gross indoor floor space operated by Licensor under the service mark SUPER KMART CENTER (or some other service mark incorporating KMART in whole or in part or under which the Stores are operated) and devoted to the sale of a broad assortment of general merchandise as well as a broad assortment of fresh foods and grocery products.

There are three elements in this definition of "Store(s)":

! "discount retail outlet(s)"

! "operated by Licensor"

! "under the service mark KMART (or some other service mark incorporating KMART in whole or in part or under which the Stores are operated)."

The fundamental issue presented in this contested matter is whether the stores sold to Sears in September 2004 which are being converted from Kmart stores to Sears Essentials stores will continue to meet the definition of "Store(s)" in the Master Agreement after these stores are converted to Sears Essentials stores.

Kmart argues that none of the three elements of the "Store(s)" definition will apply to the Sears Essentials stores after their conversion from Kmart stores. Kmart asserts that Sears Essentials will not be operated as discount stores, will not be operated by any of the Kmart subsidiaries in the Sears Holdings corporate structure and will not be operated under the Kmart tradename.

Focusing on the third element of the definition of "Store(s)" ("under the service mark KMART . . .") as suggested by the Court at a prior hearing, Footstar opposes this motion on three basic grounds: (i) the use of "Kmart + Sears = Sears Essentials" signage in connection with the transition from

Kmart to Sears Essentials stores; (ii) the parenthetical language "or under which the Stores are being

operated" which modifies the requirement in the definition of "Store(s)" of operation "under the service

mark Kmart;" (iii) the argument that the termination provision in Section 4.2(a) of the Master Agreement

does not permit termination by conversion to Sears Essentials stores. Each of these arguments will be

considered in the Discussion below.

## Discussion

## I.    The "Kmart + Sears = Sears Essentials" signage

Despite Kmart's assurances in its moving papers that Sears Essentials will not use Kmart

service marks, Footstar points out that the stores presently being converted from Kmart to Sears

Essentials are prominently displaying both indoors and outdoors signs saying "Kmart + Sears = Sears

Essentials" highlighting the Sears Essentials concept as "Two great stores. One big idea."  In addition,

the transition signage promotes the fact that the Pharmacy in the converting stores will be the "same

great" Kmart pharmacy, and Section 1.5A of a draft preliminary services license agreement between

Kmart and Sears states that Kmart "shall be permitted to continue to use the name [Kmart Pharmacy] in

the Designated Stores even after such Designated Stores are renamed [Sears Mart]."  Footstar argues

that this signage demonstrates a conscious effort by Kmart/Sears to retain the goodwill and customer

base of each Kmart store after its conversion to the Sears Essentials format.  Moreover, the signage in

various departments includes the legend "same great [department, *e.g.*, health & beauty]" just above

"Kmart + Sears = Sears Essentials."

Kmart acknowledges the signage as asserted by Footstar and avers that the purpose is

indeed to maintain the Kmart goodwill and customer base for the benefit of the converted Sears

Essentials stores.  Kmart also acknowledges that the pharmacies in the converting stores will continue to

be operated as Kmart pharmacies under the Kmart tradename until Sears obtains store-by-store the

necessary licenses to operate pharmacies.  But Kmart assures the Court that the use of this transition

signage (referring to both Kmart and Sears) is both transitional and temporary, and that all signs referring

to the Kmart tradename will be removed within a matter of weeks after the opening of each Sears

Essentials store.  With respect to the pharmacies, Kmart assures the Court that Sears intends to apply for

pharmaceutical licenses with respect to each converted store, and that the Kmart tradename will be used

in connection with the pharmacy only until each converted store obtains the necessary license to operate

as a pharmacy.

   The Court accepts these assurances by Kmart as the predicate of its decision on this

Motion.


**II.**   **The parenthetical clause "or under which the Stores are being operated"**

   As noted above, the third element in the definition of "Store(s)" is that of a store operated

by Kmart "under the service mark KMART (or some other service mark incorporating KMART in whole

or in part *or under which the Stores are operated*)" (italics supplied) or, as applicable to the larger

stores, a store "operated by [Kmart] under the service mark SUPER KMART CENTER (or some other

service mark incorporating KMART in whole or in part *or under which the Stores are operated*)"

(italics supplied).

   Applying a purported "ordinary and plain meaning" interpretation, Footstar argues that the

italicized language must be construed to wholly eliminate the third element limiting the "Store(s)" definition

to stores utilizing in some form the Kmart service mark.  Any other construction, Footstar argues, would

render the italicized language "surplusage or nugatory."

   The problem with Footstar's contention is that it would have the tail, indeed the tip of the

tail, wag the dog.  The substantive provision is the requirement for a store "operated . . . under the service

mark KMART."  This requirement is modified to the limited extent provided in the first part of the

parenthetical "or some other service mark incorporating KMART in whole or in part."  Under Footstar's

interpretation, the latter italicized clause of the parenthetical would render "surplusage and nugatory" both

- 8 -

the first half of the parenthetical and the substantive words to which the parenthetical attaches, as well as many other provisions of the Master Agreement and Exhibits E and F, all of which are predicated on the Kmart service mark and the exclusion of any other mark.  To construe the last clause of the parenthetical as reflecting an understanding and intention of the parties to nullify and render surplusage the explicit references to the Kmart service mark which immediately precede it is nonsense.  It is true that the italicized clause is ambiguous.[2]  But if the parties had really intended to eliminate the third requirement of the definition, they would have simply eliminated the substantive provision altogether, and the parenthetical with it.  The fact that the parties did not eliminate the definitional requirement of stores operated "under the service mark KMART" [or SUPER KMART CENTER] stands as a complete refutation of Footstar's argument.

Footstar's argument is also contradicted by other substantive provisions of the Master Agreement.  For example, Section 3.1 "Grant of License" contains the provisions entitling Footstar to operate Footwear Departments in Stores.  Section 3.1 grants Footstar the right to operate Footwear Departments in Stores "and the non-transferable and non-exclusive right to use the Marks on and in connection with the operation of the applicable Footwear Department and on and in connection with authorized Materials only, if and only if, **[sic]** such use complies with the terms and conditions of this Agreement. . . ."   As used in this provision, "Marks" is a defined term meaning "KMART and SUPER KMART CENTER . . . and any service mark adopted in the future that incorporates the mark KMART in whole or in part . . . all as more specifically described in Exhibit E, attached and incorporated herein."  Section 3.1 provides that "All use of the Marks by Licensee as permitted hereunder shall conform to the requirements of Exhibit E. . . ."  Further, Section 3.1 states that "No other, further or different license is

---

[2]    The ambiguity appears to result from a typographical error, to wit, a redundant and inadvertent "or" at the beginning of the italicized clause in the parenthetical..  If the "or" is eliminated from the italicized clause, the clause and the parenthetical as a whole make sense.   For a somewhat similar typo (an obviously redundant "only"), *see* Section 3.1 of the Master Agreement at the **[sic]**, quoted above and immediately below.

granted or implied and no assignment of any right or interest in the Marks is made or intended herein."

Exhibit E to the Master Agreement states that the Marks are KMART and SUPER KMART CENTER.

Section 3.1 states that Kmart "shall be entitled to change Exhibit E," but it has never done so.

Section 3.2 of the Master Agreement, entitled "Certain Restrictions," requires Footstar's

compliance with the "Rules and Regulations" set forth in Exhibit F to the Master Agreement.  The Rules

and Regulations in Exhibit F state in the last sentence of the first paragraph: "The limited license granted

herein requires that all sales to the public be offered exclusively under the service mark of 'Kmart', and

prohibits the use of the mark in any other manner."   The fifth paragraph provides that "The use in

advertising logotype or display signs or in any other manner of other service names, service marks, or

service insignia, alone, or in conjunction with the service trademark 'Kmart', is in derogation of the

requirement that all sales to the public be exclusively under the mark 'Kmart' and is prohibited by the

terms of this Agreement."

The premise of Footstar's argument — that the italicized final portion of the parenthetical

modifying the third requirement in the definition of "Store(s)" should be construed to demonstrate a

meeting of the minds that Stores' license and right to operate Footwear Departments was not limited to

stores operating under the Kmart service mark — is confounded by all of these contractual provisions.

Considering both the specific language employed in the definition of "Store(s)," the language used in the

parenthetical and the entire context of the Master Agreement, it is perfectly clear and I find as a matter

of fact and law that the parties contemplated and intended that the definition of "Store(s)" and the grant

of a license in Section 3.1 was understood and intended by the parties to be limited to operation under the

tradename Kmart or such other tradename employing the mark "Kmart in whole or in part" as Kmart

might designate.  This conclusion is in accord with Michigan law. *See Gary Boat Club, Inc. v. Oselka*,

31 Mich. App. 465, 188 N.W.2d 127 (Mich. Ct. App. 1971); *Klapp v. United Ins. Group Agency, Inc.*,

468 Mich. 459, 663 N.W.2d 447 (Mich. 2003).[3]

### III.    Argument based on the Termination provision in Section 4.2

Footstar's argument with regard to the Termination provision in Section 4.2 of the Master

Agreement may be summarized as follows, quoting from paragraphs 37 and 38 of Footstar's Limited

Response to Kmart's cross-motion:

> 37.    . . .  Kmart cannot terminate the Master Agreement using the definition of "Store."  Kmart can terminate the Master Agreement only under section 4.2, which is an *exclusive* termination provision.  . . .

> 38.  Section 4.2 does *not* contain a termination provision in the event Kmart changes the service mark under which the Stores are operated or a Store becomes a store (a "Store-to-store Transition").  . . .

> *    *    *

> Because the parties may terminate the Master Agreement only under section 4.2, the fact that section 4.2 does not contain a termination provision for service mark changes or Store-to-store Transitions demonstrates that the parties intended no termination right in such instances.

---

[3]    To the extent that extrinsic evidence were necessary to assist in construing the contract language at issue, or in connection with the rule of *contra proferentem*, the March 27, 1995 letter from Maureen Richards, Corporate and Trademark Counsel of Melville Corporation, to legal counsel at Kmart confirms the Court's conclusions expressed above.  It appears from the oral submissions of counsel at the argument that the amendments to the Master Agreement enclosed with Ms. Richards' letter of March 27, 1995 established the language which appears in the final version of the Master Agreement.  Ms. Richards' letter includes the following:

Definition of "Marks"

We have expanded this definition to include any modifications to the Kmart Service mark.

*    *    *

Definition of "Store(s)"

We have modified this definition to make it clear that the square footage of the Kmart and Super Kmart Center is not meant to be limiting and to take into account any modifications to the Kmart Service mark.

Nothing in Ms. Richards' letter suggests an understanding or intent that the Kmart service mark requirement be eliminated.

Before addressing these arguments on their merits, it must be observed that all of Footstar's contentions on this motion necessarily proceed from a basic premise that ignores the actual, undisputed facts before the Court. The facts are that the thirty stores here in question were purchased from Kmart Corporation by Sears, Roebuck & Co. in September 2004 and are owned and controlled by Sears, Roebuck & Co. Footstar has no contractual relationship with Sears, Roebuck & Co., no right to operate under the Sears tradename and no right to operate Footwear Departments in Sears stores. Kmart Corporation and Sears, Roebuck & Co. were, are now and will continue to be for the foreseeable future separate corporate entities, with Kmart Corporation operating Kmart stores and Sears, Roebuck & Co. operating Sears stores, including the prospective Sears Essentials stores. But for the merger, there could be no question that Sears could exclude Footstar from these stores purchased last September.

Although not expressly stated, the premise of all of Footstar's arguments must be that, by reason of the recently-completed Kmart/Sears merger, Kmart and Sears must be viewed as one, undifferentiated entity which is contractually bound to Footstar by the 1995 Agreements between the Footstar entities and the respective Kmart entities. As pointed out by Kmart, this premise would require multiple piercings of the corporate veil both upstream and downstream. Since Footstar has sought massive, invasive and time-consuming discovery on these corporate issues which I believe are mooted by my rulings on this motion and, in any event, since it would be within the power of Sears Holdings to combine the separate Kmart and Sears subsidiaries in the fullness of time, I shall disregard the actual facts before me and decide the motion on the Footstar premise. In so doing, however, I express no view as to the factual or legal merits of the premise.

The relevant Termination provision of the Master Agreement is Section 4.2(a)(i), which provides for termination "with respect to any Store(s) with a Footwear Department which ceases to operate and be open for business to the public. . . ." The short answer to Footstar's argument is that the conversion of a Kmart Store to a Sears Essentials store (*i.e.*, a "Store-to-store conversion") does indeed

constitute a Termination event under Section 4.2(a)(i) under the literal language of that provision. When

each of the thirty Kmart stores in question closes its doors on a given day and reopens a day or two later

as a Sears Essentials store, the Kmart Store (as defined in the Master Agreement) will have "cease[d] to

operate and be open for business to the public;" that particular store will no longer be a Kmart Store with

respect to which Footstar is granted a license to operate a Footwear Department under Section 3.1 of the

Master Agreement. This conclusion is not the "exercise [of] a termination provision that does not exist"

(quoting from heading "C" on page 18 of Debtors' Limited Response) — termination upon such a

conversion is a consequence that necessarily follows from a termination provision which does exist,

namely, Section 4.2(a)(i). Contrary to Footstar's argument in paragraph 38 of the Debtors' Limited

Response, Section 4.2(a)(i) does "contain a termination provision in the event Kmart changes the service

mark under which the Stores are operated. . . ."

       Nor can Footstar successfully argue (if such be the argument) that Kmart does not have

the right to cease operating its stores as Kmart Stores and operate its stores under a different brand, such

as Sears or Sears Essentials, not employing the Kmart service mark. Nothing in the Master Agreement

or the Sub-Agreements so constrains Kmart's ability to change the format and operation of its stores or to

abandon its use of the Kmart tradename and adopt or utilize another service mark. To sustain Footstar's

position that it is entitled to continue to operate Footwear Departments in Sears Essentials stores after

their conversion to the Sears tradename would require the Court to perform major judicial surgery on the

Master Agreement. In addition to finding that Kmart is impliedly prohibited from abandoning the Kmart

tradename and converting its stores to a different service mark, despite the absence of any such express

prohibition, all of the references to the Kmart service mark in the Master Agreement and Exhibits E and F

thereto, quoted and discussed above, would have to be judicially deemed amended to include the Sears

tradename and service mark. This Court is not empowered to do.

To summarize, Footstar's argument regarding the termination provision in Section 4.2 of the Master Agreement must be rejected. The issue is not whether Section 4.2 contains a clause permitting Kmart to terminate the Master Agreement by changing the tradename on its Stores. The question is whether anything in the Agreements prohibits Kmart from abandoning the use of the Kmart tradename and utilizing some other tradename and format for its stores. The answer to that question is that nothing in the Agreements prohibits expressly or by implication Kmart's right to do so. If Kmart exercises its right to abandon its Kmart tradename and convert certain stores from Kmart Stores to Sears Essentials stores, and thereby to cease operating the stores in question as Kmart Stores, the consequence of that business decision is expressly provided in Section 4.2(a)(i). By the terms of Section 4.2(a)(i) the Master Agreement is terminated as to any Kmart Store when it is converted to a Sears Essentials store because, upon conversion, it "ceases to operate and be open for business to the public" as a Kmart Store, and because Footstar has no right under the Master Agreement to operate in a Sears store under the Sears tradename without the Kmart tradename.

<u>Conclusion</u>

The foregoing is sufficient to dispose of the contested matter presently before the Court concerning the thirty stores sold by Kmart to Sears which have been or are in the process of being converted from Kmart stores to Sears Essentials stores. In concluding as I have that upon completion of the conversion the thirty stores here in question will no longer constitute "Store(s)" as defined in the Master Agreement and therefore will no longer fall within the grant of license provided to Footstar under Section 3.1 of the Master Agreement, I accept as a predicate of my ruling that, within a few weeks after the stores reopen under the tradename Sears Essentials, the transitional "Kmart + Sears = Sears Essentials" signs will be removed and the Kmart service mark will no longer appear in the stores, except

for the Kmart pharmacies, and the further representation that Sears is applying for pharmacy licenses and will promptly eliminate the use of Kmart in connection with pharmacies upon obtaining such licenses.

Counsel for Kmart will submit an appropriate order acceptable as to form to debtors' counsel, without prejudice to the debtors' right to appeal.

Dated:  White Plains, NY
        May 10, 2005


                                    /s/ Adlai S. Hardin, Jr.
                                    U.S.B.J.