UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                   :

In re                              :

                                   :     Chapter 11

FOOTSTAR, INC., *et al.*,         :     Case No. 04-22350 (ASH)

                                   :

                                   :     (Jointly Administered)

                      Debtors.     :

-------------------------------------------------------x


# DEBTORS' FIRST AMENDED JOINT PLAN OF
# REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE


WEIL, GOTSHAL & MANGES LLP
  Attorneys for Debtors and
  Debtors in Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000


Dated: New York, New York
       October 28, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINITIONS AND CONSTRUCTION OF TERMS ................................... 1

ARTICLE II     TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ............................................................................... 7

2.01.     Administrative Expense Claims ...................................................................... 7

2.02.     Postpetition Credit Facility Claims ................................................................ 7

2.03.     Professional Compensation and Reimbursement Claims ............................... 7

2.04.     Priority Tax Claims ........................................................................................ 7

ARTICLE III     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................... 8

ARTICLE IV     TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................... 8

4.01.     CLASS 1 - OTHER PRIORITY CLAIMS ................................................... 8

      (a)     Impairment and Voting ..................................................................... 8

      (b)     Distributions ...................................................................................... 8

4.02.     CLASS 2 - SECURED TAX CLAIMS ......................................................... 9

      (a)     Impairment and Voting ..................................................................... 9

      (b)     Distributions ...................................................................................... 9

4.03.     CLASS 3 - OTHER SECURED CLAIMS ..................................................... 9

      (a)     Impairment and Voting ..................................................................... 9

      (b)     Distributions/Reinstatement of Claims ........................................... 9

4.04.     CLASS 4 - GENERAL UNSECURED CLAIMS ........................................ 10

      (a)     Impairment and Voting ................................................................... 10

      (b)     Distributions .................................................................................... 10

4.05.     CLASS 5 - SUBORDINATED CLAIMS ..................................................... 10

      (a)     Impairment and Voting ................................................................... 10

      (b)     Distributions .................................................................................... 10

4.06.     CLASS 6 - FOOTSTAR EQUITY INTERESTS ......................................... 10

      (a)     Impairment and Voting ................................................................... 10

      (b)     Distributions .................................................................................... 10

4.07.     CLASS 7 - SUBSIDIARY EQUITY INTERESTS ..................................... 10

      (a)     Impairment and Voting ................................................................... 10

      (b)     Distributions .................................................................................... 10

i

| ARTICLE V | IMPLEMENTATION OF THE PLAN | 11 |
|---|---|---|
| 5.01. | Substantive Consolidation of the Debtors | 11 |
| 5.02. | Intercompany Claims | 11 |
| 5.03. | Merger, Dissolution, or Consolidation of Debtor and Non-Debtor Subsidiaries | 11 |
| 5.04. | Cancellation of Existing Agreements | 11 |
| 5.05. | Violations of Trading Order | 11 |
| ARTICLE VI | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 12 |
| 6.01. | Voting of Claims and Interests | 12 |
| 6.02. | Nonconsensual Confirmation | 12 |
| 6.03. | Distributions | 12 |
| 6.04. | Distributions of Cash | 12 |
| 6.05. | Timing of Distributions | 12 |
| 6.06. | Delivery of Distributions | 12 |
| 6.07. | Minimum Distributions | 13 |
| 6.08. | Manner of Payment | 13 |
| 6.09. | Distributions to Holders as of the Distribution Notification Date | 13 |
| 6.10. | Unclaimed Distributions | 13 |
| 6.11. | Setoffs | 13 |
| ARTICLE VII | PROCEDURES FOR TREATING DISPUTED CLAIMS | 14 |
| 7.01. | Objections to Administrative Expense Claims and Claims | 14 |
| 7.02. | No Distributions Pending Allowance | 14 |
| 7.03. | Tort Claims | 14 |
| 7.04. | Distributions to Holders of Disputed General Unsecured Claims Following Allowance | 14 |
| 7.05. | Distributions Relating to Allowed Insured Claims | 15 |
| 7.06. | Resolution of Administrative Expense Claims and Claims | 15 |
| ARTICLE VIII | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 15 |

| | | |
|---|---|---|
| 8.01. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 15 |
| 8.02. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 15 |
| 8.03. | Inclusiveness | 16 |
| 8.04. | Cure of Defaults | 16 |
| 8.05. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 16 |
| 8.06. | Survival of Corporate Reimbursement Obligations | 16 |
| 8.07. | Compensation and Retention Program | 16 |
| 8.08. | Employment Contracts | 16 |
| 8.09. | Reorganized Director Stock Plan | 17 |
| 8.10. | Retiree Benefits | 17 |
| ARTICLE IX | PROVISIONS REGARDING CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 17 |
| 9.01. | General | 17 |
| 9.02. | Directors and Officers of the Reorganized Debtors | 17 |
| | (a) Reorganized Debtors' Boards of Directors | 17 |
| | (b) Reorganized Debtors' Officers | 17 |
| 9.03. | Issuance of Non-Voting Securities | 17 |
| 9.04. | Certificate of Incorporation of Reorganized Footstar | 17 |
| ARTICLE X | EFFECT OF CONFIRMATION | 18 |
| 10.01. | Vesting of Assets | 18 |
| 10.02. | Discharge of Claims | 18 |
| 10.03. | Discharge of Debtors | 18 |
| 10.04. | Injunction | 18 |
| 10.05. | Term of Injunctions or Stays | 19 |
| 10.06. | Exculpation | 19 |
| 10.07. | Avoidance Actions | 19 |
| 10.08. | Retention of Causes of Action/Reservation of Rights. | 20 |

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| ARTICLE XI | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 20 |
| 11.01. | Effectiveness | 20 |
| 11.02. | Failure of Conditions | 21 |
| 11.03. | Waiver of Conditions | 21 |
| ARTICLE XII | RETENTION OF JURISDICTION | 21 |
| ARTICLE XIII | MISCELLANEOUS PROVISIONS | 22 |
| 13.01. | Effectuating Documents and Further Transactions | 22 |
| 13.02. | Withholding and Reporting Requirements | 22 |
| 13.03. | Corporate Action | 23 |
| 13.04. | Exemption from Transfer Taxes | 23 |
| 13.05. | Payment of Statutory Fees | 23 |
| 13.06. | Post-Confirmation Date Professional Fees and Expenses | 23 |
| 13.07. | Dissolution of the Creditors' Committee and Equity Committee | 24 |
| 13.08. | Plan Supplement | 24 |
| 13.09. | Amendment or Modification of the Plan | 24 |
| 13.10. | Revocation or Withdrawal of the Plan | 25 |
| 13.11. | Severability | 25 |
| 13.12. | Expedited Tax Determination | 25 |
| 13.13. | Governing Law | 25 |
| 13.14. | Binding Effect | 25 |
| 13.15. | Exhibits/Schedules | 25 |
| 13.16. | Notices | 25 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                   :

In re                          :

                                    :         **Chapter 11**

FOOTSTAR, INC., *et al.*,         :         **Case No. 04-22350 (ASH)**

                                    :

                                    :         **(Jointly Administered)**

                      **Debtors.**       :

-------------------------------------------------------x

## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Footstar, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of title 11 of the United States Code:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

<u>Definitions</u>. As used herein, the following terms have the respective meanings specified below:

1.01. <u>Administrative Expense Claim</u> means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any indebtedness or obligations incurred under the Postpetition Credit Facility, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 13.05 of the Plan.

1.02. <u>AIG Settlement</u> means that certain settlement resolving (i) an insurance coverage dispute, (ii) certain class action lawsuits, and (iii) certain derivative lawsuits between and among the Debtors, AIG Technical Services, Inc., on behalf of Illinois National Fire Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA, and the plaintiffs party to such class action and derivative lawsuits, which settlement was approved by Bankruptcy Court order, dated July 1, 2004.

1.03. <u>Allowed</u> means, with reference to any Claim against the Debtors, (i) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim allowed hereunder, (iii) any Claim that is compromised, settled, or otherwise resolved

pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.06 of the Plan, or (iv) any Claim that, if Disputed, has been Allowed by Final Order; *provided, however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include (i) interest on such Administrative Expense Claim or Claim from and after the Commencement Date or (ii) any portion of a Claim that is Disputed.

1.04.   <u>Avoidance Actions</u> means any actions as defined in Section 10.07 hereof.

1.05.   <u>Ballot</u> means the form distributed to each holder of an impaired Claim or Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.06.   <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.07.   <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.08.   <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.09.   <u>Business Day</u> means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.10.   <u>Case Interest Rate</u> means simple interest at the federal judgment rate of 1.23 % per annum from the Commencement Date through the Effective Date; *provided, however*, that, unless otherwise waived, interest on Claims arising out of the rejection of executory contracts and unexpired leases shall commence accruing from the effective date of rejection of the applicable executory contract or unexpired lease.

1.11.   <u>Cash</u> means legal tender of the United States of America.

1.12.   <u>Causes of Action</u> means any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.13.   <u>Chapter 11 Cases</u> means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled *In re Footstar, Inc., et al.*, Chapter 11 Case No. 04-22350 (ASH), which are currently pending before the Bankruptcy Court.

1.14.   Claim shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.15.   Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.16.   Collateral means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.17.   Commencement Date means March 2, 2004 with respect to Footstar and March 3, 2004 with respect to each of the other Debtors.

1.18.   Company means Footstar together with its direct and indirect Debtor and Non-Debtor Subsidiaries.

1.19.   Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.20.   Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.21.   Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall comply with the provisions of the Postpetition Credit Facility.

1.22.   Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.23.   Cure Claim means any Allowed Claim arising as a result of any and all defaults under any executory contract or unexpired lease assumed or assumed and assigned by the Debtors during the Chapter 11 Cases in accordance with section 365 of the Bankruptcy Code.

1.24.   Debtors in Possession means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.25.   Debtors means Footstar, Inc., Footstar Corporation, and Footstar HQ, LLC.

1.26.   Disbursing Agent means any Debtor or Reorganized Debtor or its assign, in its capacity as Disbursing Agent pursuant to Section 6.03 of the Plan.

1.27.   Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.28.   Disputed means, with reference to any Claim, (i) any Claim, proof of which was timely and properly filed, or any Administrative Expense Claim that is disputed under the Plan or as to which a timely objection has been interposed in accordance with section 7.01 of this Plan

and/or request for estimation has been made in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.

1.29.  <u>Distribution Notification Date</u> means the day that is three (3) Business Days from and after the Confirmation Date.

1.30.  <u>Effective Date</u> means the first (1st) Business Day on which the conditions specified in Section 11.01 of the Plan have been satisfied or waived.

1.31.  <u>Equity Committee</u> means the committee of holders of Footstar Equity Interests appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.32.  <u>Equity Interest</u> means any share of common or preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.33.  <u>Exit Facility</u> means the Postpetition Credit Facility, as amended from time to time, on and after the Effective Date.

1.34.  <u>Final Order</u> means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.35.  <u>Footstar</u> means Footstar, Inc., a Delaware corporation.

1.36.  <u>Footstar Equity Interest</u> means an Equity Interest in Footstar.

1.37.  <u>General Unsecured Claim</u> means any Claim other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, or Subordinated Claim.

1.38.  <u>Insured Claim</u> means any Claim arising from an incident or occurrence that is covered under the Debtors' insurance policies.

1.39.  Lien shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.40.  Non-Debtor Subsidiary means any direct or indirect Subsidiary of Footstar that is not a Debtor.

1.41.  Other Priority Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.42.  Other Secured Claim means any Secured Claim, other than a Secured Tax Claim.

1.43.  Plan means this chapter 11 plan of reorganization, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time.

1.44.  Plan Supplement means the document containing the forms of documents specified in Section 13.08 of the Plan.

1.45.  Postpetition Credit Facility means that certain Amended and Restated Debtor in Possession and Exit Credit Agreement, as amended, supplemented, or modified from time to time, by and among Footstar and Footstar Corporation as borrowers and the Postpetition Lenders.

1.46.  Postpetition Lenders means, collectively, the banks and financial institutions that are parties to the Postpetition Credit Facility and their successors and assigns.

1.47.  Priority Tax Claim means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.48.  Reorganized Debtors means, collectively, each of the Debtors on and after the Effective Date.

1.49.  Reorganized Footstar means Footstar on and after the Effective Date.

1.50.  Schedules means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.51.  Secured Claim means any Claim (i) to the extent reflected in the Schedules or upon a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.52.  Secured Tax Claim means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code

(determined irrespective of time limitations), and including any related Secured Claim for penalties.

1.53.  Subordinated Claim means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of shares or any other securities, if any, of any of the Debtors or an affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the forgoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges, or costs incurred on account of the forgoing Claims, or, (iv) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.

1.54.  Subsidiary means (i) any corporation, association, or other business entity of which more than fifty (50%) percent of the total voting power of shares or other voting securities outstanding thereof is at the time owned or controlled, directly or indirectly, by Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) and (ii) any partnership or limited liability company (A) the sole general partner, the managing general partner, or the managing member of which is Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) or (B) the only general partners or members of which are Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof).

1.55.  Subsidiary Equity Interest means any Equity Interest in any of the Debtors other than Footstar.

1.56.  Substantive Consolidation Order means the Court's Order Pursuant to Sections 105, 363, and 1112(B) of the Bankruptcy Code and Bankruptcy Rules 1017 and 9014 Granting Substantive Consolidation, dated September 30, 2005.

1.57.  Tax Code means the Internal Revenue Code of 1986, as amended.

1.58.  Tort Claim means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, arising from or relating to personal injury, wrongful death, property damage, products liability, discrimination, employment or similar litigation Claim.  A Tort Claim may also be an Insured Claim.

1.59.  Trading Order means, collectively, the Interim and Final Orders Pursuant to Sections 362 and 105(a) of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, dated March 2, 2004 and March 30, 2004, respectively.

Interpretation; Application of Definitions and Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.  Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule

to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, Subsection, or Clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.01.  <u>Administrative Expense Claims</u>.  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim, other than Postpetition Credit Facility Claims, shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.02.  <u>Postpetition Credit Facility Claims</u>.  On the Effective Date, all Loans (as defined in the Postpetition Credit Facility) or other required payments, including, without limitation, all fees, costs, and expenses due and owing under the Postpetition Credit Facility shall be indefeasibly paid in Cash in full.

2.03.  <u>Professional Compensation and Reimbursement Claims</u>.  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is ninety (90) days after the Confirmation Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Reorganized Debtors.

2.04.  <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the

later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable (but not prior to the date of assessment), through the sixth (6th) anniversary of the date of assessment of such Allowed Priority Tax Claim, or (iii) such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims, Postpetition Credit Facility Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Subordinated Claims | Unimpaired | No (deemed to accept) |
| Class 6 | Footstar Equity Interests | Impaired | Yes |
| Class 7 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.01. CLASS 1 - OTHER PRIORITY CLAIMS.

(a)     Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

4.02.  CLASS 2 - SECURED TAX CLAIMS.

(a)  Impairment and Voting.  Class 2 is impaired by the Plan.  Each holder of an Allowed Secured Tax Claim is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, through the sixth (6th) anniversary of the date of assessment of such Allowed Secured Tax Claim, or (iii) such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

4.03.  CLASS 3 - OTHER SECURED CLAIMS.

(a)  Impairment and Voting.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions/Reinstatement of Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Reorganized Debtors, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

4.04.  CLASS 4 - GENERAL UNSECURED CLAIMS.

(a)  Impairment and Voting.  Class 4 is unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions.  On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed General Unsecured Claim shall be paid Cash in an amount equal to the Allowed amount of such holder's General Unsecured Claim plus interest at the Case Interest Rate calculated through the Effective Date in full and complete satisfaction of such holder's General Unsecured Claim.

4.05.  CLASS 5 - SUBORDINATED CLAIMS.

(a)  Impairment and Voting.  Class 5 is unimpaired by the Plan.  Each holder of an Allowed Subordinated Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions.  Each holder of an Allowed Subordinated Claim shall be paid pursuant to the AIG Settlement in full and complete satisfaction of such holder's Subordinated Claim.

4.06.  CLASS 6 - FOOTSTAR EQUITY INTERESTS.

(a)  Impairment and Voting.  Class 6 is impaired by the Plan.  Each holder of a Footstar Equity Interest is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Except as set forth in Section 9.04 of the Plan, the Equity Interests held by each Footstar Equity Interest holder shall be unaltered.

4.07.  CLASS 7 - SUBSIDIARY EQUITY INTERESTS.

(a)  Impairment and Voting.  Class 7 is unimpaired by the Plan.  Each holder of a Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions.  Subject to the merger, dissolution, or other consolidation of the Subsidiaries following the Effective Date as set forth in the Substantive Consolidation Order or pursuant to Section 5.03 of the Plan, the Equity Interests held by each Subsidiary Equity Interest holder shall be unaltered.

# ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.01.    Substantive Consolidation of the Debtors.  The Plan is premised upon the substantive consolidation of the Company pursuant to the Substantive Consolidation Order.

5.02.    Intercompany Claims.  Intercompany Claims held by any Debtor or Non-Debtor Subsidiary against any other Debtor or Non-Debtor Subsidiary shall be treated in accordance with the Substantive Consolidation Order.

5.03.    Merger, Dissolution, or Consolidation of Debtor and Non-Debtor Subsidiaries.  In addition to the authority granted pursuant to Substantive Consolidation Order, on or as of the Effective Date, within the sole and exclusive discretion of the Reorganized Debtors, the Reorganized Debtors may, notwithstanding any other transactions described in the Plan, (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, or (iii) engage in any other transaction in furtherance of the Plan.  Any such transaction shall be effective pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors, the Debtors in Possession, or the Reorganized Debtors.

5.04.    Cancellation of Existing Agreements.  On the Effective Date, any document, agreement, or instrument evidencing any Claim, other than a Claim that is reinstated under the Plan, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims, as the case may be, shall be discharged.

5.05.    Violations of Trading Order.  Except as otherwise ordered by the Bankruptcy Court, in the event that any person or group of persons acquired Equity Interests in the Debtors or the Reorganized Debtors after March 16, 2004 in violation of the Trading Order and such person or group of persons, but for the application of the Trading Order or this Section 5.05, would be a "5% shareholder" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized Footstar as a result of the implementation of the Plan, such person(s) (and, to the extent necessary, any other person whose ownership would be attributed to any such person for purposes of section 382 of the Tax Code) (herein referred to as the "purported holder") shall not be entitled to retain its Equity Interest pursuant to the Trading Order and the Plan in excess of an amount that, in the reasonable determination of Reorganized Footstar, would not make such person or group of persons a 5% shareholder.  Except as otherwise ordered by the Bankruptcy Court, Reorganized Footstar (or its designee) as agent (i) shall use good faith efforts to sell, to the extent practicable (as determined by the agent), and shall only sell for cash to a third-party that is unrelated to the Reorganized Debtors and the purported holder, any Equity Interests that the purported holder was not entitled to retain under this Section 5.05 by reasons of the Trading Order and the provisions herein and (ii) following any such sale, shall distribute to the person (or persons on a proportionate basis) to the purported holder of such Equity Interest an amount equal to the lesser of (A) the sales proceeds in excess of the agent's expenses in connection with the sale and (B) the price paid by the purported holder for the sold Equity Interest.  Any proceeds in excess of the expenses of sale

and the amount distributable to the purported holder shall be paid to one or more charitable organizations exempt from tax under section 501(c)(3) of the Tax Code (as determined by the agent), and that is unrelated to Reorganized Footstar, the agent and the purported holder. The reasonable determinations of Reorganized Footstar (or its designee) under this Section 5.05 regarding any amounts of Equity Interests that a purported holder is not permitted to retain shall be final and binding. Any disputes under this Section 5.05 shall be resolved by the Bankruptcy Court.

## ARTICLE VI

## PROVISIONS REGARDING VOTING
## AND DISTRIBUTIONS UNDER THE PLAN

6.01.  <u>Voting of Claims and Interests</u>.  Each holder of an Allowed Claim or Equity Interest in an impaired Class of Claims or Equity Interests that is entitled to vote on the Plan pursuant to Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

6.02.  <u>Nonconsensual Confirmation</u>.  If any impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.09 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

6.03.  <u>Distributions</u>.  All distributions under the Plan shall be made by the Disbursing Agent.

6.04.  <u>Distributions of Cash</u>.  Any payment of Cash made pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

6.05.  <u>Timing of Distributions</u>.  In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.06.  <u>Delivery of Distributions</u>.  Subject to Bankruptcy Rule 9010, all distributions of Cash under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Notification Date, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim or Claim transfer agreement by such holder that provides an address for such holder different from the address reflected on the Schedules. In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined

the then current address of such holder, at which time such distribution shall be made to such holder; *provided, however,* that, with respect to any creditor whose distribution is returned as undeliverable, interest shall cease accruing on such creditor(s) Claim(s) on the date that such undeliverable distribution was first distributed; *provided further, however,* that, at the expiration of one (1) year from the date such distribution is first made such distribution shall be deemed unclaimed property and shall be treated in accordance with Section 6.10 of the Plan.

6.07. <u>Minimum Distributions</u>. No payment of Cash of less than fifty ($50) dollars shall be made to any holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

6.08. <u>Manner of Payment</u>. All distributions under the Plan shall be made by, or on behalf of Reorganized Footstar. To the extent that Cash is distributed by Reorganized Footstar to holders of Claims against a Debtor (other than Footstar) in exchange for such holders' Claims, the portion of the Claims for which such Cash is distributed shall be treated as acquired by Reorganized Footstar. Immediately thereafter, pursuant to the terms hereof, Reorganized Footstar shall make a capital contribution of such Claims, either directly or indirectly, to the applicable Reorganized Debtor and such Claims shall immediately be cancelled and discharged. Any distributions that revert to any of the Reorganized Debtors or are otherwise cancelled (such as to the extent any distributions have not been claimed within one (1) year or are cancelled pursuant to Section 6.10 of the Plan) shall revest solely in Reorganized Footstar, and any applicable Reorganized Debtor (other than Reorganized Footstar) shall not have (nor shall it be considered to ever have had) any ownership interest in such amounts.

6.09. <u>Distributions to Holders as of the Distribution Notification Date</u>. As of the close of business on the Distribution Notification Date, the Claims register shall be closed, and there shall be no further changes in the record holder of any Claim. The Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Notification Date. The Disbursing Agent shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Notification Date.

6.10. <u>Unclaimed Distributions</u>. All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in Reorganized Footstar and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

6.11. <u>Setoffs</u>. The Disbursing Agent may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim the Debtors or Reorganized Debtors may have against the holder of such Claim.

# ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED CLAIMS

7.01.   <u>Objections to Administrative Expense Claims and Claims</u>.  The Reorganized Debtors and the Equity Committee shall be entitled to object to Administrative Expense Claims and Claims.  Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) ninety (90) days after the Confirmation Date, and (ii) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date specified in clause (i) above; *provided, however,* that objections, if any, to Postpetition Credit Facility Claims that arise prior to the date of the approval of the Disclosure Statement must be filed prior to the Confirmation Date.

7.02.   <u>No Distributions Pending Allowance</u>.  Notwithstanding any other provision of the Plan, if any Claim or portion thereof is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or any portion thereof unless and until such Disputed Claim is Allowed.

7.03.   <u>Tort Claims</u>.  All Tort Claims are Disputed Claims.  No distributions shall be made on account of any Tort Claim unless and until such Claim is liquidated and becomes an Allowed Claim.  Any Tort Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim (i) was properly and timely filed in the Chapter 11 Cases and (ii) was not expunged and disallowed by order of the Bankruptcy Court, shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  Any Tort Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with this Section and applicable nonbankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as same may be approved by order of a court of competent jurisdiction, shall be paid as follows: (A) to the extent such liquidated Claim is, in whole or in part, an Insured Claim, the insured portion shall be paid by the applicable insurer pursuant to the provisions of Section 7.05 of the Plan and (B) to the extent any portion of such liquidated Claim is not covered by any of the Debtors' insurance policies, such uninsured portion shall be deemed, to the extent applicable, an Allowed Claim in Class 4 and treated in accordance with Section 4.04 of the Plan.  Nothing contained in this Section shall constitute or be deemed a waiver of any Claim, right, or Cause of Action that the Debtors or Reorganized Debtors may have against any person in connection with or arising out of any Tort Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.  Notwithstanding any other provision of the Plan, interest shall not commence accruing on any Tort Claim until such Claim has been liquidated and Allowed as set forth in this Section 7.03.

7.04.   <u>Distributions to Holders of Disputed General Unsecured Claims Following Allowance</u>.  Subsequent to the Effective Date, after such time as a Disputed General Unsecured Claim becomes Allowed, the Disbursing Agent shall pay the holder of such Claim in accordance with Section 4.04 of the Plan on the date that is twenty (20) days from the date upon which the order or judgment of the Bankruptcy Court allowing such Disputed General Unsecured Claim

becomes a Final Order or as soon thereafter as is as practicable, or such earlier date as agreed to by the Reorganized Debtors.

7.05. <u>Distributions Relating to Allowed Insured Claims</u>. Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the provisions of any applicable insurance policy. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or Reorganized Debtors may hold against any other entity, including, without limitation, insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

7.06. <u>Resolution of Administrative Expense Claims and Claims</u>. On and after the Effective Date, Reorganized Footstar shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims and Claims and compromise, settle, or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court.

ARTICLE VIII

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.01. <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>. All executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion or notice for approval of the assumption, assumption and assignment, or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.01(A) (executory contracts) or Schedule 8.01(B) (unexpired leases), which Schedules shall be contained in the Plan Supplement; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected. The Debtors shall provide notice of any amendments to Schedules 8.01(A) and 8.01(B) to the Postpetition Lenders, Creditors' Committee, the Equity Committee, and parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.02. <u>Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases</u>. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption or assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to Section 8.01 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 8.01

of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.01 of the Plan.

8.03.   <u>Inclusiveness</u>.  Unless otherwise specified on Schedules 8.01(A) and 8.01(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.01(A) and 8.01(B) shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) and 8.01(B).

8.04.   <u>Cure of Defaults</u>.  Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors shall pay all undisputed Cure Claims.  All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties (in consultation with the Equity Committee).

8.05.   <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.01 of the Plan must be filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule 8.01(A) or 8.01(B).  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, the Reorganized Debtors, their respective property, and their respective successors and assigns.

8.06.   <u>Survival of Corporate Reimbursement Obligations</u>.  The obligations of the Debtors to defend, indemnify, reimburse, or limit the liability of their directors, officers, or employees who are directors, officers, or employees, respectively, on or after the Confirmation Date, solely in their capacity as directors, officers, or employees, against any Claims or obligations pursuant to the Debtors' certificates of incorporation or by-laws, applicable state law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before, on, or after the Commencement Date.

8.07.   <u>Compensation and Retention Program</u>.  Subject only to the occurrence of the Effective Date, the Compensation and Retention Program annexed hereto as Exhibit A shall become effective without any further action by the Reorganized Debtors.

8.08.   <u>Employment Contracts</u>.  Subject only to the occurrence of the Effective Date, the Employment Contract annexed hereto as Exhibit B executed by Footstar and Jeffrey Shepard shall become effective without any further action by the Reorganized Debtors.  On or before November 3, 2005, the Debtors will file as Exhibit C hereto employment agreements for Vice-

Presidents and Senior Vice-Presidents, which agreements will become effective on the Effective Date without further action by the Reorganized Debtors. Based upon an agreement with the Equity Committee, such employments agreements will include the compensation for such individuals that is set forth in Exhibit A annexed hereto, the definition of "for cause" termination set forth in Exhibit D annexed hereto, and will contain other customary terms and conditions reasonably acceptable to the Debtors, the Equity Committee, and such individuals.

8.09.    Reorganized Director Stock Plan.  Prior to the Effective Date, Footstar shall adopt the Reorganized Director Stock Plan. On the Effective Date, Reorganized Footstar shall implement the Reorganized Director Stock Plan. The Reorganized Director Stock Plan shall be an equity-based incentive program for the directors of Reorganized Footstar pursuant to which such directors shall receive shares of Reorganized Footstar common stock. The terms of the Reorganized Director Stock Plan shall be contained in the Plan Supplement.

8.10.    Retiree Benefits.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code subject to any future right to amend, modify, or discontinue such benefits.

ARTICLE IX

PROVISIONS REGARDING CORPORATE GOVERNANCE
AND MANAGEMENT OF THE REORGANIZED DEBTORS

9.01.    General.  On the Effective Date, the management, control, and operation of Reorganized Footstar and the Reorganized Debtors shall become the general responsibility of the Boards of Directors of Reorganized Footstar and the Reorganized Debtors, respectively.

9.02.    Directors and Officers of the Reorganized Debtors.

(a)    Reorganized Debtors' Boards of Directors.  The Equity Committee shall select, in their sole discretion, the initial directors of the Reorganized Debtors on and after the Effective Date; *provided, however,* the Chief Executive Officer of the Reorganized Debtors shall be a member of the initial Board of Directors of Reorganized Footstar. Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and the Reorganized Debtors' Certificates of Incorporation and Reorganized Debtors' By-laws, as the same may be amended from time to time.

(b)    Reorganized Debtors' Officers.  The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with the Reorganized Debtors, and the Reorganized Debtors' Certificates of Incorporation and Reorganized Debtors' By-laws, as the same may be amended from time to time.

9.03. Issuance of Non-Voting Securities. From and after the Effective Date, the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code so long as it is applicable.

9.04. Certificate of Incorporation of Reorganized Footstar. Reorganized Footstar's Certificate of Incorporation shall contain provisions restricting the direct or indirect transferability of the equity interests of Reorganized Footstar such that (i) no person or "entity" may acquire or accumulate 4.75% or more (as determined under tax law principles governing the application of section 382 of the Tax Code) of the equity interests of Footstar, (ii) no person or entity owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, 4.75% or more of the equity interests of Footstar may acquire additional equity interests, and (iii) no person or "entity" owning 4.75% or more of Reorganized Footstar may dispose of more than a one percentage point interest in Reorganized Footstar in a single transaction or series of transactions or on a single day, subject, in each instance, to certain exceptions and limitations (including, without limitation, the right of the Board of Directors to waive such restrictions in its reasonable discretion and allowance for certain acquisitions without the need for prior Board of Directors approval, including, without limitation, qualified tender offers for all of Reorganized Footstar's stock). The foregoing restrictions shall expire not later than December 31, 2008.

ARTICLE X

EFFECT OF CONFIRMATION

10.01. Vesting of Assets. Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided herein. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.02. Discharge of Claims. Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.

10.03. Discharge of Debtors. Upon the Effective Date, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a

Claim shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, including rights of setoff and recoupment, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Reorganized Debtors or any of their assets or properties.

10.04. Injunction. Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Reorganized Debtors with respect to any Claim, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Reorganized Debtors on account of any Claim, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Reorganized Debtors, or against the property or interests in property of the Reorganized Debtors on account of any Claim, (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan, and (v) taking any actions to interfere with the implementation or consummation of the Plan.

10.05. Term of Injunctions or Stays. Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, including, but not limited to, the Trading Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

10.06. Exculpation. None of the Debtors, the Reorganized Debtors, the Postpetition Lenders, the Creditors' Committee, or the Equity Committee, the *ad hoc* committee of equity interest holders, or their respective employees, officers, directors, current or former members, or professionals shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the preparation or negotiation of the Disclosure Statement, the solicitation of votes in connection with the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence; *provided, however*, notwithstanding the foregoing, nothing in the Plan shall be deemed to release or exculpate Deloitte & Touche in connection with claims arising out of or related to Deloitte & Touche's alleged failure to detect and/or disclose material weaknesses in internal controls, accounts payable reconciliation procedures, and write-offs of accounts payable for each of the fiscal years 1997 through 2002. Nothing in this Section 10.06 shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the Postpetition Lenders, the Creditors' Committee, or the Equity Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

10.07.  Avoidance Actions.  From and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 546, 548(a)(1)(A), 549 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.  The Reorganized Debtors shall not retain the right to prosecute any Avoidance Actions under sections 547 or 548(a)(1)(B) of the Bankruptcy Code.

10.08.  Retention of Causes of Action/Reservation of Rights.

(a)     Except as limited by Section 10.07 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of the estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Reorganized Debtors, their officers, directors, or representatives, (ii) the turnover of any property of the Debtors' estates, and (iii) Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, or auditors relating to acts or omissions occurring prior to the Commencement Date; *provided, however,* that the Reorganized Debtors shall not retain the right to prosecute any Causes of Action against any of the officers, directors, or employees of the Debtors that are officers, directors, or employees of the Debtors as of the Confirmation Date and such Causes of Action shall be, and shall be deemed to be, extinguished pursuant to the Plan.

(b)     Except as limited by Section 10.07 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted by the Reorganized Debtors after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

ARTICLE XI

CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.01.  Effectiveness.  The Plan shall not become effective unless and until the following conditions shall have been satisfied (*provided* that the determination to become effective on any date prior to March 31, 2006 shall be subject to the consent of the Equity Committee) or waived pursuant to Section 11.03 of the Plan:

(a)     The Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered, and there shall not be a stay or injunction in effect with respect thereto;

(b)     All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(c)     The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, audited financial statements, and documents that are necessary to implement the Plan and that are required by law, regulation, or order; and

(d)     On or prior to March 31, 2006, the Debtors shall have sufficient Cash on hand (after establishing appropriate reserves as determined by the management of Footstar, in consultation with the Equity Committee) to pay Allowed Claims in accordance with Article 4 of the Plan.

11.02.  Failure of Conditions.  In the event that one or more of the conditions specified in Section 11.01 of the Plan have not occurred or otherwise been waived pursuant to Section 11.03, (i) the Confirmation Order shall be vacated, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

11.03.  Waiver of Conditions.  Footstar, with the consent of the Equity Committee and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.01 of the Plan.

ARTICLE XII

RETENTION OF JURISDICTION

12.01.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure Claims and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)     To hear and determine any and all adversary proceedings, applications, and contested matters;

(c)     To hear and determine any objection to Administrative Expense Claims or Claims or otherwise resolve any Disputed Claims;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(i)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)    To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(m)    To hear any other matter not inconsistent with the Bankruptcy Code; and

(n)    To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.01.  Effectuating Documents and Further Transactions.  The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.02.  Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any

instrument or making any distribution under the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.03. <u>Corporate Action</u>. On the Effective Date, all matters provided for under the Plan that may otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) the effectiveness of the Reorganized Footstar Certificate of Incorporation, (ii) the implementation of the Reorganized Director Stock Plan or issuance of shares of Reorganized Footstar common stock thereunder, (iii) the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors, and (iv) the effectiveness of the Compensation and Retention Program annexed to the Plan as Exhibit B and the Employment Agreements annexed to the Plan as Exhibit C shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors and the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized Footstar shall, if required, file its amended certificate of incorporation with the Secretary of State in accordance with the applicable general corporation law.

13.04. <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. Any sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

13.05. <u>Payment of Statutory Fees</u>. On the Effective Date, and thereafter as may be required, the Disbursing Agent shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.06.  <u>Post-Confirmation Date Professional Fees and Expenses</u>.  From and after the Confirmation Date, the Disbursing Agent shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Footstar, the Reorganized Debtors, the Creditors' Committee, and/or the Equity Committee, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

13.07.  <u>Dissolution of the Creditors' Committee and Equity Committee</u>.  The Creditors' Committee and Equity Committee shall terminate upon the Effective Date and their respective members and employees or agents (including attorneys, financial advisors, accountants, and other professionals) shall be released and discharged from any further authority, duties, responsibilities, and obligations relating to, arising from, or in connection with their service on such committees, except that the Creditors' Committee and Equity Committee may evaluate, object to (if necessary), and appear at the hearing to consider (i) applications for final allowances of compensation and reimbursement of expenses, including applications for compensation or reimbursement under section 503 of the Bankruptcy Code, and support or prosecute any objections to such applications and appeals therefrom, if appropriate, and (ii) any post-Confirmation Date modifications to, or motions seeking the enforcement of, this Plan or the Confirmation Order.  The post-Confirmation Date professional fees of the Creditors' Committee and Equity Committee for the services set forth in the preceding sentence shall be paid pursuant to Section 13.06 of the Plan.

13.08.  <u>Plan Supplement</u>.  The Plan Supplement shall contain (i) Reorganized Footstar's certificate of incorporation, if amended, (ii) Reorganized Footstar's by-laws, if amended, (iii) Schedules 8.01(A) and 8.01(B) referred to in Section 8.01 of the Plan, (iv) the Reorganized Director Stock Plan, and (v) any other appropriate documents; *provided, however*, that such forms of documents shall be subject to the consent of the Equity Committee.  The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the last day upon which holders of Claims and Equity Interests may vote to accept or reject the Plan; *provided, however*, the Debtors (with the consent of the Equity Committee) may amend Schedules 8.01 (A) and 8.01 (B) through and including the Confirmation Date and each of the other documents identified in (i), (ii), (iv), and (v) in the first sentence of this Section 13.08 through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Footstar in accordance with Section 13.16 of the Plan.

13.09.  <u>Amendment or Modification of the Plan</u>.  Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the

circumstances warrant such alterations, amendments, or modifications. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

13.10.  Revocation or Withdrawal of the Plan.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

13.11.  Severability.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.12.  Expedited Tax Determination.  The Disbursing Agent or Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for all taxable periods through the Effective Date.

13.13.  Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.14.  Binding Effect.  The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

13.15.  Exhibits/Schedules.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.16.  Notices.  All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

FOOTSTAR, INC.
933 MacArthur Blvd.
Mahwah, NJ 07430
Attn: Maureen Richards, Esq.
Senior Vice-President
and General Counsel
Telephone: (201) 934-2000
Facsimile: (201) 934-2770

-and-

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Martin J. Bienenstock, Esq.
         Paul M. Basta, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Dated: New York, New York
     October 28, 2005

Respectfully submitted,

FOOTSTAR, INC., *et al.*
(for itself and on behalf of each of the
    Debtors)

By:     /s/ Maureen Richards      
Name:     Maureen Richards
Title:      Senior Vice-President and
               General Counsel

Counsel:

Martin J. Bienenstock, Esq. (MB 3001)
Paul M. Basta, Esq. (PB 4434)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
    Debtors in Possession

**EXHIBIT A**
**TO**
**PLAN**

# INTRODUCTION

Footstar and the Equity Committee have agreed to the Footstar Compensation Plan 2006-2008 (the "Retention Plan") to enable Reorganized Footstar to retain certain key employees through December 31, 2008, the date on which the Kmart Agreement expires. The Retention Plan also includes a performance bonus incentive (the "Incentive Plan"). Additionally, the parties have agreed to honor all programs previously approved by the Bankruptcy Court, except as modified by the Retention Plan, including (i) the Meldisco Compensation Program (as defined in the Disclosure Statement), which includes retention and performance incentive bonuses for 2005, revised severance and continuation of the Debtors' Senior Employee Retirement Plan (the "SERP") and (ii) the Key Employee Retention Plan (as defined in the Disclosure Statement). Footstar's board of directors approved the Retention Plan and the Incentive Plan on October 27, 2005. Detailed summaries of the Incentive Plan, the Retention Plan and the SERP are set forth below.

Officers will execute employment agreements detailing the elements of compensation and benefits package contemplated by the Retention Plan and Incentive Plan. The following chart illustrates the approximate annual cost of each of the Incentive Plan and the Retention Plan:

| PLANS | 2006-2008 (ANNUAL COST) |
|---|---|
| Incentive Plan (at target) | $2,900,000 |
| Retention Plan (for Officers, including severance) | $3,314,000 |
| Retention Plan (below Officer level, excluding severance) | $2,735,000 |
| Discretionary Retention Pool | $100,000 |

# SUMMARY OF INCENTIVE PLAN

The following is a summary of the Incentive Plan.

- The Incentive Plan for 2006 through 2008 will remain unchanged from the performance incentive plan that is currently in place and was approved by the Bankruptcy Court. All rules currently in effect will apply to the Incentive Plan for 2006 through 2008. The interpretation and administration of the Incentive Plan shall be consistent with the provisions of the 1996 Incentive Compensation Plan.

- Plan participants include officers, directors, buyers, planners, district managers and other key merchandising executives (i.e., approximately 140 total participants).

- Target is calculated by multiplying base salary by bonus percentage in effect as of September 1, 2005 and multiplying the result by 1.00 (or .50 at the Director level and below). For example, if base pay is $100,000 and the target bonus percentage is 20%, the target bonus would be $20,000 (or $10,000 if the employee is at the Director level or below).

- Plan performance targets will be approved by the compensation committee of the board of directors of Reorganized Footstar (as defined in the Plan).

- Goals are set seasonally based on the financial calendar and half of the target may be earned based on achievement of goals in each season. The spring season is January through June and the fall season is July through December. Goal metrics vary by position between Company Goals and/or one or more Individual Goals.

  o Company Goals – Free Cash Flow

  o Individual Goals – Gross Margin Dollars, Inventory Turnover, Initial Mark Up, Sales, Payroll, Shrinkage

- Payouts under the Incentive Plan will be made as soon as practicable after each seasonal period assuming performance goals are achieved (July for the spring season and January for the fall season). Payouts are based upon the actual results achieved against the seasonal financial goals established for each season. At target performance, half of the Incentive Plan described above is earned. Awards above and below Target can be earned as follows:

  o Maximum – 200% payout (the highest award payout which can be earned);

  o Target – 100% payout (when the "plan" is achieved); and

- o Threshold – 50% payout (the minimum standard where an award payout can still be earned).

- o There will be no award payout for performance that falls below the Threshold level.  Performance that falls between Threshold and Target and Target and Maximum will be interpolated to the nearest whole percent unless otherwise specified.

- Should an employee experience a leave of absence greater than three months, the earned incentive will be prorated based on the actual number of months worked during the performance period.  Should an employee be terminated involuntarily as a result of a job elimination or reduction in force, a portion of the award will be paid to the Associate pro-rated based on the number of days worked to the date of termination.  Voluntary resignation or termination for "cause" would result in no additional payments other than what has already been paid prior to the termination date.

# SUMMARY OF RETENTION PLAN

The following is a summary of the Retention Plan.

- Senior Vice Presidents and above will receive compensation as set forth in the schedule that has been provided to the Equity Committee.[1] The employment agreement of Jeff Shepard is attached to the Plan as Exhibit B. On or before November 3, 2005, the Debtors will file as Exhibit C to the Plan forms of employment agreements for Vice Presidents and Senior Vice Presidents, which agreements will become effective on the Effective Date without further action by the Reorganized Debtors. Based upon an agreement with the Equity Committee, such employment agreements will include the compensation set forth herein (and supporting documentation delivered to and approved by the Equity Committee), the definition of "for cause" termination set forth on Exhibit D of the Plan and will contain other customary terms and conditions reasonably acceptable to the Debtors, the Equity Committee and such individuals.

- Total payments over the three-year period including retention and severance for Senior Vice Presidents and above range from $1,950,000 to $311,497 (the "Total Payments") and total $5,335,885. Retention payments will be made semi-annually (July 1 and January 1 of each year) throughout the three-year period. Upon involuntary termination of employment other than for Cause, the executive will receive a severance payment equal to the Total Payments minus any cash awards already paid out under the plan. If the executive accepts employment with the acquiring entity, no lump sum severance payment is due. Four senior officers will receive 328,953 restricted stock shares ranging from 4,500 to 130,000 shares for each of the executives. Such stock will vest on involuntary termination other than for Cause.

- Vice Presidents will receive awards as set forth in their employment agreements. Total payments over the three-year period, including severance and retention, for Vice Presidents will range from $159,797 to $507,000 and total $2,960,524. Payments will be made semi-annually (July 1 and January 1 of each year). Upon involuntary termination other than for Cause, Vice Presidents will receive a lump sum payment plus a pro-rata share of the semi-annual payment through the date of termination. If a Vice President accepts employment with an acquiring entity, no Lump Sum payment is due.

- If a retention eligible associate below the Vice President level is involuntarily terminated for reasons other than for Cause, a pro-rata share of the full three-year award will be paid minus any awards already received under the plan.

---

[1] Specific information regarding the Retention Plan has been provided to and approved by the Equity Committee.

- Associates below the Vice President level will be eligible for severance upon involuntary termination for reasons other than for Cause under the existing Severance Pay Plan; however, no severance will be due if an Associate accepts employment with the acquiring entity.

- Awards for Associates below Vice President level will be determined using 2005 incentive targets and base salary in effect on September 1, 2005.

- Approximately 275 associates below the Vice President level will participate in the retention plan.

- Associates below the Vice President level will receive quarterly retention payments throughout the three-year period with a lump sum payment due December 31, 2008.

- The Total cost of the Retention Plan for Associates below the Vice President level will be $8,205,000 over the three-year period. Individual awards over the three-year period range from $7,500 to $114,210.

- A special discretionary retention pool will be established, which will provide for a $100,000 annual discretionary pool to be used by the CEO to retain key associates. Any forfeited retention dollars resulting from turnover will be added back to the pool and used for additional retention as required.

## **SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN (SERP)**

- Four executives shall receive benefits under the SERP upon involuntary termination of employment other than for cause or in connection with an approved early retirement or normal retirement. The benefit to be paid is the "lump sum value" payable under article 7 of the SERP as if the executive's employment termination occurred on the day after a change in control (as defined in the SERP document). The estimated liability is $5.3 million as of December 31, 2005.

**EXHIBIT B**
**TO**
**PLAN**

FOOTSTAR

---

Employment Agreement for Jeffrey Shepard

---

# FOOTSTAR

## Employment Agreement for Jeffrey Shepard

| | | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Term of Employment | 2 |
| 3. | Position, Duties and Responsibilities | 2 |
| 4. | Base Salary | 3 |
| 5. | Annual Incentive Awards | 3 |
| 6. | Long-Term Stock Incentive Programs | 3 |
| 7. | Employee Benefit Programs | 3 |
| 8. | Reimbursement of Business and Other Expenses | 4 |
| 9. | Termination of Employment | 4 |
| 10. | Confidentiality; Cooperation with Regard to Litigation | 11 |
| 11. | Non-competition | 12 |
| 12. | Non-solicitation of Employees | 13 |
| 13. | Remedies | 14 |
| 14. | Resolution of Disputes | 14 |
| 15. | Indemnification | 14 |
| 16. | Excise Tax Gross-Up | 15 |
| 17. | Deferred Compensation | 17 |
| 18. | Effect of Agreement on Other Benefits | 17 |
| 19. | Assignability; Binding Nature | 17 |
| 20. | Representation | 17 |
| 21. | Entire Agreement | 17 |
| 22. | Amendment or Waiver | 17 |
| 23. | Severability | 18 |

FOOTSTAR

Employment Agreement for Jeffrey Shepard

| | | Page |
|---|---|---|
| 24. | Survivorship | 18 |
| 25. | Beneficiaries/References | 18 |
| 26. | Governing Law/Jurisdiction | 18 |
| 27. | Notices | 18 |
| 28. | Headings | 19 |
| 29. | Counterparts | 19 |

## EMPLOYMENT AGREEMENT

AGREEMENT, made and entered into as of the ___ day of October, 2005 by and between Footstar, Inc., a Delaware corporation and Footstar Corporation, a Texas Corporation (together with its successors and assigns permitted under this Agreement, the "Company"), and Jeffrey Shepard (the "Executive").

## WITNESSETH:

WHEREAS, the Company desires to employ the Executive pursuant to an agreement embodying the terms of such employment (this "Agreement") and the Executive desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt of which is mutually acknowledged, the Company and the Executive (individually a "Party" and together the "Parties") agree as follows:

1.    Definitions.

    (a)   "Approved Early Retirement" shall have the meaning set forth in Section 9(g) below.

    (b)   "Base Salary" shall have the meaning set forth in Section 4 below.

    (c)   "Board" shall mean the Board of Directors of the Company.

    (d)   "Cause" shall have the meaning set forth in Section 9(c) below.

    (e)   "Confidential Information" shall have the meaning set forth in Section 10(c) below.

    (f)   "Constructive Termination Without Cause" shall have the meaning set forth in Section 9(d) below.

    (g)   "Effective Date" shall have the meaning set forth in Section 2 below.

    (h)   "1996 ICP" shall have the meaning set forth in Section 5(a) below.

    (i)   "Kmart Agreement" shall mean the Amended and Restated Master Agreement made and entered into as of August 24, 2005 by and between Kmart Corporation , the Company and related entities.

    (j)   "Normal Retirement" shall have the meaning set forth in Section 9(g) below.

    (k)   "Plan of Reorganization" shall mean the "Debtors First Amended Joint Plan of Reorganization" as it may be amended from time to time, filed in connection with the Company's cases under Chapter 11 of the U.S. Bankruptcy Code.

(l) "Restriction Period" shall have the meaning set forth in Section 11 below.

(m) "SERP" shall mean the Supplemental Retirement Plan for Senior Management of Footstar, Inc., effective October 14, 1996, as amended and restated effective June 19, 2002, as amended from time to time.

(n) "Severance Period" shall mean the period of 24 months following the termination of the Executive's employment.

(o) "Subsidiary" shall have the meaning set forth in Section 10(d) below.

(p) "Term of Employment" shall have the meaning set forth in Section 2 below.

2.     Term of Employment.

The term of the Executive's employment under this Agreement shall commence on the date this agreement is fully executed subject only to the Company's emergence from bankruptcy pursuant to its Plan of Reorganization (the "Effective Date") and end on December 31, 2008 (the "Original Term of Employment") or, if sooner, the date Executive's employment is terminated pursuant to Section 9. Thereafter the Original Term of Employment shall be automatically renewed for successive one-year terms ("Renewal Terms") unless at least 90 days prior to the expiration of the Original Term of Employment or any Renewal Term, either Party notifies the other Party in writing that he or it is electing to terminate this Agreement at the expiration of the then current Term of Employment. "Term of Employment" shall mean the Original Term of Employment and all Renewal Terms. If the Executive elects not to renew this Agreement, his employment termination following the expiration of the Term of Employment shall be treated as a voluntary termination pursuant to Section 9(e) below. If the Company elects not to renew this Agreement, the Executive's employment termination following the expiration of the Term of Employment shall be treated as a termination without Cause under Section 9(f) below.

3.     Position, Duties and Responsibilities.

(a)     Generally. Executive shall serve as an Executive Vice President to the Company as well as Chief Executive Officer and President of the Company's Meldisco Division until such date as Dale Hilpert shall no longer serve as the Company's Chief Executive Officer and President whereupon Executive shall cease to hold such positions and replace Mr. Hilpert as the Company's Chief Executive Officer and President. Executive shall have and perform such duties, responsibilities, and authorities as shall be specified by the Company from time to time and as are customary for a Chief Executive Officer and President of a publicly held corporation (or prior to the date he holds such positions, as are customary of an executive vice president and chief executive officer and president of a significant operating division of a publicly held corporation) of the size, type, and nature of the Company as they may exist from time to time and as are consistent with such position and status. Executive shall devote all of his business time and attention (except for periods of vacation or absence due to illness), and his best efforts, abilities, experience, and talent to his position and the businesses of the Company.

(b)     Other Activities. Anything herein to the contrary notwithstanding, nothing in this Agreement shall preclude the Executive from (i) engaging in charitable activities and community affairs and (ii) managing his personal investments and affairs, provided that such

activities do not materially interfere with the proper performance of his duties and responsibilities under this Agreement. Unless approved in writing by the Board, the Executive may not serve on the board of directors of any corporation or the board of any association and/or charitable organization.

4.    Base Salary.

The Executive shall be paid an annualized salary, payable in accordance with the regular payroll practices of the Company, of not less than $650,000, subject to annual review for increase at the discretion of the Compensation Committee of the Board ("Base Salary").

5.    Other Awards.

(a)    Incentive Awards. The Executive shall participate in the Company's 1996 Incentive Compensation Plan (the "1996 ICP") under which he shall be afforded the opportunity to earn no less than 100% of Base Salary per year if targets are achieved or in a successor plan to the 1996 ICP that provides the Executive with an equivalent opportunity. Measurement of Company performance and payment of incentive awards shall be done seasonally and in accordance with the Company's practice with respect to the incentive awards for other senior-level executives.

(b)    Retention Bonuses. The Executive shall receive $158,437.50 on each July 1st and December 31st of 2006, 2007 and 2008 if the Executive continues to be employed by the Company through the date such payments are due.

(c)    Emergence Payments. The Executive shall receive the payments approved and not yet paid  under the Order entered in the U.S. Bankruptcy Court on May 6, 2004, immediately upon the Company's emergence from bankruptcy pursuant to its Plan of Reorganization.

6.    Long-Term Stock Incentive Programs.

(a)    General. The Executive shall be eligible to participate in and to receive stock incentive awards under the 1996 ICP and any successor plan.

(b)    Effective Date Award. On the Effective Date, the Company shall grant Executive a restricted stock grant of 130,000 shares of the Company's common stock, which restrictions shall lapse only upon certain terminations of the Executive's employment as provided in Section 9 below. Prior to the Effective Date, the Executive may elect that the Company grant him restricted stock units with comparable vesting terms in lieu of the restricted stock provided for herein.

7.    Employee Benefit Programs.

(a)    General Benefits. During the Term of Employment, the Executive shall be entitled to participate in such employee pension and welfare benefit plans and programs of the Company and such perquisite programs as are made available to the Company's senior-level executives or to its employees generally, as such plans or programs may be in effect from time to time, including, without limitation, health, medical, dental, long-term disability, travel accident and life insurance plans, participation in executive health, tax preparation and financial planning programs.

(b)　SERP.　The Executive, or in the event of Executive's death, his beneficiary, shall be entitled to accrue benefits under the supplemental executive retirement plan ("SERP"), in accordance with the terms of such Plan.

8.　Reimbursement of Business and Other Expenses.

The Executive is authorized to incur reasonable expenses in carrying out his duties and responsibilities under this Agreement, and the Company shall promptly reimburse him for all such expenses, subject to documentation in accordance with the Company's policy.

9.　Termination of Employment.

(a)　Termination Due to Death.　In the event the Executive's employment with the Company is terminated due to his death, his estate or his beneficiaries, as the case may be, shall be entitled to and their sole remedies under this Agreement shall be:

(i)　Base Salary through the date of death which shall be paid in a single lump sum not later than 15 days following the Executive's death;

(ii)　pro rata incentive award for any incomplete performance period of the year in which the Executive's death occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his death;

(iii)　lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his death;

(iv)　immediate vesting of any matching grant under the Company's Switch to Equity Program ("STEP") and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of death;

(v)　immediate vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following death (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

(vi)　immediate vesting of all outstanding awards under the Company's "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) after his death;

(vii)　the balance of any incentive awards earned as of the date of death (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's death;

(viii)　the "lump sum value" payable under Article 7 of the SERP as if the Executive's death occurred on the day after a "change in control" as defined in the SERP; and

(ix)　other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(b)     <u>Termination by the Company due to Disability</u>.

        The Company shall provide the Executive with at least fifteen (15) days advance written notice that it is terminating Executive's employment on account of Disability. For purposes of this Agreement, "<u>Disability</u>" means a condition that qualifies the Executive to receive benefits under the Company's Long-Term Disability Plan.  In the event the Executive's employment with the Company is terminated due to his Disability, then the Executive shall be entitled to and his sole remedies under this Agreement shall be:

        (i)     Base Salary through the date of employment termination, which shall be paid in a single lump sum not later than 15 days following the employment termination;

        (ii)    $1,950,000 payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment less the aggregate of any payments made to the Executive under Section 5(b) above;

        (iii)   pro rata incentive award for any incomplete performance period of the year in which the Executive's employment termination occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his employment termination;

        (iv)    lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

        (v)     immediate vesting of any matching grant under STEP and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of employment termination;

        (vi)    immediate vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following his date of employment termination (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

        (vii)   immediate vesting of all outstanding awards under the Company's "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) after his employment termination;

        (viii)  the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the date of the Executive's employment termination;

        (ix)    continuation of medical, dental and life insurance coverage for two years on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but if, during such two year period, the Executive is precluded from continuing his participation in any Company plan or program or, if no such plan or program exists due to the Company's (or a successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant

period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage. Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due. If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance. The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph. For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein;

(x)     the "lump sum value" payable under Article 7 of the SERP as if the Executive's employment termination occurred on the day after a "change in control" as defined in the SERP; and

(xi)     other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(c)     <u>Termination by the Company for Cause</u>.

(i)     "<u>Cause</u>" shall mean:

(A)     the Executive's willful and material breach of Sections 3, 10, 11 or 12 of this Agreement;

(B)     the Executive is convicted of a felony; or

(C)     the Executive engages in conduct that constitutes willful gross neglect or willful gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in material harm to the financial condition or reputation of the Company.

For purposes of this Agreement, an act or failure to act on Executive's part shall be considered "willful" if it was done or omitted to be done by him not in good faith, and shall not include any act or failure to act resulting from any incapacity of Executive.

(ii)     A termination for Cause shall not take effect unless the provisions of this paragraph (ii) are complied with. The Executive shall be given written notice by the Company of its intention to terminate him for Cause, such notice (A) to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination for Cause is based and (B) to be given within 180 days of the Company's learning of such act or acts or failure or failures to act. The Executive shall have 10 days after the date that such written notice has been given to him in which to cure such conduct, to the extent such cure is possible. If he fails to cure such conduct, the Executive shall then be entitled to a hearing before the Compensation Committee of the Board at which the Executive is entitled to appear. Such hearing shall be held within 21 days of such notice to the Executive, provided he requests such hearing within 10 days of the written notice from the Company of the intention to terminate him for Cause. If, within five days following such hearing, the Executive is furnished written notice by the Board confirming that, in its judgment, grounds for Cause on the basis of the original notice exist, he shall thereupon be terminated for Cause. Such hearing shall not limit any other review as set forth in this Agreement on a <u>de novo</u> basis.

(iii)     In the event the Company terminates the Executive's employment for Cause, he shall be entitled to and his sole remedies under this Agreement shall be:

(A)     Base Salary through the date of the termination of his employment for Cause, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(B)     any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment; and

(C)     other or additional benefits then due or earned in accordance with applicable plans or programs of the Company including but not limited to the STEP and Career Equity program.

(d)     "Constructive Termination Without Cause" shall mean a termination of the Executive's employment at his initiative following the occurrence, without the Executive's written consent, of one or more of the following events (except as a result of a prior termination):

(A)     an assignment of any duties to Executive which are materially inconsistent with his status as a senior executive of the Company, that is not cured within 10 days of Executive's advance written notice of such occurrence;

(B)     a decrease in annual Base Salary or in the target incentive award annual opportunity below 100% of Base Salary, that is not cured within 10 days of Executive's advance written notice of such occurrence;

(C)     any other failure by the Company to perform any material obligation under, or breach by the Company of any material provision of, this Agreement that is not cured within 30 days of Executive's advance written notice of such occurrence;

(D)     any failure to secure the agreement of any successor corporation to the Company or successor to the Company's business (whether by sale of stock or assets) to fully assume the Company's obligations under this Agreement, that is not cured within 10 days of Executive's advance written notice of such occurrence;

(E)     a termination of the Executive's employment at his initiative as provided in this Section following the relocation of his principal place of employment outside a 35-mile radius of his principal place of employment as of the Effective Date; or

(F)     a termination of the Executive's employment at his initiative following the acquisition, by any person or entity, the business of the Company, whether by virtue of the sale of the stock or assets of the Company; provided that the Executive does not accept an offer of comparable employment from such person or entity. For purposes of this subsection "comparable employment" shall mean employment (i) where the Executive performs substantially the same duties performed by the Executive immediately prior to the acquisition and no duties that are inconsistent with the Executive's then status as an executive (except that employment shall not fail to be considered "comparable employment" merely because the Company becomes a freestanding division of a larger corporation); (ii) Executive receives at least the same salary rate and bonus in effect immediately prior to the acquisition; (iii) Executive receives an equivalent target annual bonus opportunity; (iv) Executive is eligible for substantially comparable employee benefits in the aggregate to the employee benefits applicable immediately prior to the acquisition, including, without limitation, equivalent severance benefits offered under this Agreement, life insurance, retirement benefits and supplemental retirement

benefits; and (v) Executive's principal place of employment that is not more than 35 miles from Executive's principal place of employment on the Effective Date.

      (e)    <u>Voluntary Termination</u>.  In the event of a termination of employment by the Executive on his own initiative after delivery of 10 business days advance written notice (or if the Company elects to extend such termination date, in the event of an employment termination no later than 30 days beyond the termination date specified by the Executive in his notice), other than a termination due to death, Disability, a Constructive Termination Without Cause, or Approved Early Retirement or Normal Retirement pursuant to Section 9(g) below, the Executive shall have the same entitlements as provided in Section 9(c)(iii) above for a termination for Cause.  In the event the Company elects to extends the Executive's employment beyond the ten business day notice period, the Company shall provide Executive with the following in a single lump sum not later than 15 days following the Executive's termination of employment (i) a pro rata incentive award for the performance period in which the Executive's employment terminates for the additional period employed as a result of such extension assuming that the Executive would have incentive awards for the entire year equal to 100% of Base Salary for such year (or such higher percentage of Base Salary as is payable for achievement of targeted performance during the relevant period); and (ii) a pro rata retention bonus, calculated by multiplying the next scheduled retention bonus payable under Section 5(b) by a fraction the numerator of which is the number of additional days the Executive is employed as a result of such extension and the denominator of which is the number of days between the last retention bonus payment and the next scheduled bonus payment.

      (f)    <u>Termination Without Cause or Constructive Termination Without Cause</u>. In the event the Executive's employment with the Company is terminated without Cause (which termination shall be effective as of the date specified by the Company in a written notice to the Executive), other than due to death or Disability, or in the event there is a Constructive Termination Without Cause (as defined above), then subject to Sections 9(k) and 17 below, the Executive shall be entitled to and his sole remedies under this Agreement shall be:

      (i)    Base Salary through the date of termination of the Executive's employment, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

      (ii)    $1,950,000 payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment less the aggregate of any payments made to the Executive under Section 5(b) above;

      (iii)    pro rata incentive award for any incomplete performance period of the year in which the Executive's employment termination occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his employment termination;

      (iv)    lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

      (v)    immediate vesting of any matching grant under STEP and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of employment termination;

(vi)     immediate vesting of all outstanding stock options and the right to exercise such stock options during the Severance Period or for the remainder of the exercise period, if less;

(vii)     immediate vesting of all outstanding awards under the "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment;

(viii)     the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(ix)     continuation of medical, dental and life insurance coverage for the Severance Period (or if shorter until the Executive is covered under plans and programs of an employer providing comparable coverage) on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but if, during the Severance Period, the Executive is precluded from continuing his participation in any Company plan or program or, if no such plan or program exists due to the Company's (or successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage. Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due. If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance. The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph. For purposes of this clause, coverage shall not be comparable unless affords the Executive (or his dependents) coverage for any condition for which he or such dependent are being treated and covered under this Agreement. For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein; and

(x)     the "lump sum value" payable under Article 7 of the SERP as if the Executive's employment termination occurred on the day after a "change in control" as defined in the SERP;

(xi)     other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(g)     Approved Early Retirement or Normal Retirement. Upon the Executive's Approved Early Retirement or Normal Retirement, then subject to Sections 9(k) and 17 below, the Executive shall be entitled to and his sole remedies under this Agreement shall be:

(i)     Base Salary through the date of termination of the Executive's employment, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(ii)     pro rata incentive award for the period in which termination occurs, based on the performance valuation at the end of such period and payable in a cash lump sum promptly after results are determined (but in no event later than 15 days after such determination);

(iii)     lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

(iv)     continued vesting (as if the Executive remained employed by the Company) of any outstanding deferred shares as of the date of termination of employment, including any matching grant, under the Company's STEP program:

(v)     continued vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following the Executive's termination of employment (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

(vi)     continued vesting (as if Executive remained employed by the Company) of all outstanding awards under the "Career Equity" program payable in a cash lump sum promptly following such vesting (but in no event later than 15 days thereafter);

(vii)     the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(viii)     the "lump sum value" payable under Article 7 of the SERP as if the Executive retired on the day after a "change in control" as defined in the SERP;

(ix)     settlement of all deferred compensation arrangements in accordance with the Executive's duly executed Deferral Election Forms or the terms of any mandatory deferral;

(x)     continuation of medical, dental and life insurance coverage for two years (or if shorter until the Executive is covered under plans and programs of an employer providing comparable coverage) on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but only to the extent that the Executive is not participating in the Company's retiree medical program and has not obtained comparable coverage from a subsequent employer. If, during the two year period, the Executive is precluded from continuing his participation in any Company plan or program (including any retiree medical program) or, if no such plan or program exists due to the Company's (or successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage. Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due. If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance. The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph. For purposes of this clause, coverage shall not be deemed comparable unless it affords the Executive (or his dependents) coverage for any condition for which he or such dependents are being treated and covered under the terms of this Agreement. For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein; and

(xi)     other or additional benefits then due or earned in accordance with applicable plans and programs of the Company including, if the Executive is eligible to participate in such program, any retiree health plan.

"Approved Early Retirement" shall mean the Executive's voluntary termination of employment with the Company at or after attaining age 55 with at least 10 years of service but prior to attaining Normal Retirement age, if such termination is approved in advance by the Compensation Committee.

"Normal Retirement" shall mean the Executive's voluntary termination of employment with the Company at or after the later of (i) the expiration of the Original Term of Employment (or if earlier, the date the Kmart Agreement is terminated) and (ii) the date the Executive attains age 60 with 10 years of service.

(h)     No Mitigation; No Offset.  In the event of any termination of employment under this Section 9, the Executive shall be under no obligation to seek other employment; amounts due the Executive under this Agreement shall not be offset by any remuneration attributable to any subsequent employment that he may obtain.

(i)     Nature of Payments.  Any amounts due under this Section 9 are in the nature of severance payments considered to be reasonable by the Company and are not in the nature of a penalty.

(j)     Exclusivity of Severance Payments.  Upon termination of the Executive's employment during the Term of Employment, he shall not be entitled to any severance payments or severance benefits from the Company or any payments by the Company on account of any claim by him of wrongful termination, including claims under any federal, state or local human and civil rights or labor laws, other than the payments and benefits provided in this Section 9.

(k)     Release of Employment Claims.  The Executive agrees, as a condition to receipt of the termination payments and benefits provided for in this Section 9, that he will execute a release agreement, in a form reasonably satisfactory to the Company, releasing any and all claims arising out of the Executive's employment (other than enforcement of this Agreement, the Executive's rights under any of the Company's incentive compensation and employee benefit plans and programs to which he is entitled under this Agreement, and any claim for any tort for personal injury not arising out of or related to his termination of employment).

(l)     Resignation as Officer or Director.  The Executive shall be deemed to resign as an officer of the Company and as a director from the Board (and as an officer or director of any Subsidiary of the Company) effective as of the date of any employment termination, without any further action on his part.  The Executive agrees to execute any documents confirming such resignation.

10.     Confidentiality; Cooperation with Regard to Litigation.

(a)     During the Term of Employment and thereafter, the Executive shall not, without the prior written consent of the Company, disclose to anyone except in good faith in the ordinary course of business to a person who will be advised by the Executive to keep such information confidential or make use of any Confidential Information, except when required to do so by legal process, by any governmental agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee

thereof) that requires him to divulge, disclose or make accessible such information. In the event that the Executive is so ordered, he shall give prompt written notice to the Company in order to allow the Company the opportunity to object to or otherwise resist such order.

(b)     During the Term of Employment and thereafter, Executive shall not disclose the existence or contents of this Agreement beyond what is disclosed in the proxy statement or documents filed with the government unless and to the extent such disclosure is required by law, by a governmental agency, or in a document required by law to be filed with a governmental agency or in connection with enforcement of his rights under this Agreement. In the event that disclosure is so required, the Executive shall give prompt written notice to the Company in order to allow the Company the opportunity to object to or otherwise resist such requirement. This restriction shall not apply to such disclosure by him to members of his immediate family, his tax, legal or financial advisors, any lender, or tax authorities, or to potential future employers (but in the case of disclosure to future employers disclosure shall be limited to what is necessary to inform the employer of the scope of this covenant to the extent this document is not publicly available), each of whom shall be advised not to disclose such information.

(c)     "Confidential Information" shall mean all information that is not known or available to the public concerning the business of the Company or any Subsidiary relating to any of their products, product development, trade secrets, customers, suppliers, finances, and business plans and strategies. For this purpose, information known or available generally within the trade or industry of the Company or any Subsidiary shall be deemed to be known or available to the public. Confidential Information shall include information that is, or becomes, known to the public as a result of a breach by the Executive of the provisions of Section 10(a) above.

(d)     "Subsidiary" shall mean any corporation controlled directly or indirectly by the Company and any affiliate of the Company.

(e)     The Executive agrees to cooperate with the Company, during the Term of Employment and thereafter (including following the Executive's termination of employment for any reason), by making himself available to testify on behalf of the Company or any Subsidiary or affiliate of the Company, in any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, and to assist the Company, or any Subsidiary or affiliate of the Company, in any such action, suit, or proceeding, by providing information and meeting and consulting with the Board or its representatives or counsel, or representatives or counsel to the Company, or any Subsidiary or affiliate of the Company, as requested. The Company agrees to reimburse the Executive, on an after-tax basis, for all reasonable expenses actually incurred in connection with his provision of testimony or assistance.

11.     Non-competition

(a)     During the Restriction Period (as defined in Section 11(b) below), the Executive shall not engage in Competition with the Company or any Subsidiary. "Competition" shall mean engaging in any activity, except as provided below, for a Competitor of the Company or any Subsidiary, whether as an employee, consultant, principal, agent, officer, director, partner, shareholder (except as a less than one percent shareholder of a publicly traded company) or otherwise; provided, however, that this provision shall not apply if the Company ceases to do business (including through a sale of all or substantially all of the assets of the Company to Kmart as contemplated by the Company's Master Agreement with Kmart Corporation) and there is no successor to the Company otherwise. A "Competitor" shall mean (i) Payless ShoeSource, Wal-Mart, Foot Locker, Lady Foot Locker, Kids' Foot Locker, Kohl's, Rite Aid, Target, and J.

C. Penney (and any successor or successors thereto), or (ii) the portion of any other corporation or other entity or start-up corporation or entity that is engaged in the Discount Retail Footwear Business within fifty (50) miles of any Discount Retail Footwear Business outlet in the United States of the Company or any Subsidiary, provided that a corporation or entity described in clause (ii) above shall not be deemed to be a Competitor if the Executive shall not either directly or indirectly oversee or manage the activities of such corporation or entity's division or unit engaged in the Discount Retail Footwear Business. If the Executive commences employment or becomes a consultant, principal, agent, officer, director, partner, or shareholder of any entity that is not a Competitor at the time the Executive initially becomes employed or becomes a consultant, principal, agent, officer, director, partner, or shareholder of the entity, future activities of such entity shall not result in a violation of this provision unless (x) such activities were contemplated at the time the Executive initially became employed or becomes a consultant, principal, agent, officer, director, partner, or shareholder of the entity (and the contemplation of such activities was known to the Executive) or (y) the Executive commences directly or indirectly overseeing or managing the activities which are competitive with the activities of the Company or Subsidiary. The Executive shall not be deemed indirectly overseeing or managing the activities which are competitive with the activities of the Company or Subsidiary so long as he does not regularly participate in discussions with regard to the competing business. For purposes of the foregoing, "Discount Retail Footwear Business" shall mean a group of four or more stores which primarily sells discount footwear.

   (b) For the purposes of this Section 11 and Section 12 below, "Restriction Period" shall mean the period beginning with the Effective Date and ending with:

     (i) in the case of a termination of the Executive's employment without Cause or a Constructive Termination Without Cause, the end of the Severance Period;

     (ii) in the case of a termination of the Executive's employment for Cause or voluntary termination of employment, the first anniversary of such termination;

     (iii) in the case of Approved Early Retirement or Normal Retirement pursuant to Section 9(g) above, the remainder of the Term of Employment.

   (c) Separate Covenants. The covenants contained in this Sections 10, 11 and 12, collectively, are separate and independent of the covenants contained in the Confidentiality and Non-Competition Agreement between the Company and the Executive attached hereto as Exhibit A, which agreement shall remain in full force and effect except that the reference therein to the Master Agreement between the Company and Kmart Corporation shall mean the Amended and Restated Master Agreement made and entered into as of August 24, 2005. In the event that Section 10, 11 and 12 of this Agreement and the Confidentiality and Non-Competition Agreement shall conflict, the Company shall get the benefit of the provision that affords it the greatest protection.

  12. Non-solicitation of Employees.

   During the portion of the Restriction Period following the termination of the Executive's employment, the Executive shall not induce employees of the Company or any Subsidiary to terminate their employment. During the portion of the Restriction Period following the termination of the Executive's employment, the Executive shall not directly or indirectly hire any employee of the Company or any Subsidiary or any person who was employed by the Company or any Subsidiary within 180 days of such hiring. This covenant shall cease to apply if the Company ceases to do business (including through a sale of all or

substantially all of the assets of the Company to Kmart as contemplated by the Company's
Master Agreement with Kmart Corporation) and there is no successor to the Company otherwise.

13.    Remedies.

        In addition to whatever other rights and remedies the Company may have at
equity or in law, if the Executive breaches any of the provisions contained in Sections 10, 11 or
12 above, the Company (a) shall have the right to immediately terminate all payments and
benefits due under this Agreement and (b) shall have the right to seek injunctive relief.  The
Executive acknowledges that such a breach would cause irreparable injury and that money
damages would not provide an adequate remedy for the Company.

14.    Resolution of Disputes.

        Any disputes arising under or in connection with this Agreement, other than
seeking injunctive relief under Section 13, shall be resolved by binding arbitration, to be held at
an office closest to the Company's principal offices in accordance with the rules and procedures
of the American Arbitration Association, except that disputes arising under or in connection with
Sections 10, 11 and 12 above shall be submitted to the federal or state courts in the State of New
Jersey.  Judgment upon the award rendered by the arbitrator(s) may be entered in any court
having jurisdiction thereof.  In the event the Executive prevails as to a material aspect of his
action, the Company shall pay or reimburse the Executive all reasonable costs and expenses
(including fees and disbursements of counsel) incurred by the Executive in seeking to enforce
rights pursuant to this Agreement.

15.    Indemnification.

        (a)    Company Indemnity.  The Company agrees that if the Executive is made
a party, or is threatened to be made a party, to any action, suit or proceeding, whether civil,
criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he is or was
a director, officer or employee of the Company or any Subsidiary or is or was serving at the
request of the Company or any Subsidiary as a director, officer, member, employee or agent of
another corporation, partnership, joint venture, trust or other enterprise, including service with
respect to employee benefit plans, whether or not the basis of such Proceeding is the Executive's
alleged action in an official capacity while serving as a director, officer, member, employee or
agent, the Executive shall be indemnified and held harmless by the Company to the fullest extent
legally permitted or authorized by the Company's certificate of incorporation or bylaws or
resolutions of the Company's Board of Directors or, if greater, by the laws of the State of
Delaware, against all cost, expense, liability and loss (including, without limitation, attorney's
fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in
settlement) reasonably incurred or suffered by the Executive in connection therewith, and such
indemnification shall continue as to the Executive even if he has ceased to be a director, member,
officer, employee or agent of the Company or other entity and shall inure to the benefit of the
Executive's heirs, executors and administrators.  The Company shall advance to the Executive
all reasonable costs and expenses incurred by him in connection with a Proceeding within 20
days after receipt by the Company of a written request for such advance.  Such request shall
include an undertaking by the Executive to repay the amount of such advance if it shall
ultimately be determined that he is not entitled to be indemnified against such costs and
expenses.

        (b)    No Presumption Regarding Standard of Conduct.  Neither the failure of
the Company (including its board of directors, independent legal counsel or stockholders) to

have made a determination prior to the commencement of any proceeding concerning payment of amounts claimed by the Executive under Section 15(a) above that indemnification of the Executive is proper because he has met the applicable standard of conduct, nor a determination by the Company (including its board of directors, independent legal counsel or stockholders) that the Executive has not met such applicable standard of conduct, shall create a presumption that the Executive has not met the applicable standard of conduct.

      (c)   <u>Liability Insurance</u>. The Company agrees to continue and maintain a directors and officers' liability insurance policy covering the Executive to the extent the Company provides such coverage for its other executive officers.

16.   <u>Excise Tax Gross-Up</u>.

If the Executive becomes entitled to one or more payments (with a "<u>payment</u>" including, without limitation, the vesting of an option or other non-cash benefit or property), whether pursuant to the terms of this Agreement or any other plan, arrangement, or agreement with the Company or any affiliated company (the "<u>Total Payments</u>"), which are or become subject to the tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") (or any similar tax that may hereafter be imposed) (the "<u>Excise Tax</u>"), the Company shall pay to the Executive at the time specified below an additional amount (the "<u>Gross-up Payment</u>") (which shall include, without limitation, reimbursement for any penalties and interest that may accrue in respect of such Excise Tax) such that the net amount retained by the Executive, after reduction for any Excise Tax (including any penalties or interest thereon) on the Total Payments and any federal, state and local income or employment tax and Excise Tax on the Gross-up Payment provided for by this Section 16, but before reduction for any federal, state, or local income or employment tax on the Total Payments, shall be equal to the sum of (a) the Total Payments, and (b) an amount equal to the product of any deductions disallowed for federal, state, or local income tax purposes because of the inclusion of the Gross-up Payment in the Executive's adjusted gross income multiplied by the highest applicable marginal rate of federal, state, or local income taxation, respectively, for the calendar year in which the Gross-up Payment is to be made.

For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax:

      (i)   The Total Payments shall be treated as "<u>parachute payments</u>" within the meaning of Section 280G(b)(2) of the Code, and all "<u>excess parachute payments</u>" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, unless, and except to the extent that, in the written opinion of independent compensation consultants, counsel or auditors of nationally recognized standing ("<u>Independent Advisors</u>") selected by the Company and reasonably acceptable to the Executive, the Total Payments (in whole or in part) do not constitute parachute payments, or such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered within the meaning of Section 280G(b)(4) of the Code in excess of the base amount within the meaning of Section 280G(b)(3) of the Code or are otherwise not subject to the Excise Tax;

      (ii)   The amount of the Total Payments which shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of the Total Payments or (B) the total amount of excess parachute payments within the meaning of Section 280G(b)(1) of the Code (after applying clause (i) above); and

(iii) The value of any non-cash benefits or any deferred payment or benefit shall be determined by the Independent Advisors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.

For purposes of determining the amount of the Gross-up Payment, the Executive shall be deemed (A) to pay federal income taxes at the highest marginal rate of federal income taxation for the calendar year in which the Gross-up Payment is to be made; (B) to pay any applicable state and local income taxes at the highest marginal rate of taxation for the calendar year in which the Gross-up Payment is to be made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes if paid in such year (determined without regard to limitations on deductions based upon the amount of the Executive's adjusted gross income); and (C) to have otherwise allowable deductions for federal, state, and local income tax purposes at least equal to those disallowed because of the inclusion of the Gross-up Payment in the Executive's adjusted gross income. In the event that the Excise Tax is subsequently determined to be less than the amount taken into account hereunder at the time the Gross-up Payment is made, the Executive shall repay to the Company at the time that the amount of such reduction in Excise Tax is finally determined (but, if previously paid to the taxing authorities, not prior to the time the amount of such reduction is refunded to the Executive or otherwise realized as a benefit by the Executive) the portion of the Gross-up Payment that would not have been paid if such Excise Tax had been applied in initially calculating the Gross-up Payment, plus interest on the amount of such repayment at the rate provided in Section 1274(b)(2)(B) of the Code. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder at the time the Gross-up Payment is made (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-up Payment), the Company shall make an additional Gross-up Payment in respect of such excess (plus any interest and penalties payable with respect to such excess) at the time that the amount of such excess is finally determined.

The Gross-up Payment provided for above shall be paid on the 30th day (or such earlier date as the Excise Tax becomes due and payable to the taxing authorities) after it has been determined that the Total Payments (or any portion thereof) are subject to the Excise Tax; provided, however, that if the amount of such Gross-up Payment or portion thereof cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined by the Independent Advisors, of the minimum amount of such payments and shall pay the remainder of such payments (together with interest at the rate provided in Section 1274(b)(2)(B) of the Code), as soon as the amount thereof can be determined. In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth day after demand by the Company (together with interest at the rate provided in Section 1274(b)(2)(B) of the Code). If more than one Gross-up Payment is made, the amount of each Gross-up Payment shall be computed so as not to duplicate any prior Gross-up Payment. The Company shall have the right to control all proceedings with the Internal Revenue Service that may arise in connection with the determination and assessment of any Excise Tax and, at its sole option, the Company may pursue or forego any and all administrative appeals, proceedings, hearings, and conferences with any taxing authority in respect of such Excise Tax (including any interest or penalties thereon); provided, however, that the Company's control over any such proceedings shall be limited to issues with respect to which a Gross-up Payment would be payable hereunder, and the Executive shall be entitled to settle or contest any other issue raised by the Internal Revenue Service or any other taxing authority. The Executive shall cooperate with the Company in any proceedings relating to the determination and assessment of any Excise Tax and shall not take any position or action that would materially increase the amount of any Gross-Up Payment hereunder.

17.     Deferred Compensation.

        Notwithstanding anything to the contrary in this Agreement, payments hereunder will be deferred until 6 months after employment terminates to the extent necessary to satisfy Section 409A of the Code.

18.     Effect of Agreement on Other Benefits.

        Except as specifically provided in this Agreement, the existence of this Agreement shall not be interpreted to preclude, prohibit or restrict the Executive's participation in any other employee benefit or other plans or programs in which he currently participates.

19.     Assignability; Binding Nature.

        This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs (in the case of the Executive) and permitted assigns. No rights or obligations of the Company under this Agreement may be assigned or transferred by the Company except that such rights or obligations may be assigned or transferred in connection with the sale or transfer of all or substantially all of the assets of the Company, provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company and such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. The Company further agrees that in the event of a sale or transfer of assets as described in the preceding sentence, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder. No rights or obligations of the Executive under this Agreement may be assigned or transferred by the Executive other than his rights to compensation and benefits, which may be transferred only by will or operation of law, except as provided in Section 25 below.

20.     Representation.

        The Parties represent and warrant that each are fully authorized and empowered to enter into this Agreement and that the performance of their respective obligations under this Agreement will not violate any agreement between such Party and any other person, firm or organization.

21.     Entire Agreement.

        This Agreement contains the entire understanding and agreement between the Parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Parties with respect thereto.

22.     Amendment or Waiver.

        No provision in this Agreement may be amended unless such amendment is agreed to in writing and signed by the Executive and an authorized officer of the Company. No waiver by either Party of any breach by the other Party of any condition or provision contained in this Agreement to be performed by such other Party shall be deemed a waiver of a similar or dissimilar condition or provision at the same or any prior or subsequent time. Any waiver must

be in writing and signed by the Executive or an authorized officer of the Company, as the case may be.

23.    Severability.

The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision. In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

24.    Survivorship.

The respective rights and obligations of the Parties hereunder shall survive any termination of the Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

25.    Beneficiaries/References.

The Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following the Executive's death by giving the Company written notice thereof. In the event of the Executive's death or a judicial determination of his incompetence, reference in this Agreement to the Executive shall be deemed, where appropriate, to refer to his beneficiary, estate or other legal representative.

26.    Governing Law/Jurisdiction.

This Agreement shall be governed by and construed and interpreted in accordance with the laws of New Jersey without reference to principles of conflict of laws, except insofar as the Delaware General Corporation Law, federal laws and regulations may be applicable. Subject to Section 14, the Company and the Executive hereby consent to the jurisdiction of any or all of the following courts for purposes of resolving any dispute under this Agreement: (i) the United States District Court for New Jersey, (ii) any of the courts of the State of New Jersey, or (iii) any other court having jurisdiction. The Company and the Executive further agree that any service of process or notice requirements in any such proceeding shall be satisfied if the rules of such court relating thereto have been substantially satisfied. The Company and the Executive hereby waive, to the fullest extent permitted by applicable law, any objection which it or he may now or hereafter have to such jurisdiction and any defense of inconvenient forum.

27.    Notices.

Any notice given to a Party shall be in writing and shall be deemed to have been given when delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested, duly addressed to the Party concerned at the address indicated below or to such changed address as such Party may subsequently give such notice of:

|                      |                              |
|----------------------|------------------------------|
| If to the Company:   | Footstar, Inc.               |
|                      | 933 MacArthur Boulevard      |
|                      | Mahwah, New Jersey 07430     |
|                      | Attention: General Counsel   |
|                      |                              |
| If to the Executive: | Jeffrey Shepard              |
|                      | 14 Bramshill Road            |
|                      | Mahwah, NJ 07430             |

28.   <u>Headings</u>.

The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

29.   <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts. Once executed this Agreement shall be in full force and effect without further corporate action subject only to the Company's emergence from bankruptcy pursuant to its Plan of Reorganization.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

FOOTSTAR, INC

By:_____

Name:

Title:

FOOTSTAR CORPORATION

By:_____

Name:

Title:

EXECUTIVE

_____

Jeffrey Shepard////

**EXHIBIT C**
**TO**
**PLAN**

**TO BE FILED NO LATER**
**THAN NOVEMBER 3, 2005**

# EXHIBIT D
## TO
## PLAN

**Cause Definition**

(i)      "<u>Cause</u>" shall mean:

          (A)      the Executive's willful and material breach of the provisions of his or her employment agreement that address the following issues: Position, Duties and Responsibilities; Confidentiality; Cooperation with Regard to Litigation; Non Competition and Non-Solicitation

          (B)      the Executive is convicted of any felony or a misdemeanor involving moral turpitude; or

          (C)      the Executive engages in conduct that constitutes gross neglect or gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in a substantial loss to the Company or substantial damage to its reputation.