**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    **Chapter 11 Case No.** |
| **FOOTSTAR, INC., <u>et al.</u>,** | :    **04-22350 (ASH)** |
| | : |
| | :    **(Jointly Administered)** |
| Debtors. | : |

---------------------------------------------------------------x

## PROPOSED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
  Attorneys for Debtors and
  Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

Dated:  New York, New York
      October 28, 2005

## TABLE OF CONTENTS

**Page**

I. Introduction ........................................................................................................................ 1

II. Treatment of Creditors and Shareholders Under the Plan ............................................... 3
    A. Outline of the Plan ............................................................................................ 3
    B. Summary of Classification and Treatment ....................................................... 3
    C. Description of Classes under the Plan ............................................................... 5
    D. Certain Conditions to the Effective Date ......................................................... 7
    E. Administrative Expenses and Priority Claims .................................................. 7
    F. Substantive Consolidation ................................................................................ 8
    G. Reservation of "Cram Down" Rights ............................................................... 8

III. Voting Procedures and Requirements .............................................................................. 9
    A. Vote Required for Acceptance by a Class ........................................................ 9
    B. Classes Not Entitled to Vote ............................................................................ 9
    C. Voting ............................................................................................................. 10

IV. Financial Information and Projections ............................................................................ 10
    A. Introduction .................................................................................................... 10
    B. The Financial Projections ............................................................................... 11

V. Business Description and Reasons for Chapter 11 .......................................................... 11
    A. The Debtors' Businesses ................................................................................. 11
    B. The Debtors' Prepetition Capital Structure .................................................... 15
    C. Events Leading to the Commencement of the Chapter 11 Cases .................... 16
    D. Prepetition Restructuring Initiatives ............................................................... 18
    E. Pending Litigation and Other Proceedings ..................................................... 18

VI. Significant Events During the Chapter 11 Cases ........................................................... 20
    A. Bankruptcy Filing and First Day Orders ........................................................ 20
    B. Appointment of the Creditors' Committee ...................................................... 21
    C. Equity Committee ........................................................................................... 22
    D. Retention of Legal Counsel and Financial Advisors ....................................... 22
    E. The Debtors' Credit Agreements .................................................................... 23
    F. Prior Litigation with Kmart and the Kmart Settlement ................................... 23
    G. Federated and Gordmans Termination Agreements ........................................ 27
    H. The Debtors' Properties .................................................................................. 27

**TABLE OF CONTENTS**
(continued)

Page

I.       Sale of Certain Business Units ........................................................................ 28

J.       AIG Settlement .............................................................................................. 32

K.       John Michael Robinson Stipulation ............................................................... 32

L.       De Minimis Assets Sale Procedures .............................................................. 33

M.       Lease Rejection and Abandonment Procedures .............................................. 33

N.       Settlement Procedures .................................................................................... 33

O.       Key Employee and Key Executive Retention Program ................................... 33

P.       Retention of Amper Politziner & Mattia P.C. ................................................. 37

Q.       Claims Process and Bar Date .......................................................................... 37

VII.   Governance of Reorganized Footstar ......................................................................... 38

A.       Board of Directors ......................................................................................... 38

B.       Senior Management ........................................................................................ 38

VIII.  Other Aspects of the Plan ........................................................................................ 39

A.       Voting of Claims and Interests ....................................................................... 39

B.       Distributions .................................................................................................. 39

C.       Treatment of Executory Contracts and Unexpired Leases ............................... 41

D.       Exit Facility ................................................................................................... 42

E.       Effect of Confirmation ................................................................................... 42

F.       Derivative Claims .......................................................................................... 43

G.       Compensation and Retention Programs .......................................................... 43

H.       Employment Contracts ................................................................................... 43

I.       Reorganized Director Stock Plan .................................................................... 44

J.       Retiree Benefits ............................................................................................. 44

K.       Survival of Corporate Reimbursement Obligations ........................................ 44

L.       Certificate of Incorporation of Reorganized Footstar ..................................... 44

M.       Violations of the Trading Order ...................................................................... 45

N.       Miscellaneous Provisions ............................................................................... 45

IX.    Certain Factors to Be Considered .............................................................................. 46

A.       Certain Bankruptcy Considerations ................................................................ 46

B.       Risks Relating to the Recoveries under the Plan ............................................. 46

C.       Risks Associated with the Business ................................................................ 46

**TABLE OF CONTENTS**
(continued)

Page

X.      Confirmation of the Plan ................................................................................. 47

        A.      Confirmation Hearing ........................................................................ 47

        B.      General Requirements of Section 1129 ............................................. 47

        C.      Best Interests Tests/Liquidation Analysis ........................................ 49

        D.      Feasibility ........................................................................................... 49

        E.      Section 1129(b) ................................................................................... 49

XI.     Alternatives to Confirmation and Consummation of this Plan .................... 50

        A.      Liquidation Under Chapter 7 .............................................................. 50

        B.      Alternative Plan of Reorganization .................................................... 50

XII.    Securities Laws Matters ................................................................................ 51

XIII.   Certain Federal Income Tax Consequences of the Plan ............................... 51

        A.      Introduction ......................................................................................... 51

        B.      Consequences to the Debtors ............................................................. 52

        C.      Consequences to Holders of Subordinated Claims ........................... 55

        D.      Consequences to Holders of Footstar Equity Interests ...................... 55

        E.      Information Reporting and Withholding ............................................ 55

XIV.    Conclusion ..................................................................................................... 56

# GLOSSARY

| | |
|---|---|
| *Administrative Expense Claim* | Any expense relating to the administration of the chapter 11 cases, including actual and necessary costs and expenses of preserving the Debtors' estates and operating the Debtors' businesses, any indebtedness or obligations incurred or assumed during the chapter 11 cases, allowances for compensation and reimbursement of expenses if allowed by the Bankruptcy Court, allowed claims arising under the DIP Credit Agreement and certain statutory fees chargeable against the Debtors' estates. |
| *Athletic* | The athletic footwear and apparel segment of the Debtors' business. |
| *Ballot* | The form distributed to each holder of an impaired Secured Tax Claim, General Unsecured Claim or Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan. |
| *Bankruptcy Code* | Title 11 of the United States Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the Southern District of New York. |
| *Case Interest Rate* | From the Petition Date through the Effective Date, simple interest at the rate of 1.23% per annum, except that, unless otherwise waived, interest on claims arising from the rejection of executory contracts or unexpired leases of real property accrue from the effective date of rejection. |
| *Cash* | Legal tender of the United States of America. |
| *Confirmation Date* | The date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court. |
| *Confirmation Order* | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order will comply with the provisions of the DIP Credit Agreement. |
| *Credit Agreement* | The Credit Agreement, dated as of October 18, 2002, among Footstar and Footstar Corporation and Fleet National Bank as administrative agent, certain co-agents named therein, and the lender parties thereto, as amended. |
| *CSFB* | Credit Suisse First Boston, the Debtors' financial advisor. |
| *Creditors' Committee* | The statutory committee of unsecured creditors appointed in the Debtors' chapter 11 cases, as constituted from time to time. |
| *Cure Claim* | Any allowed claim that the Debtors agree or are required by order to pay arising as a result of any and all defaults under any executory contract or unexpired lease assumed or assumed and assigned by the Debtors during the chapter 11 cases in accordance with section 365 of the Bankruptcy Code. |
| *Debtors* | Footstar, Inc., Footstar Corporation and Footstar HQ, LLC. |
| *DIP Credit Agreement* | The Debtor-In-Possession Credit Agreement, dated as of March 4, 2004, as amended from time to time, including amendments providing for an exit facility, among Footstar and each of its subsidiaries named therein and the lenders thereto. |
| *Disclosure Statement* | This document together with the annexed exhibits. |
| *Disbursing Agent* | Any Debtor or Reorganized Debtor entity or its assign in its capacity as Disbursing Agent pursuant to section 6.03 of the Plan. |
| *Effective Date* | A business day selected by the Debtors on or after the date of confirmation of the Plan, but no later than March 31, 2006, on which the conditions to the effectiveness of the Plan have been satisfied or waived and on which there is no stay of the order confirming the Plan in effect. |
| *Equity Committee* | The official committee of equity interest holders appointed in the Debtors' chapter 11 cases. |
| *Equity Interest* | Any share of common or preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option warrant or right, contractual or otherwise, to acquire any such interest. |

| | |
|---|---|
| *Footstar* or *the Company* | Footstar, Inc. |
| *Footstar Equity Interest* | An equity interest in Footstar. |
| *General Unsecured Claim* | Any general unsecured claim against the Debtors. |
| *Kmart* | Kmart Corporation and all affiliated entities. |
| *Kmart Settlement* | That certain agreement, dated as of July 2, 2005, between Footstar and Kmart. |
| *Master Agreement* | That certain master agreement, effective as of July 1, 1995, as amended, that governs the relationship between Kmart and the Debtors. |
| *Meldisco* | The discount and family footwear segment of the Debtors' business. |
| *Other Priority Claim* | Any claim entitled to priority under the Bankruptcy Code other than Administrative Expense Claims and Priority Tax Claims. |
| *Other Secured Claims* | Any secured claim, other than a Secured Tax Claim. |
| *Petition Date* | March 2, 2004, the date on which the Debtors commenced their chapter 11 cases. |
| *Plan* | The Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code annexed as Exhibit A to this Disclosure Statement. |
| *Postpetition Lenders* | Collectively, the banks and financial institutions that are parties to the DIP Credit Agreement and their successors and assigns. |
| *Priority Tax Claim* | A claim of a governmental entity for taxes that are entitled to priority in payment under the Bankruptcy Code. |
| *Reorganized Debtors* | The Debtors, as reorganized, as of the Effective Date in accordance with the Plan. |
| *Reorganized Footstar* | Footstar on and after the Effective Date. |
| *SEC* | Securities and Exchange Commission. |
| *Secured Claim* | Any claim (i) to the extent reflected in the Debtors' schedules or upon a proof of claim as a Secured Claim, which is secured by a lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code. |
| *Secured Tax Claim* | Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code, (determined irrespective of time limitations), and including any related Secured Claim for penalties. |
| *Shoemart* | The footwear departments operated by the Debtors in each applicable Kmart store. |
| *Shoemart Subsidiaries* | The Debtor entities that, prior to the elimination of subsidiaries pursuant to the Kmart Settlement, operated the footwear departments in Kmart stores. |
| *Subordinated Claim* | Any claim (i) arising from the rescission of a purchase or sale of securities in any of the Debtors or an affiliate of the Debtors, (ii) for damages arising from the purchase of such a security, (iii) for violations of securities laws, misrepresentations and similar claims if they relate to the sale of securities or otherwise subject to section 510 of the Bankruptcy Code and (iv) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of such claim. |
| *Subsidiary* | (I) Any corporation, association, or other business entity of which more than 50% of the total voting power of shares or other voting securities outstanding thereof is at the time owned or controlled, directly or indirectly, by Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) and (II) any partnership or limited liability company (a) the sole general partner, the managing general partner, or the managing member of which is Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) or (b) the only general partners or members of which are Footstar or one or more of the other Subsidiaries of |

|  | Footstar (or any combination thereof). |
|---|---|
| *Subsidiary Equity Interest* | An equity interest in any of the Debtors other than Footstar. |
| *Tax Code* | Internal Revenue Code. |
| *Trading Order* | The Interim and Final Orders Pursuant to Sections 362 and 105(s) of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interest in the Debtors' Estates, dated March 2, 2004 and March 30, 2004, respectively. |
| *Voting Agent* | See section I of this Disclosure Statement for contact information. |
| *Voting Deadline* | [insert date], is the last date for the actual *receipt* of Ballots to accept or reject the Plan. |

# I.

## Introduction

Footstar, Inc. and its Debtor-affiliates are soliciting votes to accept or reject the Plan. A copy of the Plan is attached as Exhibit A to this Disclosure Statement. Footstar, Inc., Footstar Corporation and Footstar HQ, LLC are referred to as the "Debtors." *Please refer to the attached Glossary for definitions of other terms used in this Disclosure Statement.*

The Debtors' first plan of reorganization (the "Original Plan"), which was filed with the Bankruptcy Court on November 12, 2004, provided for payment in full of General Unsecured Claims, including postpetition interest at the Case Interest Rate. The Original Plan provided for distributions in the event of a sale of the Debtors or a reorganization around the Meldisco business. The Original Plan was contingent upon, among other things, a resolution of the Debtors' litigation with Kmart regarding assumption of the Kmart Agreement. The Creditors' Committee supported the Original Plan.

In August of 2005, the Bankruptcy Court approved the Kmart Settlement, which assured the solvency of the Debtors by allowing the Debtors to reorganize around their Meldisco business and assume the Kmart Agreement. In light of the Kmart Settlement, the Original Plan required amendments, including removal of the concept of a sale of the Debtors' business. Key provisions in the Original Plan, including the Case Interest Rate, remain unchanged and are incorporated in the Plan. Nevertheless, the Creditors' Committee has indicated its refusal to support the Plan, and has instead demanded that the Plan provide for a higher interest rate for claims. Relevant case law does not support the Creditors' Committee's new position on the interest rate issue. Accordingly, the Plan does not provide postpetition interest at a rate higher than federal judgment rate. For this reason, the Plan does not have the support of the Creditors' Committee. Nevertheless, the Debtors are prepared to defend application of the federal judgment rate before the Bankruptcy Court at the hearing to confirm the Plan. The Bankruptcy Court has already ruled that disputes over the appropriate interest rate for General Unsecured Claims to be an issue for confirmation, and overruled objections to the Disclosure Statement relating to fixing the appropriate interest rate for claims.

The Plan is predicated upon Footstar's settlement with Kmart, as embodied in the Kmart Settlement and the Master Agreement (as amended by the Kmart Settlement). As described in section VI, the Kmart Settlement resolved all outstanding litigation between the parties, allowed Footstar to assume the Master Agreement and continue to operate footwear departments in Kmart stores. The Kmart Settlement also provides that the Master Agreement will terminate at the end of 2008 (instead of 2012), but requires Kmart to buy out the Debtors' inventory at book value to help ensure an orderly disposition of the Debtors' inventory held at the Kmart stores at the end of the term of the Master Agreement. Most importantly, the Settlement enabled the Debtors to file the Plan that provides for payment in full to creditors (plus interest at a rate previously agreed to by the Creditors' Committee) and a return to holders of Foostar's Equity Interests. If the Debtors had lost in litigation with Kmart, it is likely that creditors would not have been paid in full and Footstar Equity Interests would have been extinguished.

The purpose of the Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors who are entitled to vote to make an informed decision on whether to accept or reject the Plan. The Disclosure Statement describes:

- how the Plan treats creditors and shareholders of the Debtors and the conditions to distribution and the Effective Date under the Plan (section II);

- how to submit a vote on the Plan and who is entitled to vote (section III);

- certain financial information about the Debtors, including their 3-year projections (section IV);

- the businesses of the Debtors and the reasons why they commenced their chapter 11 cases (section V);

- significant events that have occurred in the Debtors' chapter 11 cases (section VI);

- how the Board of Directors will be selected (section VII);

- how distributions under the Plan will be made and the manner in which disputed claims are to be resolved (section VIII);

- certain factors creditors should consider before voting (section IX);

- the procedure for confirming the Plan (section X);

- alternatives to confirmation of the Plan (section XI);

- certain securities laws issues (section XII); and

- certain tax laws issues (Section XIII).

Please note that if there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern.

Additional financial information about the Debtors can be found in the annual report on Form 10-K for the year ended January 1, 2005 and their quarterly reports on Form 10-Q for the first two quarters of fiscal year 2005, which were filed by Footstar with the Securities and Exchange Commission on September 29 and 30, 2005. Copies of these SEC filings may be obtained over the internet at www.sec.gov.

This Disclosure Statement and the Plan are the only materials creditors should use to determine whether to vote to accept or reject the Plan.

> **The *last day* to vote to accept or reject the Plan is [insert date]. To be counted, your Ballot must be actually *received* by the Voting Agent by this date.**
>
> **The *record date* for determining which creditors may vote on the Plan is [insert date].**

The Plan was developed over several months and through extensive negotiations with the Creditors' Committee and the Equity Committee. The Debtors believe that confirmation of the Plan is their best chance for emerging from chapter 11.

> **Recommendation:** The Debtors and the Equity Committee urge secured tax creditors and equity holders to vote to accept the Plan.

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the following address:

---

Footstar, Inc.
Financial Balloting Group
757 Third Avenue – 3rd Floor
New York, New York  10017
866-328-1983

---

The summaries of the Plan and other documents related to the restructuring of the Debtors are qualified in their entirety by the Plan and its exhibits.  The financial and other information included in this Disclosure Statement are for purposes of soliciting acceptances of the Plan.

The Bankruptcy Code provides that only creditors and equity holders who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained.  Failure to timely deliver a properly completed Ballot by the Voting Deadline will constitute an abstention (will not be counted as either an acceptance or a rejection), and any improperly completed or late Ballot will not be counted.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREWITH.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

## II.

### Treatment of Creditors and Shareholders
### Under the Plan

The Plan governs the treatment of claims against and interests in each of the separate Debtors in the chapter 11 cases.  The table in section II.B. below summarizes the treatment for each class.  The table is followed by a description of the types of claims or interests in each class and a description of the property to be distributed under the Plan.

**A.      Outline of the Plan**

The Plan provides for a stand-alone reorganization of the Debtors around their Meldisco business, which currently generates over 90% of its revenue from the Debtors' relationship with Kmart, which is governed by the Master Agreement (as amended by the Kmart Settlement).  The Plan contemplates that the Debtors will emerge with up to $100 million in exit financing and all unsecured creditors will be paid in full with interest.  Footstar Equity Interests will be unaltered and will remain in place.  Subsidiary Equity Interest will be unaltered and remain in place unless provided for otherwise by order of the Bankruptcy Court.

**B.      Summary of Classification and Treatment**

The following table divides the claims against and equity interests in the Debtors into separate classes and summarize the treatment for each class.  The table also identifies which classes are entitled to vote on the Plan based on rules set forth in the Bankruptcy Code.  Finally, the table indicates

an estimated recovery for each class. **Important Note:** As described in section IX.C. below, numerous uncertainties affect the footwear industry. The operational health of the Debtors' Meldisco business is in large part a function of business decisions made by Kmart. While implementation of the Kmart Settlement will enable the Debtors to continue their operations, the health of Kmart's business, coupled with the other risks related to the Debtors, make it difficult to determine a precise value for the Debtors. The recoveries described in the following table represents the Debtors' best estimates of those values given the information available at this time. These estimates do not predict the potential trading prices for Footstar Equity Interests. Unless otherwise specified, the information in the following table and in the sections below are based on calculations as of July 2, 2005. The estimation of recoveries makes the following assumption:

- The Debtors project that the aggregate amount of allowed General Unsecured Claims against the Debtors is approximately $134 million – See the discussion below on the estimated amounts and types of claims making up these classes.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| -- | DIP Credit Agreement Claims | All Loans (as defined in the DIP Credit Agreement) or other required payments, including, without limitation, all fees, costs and expenses due and owing under the DIP Credit Agreement, will be indefeasibly paid in cash in full on the Effective Date. | No | 100% |
| -- | Administrative Expense Claims | Payment in full on the Effective Date. | No | 100% |
| -- | Priority Tax Claims | Payment in full on the Effective Date or over six years from the date of assessment of the tax, with interest. | No | 100% |
| 1 | Other Priority Claims | Payment in full on the Effective Date of the allowed amount of such claim. | No | 100% |
| 2 | Secured Tax Claims | Payment in full on the Effective Date or over six years from the date of assessment of the tax, with interest. | Yes | 100% |
| 3 | Other Secured Claims | Payment in full on the Effective Date, reinstatement by curing all outstanding defaults or delivery or retention of collateral plus payment of interest. | No | 100% |
| 4 | General Unsecured Claims | Payment in full in Cash on the Effective Date, plus interest at the Case Interest Rate calculated through the Effective Date. | No | 100% |
| 5 | Subordinated Claims | Payment to holder of an allowed claim its pro rata share of the proceeds of the AIG Settlement. | No | See below |
| 6 | Footstar Equity Interests | Footstar Equity Interests are unaltered, except as set forth in section 9.04 of the Plan. | Yes | See below |
| 7 | Subsidiary Equity Interests | Subject to the merger, dissolution or other consolidation of the Subsidiaries following the Effective Date as set forth in the order of the Bankruptcy Court approving of substantive consolidation, Subsidiary Equity Interests are unaltered. | No | See below |

### C.    Description of Classes under the Plan

Unless otherwise indicated, the characteristics and amount of the claims or interests in the following classes are based on the books and records of the Debtors.

1.    *Other Priority Claims (Class 1)*

The claims in Class 1 are of the types identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims). For the Debtors, these claims relate primarily to prepetition wages and employee benefit plan contributions that had not yet been paid as of the Petition Date. Most of these claims have already been paid by the Debtors pursuant to an order entered by the Bankruptcy Court on the Petition Date. The Debtors estimate that the aggregate allowed amount of the claims in these classes will be $1 million.

Class 1 is unimpaired by the Plan. Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

2.    *Secured Tax Claims (Class 2)*

The claims in Class 2 are the types of claims which, absent their status as a secured claim, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that the aggregate amount of claims in this class is approximately $1.9 million. If a secured tax claim accrues interest under applicable local law and the value of the collateral exceeds the amount of the allowed claim, such secured claim will include interest.

Class 2 impaired and is therefore entitled to vote to accept or reject the Plan.

3.    *Other Secured Claims (Class 3)*

The claims in Class 3 consist of all secured claims other than Secured Tax Claims in Class 2. Based upon the Debtors' Schedules and the proofs of claim filed in the chapter 11 cases, Class 3 claims against the Debtors include obligations under equipment leases, mechanics liens, liens of landlords on the accounts, general intangibles, or inventory related to properties leased by them to the Debtors, contingent insurance carrier claims or mortgage claims. The Debtors estimate that the aggregate amount of Other Secured Claims is $8.0 million. In each case, the Debtors reserve the right to pay the secured claim in full, reinstate the debt, return the collateral, or provide periodic Cash payments having a present value equal to the value of the secured creditor's interest in the Debtor's property.

Class 3 is unimpaired by the Plan. Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.    *General Unsecured Claims (Class 4)*

The aggregate amount of general unsecured claims timely filed against the Debtors, including all duplicate claims, exceeds $600 million. The Debtors estimate that, following completion of the claims reconciliation process, the aggregate amount of allowed claims in Class 4 will be approximately $134 million, after deducting duplicate claims, claims not supported by the Debtors' books and records, claims that have already been reduced by agreement of the parties or order of the Bankruptcy Court, claims that are subject to other objections and claims covered by insurance. Claims filed by Kmart are not included in this estimate, as they are cure claims that have been fixed and paid under the Kmart Settlement. The claims in Class 4 consist of the claims of vendors, landlords with prepetition rent claims

and/or claims based on rejection of leases, prepetition personal injury, prepetition litigation, parties to contracts with the Debtors that are being rejected and other general unsecured claims.

On the Effective Date, or as soon thereafter as practicable, holders of allowed General Unsecured Claims will be paid in full in Cash in an amount equal to the allowed amount of such claims, plus interest at the Case Interest Rate calculated through the Effective Date, in full and complete satisfaction of such holder's General Unsecured Claims.

Class 4 is unimpaired by the Plan. Each holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.    *Subordinated Claims (Class 5)*

The claims in Class 5 are the types of claims which, because they arose in connection with the purchase or sale of a security of Footstar, are subordinated to General Unsecured Claims under section 510(b) of the Bankruptcy Code. For the Debtors, these claims relate to class action lawsuits instituted against the Debtors by certain stockholders. To resolve the litigation associated with these claims, the Debtors entered into settlements with its insurer ("AIG") and the plaintiffs in the underlying class action lawsuits. These settlements are defined in the glossary as the "AIG Settlement." For a more detailed discussion of the circumstances giving rise to the AIG Settlement, please see Section VI.J. below.

Under the AIG Settlement, $14.3 million of insurance proceeds will be made available to the class of stockholders represented in those lawsuits. Each holder of a an allowed Class 5 claim will receive its pro rata share of the proceeds of the AIG Settlement in full satisfaction of its claim.

Class 5 is unimpaired by the Plan. Each holder of a Subordinated Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

6.    *Footstar Equity Interests (Class 6)*

This class consists of the equity interests in Footstar. Footstar Equity Interests held by Class 6 equity holders will be unaltered, except that Reorganized Footstar's Certificate of Incorporation will contain provisions restricting the direct or indirect transferability of the equity interests of Reorganized Footstar under certain circumstances, as set forth in section 9.04 of the Plan.

Class 6 is impaired by the Plan. Each holder of a Footstar Equity Interest is entitled to vote to accept or reject the Plan.

7.    *Subsidiary Equity Interests (Class 7)*

This class consists of the equity interests in the Debtors other than Footstar.

Subject to the merger, dissolution or other consolidation of the Subsidiaries following the Effective Date as set forth in the order of the Bankruptcy Court approving of substantive consolidation or pursuant to section 5.03 of the Plan, the Subsidiary Equity Interests will be unaltered.

Class 7 is unimpaired by the Plan. Each holder of a Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**D.      Certain Conditions to the Effective Date**

Section 11.01 of the Plan sets forth certain conditions of the Effective Date. A copy of the Plan is annexed hereto as Exhibit A. These conditions include entry of the Confirmation Order (in a form acceptable to the Debtors), that there be no stay or injunction in effect upon the Confirmation Order and that, on or prior to March 31, 2006, Footstar has a sufficient amount of Cash on hand (after establishing appropriate reserves as determined by the management of Footstar) to pay allowed claims in accordance with the Plan.

**E.      Administrative Expenses and Priority Claims**

1.      *Administrative Expenses*

In order to confirm the Plan, allowed Administrative Expense Claims must be paid in full or in a manner otherwise agreeable to the holders of those claims. Administrative expenses are the actual and necessary costs and expenses of the Debtors' chapter 11 cases. Those expenses include, but are not limited to, postpetition salaries and other benefits for employees, postpetition rent for facilities and offices, amounts owed to vendors providing goods and services during the chapter 11 cases, tax obligations incurred after the commencement of the chapter 11 cases, including interest, if applicable, under relevant state law, and certain statutory fees and expenses. Other administrative expenses include the actual, reasonable and necessary fees and expenses of the professionals retained by the Debtors, the Creditors' Committee and the Equity Committee, as well as the obligations outstanding under the DIP Credit Agreement. Postpetition personal injury claims covered by insurance and not otherwise governed by an agreement between the parties, once liquidated, will be paid in the ordinary course of the Debtors' business only if the claims exceed the insurance coverage.

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for allowed Administrative Expense Claims to be paid in full on the Effective Date, except for Administrative Expense Claims relating to ordinary course of business transactions or for money borrowed, both of which will be paid in accordance with the past practice of the Debtors and the terms of the agreements governing such obligations. Allowed Administrative Expense Claims relating to compensation of the professionals retained by the Debtors, the Creditors' Committee or the Equity Committee, or for the reimbursement of expenses for certain members of the Creditors' Committee or Equity Committee will, unless otherwise agreed by the claimant, be paid on the date on which an order allowing such Administrative Expense Claim is entered (or as soon thereafter as practicable).

2.      *Priority Tax Claims*

Unless a holder of an Allowed Priority Tax Claim has been paid prior to the Effective date or agrees to a less favorable treatment, Allowed Priority Tax Claims entitled to priority under the Bankruptcy Code will be paid, at the sole option of the Reorganized Debtors, as follows:  (i) in full on the later of the Effective Date and the date such claim becomes allowed, (ii) equal annual Cash payments in an amount equal to such allowed Priority Tax Claim, with interest at a fixed annual rate equal to 5.0% commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an allowed Priority Tax Claim, or as soon thereafter as is practicable (but not prior to the date of assessment), through six years from the date of assessment of the tax or (iii) on such other terms determined by the Bankruptcy Court to provide such holder of an allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims.

3.    *Debtor in Possession Financing*

The Debtors estimate that on the Effective Date there will be approximately $16-18 million outstanding, the majority of which consists of standby letters of credit, under the DIP Credit Agreement on the Effective Date. All Loans (as defined in the DIP Credit Agreement) or other required payments, including, without limitation, all fees, costs and expenses due and owing under the DIP Credit Agreement under the DIP Credit Agreement will be indefeasibly paid in full in cash on the Effective Date.

4.    *Fees and Expenses of Professionals*

As of October 1, 2005, the Debtors have paid the various professionals in their chapter 11 cases an aggregate of approximately $28 million since the Petition Date. Those professionals have invoiced the Debtors or filed fee applications for an additional $1.2 million. The Debtors estimate that various professionals will file fee applications subsequent to October 1, 2005 for approximately $4.4 million, assuming the Effective Date is March 31, 2006.

5.    *Quarterly Fees to United States Trustee*

All fees payable to the United States Trustee for Region 2 will be paid on or before the Effective Date.

**F.    Substantive Consolidation**

By order dated September 30, 2005, the Bankruptcy Court authorized the Debtors to (i) substantively consolidate the assets and liabilities of all of the Debtors and (ii) legally consolidate certain Debtor subsidiaries into a few Debtor subsidiaries by effecting, within the Debtors' discretion, liquidations, dissolutions, mergers, transfers, recapitalizations, reclassifications, restructurings or other reorganizations of any appropriate Debtor subsidiaries. The Bankruptcy Court also authorized the Debtors to (i) adjust, continue, write off, subordinate or otherwise treat Debtor and non-Debtor intercompany claims (in the Debtors' discretion) and (ii) dismiss the chapter 11 cases of the Debtors that are eliminated through the consolidation. Of the approximately 2,500 of the Debtors' chapter 11 cases that were filed, all but three were dismissed.

As a result of this consolidation, for purposes of voting, confirmation and distributions made under the Plan, the Debtors will be considered to be a single legal entity. This consolidation has three major effects. First, it eliminates guaranties of the obligations of one Debtor by another Debtor. Second, each claim filed against any of the Debtors will be considered to be a single claim against the consolidated Debtors. Third, no distributions will be made to a Debtor for a claim it holds against another Debtor. Because the Plan provides for full payment of creditors (plus interest) and a return to equity holders, no creditor will receive less as a result of the proposed consolidation than it would receive absent the proposed consolidation, and equity holders will benefit as a result of the administrative fee savings realized by the consolidation.

**G.    Reservation of "Cram Down" Rights**

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of

claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors each reserve the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by the classes entitled to vote (Class 2 – Secured Tax Claims and Class 6 – Footstar Equity Interests).

## III.

### Voting Procedures and Requirements

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. The following classes are the only classes entitled to vote to accept or reject the Plan:

| Class | Description |
|-------|-------------|
| 2 | Secured Tax Claims |
| 6 | Footstar Equity Interests |

If your claim or interest is not in any of these classes, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement. If your claim or interest is in one of these classes, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

---

**Ballot information number:**

**For Voting Classes 2 and 6:  866-328-1983**

---

**A.**    **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting. Acceptance of a plan of reorganization by a class of equity interests is determined by calculating the amount of the allowed equity interests voting to accept, based on the actual total allowed equity interests voting. Acceptance requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting and affirmative vote of at least two-thirds in dollar amount of the allowed equity interests voting.

**B.**    **Classes Not Entitled to Vote**

Under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no property under the Plan. Based on this standard, for example, the holders of Other Priority Claims, Other Secured Claims and General Unsecured Claims are not being affected by the Plan, and therefore are not entitled to vote for the Plan. For a summary of the classes entitled to vote, see the charts in section II.B.

## C.      Voting

In order for your vote to be counted, your Ballot (or the Master Ballot cast on your behalf) must be actually <u>received</u> by the voting agent at the following address before the Voting Deadline of 4:00 p.m., Eastern Time, on [        ]:

---

**Voting Agent:**

Footstar, Inc.
Financial Balloting Group
757 Third Avenue – 3rd Floor
New York, New York  10017
866-328-1983

---

If a Ballot is damaged or lost, you may contact the Debtors' voting agent at the number set forth above.  Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.  If the return envelope included with your Solicitation Package is addressed to your Nominee, please allow enough time for your Nominee to submit your vote on a Master Ballot.

## IV.

### Financial Information and Projections

## A.      Introduction

This section provides summary information concerning the recent financial performance of the Debtors.  The following factors are the primary reasons for the differences in the financial projections filed as part of the November 2004 disclosure statement and the ones set forth herein: (i) payments in connection with the Kmart Settlement; (ii) additional costs in 2005 related to the bankruptcy proceedings; (iii) lower sales and profits primarily due to the loss of the Wal-Mart domestic business; and (iv) timing shifts related to the net working capital accounts.

The projections assume an Effective Date of December 31, 2005, with allowed claims treated in accordance with the Plan.  Expenses incurred as a result of the reorganization cases are assumed to be paid on the Effective Date.  If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expenses will be incurred until such time as a plan of reorganization is confirmed and becomes effective.

It is important to note that the projections described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of these businesses.  These assumptions include stability of the Meldisco business, labor and other operating costs, inflation, assumptions regarding Kmart's business operations and the level of investment required for capital expenditures and working capital.  Please refer to Section IX below for a discussion of many of the factors that could have a material effect on the information provided in this section.

**THE PLAN IS A STAND-ALONE PLAN REORGANIZING THE DEBTORS AROUND THEIR REMAINING BUSINESS, MELDISCO.  MELDISCO'S FUTURE AND FINANCIAL HEALTH DEPENDS IN LARGE PART ON ITS RELATIONSHIP WITH KMART. THE KMART AGREEMENT GOVERNS THE DEBTORS' RELATIONSHIP WITH KMART,**

WHICH, AMONG OTHER THINGS, AUTHORIZES THE DEBTORS TO OPERATE
FOOTWEAR DEPARTMENTS IN CERTAIN KMART STORES.  BY ORDER DATED AUGUST
24, 2005, THE BANKRUPTCY COURT AUTHORIZED THE DEBTORS TO ASSUME THE
KMART AGREEMENT, AS AMENDED BY THE KMART SETTLEMENT.

THE FUTURE FINANCIAL HEALTH OF THE DEBTORS DEPENDS UPON
DECISIONS MADE BY KMART THAT ARE BEYOND THE DEBTORS' CONTROL.  FOR
INSTANCE, PURSUANT TO THE KMART SETTLEMENT, THE DEBTORS ESTABLISHED A
MINIMUM NUMBER OF KMART STORES IN WHICH THEY WILL OPERATE FOOTWEAR
DEPARTMENTS.  THE KMART SETTLEMENT REQUIRES KMART TO PAY FOOTSTAR
FOR STORE CLOSURES AND/OR CONVERSIONS IF THE NUMBER OF KMART STORES
FALLS BELOW THAT MINIMUM THRESHOLD.  KMART, HOWEVER, RETAINS THE
UNILATERAL RIGHT TO CLOSE OR CONVERT STORES UP TO THAT MINIMUM
NUMBER WITHOUT PENALTY, AND MAY CONVERT OR CLOSE 550 STORES IN THE
AGGREGATE THROUGH 2008 WITHOUT PENALTY.  THE PROJECTIONS ASSUME THAT
KMART WILL CLOSE OR CONVERT THE MAXIMUM NUMBER OF STORES IT CAN
EACH YEAR.

KMART EMERGED FROM BANKRUPTCY IN MAY 2003, AND THE STORE
CLOSINGS DURING KMART'S BANKRUPTCY CASES, COUPLED WITH REDUCED
TRAFFIC IN THE REMAINING KMART STORES, HAS HAD AND CONTINUES TO HAVE A
NEGATIVE EFFECT ON THE SALES AND PROFITS OF MELDISCO.  IT IS DIFFICULT TO
PREDICT WHETHER KMART'S OPERATIONS, OR MELDISCO'S OPERATIONS OF
FOOTWEAR DEPARTMENTS IN KMART STORES, WILL RETURN TO PREVIOUS
LEVELS, OR WILL BE MAINTAINED AT CURRENT LEVELS, OF SALES OR
PROFITABILITY.

**B.      The Financial Projections**

Annexed hereto as Exhibit B are the financial projections of the Debtors.  For the
purposes of presentation, the financial projections assume emergence from chapter 11 on December 31,
2005.  The Debtors believe that they will likely emerge from chapter 11 in the first quarter of 2006.

**V.**

**Business Description and Reasons for Chapter 11**

**A.      The Debtors' Businesses**

Footstar is a public corporation organized under the laws of Delaware that serves as a
holding company for Footstar's businesses.  As of the Petition Date, Footstar was one of the largest
specialty footwear retailers in the United States, whose operations included footwear retail operations
throughout the United States, Puerto Rico and the U.S. Virgin Islands.  Footstar's operations were
comprised of two distinct business segments:  (i) the discount and family footwear-segment (also known
as Meldisco) and (ii) the athletic footwear and apparel segment (also known as Athletic).

1.      *Meldisco*

The Plan provides for a reorganization around Meldisco's operation of footwear
departments in Kmart stores.  Meldisco is a discount and family footwear business.  Prior to the Petition
Date, Footstar operated licensed footwear departments within (i) Kmart Corporation stores throughout the

United States, Puerto Rico and the U.S. Virgin Islands, (ii) Gordmans, Inc. department stores throughout the United States, (iii) Federated Department Stores, Inc. stores throughout the United States and (iv) Rite Aid Corporation stores located primarily in California. Meldisco also operated 36 Shoe Zone retail stores, located primarily in Puerto Rico. Additionally, Meldisco operated as a supplier through wholesale arrangements, whereby Meldisco supplied Footstar-owned brands and products to other retail chains, most notably Wal-Mart Stores, Inc. stores located throughout the United States and Rite Aid stores located in the eastern half of the United States.

Meldisco's family footwear selections include footwear for men, women and children, including styles such as dress, casual, athletic, work shoes and slippers. Meldisco sells Footstar-owned brands such as Thom McAn, Cobbie Cuddlers, Cara Mia and Texas Steer. Meldisco sources its footwear under these and other Footstar-owned brand names from overseas factories that manufacture shoes to the specifications provided by Footstar.

     a.    <u>Kmart</u>

As set forth below, Meldisco has sold or closed down retail operations in all stores but for the Kmart and Rite Aid stores. Footstar's relationship with Kmart is governed by the Master Agreement. The Master Agreement allows Footstar to operate a footwear department in each applicable Kmart store. Separate Footstar corporations, known as Shoemart Subsidiaries, operated each footwear department. Footstar owned a 51% equity interest in each of the Shoemart Subsidiaries, while Kmart owned the remaining 49% equity interest in each, with the exception of 23 Shoemart Subsidiaries, in which Footstar owned a 100% equity interest. As described in more detail in Section VI., pursuant to the Kmart Settlement, Kmart's interest in the Shoemart Subsidiaries were eliminated, effective January 2, 2005. Additionally, except for a miscellaneous expense fee, all former fees owed to Kmart under the Master Agreement were eliminated. Instead, Footstar will pay Kmart a single fee based on percentages of sales made by Footstar in the footwear departments.

     b.    <u>Relationships with Other Retailers</u>

Prior to the Petition Date, Footstar also had relationships with Gordmans and Federated. A master agreement governed each of these relationships. The master agreement with Gordmans provided Meldisco with authority to sell family footwear in each of the applicable stores. Separate Footstar-owned corporations operated these footwear departments. The master agreement with Federated provided Meldisco with authority to sell children's footwear in each of the applicable stores. Under the agreements, Footstar paid fees to the retailers, with such fees calculated based on sales performances of each footwear department. Footstar owned the inventory in each of the stores and was responsible for staffing. Under the master agreements, the retailers collected the gross sale proceeds per week and made weekly remittances to Footstar of such proceeds. The retailers deducted their fees from the weekly remittances, as provided for in the master agreements.

In an effort to streamline Meldisco, Footstar evaluated the performance of all of its business relationships and determined that the relationships with Gordmans and Federated were a drain on the Debtors' estates and should be eliminated. The Bankruptcy Court approved the terminations of the Gordmans and Federated agreements. For a more detailed description of the license agreements and such terminations see Section VI.G. below.

c.    Wholesale Arrangements

Meldisco also supplies certain chain retail stores on a wholesale basis through its Stellar Wholesaling, Inc. subsidiary. Currently, Meldisco supplies footwear brands to over 2,500 Rite-Aid stores throughout the eastern half of the United States.

d.    Shoe Zone

Prior to the Petition Date, Meldisco operated retail stores that sold family footwear and related leather accessories, such as belts, handbags, and wallets. Shoe Zone stores sold both value-priced family footwear and higher-end footwear and related leather goods. The Shoe Zone stores specialized in the sales of Footstar-owned brands, such as Thom McAn and Cara Mia, in addition to other national footwear brands. Footstar operated 39 Shoe Zone, with 27 stores in Puerto Rico, nine stores in the United States, and three stores in the U.S. Virgin Islands.

During the course of the chapter 11 cases, Footstar evaluated its Shoe Zone retail stores and determined that its continued operation would not benefit the Debtors' estates. The Bankruptcy Court authorized the Debtors to sell the merchandise and conduct store closing sales at nine Shoe Zone stores located in the United States. In addition, the Bankruptcy Court approved the sale of the remaining Shoe Zone stores in Puerto Rico and store name to Novus, Inc. For a more detailed discussion see Section VI.H.3. below.

2.    *Athletic*

Prior to the Petition Date, Athletic was a branded athletic footwear and apparel business, which operated, as of March 1, 2004, through (i) 428 Footaction, 88 Just For Feet and three Uprise retail stores located throughout the United States and (ii) Internet and service center sales through its Consumer Direct operations.

Athletic specialized in the sale of branded athletic footwear, apparel and accessories. Athletic relied on its relationship with merchandise vendors, as Athletic's revenues depended upon sales of popular brand-name athletic footwear and apparel. Each of Athletic's retail chains sold similar products, including footwear and apparel from major brands such as Nike, Reebok, New Balance, Puma, Fila, and Adidas.

a.    Footaction

Footaction stores were predominantly located in malls, although some Footaction stores were located at select strip mall locations and others were stand-alone retail stores. Footaction primarily directed its marketing efforts to the 12 to 24 year-old fashion-conscious consumer. To strengthen its appeal to this select target market, Footaction offered the most current and innovative "street inspired" athletic footwear and apparel styles, on an exclusive basis when possible. To effectuate this business model, Footstar had to obtain access to the newest and most popular styles of major brands.

Prior to the Petition Date, numerous Footaction stores operated at a loss. Shortly after the Petition Date, on March 5, 2004, the Debtors filed with the Bankruptcy Court a motion authorizing the liquidation of 75 of their Footaction retail stores. For a more detailed discussion of the auction process and the going out of business sales, see Section VI.H.1. below. In addition, Footstar agreed to sell substantially all of the assets of its Footaction business to Foot Locker, Inc. and certain of its affiliates, including 353 Footaction stores. The Bankruptcy Court approved the sale and on May 7, 2004, the sale

was consummated. For a description of that sale and the circumstances related thereto, see Section VI.H.3. below.

        b.      <u>Just For Feet</u>

        Just For Feet stores were large box off-mall stores located primarily in the southern United States that targeted family shoppers. The Just For Feet stores offered a broad product selection of branded athletic footwear and apparel at competitive prices. In March of 2000, Footstar acquired the "Just For Feet" brand-name and 79 stores in connection with Just For Feet Inc.'s chapter 11 proceedings in an effort to expand Footstar's athletic footwear segment. This investment underperformed, as nearly none of the Just For Feet Locations were ever profitable. As of January 31, 2004, Footstar operated 88 Just For Feet stores. On March 5, 2004, the Debtors sought authority for the liquidation of their entire Just For Feet chain. For a more detailed discussion of the auction process and the going out of business sales see Section VI.H.1. below.

        c.      <u>Uprise</u>

        During 2002, Footaction launched its Uprise retail chain. The Uprise chain targeted the action-sport and fashion conscious suburban teen. The Uprise stores were mall-based. As of the Petition Date, there were 3 Uprise retail stores, each of which was located in Texas. On May 6, 2004, the Bankruptcy Court authorized store closings and the liquidation of the existing merchandise at these Uprise stores. See Section VI.H.3. below.

        d.      <u>Consumer Direct</u>

        During 2002, Footstar began its Consumer Direct business, which sold athletic footwear and apparel through the Internet and customer service centers. Consumer Direct conducted Internet-based sales through the Footaction and Just For Feet websites, and offered athletic footwear and apparel carried at Footaction and Just For Feet stores. The customer service centers provided customer support to the Footaction and Just For Feet stores. Consumer Direct business operations closed in early June of 2004.

        3.      *Corporate Structure*

        A summary description of Footstar's organizational structure, as of the Petition Date, is set forth below. This summary does not identify all legal entities with the corporate structure.

**FOOTSTAR, INC. & SUBSIDIARIES**



## B.    The Debtors' Prepetition Capital Structure

### 1.    *The Credit Agreement*

Prior to the Petition Date, Footstar and Footstar Corporation, a Debtor, were the primary borrowers under the Credit Agreement. The Credit Agreement consisted of a $90 million term loan and $255 million in revolving credit commitments. Each of the Debtors guaranteed the obligations under the Credit Agreement and pledged their assets to secure the Credit Agreement.

As of the Petition Date, under the Credit Agreement, the Debtors had loans and letters of credit outstanding of approximately $229 million, in addition to past due interest in the amount of approximately $50,000 based upon the Debtors' failure to pay accrued interest due on March 1, 2004, as well as unpaid bank fees of approximately $200,000.

### 2.    *Trade Debt*

As a retailer of footwear and apparel, both athletic and family, Footstar purchased all of its inventory from merchandisers located throughout the United States and abroad. Footstar's foreign suppliers are located primarily in the People's Republic of China. As of the Petition Date, Footstar estimated that it had approximately $143.8 million in trade debt, with $59.7 million representing domestic trade debt and $84.1 million representing debt owed to foreign entities. On March 30, 2004, the

Bankruptcy Court authorized the Debtors to satisfy all of the trade debt of their foreign vendors. See Section VI.A.2.

**C.      Events Leading to the Commencement of the Chapter 11 Cases**

The Debtors' financial difficulties are attributable to a number of different factors, each of which is discussed below.

1.      *Sales Declines*

Prior to the Petition Date, Footstar experienced financial difficulties due to steady sales declines commencing in 2001 and net losses in 2001 and 2002. This trend continued into 2003, with a 13.5% net sales decrease in 2003 as compared against 2002. These sales declines hit Footstar particularly hard for a number of reasons, not the least of which is that most of Footstar's operating expenses are fixed (such as leases and operational costs of retail locations, warehousing facilities, corporate offices, interest expenses and labor expenses) and do not fluctuate depending on sales performances. Footstar's declining revenues can be attributed to the poor performance of Footstar's strategic acquisitions, the poor performance of certain of its retail stores and untimely financial distress of some of its strategic partners, such as Kmart and Ames Department Stores, Inc. Meldisco's revenues declined in this period due to the financial difficulties of its primary strategic partner, Kmart. On January 22, 2002, Kmart filed for chapter 11 protection. During the first six months of 2002, Kmart closed 283 underperforming stores. During the first four months of 2003, Kmart closed an additional 319 underperforming stores. These store closings had a negative effect on cash flows and profitability during fiscal year 2003, resulting in approximately $300 million in lost Meldisco revenue. The Kmart bankruptcy further eroded Meldisco's revenues due to significant reduction in foot traffic in the remaining Kmart stores.

2.      *Unsuccessful Strategic Acquisitions*

On March 7, 2000, Footstar acquired 79 Just For Feet stores in an asset sale conducted in Just For Feet, Inc.'s bankruptcy cases. The Just For Feet business had operated at a loss since its acquisition in March 2000. As a result of consistently poor performance in these stores, prior to the Petition Date, Footstar began to streamline Athletic and, in connection therewith, closed approximately 9 Just For Feet stores and 121 Footaction stores in 2002 and 2003.

In February 2001, Footstar acquired leased footwear departments formerly operated by J. Baker, Inc. in 13 retailers for $59 million. This strategic acquisition was plagued by the economic failure of the host stores in which the J. Baker licensed footwear businesses operated. The Meldisco division exited this business by 2003 as a result of the significant financial distress experienced by most of J. Baker's hosts, including, most importantly, Ames Department Stores, Inc., which filed for bankruptcy protection in August of 2001, and commenced liquidating its entire operation in August of 2002. Meldisco's exit from the J. Baker business resulted in revenue declines of approximately $200 million. Collectively, the Just For Feet and the J. Baker acquisitions, including both initial purchase price as well as working capital requirements, increased Footstar's borrowings by an estimated $200 million.

3.      *Competitive Environment*

In addition to the steady sales declines, the Debtors were also operating in an extremely competitive environment. The retail athletic and outdoor footwear industry and discount and family footwear industry is highly competitive. The athletic footwear retail consumer has been served through a variety of distribution options, including mall-based specialty retail stores, department stores, discount

retailers, sporting good stores, the internet and retailers providing a large assortment of select lines of merchandise at competitive prices.

> 4.     *Restatement of Financial Statements*

In the midst of this revenue decline and unsuccessful strategic acquisitions, Footstar had to contend with restating its financial statements for a period that covered five and one-half years. In November 2002, Footstar announced that it had discovered discrepancies in the reporting of its accounts payable balances, and in connection therewith, notified the Securities and Exchange Commission. Footstar immediately commenced its own internal investigation and identified instances of incorrect accounting results. This investigation required significant management attention and resources and, as of the Petition Date, had cost Footstar more than $15 million in professional fees. The restatement reduced earnings by an aggregate of approximately $47.4 million over the five and one-half year period under review from the beginning of fiscal year 1997 through June 29, 2002. Of the $47.4 million in pre-minority interest and pre-tax reduction in earnings, $46.1 million related to accounts payable adjustments and the remaining $1.3 million reflects the net of various adjustments primarily affecting inventory, fixed assets, accrued expenses, minority interests, and consolidation elimination entries. Subsequently, the SEC commenced an investigation into the facts and circumstances giving rise to the reporting discrepancies, which investigation is still ongoing.

On December 29, 2003, the New York Stock Exchange ("NYSE") suspended trading in the common stock of Footstar and, thereafter, Footstar's common stock was delisted. The NYSE stated that it decided to take these actions in view of the overall uncertainty surrounding Footstar's previously announced restatement of its results for 1997 through 2002 and the continued delay in fulfilling its financial statement filing requirements.

> 5.     *The Prepetition Senior Lenders*

Prior to the Petition Date, the Debtors' liquidity needs were met through cash generated from sales and borrowings under the Credit Agreement. However, Athletic and Meldisco, for the reasons described above, may not have generated profits sufficient for the Debtors to satisfy certain financial covenants contained in the Credit Agreement. Additionally, the Debtors were having difficulty in timely filing their restated financials for the 2002 fiscal year, and this delay caused concern among the Debtors' prepetition lenders. The Debtors explored numerous out of court restructuring alternatives, including selling Athletic and the entire Footstar business, in the hopes of generating incremental liquidity. All of these alternatives proved unsuccessful. The lenders under the Credit Agreement were unwilling to waive defaults thereunder to provide the Debtors with an opportunity to engineer an out of court restructuring or sale of their businesses. Absent filing for bankruptcy protection and obtaining postpetition financing (the details of which are set forth below), the Debtors would not have had the liquidity sufficient to sustain their ongoing operations.

> 6.     *Loss of Trade Credit*

Prior to the Petition Date, a number of the Debtors' key suppliers refused to ship merchandise to the Debtors under customary credit terms. This refusal was triggered by a number of different factors, including the announcement of defaults under the Credit Agreement, the delisting of Footstar's stock from the NYSE, and the earlier news that the Debtors were required to restate their financial statements. This loss of trade credit further strained the Debtors' liquidity. Reduced trade credit, coupled with depressed earnings and the underperformance of certain acquisitions, prevented the Debtors from generating liquidity sufficient to explore out of court restructuring and/or sale alternatives to the bankruptcy.

## D.    Prepetition Restructuring Initiatives

In response to continuing decline in the performance of Footstar's businesses, prior to the Petition Date, Footstar (i) initiated cost reduction and head count reduction programs aimed at aligning its ongoing operating costs with its expected revenues, (ii) initiated aggressive marketing efforts aimed at selling some or all of Athletic's stores, (iii) obtained waivers from the Prepetition Lenders to remain in compliance with the Credit Agreement, (iv) explored ways to obtain additional liquidity during the restructuring process and (v) negotiated a stipulation with Kmart to ensure that the Shoemart Subsidiaries continue to operate with as little disruption as possible due to the commencement of these chapter 11 cases.

### 1.    Cost Reduction Initiative

From January 2002 through January 2004, Footstar implemented several rounds of cost cutting initiatives. Footstar's cost cutting initiatives focused on streamlining its operations, including, among other things, closing certain underperforming retail stores in Athletic, consolidating the Just For Feet and Footaction administrative functions, closing excess corporate facilities, reducing corporate administrative expenses, and consolidating approximately 2,500 Rite Aid subsidiaries into a wholesaling relationship with Rite Aid. In connection with these initiatives, as well as layoffs related to the Kmart and J. Baker host store closings, Footstar initiated work-force reductions, resulting in layoffs of approximately 7,000 employees.

### 2.    Prepetition Sales Efforts

In addition, Footstar actively marketed Athletic to potential strategic and financial investors. Such marketing efforts drew expressions of interest, but no buyer committed to purchase Athletic in the time frame required by Footstar. As such, Footstar examined whether reorganizing around a profitable core Athletic business or selling Athletic would yield a greater value to the Debtors' estates, creditors, and equity holders. Footstar also explored selling its entire business. Liquidity constraints substantially decreased the amount of time the Debtors had to explore these options and effectively prevented the Debtors from exploring all the possibilities of a sale of the entire business.

## E.    Pending Litigation and Other Proceedings

### 1.    Derivative Actions

In 2002, plaintiffs filed two derivative actions naming various officers and directors as defendants. The complaints alleged that the named officers and directors breached their fiduciary duties to Footstar by failing to implement and maintain an adequate internal accounting control system and violated federal securities law. The complaints sought unspecified damages against Footstar and costs and expenses associated with the prosecution of the action. The plaintiffs filed the complaints in the United States District Court for the Southern District of New York and in the Supreme Court of the State of New York, Rockland County. The United States District Court for the Southern District of New York consolidated the complaints into a single action. After extensive negotiations with the plaintiffs and the Debtors' insurance carriers, the Debtors have entered into a settlement with such parties regarding this derivative action. For a more detailed discussion of the settlement see Section VI.J. below.

### 2.    Shareholder Class Actions

In November, 2002 five shareholders filed five separate class action lawsuits against Footstar, J. M. Robinson, the former President, Chairman and CEO and Stephen R. Wilson, Executive

Vice President and CFO for alleged violations of securities laws. The complaints alleged that starting in mid-May, 2000 Footstar and the named officers misrepresented Footstar's financial performance. The complaints sought unspecified monetary damages and costs and expenses associated with the prosecution of the actions. The United States District Court for the Southern District of New York consolidated the complaints into a single action. An amended complaint was filed on March 8, 2004 adding KPMG, L.L.P. and Carlos E. Alberini, the former CFO of Footstar, as named defendants. After extensive negotiations with the plaintiffs and the Debtors' insurance carriers, the Debtors have entered into a settlement with such parties regarding this class action. See Section VI.J. for a more complete discussion of the settlement.

     3.    *Other Actions*

     a.    <u>Adidas Litigation</u>

Prior to the Commencement Date, on or about May 22, 2002, Adidas America, Inc. and Adidas-Salomon AG (collectively, "Adidas"), filed suit against Kmart in the United States Bankruptcy Court for the Northern District of Illinois, in a case styled *In re Kmart Corporation* (Adv. Proc. No. 02-A-00671) (the "Prepetition Litigation"). In the Prepetition Litigation, Adidas asserted claims for trademark infringement, trade dress infringement and unfair competition arising out of the Debtors' sale (in Kmart stores) of four-stripe footwear. The Debtors, Kmart and Adidas settled the Prepetition Litigation by entering into a Settlement Agreement, dated October 15, 2002 (the "Settlement Agreement"), pursuant to which the Debtors and Kmart agreed not to continue to sell products allegedly infringing Adidas' three-stripe mark.

After the Commencement Date, on or about March 3, 2005, Adidas commenced an action against Kmart and Footstar in the United States District Court for the District of Oregon (the "Oregon Action"). The Oregon Action is captioned *Adidas America, Inc. and Adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.*, No. CV05-120 ST. In the Oregon Action, Adidas asserts similar claims to those asserted in the Prepetition Litigation, including claims for trademark infringement, trademark dilution, unfair competition and deceptive trade practices. In the Oregon Action, Adidas also asserts a claim for breach of the Settlement Agreement, based on the alleged continued sale of infringing footwear in Kmart stores. While it is too early in Oregon Action to predict the outcome of the claims asserted against the Debtors, the Debtors believe that they have meritorious defenses to the claims asserted by Adidas and have filed an answer denying the allegations asserted in the complaint.

     b.    <u>Other Pending Litigations</u>

In the ordinary course of their business, the Debtors are defendants in approximately 70 lawsuits which alleged personal injury, employment related actions, real estate related actions and intellectual property matters.

     4.    *Accounting Related Claims*

The Debtors, in consultation with the Creditors' Committee and the Equity Committee, have investigated potential claims relating to or arising from the restatement of Footstar's consolidated financial statements for the five and one-half year period beginning January 1, 1997 through June 29, 2002. In particular, the Debtors determined that it was in the best interest of the estates to release any claims against KPMG, LLP, Footstar's former external auditors, in connection with the accounting issues giving rise to restatement. Accordingly, the Debtors entered into a release and dismissal of claims asserted against KPMG in connection with the application of the Debtors for employment and retention of KPMG as accountants and auditors for the Debtors *nunc pro tunc* to March 2, 2004, which application

was approved by Order of the Bankruptcy Court dated July 14, 2004. The Equity Committee, through its conflict counsel, is currently investigating potential claims against Deloitte & Touche, LLP ("Deloitte"), Footstar's former internal auditors, in connection with *inter alia* Deloitte's alleged failure to detect and/or disclose material weaknesses in internal controls, improperly performed accounts payable reconciliation procedures, and improper write-offs of accounts payable that resulted in accounts payable being materially understated for each of the fiscal years 1997 through 2002, the consequent overstatement of earnings, and the need for the restatement of Footstar's consolidated financial statements. The Equity Committee believes that claims based upon such conduct have merit, but has not concluded its investigation. The Debtors, in consultation with the Equity Committee, will make a determination of whether to commence an action against Deloitte following the conclusion of such investigation.

## VI.

### Significant Events During the Chapter 11 Cases

**A.     Bankruptcy Filing and First Day Orders**

Commencing on March 2, 2004, the Debtors filed their petitions under chapter 11 of the Bankruptcy Code. On that date, the Bankruptcy Court entered certain orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization. These orders are summarized as follows:

1.     *Case Administration Orders*

These orders facilitated the orderly administration of the Debtors' chapter 11 cases, as follows: (i) authorizing joint administration of the chapter 11 cases, (ii) establishing interim compensation procedures for professionals, (iii) authorizing employment of professionals utilized in the ordinary course of business, (iv) granting an extension of the time to file the Debtors' schedules and statements and authorizing the Debtors to file schedules, statements and monthly operating reports on a consolidated basis and (v) authorizing establishment of procedures for notifying creditors of the commencement of the Debtors' chapter 11 cases and waiving of the requirement for filing a list of creditors.

2.     *Payments on Account of Certain Prepetition Claims*

The Bankruptcy Court authorized the payment of the following prepetition claims: (i) claims for wages, compensation and employee benefits, (ii) claims for sales, use and other excise taxes, (iii) claims of common carriers, third party logistics providers and pool point providers, (iv) prepetition obligations under workers' compensation programs, liability and property insurance programs and bonds relating thereto and (v) claims of foreign creditors of which the Debtors have made payments totaling approximately $86.5 million on account of these claims. Of this amount, approximately $5.4 million were related to claims of employees for wages.

3.     *Business Operations*

To minimize disruption to the operation of the Debtors' businesses caused by the commencement of the chapter 11 cases, the Bankruptcy Court authorized the Debtors to continue certain business practices, as follows: (i) current investment guidelines, (ii) customer programs, (iii) existing bank accounts and business forms, (v) centralized cash management system, (vi) provision of adequate assurance to utility companies and (vii) entry into a stipulation with Kmart regarding adequate protection and the continuation of obligations under the Master Agreement.

4.    *Bankruptcy Matters*

In furtherance of the Debtors' efforts to reorganize, on March 3, 2004, the Bankruptcy Court authorized the following:  (i) rejection of four unexpired leases of nonresidential real property, (ii) notification procedures and restriction on the trading of certain interests in the Debtors' estates, (iii) administrative expense status to undisputed obligations arising from the postpetition delivery of goods ordered in the prepetition period and payment of such claims in the ordinary course of business and (iv) interim postpetition financing under the DIP Credit Agreement on a superpriority basis for $300 million, pending further interim and final hearings.

**B.    Appointment of the Creditors' Committee**

On March 11, 2004, the United States Trustee for the Southern District of New York, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are set forth below:

| | |
|---|---|
| Simon Property Group, LP<br>115 West Washington Street<br>Indianapolis, IN  46204 | S. Goldberg & Co., Inc.<br>*d/b/a SGFootwear Co.*<br>20 East Broadway<br>Hackensack, NJ  07601-6892 |
| Mercury International Trading Corporation<br>19 Alice Agnew Drive<br>North Attleboro, MA  02761<br>(effective March 16, 2004) | Rockport Company<br>(Subsidiary of Reebok International Ltd.)<br>1895 J.W. Foster Boulevard<br>Canton, MA  02021 |
| Longacre Management, LLC<br>810 Seventh Avenue, 22nd Floor<br>New York, NY  10001 | SPCP Group, LLC as agent for Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd.<br>Two Greenwich Plaza<br>Greenwich, CT  06830 |

The Creditors' Committee has retained the following advisors:

| <u>Attorneys</u> | <u>Financial Advisors</u> |
|---|---|
| Kronish Lieb Weiner & Hellman LLP<br>1114 Avenue of the Americas<br>7th Floor<br>New York, New York  10036 | Deloitte Financial Advisory Services LLP<br>Two World Financial Center<br>New York, New York  10281-1414 |
| Scarcella Rosen & Slome LLP<br>333 Earle Ovington Boulevard<br>Ninth Floor<br>Uniondale, New York 11553-3622 | Navigant Consulting, Inc.<br>666 Third Avenue<br>New York, New York  10017 |

Since the appointment of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases.  The Debtors have informed

the Creditors' Committee with respect to their operations and have sought concurrence of the Creditors' Committee for actions and transactions outside of the ordinary course of business.

### C.    Equity Committee

On April 1, 2004, Kramer Levin Naftalis & Frankel LLP filed a verified statement pursuant to Rule 2019 of the Bankruptcy Rules disclosing its representation of an ad hoc equity committee in the chapter 11 cases.  The verified statement also served to disclose the equity ownership interests of the 12 members of the ad hoc equity committee.

On June 22, 2004, the United States Trustee for the Southern District of New York, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the official Equity Committee. Since its inception, the ad hoc equity committee and thereafter, the Equity Committee, has participated actively, together with the Debtors' management and professionals, in all aspects of the Debtors' chapter 11 cases.

The current members of the Equity Committee are set forth below:

| | |
|---|---|
| Couchman Partners, LP | Sagamore Hill Hub Fund Ltd. |
| 800 Third Avenue, 31st Floor | c/o Sagamore Hill Capital Management LP |
| New York, New York 10022 | 10 Glenville Street |
| | Greenwich, Connecticut 06831 |
| North Run Capital, LP | Kirkwood Capital |
| One International Plaza, Suite 2401 | 1634 Ponce de Leon Avenue, # 402 |
| Boston, Massachusetts 02110 | Atlanta, Georgia 30307 |

The Equity Committee has retained the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Kramer Levin Naftalis & Frankel LLP | Chanin Capital Partners |
| 1177 Avenue of the Americas | 330 Madison Avenue |
| New York, New York 10036 | 11th Floor |
| | New York, New York 10017 |
| Mullin Hoard & Brown, L.L.P. | |
| 1185 Avenue of the Americas | |
| 17th Floor | |
| New York, New York 10036 | |

### D.    Retention of Legal Counsel and Financial Advisors

The Bankruptcy Court has entered orders authorizing the Debtors to retain the following professionals to assist in the chapter 11 cases: (i) Weil, Gotshal & Manges LLP as chapter 11 attorneys; (ii) Butler Fitzgerald as conflicts counsel; (iii) FTI Consulting, Inc. as financial advisors; (iv) Abacus Advisors Group LLC as wind-down advisors and consultant; (v) Credit Suisse First Boston LLC as financial advisors; (vi) Ernst & Young, LLP as internal auditors; (vii) KPMG LLP as accountants and auditors; (viii) a joint venture consisting of The Ozer Group LLC, SB Capital Group, LLC, The Nassi Group, LLC, Gordon Brothers Retail Partners, LLC and DJM Asset Management, Inc., as real estate

agents and consultants; (ix) Latham & Watkins LLP as special litigation counsel, (x) Colliers Pinkard and Colliers Cauble & Co. as real estate brokers and (xi) Amper Politziner & Mattia P.C. as accountants and auditors. Pursuant to an order of the Bankruptcy Court, the Debtors have also retained numerous professionals in the ordinary course of business.

**E.    The Debtors' Credit Agreements**

1.    *Credit Agreement*

Prior to the Petition Date, Footstar and Footstar Corporation, a Debtor, entered into the Credit Agreement, pursuant to which certain lenders, led by Fleet National Bank as administrative agent, extended a credit facility that provided for revolving credit loans and letters of credit of up to $255 million and a term loan of $90 million, each of which were guaranteed by the other Debtors. The obligations of the Debtors pursuant to the Credit Agreement and the guarantees related thereto were secured by substantially all of the Debtors' assets. As of the Petition Date, the Debtors were each indebted to the lenders in the principal sum of approximately $229 million, plus accrued interest, costs, fees and professional fees and expenses, in addition to other obligations arising under the Credit Agreement.

2.    *DIP Credit Agreement*

The Debtors urgently required working capital to continue their business operations during the course of the chapter 11 cases. However, as of the Petition Date, the Debtors were in default under the Credit Agreement and, as a result, there was no available credit thereunder. Prior to the Petition Date, the Debtors surveyed various sources of financing and determined that the then current syndicate of lenders, acting through their agent, Fleet National Bank, offered the best postpetition financing proposal. The Debtors engaged in extensive negotiations with these lenders, which resulted in an agreement to provide postpetition financing to the Debtors.

Prior to the final hearing to approve the DIP Credit Agreement, however, the Debtors sold substantially all of the assets of their Athletic business segment. Given the reduced size of the Debtors' operations and financial needs of their remaining Meldisco business segment, the Debtors no longer required a facility of the same size and structure as originally contained in the DIP Credit Agreement. Accordingly, the Debtors and the Postpetition Lenders negotiated certain amendments to the DIP Credit Agreement.

In July of 2004, the Debtors and the Postpetition Lenders further amended the DIP Credit Agreement to provide for an exit facility (the "Exit Facility") upon the Debtors' emergence from chapter 11. On May 31, 2005, the Debtors and the Postpetition Lenders further amended the DIP Credit Agreement. This amendment eliminated a gap between postpetition financing and financing provided by the Exit Facility upon emergence from chapter 11. Additionally, the amendment reduced the Exit Facility from $160 million to $100 million to reflect the Debtors' reduced borrowing needs. On June 30, 2005, the Bankruptcy Court entered an order approving this amendment to the DIP Credit Agreement.

**F.    Prior Litigation with Kmart and the Kmart Settlement**

1.    *Relationship with Kmart*

Certain of the Debtors and Kmart are party to the Master Agreement, which provides Footstar with the right to operate footwear departments in certain Kmart stores. Each footwear department was a separate corporation and, collectively, are referred to as Shoemart Subsidiaries.

Footstar operates approximately 1,500 footwear departments in Kmart stores. With the exception of 29 of the Shoemart Subsidiaries, which were wholly-owned directly or indirectly by Footstar, Footstar owned a 51% interest in each of the Shoemart Subsidiaries and Kmart directly or indirectly owned the remaining 49% interest. Kmart collected the gross sales from each entity, and remitted such sale proceeds to Footstar, as agent for the entities, on a weekly basis. As described below, the Kmart Settlement eliminated Kmart's interest in the Shoemart Subsidiaries, effective as of January 2, 2005.

Pursuant to the Master Agreement, Kmart collected certain fees from and was reimbursed for certain expenses, including the following: (i) a license and advertising fee; (ii) reimbursement for the weekly payroll paid to employees of the Shoemart Subsidiaries by Kmart; (iii) a fee for certain miscellaneous costs, including fixtures, storage space, public liability claims, insurance premiums, trade memberships, charitable contributions, bank card charges, postage, signage, supplies and other incidentals; (iv) a fee for discounts given to employees of the Shoemart Subsidiaries for items purchased at Kmart and (v) a wiring fee for data terminals installed in the footwear departments. Kmart deducted these fees from the weekly payments made to Footstar in accordance with the Master Agreement. As described below, pursuant to the Kmart Settlement, Footstar and Kmart have amended the Master Agreement to eliminate all fees except for the certain miscellaneous expense fee and a fee based on the Debtors' sales in Kmart stores.

Additionally, prior to the approval of the Kmart Settlement, each of the Shoemart Subsidiaries paid Kmart two annual fees, each of which was based upon the profits of the Shoemart Subsidiaries from the previous year. Due to the commencement of the chapter 11 cases, the Shoemart Subsidiaries did not pay Kmart all of these annual fees estimated to be due for the 2003 fiscal year. Because the Kmart Settlement provides for the elimination of Kmart's equity interests in the Shoemart Subsidiaries, Footstar will no longer pay Kmart these annual fees.

To maintain operations of the Shoemart Subsidiaries during the course of the Debtors' chapter 11 cases with the minimum disturbance to their business, Footstar agreed to provide Kmart with adequate protection in exchange for the receipt of weekly payments and other valuable consideration, all in accordance with the terms of the stipulation signed by Kmart and the Debtors and approved by the Court on March 3, 2004.

2.    *Litigation with Kmart*

Because the Debtors derive over 90% of their revenues from their operations in Kmart stores, Footstar moved to assume the Master Agreement. Kmart vigorously objected to the Debtors' assumption of the Master Agreement and cross-moved to terminate the Master Agreement, asserting numerous grounds for termination. The dispute involved the following issues: (i) whether section 365(c)(1) of the Bankruptcy Code precluded the Debtors from assuming the Master Agreement; (ii) whether Kmart can terminate the Master Agreement pursuant to 365(e)(2) by exercise of an *ipso facto* termination provision; (iii) whether the Debtors would have satisfied the performance standards contained in the Master Agreement on a go-forward basis; (iv) whether the Debtors were required to staff the footwear departments for each hour the Kmart stores were opened and (v) the extent of Kmart's claim against Footstar for past defaults under the Master Agreement, which Kmart asserted to be approximately $70 million (collectively, the "Assumption Litigation").

Additionally, after the Debtors announced their intention to assume the Master Agreement, Kmart announced its acquisition of Sears, Roebuck and Co. ("Sears"). In connection therewith, Kmart decided to convert a number of its retail stores to stores operating under the service mark "SEARS ESSENTIALS." A separate litigation between Kmart and Footstar commenced with respect to Footstar's rights under the Master Agreement to operate footwear departments in Kmart stores

that were operating under the "SEARS ESSENTIALS" service mark (the "Sears Conversion Litigation," and together with the Assumption Litigation, the "Litigations").

        a.    <u>Assumption Litigation</u>

      On August 12, 2004, Footstar filed a motion to assume the Master Agreement (the "Assumption Motion"). Kmart objected to the Assumption Motion and filed its own cross-motion for relief from the automatic stay to exercise certain termination provisions of the Master Agreement. The Bankruptcy Court bifurcated the litigation and first considered the legal issues presented by Footstar's attempted assumption of the Master Agreement. In a decision dated February 16, 2005, the Court decided the first of many legal issues and held that section 365(c)(1) of the Bankruptcy Code does not prevent the Debtors from assuming the Master Agreement because they did not seek to assign it (the "Decision"). Upon a request by Kmart to reconsider the Decision, the Court reaffirmed its holding in a supplemental decision.

      Kmart and the Debtors filed additional briefing regarding the issue of whether section 365(e)(2) of the Bankruptcy Code allows Kmart to terminate the Master Agreement under its *ipso facto* provisions. In a decision dated May 10, 2005 (the "365(e)(2) Decision"), the Court ruled that section 365(e)(2) did not allow Kmart to exercise the Master Agreement's *ipso facto* provision to prevent Footstar from assuming the Master Agreement. On May 20, 2005, Kmart filed an appeal from the 365(e)(2) Decision. Footstar filed a motion to dismiss such appeal as interlocutory. Approval of the Kmart Settlement rendered Footstar's motion to dismiss and the appeal moot.

      The second part of the litigation regarding Footstar's assumption of the Master Agreement involved Kmart's right to terminate the Master Agreement based upon whether (i) the Debtors would satisfy the performance standards in the Master Agreement on a go-forward basis and (ii) the Debtors satisfied the staffing requirements in the Master Agreement. In connection therewith, the parties commenced a period of extensive discovery. The Court had scheduled a trial on these factual issues to commence on July 18, 2005. Upon the request of Kmart and Footstar, the Bankruptcy Court canceled the trial and, on August 25, 2005, approved the Kmart Settlement. Approval of the Kmart Settlement by the Court rendered the trial moot.

        b.    <u>Sears Conversion Litigation</u>

      In June of 2004, Kmart announced the sale of approximately 50 of its retail store locations (the "Stores") to Sears. Thereafter, on November 17, 2004, Kmart announced plans to merge with Sears, Roebuck and Co. (the "Merger"). On March 24, 2005, Kmart and Sears completed their merger to form Sears Holding Corporation.

      Following the announcement of the Merger, Kmart announced its plan to begin the reconfiguration of some of the Stores slated for conversion to a new Sears format called "Sears Essentials." In connection with Footstar's motion to enforce the automatic stay, the Bankruptcy Court ruled that the automatic stay barred Kmart from taking any actions to remove Footstar from the Stores absent a motion for relief from the automatic stay.

      Accordingly, on March 4, 2005, Kmart filed a motion seeking relief from the automatic stay, which spawned additional litigation regarding whether the Master Agreement gave the Debtors the right to operate in Sears Essential Stores. On March 25, 2005, at a status conference in connection with Kmart's motion to lift the stay, the Bankruptcy Court instructed Footstar to submit a brief on the issue of whether Footstar had the right under the Master Agreement to operate the footwear departments at stores operated under the "SEARS ESSENTIALS" service mark. Following a hearing conducted on April 6,

2005, the Bankruptcy Court ruled that Kmart could terminate the Master Agreement with respect to those Stores being converted to a "SEARS ESSENTIALS" retail format. The Debtors filed a motion to reconsider the Bankruptcy Court's decision based upon newly-discovered evidence regarding the meaning of the Master Agreement. On June 24, 2005, the Bankruptcy Court rejected the Debtors' motion for reconsideration and supplemented its original decision (as supplement, the "Service Mark Decision").

As a result of the Service Mark Decision, Kmart received Court approval to remove Footstar from the Stores it converts to the Sears Essentials format, which provided Kmart the power to slowly displace Footstar from Kmart stores, while Footstar was left with no ability to curtail such conversions. The Debtors, the Creditors' Committee and the Equity Committee filed a notice of appeal of the Service Mark Decision. Approval of the Kmart Settlement by the Court has rendered the appeals of the Service Mark Decision moot.

3.      *Kmart Settlement*

On July 2, 2005, Footstar and Kmart entered into a comprehensive settlement, which resolved the Litigations and provided for the assumption of the Master Agreement, as modified thereby. The Kmart Settlement addressed both the risk of continued litigation with Kmart and the risk to the Debtors' business even if the Debtors had ultimately attained litigation victory. The Kmart Settlement accomplished numerous objectives, as follows:

eliminated the Litigations, which posed a risk to Footstar's continued viability, and fixes Footstar's cure obligation at $45 million;

established a minimum "footprint" of stores in which Footstar will continue to operate a footwear department and requires Kmart to compensate Footstar for closures and/or conversions if the number of stores falls below such minimum;

eliminated uncertainties relating to Footstar's staffing obligations by allowing Footstar to reduce staffing as sales decline;

eliminated performance standards that could arguably provide a basis for termination post-bankruptcy;

provides adequate advertising;

incentivizes Kmart to cooperate with Footstar by connecting Kmart's fees under the Master Agreement to the Debtors' gross sales and eliminates other fees except for a miscellaneous expense fee; and

affords the Debtors the ability to proceed with a chapter 11 plan providing for a full recovery to creditors and a return to equity holders.

The Kmart Settlement also provides that the Master Agreement will terminate at the end of 2008 (instead of 2012), but requires Kmart to buy out the Debtors' inventory at book value to help ensure an orderly disposition of the Debtors' inventory held at Kmart stores at the end of the term of the Master Agreement.

On August 25, 2005, the Bankruptcy Court approved the Kmart Settlement. Copies of the Kmart Settlement and the Master Agreement (as amended by the Kmart Settlement) are annexed hereto as Exhibits C and D, respectively.

### G.   Federated and Gordmans Termination Agreements

1.   *Federated*

On or about December 31, 2001, Footstar entered into a master agreement with Federated, pursuant to which Federated granted Footstar the right to operate the children's footwear departments in certain Federated stores. After extensive analysis, the Debtors determined to terminate the agreement with Federated because this line of business was not profitable and was not projected to be profitable in the foreseeable future.

On July 23, 2004, the Debtors entered into a termination agreement with Federated that provided for the termination of the Debtors' right to sell footwear in Federated's stores. The termination agreement provided that the Debtors and Federated will consolidate the footwear departments into a few remaining footwear departments , with all remaining footwear inventory to be transferred to certain Federated stores for orderly liquidation. Pursuant to the terms of the termination agreement, the master agreement terminated on September 15, 2004. The Debtors were authorized to terminate the agreement with Federated pursuant to the terms of the settlement procedures order (described below) and obtained the consent of the Creditors' Committee, the Equity Committee and the lenders under the DIP Credit Agreement as required thereunder.

2.   *Gordmans*

On January 7, 2002, the Debtors entered into an agreement with Gordmans. The agreement granted the Debtors the right to sell footwear and related shoe accessories in the footwear departments of Gordmans stores. After extensive analysis, the Debtors determined to terminate the agreement with Gordmans because this line of business was not profitable and was not projected to be profitable in the foreseeable future.

On May 4, 2004, the Debtors entered into an agreement with Gordmans to terminate the Debtors' right to sell footwear in Gordmans' stores. Pursuant to this termination agreement, Gordmans agreed to purchase all footwear inventory located in the Footwear Departments for a price based on the Debtors' cost. On June 10, 2004, the Debtors filed a motion seeking approval of (i) the termination agreement, (ii) the settlement of certain claims with Gordmans under Bankruptcy Rule 9019 and (iii) the sale of all footwear inventory to Gordmans outside the ordinary course of business, and free and clear of all liens, claims or encumbrances, pursuant to section 363 of the Bankruptcy Code. On July 7, 2004, the Bankruptcy Court authorized the termination agreement, the sale of inventory and the settlement of claims. Pursuant to the terms of the termination agreement, the master agreement terminated on July 9, 2004.

### H.   The Debtors' Properties

Footstar's headquarters was previously located in 43,000 square feet of leased office space in West Nyack, New York. Meldisco's corporate offices are located in 129,000 square feet of owned office space in Mahwah, New Jersey. The West Nyack lease expired, and the Debtors moved Footstar's headquarters into the Meldisco office building. The Debtors also moved their Shared Services Center from Dallas, Texas to the Meldisco office building. Footstar's corporate tax department is located in 3,500 square feet of leased office space in Worcester, Massachusetts. The Company also maintained approximately 8,300 square feet of leased office space in Wausau, Wisconsin in which its direct marketing operations were primarily located; that lease ended as of June 2004. The Company previously operated out of two owned distribution facilities, located in Mira Loma, California, and Gaffney, South

Carolina, with a total of 1.2 million square feet. In addition, the Company leased a 200,000 square feet distribution facility in Morrow, Georgia.

## I.    Sale of Certain Business Units

### 1.    *Store Closing Sales*

The Debtors had previously determined that the Just For Feet retail chain, comprised of 88 stores, and 75 Footaction stores were underperforming and required liquidation immediately after the Petition Date. As a result of this analysis, the Debtors obtained approval from the Bankruptcy Court to conduct an auction for the employment of a liquidation agent and, thereafter, to conduct store closing and going out of business sales at these store locations.

In accordance with procedures established by the Bankruptcy Court, the Debtors used their best efforts to solicit bids from major liquidation firms throughout the United States. Several liquidation firms expressed interest in being engaged as the Debtors' liquidating agent and submitted bids. Hilco Merchant Resources ("Hilco") submitted the best and highest bids. On March 18, 2004, the Bankruptcy Court approved the liquidation sales and the Debtors' agency agreements with Hilco. The Debtors entered into two agency agreements with Hilco, one for the liquidation of merchandise in Footaction stores, and one for liquidation of merchandise in Just For Feet stores.

Pursuant to the agency agreement for the liquidation of the Footaction stores, Hilco agreed to pay to the Debtors 41.25% of aggregate retail price of all merchandise. Pursuant to the agency agreement for the liquidation of the Just for Feet stores, Hilco agreed to pay to the Debtors 45.25% of aggregate retail price of all merchandise. For all stores, for any amounts received above that amount, Hilco would receive 2% of the aggregate retail price of all merchandise as a fee, in addition to its agreed expenses. The Debtors and Hilco would share the remaining proceeds, 60% to the Debtors and 40% to Hilco.

### 2.    *Nike Litigation*

Since the formation of Footstar in 1996, Nike USA, Inc. ("Nike") had supplied athletic footwear and apparel to the Debtors' Athletic division. Footstar was one of Nike's largest customers worldwide, and the majority of footwear and apparel sold by Athletic was purchased from Nike. Prior to the Petition Date, Nike historically provided the Debtors with an 11% discount on goods. On March 8, 2004, Nike notified the Debtors that it no longer would extend the discount, citing the Debtors' failure to pay approximately $8 million of prepetition claims owed to Nike.

On March 16, 2004, the Debtors requested the Bankruptcy Court to hold Nike in civil contempt for violation of the automatic stay under section 362 of the Bankruptcy Code and to grant compensatory and punitive damages. The Debtors also sought a temporary restraining order and preliminary injunction pending resolution of the motion for an order holding Nike in contempt. On March 16, 2004, the Bankruptcy Court held a hearing and encouraged the Debtors and Nike to reach a consensual resolution. After extensive negotiations, Nike agreed to continue to ship to the Debtors consistent with past business practices, but only for a limited period of time.

3. *Sale of the Athletic Division*

a. The Motion to Sell the Assets of Athletic

As the sale of Nike's products dominated Athletic's revenues, Nike's refusal to commit to supply the Debtors on normal business terms beyond a limited period forced the Debtors to re-evaluate whether Athletic could be run profitably without Nike's cooperation and confirmed the Debtors' prior intention to sell Athletic. After considering numerous options, the Debtors decided that a public sale of Athletic was the likeliest way to maximize value for the Debtors' estate. Accordingly, on March 26, 2004, the Debtors filed a motion seeking authority to (i) sell all or substantially all of the assets of their Athletic business, (ii) conduct an auction relating to the sale of such assets and (iii) establish bidding procedures in connection with the auction. By order dated April 6, 2004, the Bankruptcy Court approved the auction procedures.

In connection with the motion to sell Athletic, the Debtors solicited offers for the purchase of Athletic's assets. In anticipation of the auction, the Debtors solicited numerous types of bids for Athletic's assets, including going concern bids, liquidation bids, lease purchase bids, and any combination of the foregoing. The Debtors also conducted discussions with certain strategic and financial purchasers and provided due diligence packages to all interested parties.

The Orders of the Bankruptcy Court approving the various sale transactions described in this section authorize the exemption of such transactions from state and local transfer taxes pursuant to section 1146(c) of the Bankruptcy Code. Certain taxing authorities have asserted that section 1146(c) of the Bankruptcy Code does not apply to pre-Plan transactions even though they did not object to such sales.

b. The Foot Locker Sale

On April 9, 2004, the Debtors received a going concern bid from Foot Locker to purchase substantially all of the assets of the stores of the Athletic business, including the leases and inventory at 349 of the Debtors' remaining 353 Footaction retail stores, along with the remaining inventory from the other four remaining stores. Because the Debtors did not receive any bids comparable to the Foot Locker bid, on April 13, 2004, the Debtors entered into an agreement with Foot Locker for the purchase price of $160 million, and removed the subject assets from the auction. In response, a competing bidder, The Finish Line, Inc., submitted a joint bid with Hilco for substantially the identical assets, with a face amount of $210 million. In response, Foot Locker increased its purchase price to $225 million. On April 26, 2004, the Court entered an order approving the sale to Foot Locker. The sale to Foot Locker was consummated on May 7, 2004. After effectuating certain purchase price adjustments contained in the agreement with Foot Locker, the Debtors received approximately $210 million from the sale.

c. Remaining Athletic Leases

On April 16, 2004, the Debtors conducted an auction for 14 leases not included in the Foot Locker bid. Approximately 10 bidders submitted bids for the purchase of these leases. The auction generated approximately $790,000 to the Debtors' chapter 11 estates.

Additionally, Abacus and the Joint Venture marketed the remaining Athletic segment leases. Certain of the landlords entered into lease termination agreements, and thereby waived their claims to damages. The Debtors entered into 20 lease termination agreements.

Five other leases were successfully marketed and resulted in the execution of assumption and assignment agreements.

    d.    <u>Sale of Mira Loma Distribution Center</u>

The Debtors owned an integrated warehouse, distribution and office facility located in Mira Loma, California. Because the Debtors had exited the Athletic business, the Debtors no longer required the real estate, office space and distribution facility at Mira Loma. Accordingly, the Debtors began to market the Mira Loma property to interested parties. The Debtors identified numerous interested parties and conducted an auction for the Mira Loma property. On July 20, 2004, the Bankruptcy Court approved the sale of the Mira Loma property to Thrifty Oil Co. for a purchase price of $28 million. Additionally, the Debtors negotiated with the prospective new tenant of Mira Loma, FMI International, LLC, so that the Debtors' distribution needs for Meldisco could be satisfied.

    e.    <u>Sale of Gaffney Distribution Center</u>

The Debtors owned an integrated warehouse and distribution facility located in Gaffney, South Carolina. Because the Debtors had successfully exited the Athletic business, the Debtors no longer required the real estate and distribution facility at Gaffney. Accordingly, the Debtors began to market the Gaffney property to interested parties. The Debtors identified numerous interested parties and planned an auction for the Gaffney property on September, 14, 2004. On September 2, 2004, NBTY, Inc. filed an application for an order to show cause to stay the Gaffney auction. After a telephonic hearing, the Bankruptcy Court entered an order denying the application to stay the Gaffney auction. The Debtors conducted the auction on September 14, 2004 and ADS Logistics Services – Gaffney LLC submitted the highest bid. On September 9, 2004, the Bankruptcy Court approved the sale of the Gaffney property to ADS Logistics Services – Gaffney LLC for a purchase price of $20,250,000.

    f.    <u>Sale of Hurst Property</u>

The Debtors owned real and personal property at Hurst Plaza in Tarrant County, Texas. Because the Debtors had successfully exited the Athletic business, the Debtors no longer required the real estate at Hurst, which had previously been a location for a Just For Feet store. Accordingly, the Debtors began to market the Hurst property to interested parties. The Debtors identified numerous interested parties and conducted an auction for the Hurst property. On September 9, 2004, the Bankruptcy Court approved the sale of the Hurst property to The Katz Family Trust for a purchase price of $2,500,000.

    g.    <u>Sale of Knoxville and Orlando Properties</u>

The Debtors owned real and personal property in Knoxville, Tennessee and Orlando, Florida. Because the Debtors successfully exited the Athletic business, the Debtors no longer required the Knoxville and Orlando properties, which had previously been locations for Just For Feet stores. Accordingly, the Debtors engaged in an extensive marketing process for these properties. The Debtors identified interested parties and conducted an auction for the Knoxville and Orlando properties. On October 14, 2004, the Bankruptcy Court approved the sale of the Knoxville property to Steven Levin for a purchase price of $1,450,000 and the Orlando property to The Katz Family Trust for a purchase price of $2,100,000.

    h.    <u>Sale of Morrow Distribution Center</u>

The Debtors also leased a warehouse and distribution facility and owned adjacent real property in Morrow, Georgia. Because the Debtors successfully exited the Athletic business, the Debtors

no longer require the property at Morrow. Accordingly, the Debtors marketed the Morrow property to interested parties. The Debtors did not hold an auction for this property as it only received one bid. On January 20, 2005, the Bankruptcy Court approved the termination of the lease and the sale of the Morrow property to DLK 1100, LLC, DSK 1100, LLC, and AKS 1100, LLC for a purchase price of $650,000.

### 4. *Shoe Zone/Uprise Store Closing Sales*

As a result of the Debtors' continued analysis of both the Athletic and Meldisco businesses, the Debtors determined that Athletic's Uprise chain, which was comprised of three stores, and six of Meldisco's Shoe Zone stores located in the United States, were underperforming and required immediate liquidation to maximize the value of the merchandise therein.

By motion dated April 20, 2004, the Debtors sought authority to conduct store closing, going out of business, or similar sales at the Uprise and Shoe Zone stores. Because of the small number of stores involved, the Debtors did not require the assistance of a liquidating agent to assist with the disposition of the merchandise. Instead, the Debtors sought authority for self-liquidation of the Uprise and Shoe Zone stores as the most feasible, economical, and efficient means of achieving the disposition of the merchandise. On May 6, 2004, the Court entered an order authorizing the Debtors to conduct such sales.

### 5. *Shoe Zone Sale*

Since the Petition Date, the Debtors had analyzed the costs and benefits of continuing operations at their Shoe Zone retail stores located in Puerto Rico and the U.S. Virgin Islands. As noted above, the Debtors had initially determined to liquidate six of the Shoe Zone stores located in the mainland United States. The Debtors determined, however, that the remaining Shoe Zone stores in Puerto Rico and the U.S. Virgin Islands were a drain on the Debtors estates and should be liquidated. Specifically, these stores incurred operating losses in 2003 and were projected to incur losses in 2004. There were substantial selling, general and administrative costs related to running these stores. To achieve the scale necessary to operate a healthy and profitable chain would have required the Debtors to invest significant capital to build additional stores. Also, because Shoe Zone is a relatively new chain not recognized by most consumers, the Debtors would have had to make a substantial investment in advertising to increase sales. Taking into account the level of additional investment required, and the historic and projected operating losses, the Debtors determined that the sale of these Shoe Zone stores was the best way to maximize the value of that business.

Accordingly, the Debtors engaged in the process of marketing and soliciting offers for these Shoe Zone stores and related assets. In response to these efforts, the Debtors received an offer from Novus, Inc. for the package of Shoe Zone stores in Puerto Rico as a going concern. Based upon the absence of any offer for a significant portion of the Shoe Zone stores and the absence of even the prospect of any offer comprising comparable economic terms to that of the Novus offer, the Debtors determined that the proposed sale transaction between the Debtors and Novus would provide the greatest recovery to the Debtors' estates. After extensive negotiations, on May 17, 2004, the Debtors and Novus entered into an Asset Purchase Agreement for the Puerto Rico Shoe Zone stores.

On July 14, 2004, the Bankruptcy Court authorized the sale of these Shoe Zone stores to Novus. The Debtors received approximately $5.5 million from this sale, subject to certain adjustments. The Debtors self-liquidated the three Shoe Zone stores located in the U.S. Virgin Islands.

## J.    AIG Settlement

By motion dated June 8, 2004, the Debtors sought approval of a settlement agreement with AIG Technical Services, Inc., on behalf of Illinois National Fire Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA ("AIG"). The AIG Settlement resolved (i) an insurance coverage dispute, (ii) certain class action lawsuits and (iii) certain derivative lawsuits.

As noted previously, due to certain accounting inaccuracies, the Debtors were required to restate their financial statements for a period of time spanning five and one-half years. The announcement of the restatement triggered numerous lawsuits against the Debtors and certain of its officers and directors. Specifically, stockholders filed (i) class-action lawsuits against Footstar and certain of its officers and a director and (ii) derivative lawsuits on Footstar's behalf against certain of Footstar's officers and directors.

The Debtors' insurance carrier indicated its intention to deny coverage under the Debtors' prepetition insurance policy for matters relating to these actions. Any failure to provide coverage placed at risk the primary asset available to satisfy defense costs and compensate for any liability resulting from these litigations.

To resolve all disputes associated with the restatement-related litigation and the insurance coverage in respect thereto, the Debtors entered into settlements with AIG and the plaintiffs in the underlying lawsuits. Specifically, the Debtors entered into three interrelated settlements: (i) a settlement with its insurance carrier, thereby availing the Debtors of insurance proceeds in connection with the restatement-related litigation; (ii) a settlement of the class action lawsuits instituted against Footstar whereby $14.3 million of the insurance proceeds will be made available to the class of stockholders represented in those lawsuits and (iii) a settlement of the derivative lawsuits brought on Footstar's behalf, which actions became property of the estates as a result of the chapter 11 filings. The AIG Settlement also ensures reimbursement of some of the Debtors' legal expenses in connection with the class action lawsuits, derivative lawsuits and other proceedings related to the restatement.

On July 1, 2004, the Bankruptcy Court entered an order approving these settlements.

## K.    John Michael Robinson Stipulation

On September 13, 2003, Footstar terminated John Michael Robinson, the Debtors' former Chairman of the Board of Directors, President and Chief Executive Officer. On October 15, 2003, Mr. Robinson initiated an arbitration proceeding against Footstar seeking payments purportedly due to him under his employment agreement. On November 11, 2003, Footstar issued a press release stating that Mr. Robinson's employment was terminated "for cause" and asserted counterclaims in the arbitration. Mr. Robinson filed a petition in the United States District Court for the Southern District of New York for a determination that Footstar's counterclaims were not capable of being arbitrated. The commencement of the Debtors' chapter 11 cases stayed the arbitration and any decision as to the arbitrability of Footstar's counterclaims in the district court proceeding.

By motion filed on May 10, 2004, Mr. Robinson sought relief from the automatic stay to permit (i) the arbitration to proceed to judgment and (ii) the district court to decide the proceeding before it. After extensive negotiations, the Debtors entered into a stipulation with Mr. Robinson to resolve (i) issues of the status of his termination and (ii) the amount Footstar owes Mr. Robinson under the applicable employment agreement as a result of his termination. The Robinson Settlement provides Mr. Robinson with a press release and written acknowledgement that his termination was not "for cause" and

$5 million in full satisfaction of Mr. Robinson's claims against Footstar. On July 1, 2004, the Bankruptcy Court approved the Robinson Settlement.

**L.        De Minimis Assets Sale Procedures**

By Motion dated May 11, 2004, the Debtors requested authority to establish procedures to sell property of de minimis value in accordance with prior practice and in consultation with the Creditors' Committee and the Equity Committee. The procedures allow the Debtors to conduct sales for $250,000 or less, with notice and opportunity to be heard by the Creditors' Committee and the Equity Committee, without further authorization from the Court. On June 3, 2004, the Court entered an order establishing the de minimis asset sale procedures.

**M.       Lease Rejection and Abandonment Procedures**

The Debtors are parties to hundreds of contracts and leases, including approximately 600 unexpired real property leases, numerous personal property leases, and other executory contracts. By Motion dated March 26, 2004, the Debtors sought approval procedures to facilitate an expeditious and efficient process for rejecting such burdensome leases and contracts. The procedures required the Debtors to give notice and an opportunity to be heard to the counter-party to the applicable lease or contract, the Creditors' Committee, the Postpetition Lenders and the Equity Committee. The Motion also requested authority for the Debtors to establish procedures to abandon property with little or no value to the estates.

The Court entered an order on April 12, 2004, approving the Lease Rejection Procedures. As of September 1, 2005, 134 leases have been rejected pursuant to the Lease Rejection Procedures.

**N.        Settlement Procedures**

Prior to the Commencement Date, in the ordinary course of their businesses, the Debtors' management investigated, evaluated and resolved claims or potential causes of action asserted by or against the Debtors. Depending upon the specific facts and the risks involved in engaging in litigation with respect to such claims, the Debtors, in the exercise of their business judgment, would make appropriate offers to settle such claims.

By Motion dated May 14, 2004, the Debtors sought to liquidate prepetition claims and damage claims resulting from the rejection of leases and executory contracts by establishing procedures to settle claims in accordance with prior practice and in consultation with the Creditors' Committee, the Equity Committee, the lenders under the DIP Credit Agreement and the U.S. Trustee. Specifically, the Debtors requested authority to (i) settle prepetition claims where the proposed settlement amount is not more than $250,000 and (ii) enter into compromises and settlements to resolve rejection damage claims, which settlements and compromises may provide for granting non-Debtor parties allowed claims against the estates or for immediate payments in cash. On May 27, 2004, the Bankruptcy Court authorized the Debtors to implement the guidelines and procedures outlined above with respect to the compromise and settlement of Settlement Procedures Claims.

**O.        Key Employee and Key Executive Retention Program**

By motion dated April 20, 2004, the Debtors sought to (i) assume the employment agreement of its current Chief Executive Officer and President, Dale W. Hilpert and (ii) establish a key employee retention plan.

1.    *Hilpert Employment Agreement*

On January 15, 2004, the Board of Directors named Dale W. Hilpert as Chairman, President, and Chief Executive Officer of Footstar, Inc. Just prior to the Petition Date, the Debtors realized that Mr. Hilpert's guidance and direction would be crucial throughout their chapter 11 cases, and so, on March 1, 2004, the Debtors amended Mr. Hilpert's employment agreement to further incentivize him to continue employment with the Debtors' through the conclusion of their chapter 11 proceedings. Mr. Hilpert spearheaded the sale to Foot Locker of a large portion of the Debtors' Athletic business segment.

Mr. Hilpert's employment agreement is for a term beginning March 1, 2004 to the later of (i) January 19, 2006 or (ii) the Effective Date. Base salary under the employment agreement is payable as follows: (i) $2,125,000 initial salary for the fiscal year ending January 1, 2005 and (ii) $850,000 subsequent annual salary, subject to annual review for increase at the discretion of the compensation committee of Footstar's Board of Directors, and with approval of the Bankruptcy Court. For the 2005 fiscal year, Mr. Hilpert is eligible to participate in Footstar's annual incentive award plan, with a target annual incentive award opportunity of no less than 150% of Base Salary. The agreement also provides for an additional incentive award of $1.7 million to be paid upon the effective date of a plan of reorganization, subject to certain conditions. The agreement generally provides for (i) participation in benefit plans and programs including retirement benefits, life insurance and medical benefits, and (ii) restrictive covenants including non-disclosure, non-solicitation of employees and availability for litigation support.

In the event Mr. Hilpert terminates his employment with good reason, as defined (including, without limitation, a reduction in Mr. Hilpert's duties and a change in control of Footstar), he is entitled to receive (i) base salary through the date of termination; (ii) base salary through January 19, 2006 and his 2005 annual incentive award; and (iii) the additional incentive award payable on the effective date of a plan of reorganization; to the extent that any of such amounts have not already been paid to him. If Mr. Hilpert is terminated without cause, he is not precluded from receiving the additional incentive award or the annual incentive award, provided that they were earned pursuant to the terms of his agreement. If Mr. Hilpert terminates his employment without good reason, he is not entitled to severance. Mr. Hilpert would not, however, be precluded from receiving the additional incentive award or the annual incentive award provided they were earned pursuant to the terms of his agreement prior to such termination. If his employment is terminated for cause, as defined, he is not entitled to the annual incentive award or the additional incentive award to the extent not already paid.

2.    *Key Employee Retention Plan*

During the course of streamlining their workforce, the Debtors identified key employees who possessed unique knowledge, skills, and experience that are vital to the business enterprise and, in many cases, impracticable to replicate. The continued employment and dedication of these key employees was identified as essential to the preservation of the value of the Debtors' estates and to an eventual reorganization under chapter 11.

The retention plan is divisible into three parts: (i) a retention bonus, (ii) severance and (iii) disposition of the deferred compensation plan. The retention bonus plan covers 32 of the Debtors' key employees, with awards ranging from $15,000 to $936,000, with payments made upon involuntary termination or completion. In addition, a discretionary pool of up to $1 million may be awarded at the CEO's discretion to reward the performance of other employees not included in the retention bonus plan. The Debtors' severance program includes five senior level executives. The severance program provides for varying levels of severance, ranging in duration depending on position. Employees are eligible for

severance if the employee is permanently terminated as a result of reduction in workforce or elimination of position. Additionally, participants in the Debtors' deferred compensation plan will receive the contributions they made thereunder. The Debtors deferred compensation plan was terminated and paid out. It was an elective benefit program providing a non-qualified deferred compensation plan in which 12 of the Debtors' employees participated. The total payout of the deferred compensation plan is $650,000.

On May 6, 2004, the Bankruptcy Court entered an Order approving the Debtors' retention bonus plan, severance program and deferred compensation plan payout. On May 28, 2004, the Bankruptcy Court entered an order approving the Debtors' assumption of Mr. Hilpert's employment agreement.

3.    *Meldisco Compensation Program and Non-Compete Agreements*

By motion dated November 30, 2004, the Debtors sought authorization of the Bankruptcy Court to (i) establish a comprehensive compensation program for Meldisco employees (the "Meldisco Compensation Program") and (ii) enter into non-compete agreements with certain key Meldisco executives (the "Non-Compete Agreements").

a.    The Meldisco Compensation Program

In the last quarter of 2004, the Assumption Litigation threatened the Debtors' ability to reorganize and called into question whether the Debtors would survive as a going concern. Such a threat placed the Debtors in danger of suffering an unacceptable level of employee attrition. To prevent such attrition, the Debtors developed the Meldisco Compensation Program, which was designed to incentivize Meldisco employees to remain with the Debtors during the course of these chapter 11 cases and post-emergence after the Effective Date.

The Meldisco Compensation Program is divisible into five parts: (i) a performance bonus for select Meldisco employees for fiscal year 2005, (ii) a retention bonus for select Meldisco employees for fiscal year 2005, (iii) a revised severance program, (iv) accelerated payments of a portion of retention bonus payments established pursuant to the Debtors' original Court-approved retention program and (v) the Debtors' senior executive retirement plan.

In the ordinary course of business, Meldisco establishes annual bonuses to incentivize employs to achieve certain performance goals. With the performance bonus contemplated by the Meldisco Compensation Program, Meldisco sought to establish a bonus program that adjusts performance metrics to align the interests of Meldisco employees and equity holders. The Debtors identified approximately 170 Meldisco employees who would receive performance bonuses, with awards ranging from $3,300 to $650,000. The cost of the performance bonus was approximately $3.6 million if certain performance targets were reached. In August of 2005, the Debtors paid $3.3 million of performance bonuses to employees because performance targets were exceeded. The Debtors will not make any additional performance bonus payments unless the Equity Committee concurs with the Debtors that such payments are appropriate in accordance with the applicable formula. The Debtors also sought to establish a retention bonus that provides retentive payments to key Meldisco employees to stem attrition during 2005. The Debtors have identified approximately 240 current employees that will receive retention bonuses, which will be earned and paid quarterly, at a total cost of approximately $3.5 million. Both the performance bonus and retention bonus will be pro rated in the event of an involuntary termination during fiscal year 2005. If there is a change of control of Meldisco, the Debtors will pay the performance bonuses and the retention bonuses to all eligible participants on a pro rated basis calculated daily. Pursuant to the order approving the Meldisco Compensation Plan, no change of control will occur on the Effective Date of the Plan.

The Debtors also revised their current severance packages to provide competitive severance benefits. Under this new severance program, Meldisco will provide its employees with severance benefits, the amount of which is based on years of service and/or minimum severance status based upon job level, whether or not such employee has found another employment opportunity after termination. The Debtors currently estimate that the maximum amount the revised severance program could cost the Debtors is approximately $1.7 million above their prior severance obligations. If such senior executive accepts non-comparable employment by the acquiring entity, however, such executive is not entitled to the severance enhancement.

The Debtors also sought to accelerate portions of payments due under the original Bankruptcy Court-approved retention program. The Debtors, in consultation with the Creditors' Committee and the Equity Committee, guaranteed payment of 50% of the Debtors' 2004 performance bonuses to those Meldisco employees who were not participants in the original retention program. These payments were due and paid in February of 2005. To avoid penalizing original retention program participants, the Debtors paid 50% of such participants the 2004 performance bonus component of the original retention bonus on July 1, 2005.

Prior to the Commencement Date, the Debtors maintained a supplemental executive retirement plan (the "SERP"). The Debtors initially sought approval of the SERP as a component of the original retention program, but agreed to delay consideration of such approval. The Debtors obtained authority to continue the SERP for certain key Meldisco executives as an additional retention component under the Meldisco Compensation Program. Pursuant to the SERP, the Debtors provide supplemental benefits to certain senior executive employees whose income exceeds the Internal Revenue Service's limitations for compensation eligible for contribution to the Debtors' 401(k) retirement plan. The vesting of SERP benefits for a participating executive will occur when such executive (i) reaches the age of 55 and (ii) has been employed by the Debtors for ten or more years. If, however, there is a Change of Control of the Debtors (as modified by the Order approving the Meldisco Compensation Plan) that results in a termination of a participating executive, the SERP vests notwithstanding failure to satisfy the qualification requirements. Certain executives currently participate in the SERP, with the total liability thereunder currently estimated at approximately $5.3 million as of December 31, 2005. The Debtors will continue the SERP, except that (i) future benefit calculations have been modified to reflect current salary levels but bonus targets used will be capped at the 2004 level and (ii) vesting occurs upon the sale of substantially all of the assets or stock of the Debtors. Pursuant to the order approving the Meldisco Compensation Plan, no change of control will occur on the Effective Date of the Plan. No new participants will be added to this program.

b.    The Non-Compete Agreements

Kmart's tactics during the Assumption Litigation fueled employee concerns over the Debtors' ability to operate Meldisco as a going concern and has created instability at Meldisco. Additionally, the Debtors were deeply concerned that Kmart may try to entice several key Meldisco executives to work for Kmart in an attempt to quickly replicate Meldisco's business during the course of the Assumption Litigation. Loss of certain Meldisco employees would have numerous deleterious consequences, including jeopardizing relationships with foreign vendors, whose supply of merchandise is crucial to Meldisco's operations. To deter Kmart from hiring key Meldisco employees, the Debtors sought authority to enter into the Non-Compete Agreements with these employees. The elements of the Meldisco Compensation Program serve as consideration for the non-compete covenants contained in the Non-Compete Agreements. The Non-Compete Agreements restrict these executives during (i) their employment with the Debtors and (ii) the earlier of (a) 12 months after such executives are terminated or (b) 12 months after the Master Agreement is terminated, from engaging in the procurement, sale or marketing of footwear, or the operation of a footwear business within Kmart and/or Sears. The Non-

Compete Agreements also include a confidentiality provision, a non-solicitation of employees provision, and a provision prohibiting the executives from interfering with or disrupting the relationships between the Debtors and any of their customers, vendors, suppliers or distributors. The Meldisco Compensation Program and the Non-Compete Agreements were approved by the Bankruptcy Court in an Order dated December 20, 2004.

**P.      Retention of Amper Politziner & Mattia P.C.**

By order dated July 14, 2004, KPMG LLP ("KPMG") was retained by Footstar as accountants and auditors *nunc pro tunc* to March 2, 2004. On September 3, 2004, Footstar filed its restated financial statements that are included in its Form 10-K for the fiscal year 2002 with the accompanying audit report prepared by KPMG as independent certified public accountants. As of December 14, 2004, Footstar's board of directors voted to change accountants and auditors and to retain Amper Politziner & Mattia P.C. ("Amper") as accountants and auditors to audit Footstar's 2003 fiscal year financial statements. In connection with this decision, on January 14, 2005, the Debtors filed an application to approve the retention of Amper as their independent registered public accounting firm *nunc pro tunc* to December 14, 2004. Amper's retention was approved by the Bankruptcy Court on February 10, 2005.

Because the Debtors would no longer employ KPMG in the manner contemplated in KPMG's original retention order, the Debtors sought to reduce KPMG's retention in their chapter 11 cases to the level of a professional employed in the ordinary course of business. With KPMG's approval, on March 15, 2005, the Debtors filed a notice to amend its list of ordinary course professionals to add KPMG. The addition of KPMG to the Debtors' ordinary course professional list serves to facilitate KPMG's continued employment with the Debtors on an as-needed basis.

**Q.      Claims Process and Bar Date**

1.      *Schedules and Statements*

On June 15, 2004, the Debtors filed with the Bankruptcy Court their schedules of liabilities and on June 30, 2004, the Debtors filed with the Bankruptcy Court, their statements of financial affairs and schedules of assets. The Debtors filed three sets of schedules, filed on a consolidated basis for the Athletic division, the Meldisco division and the Debtors' corporate operations. One statement of financial affairs was filed on a consolidated basis for all Debtors.

2.      *Bar Date*

By order dated June 25, 2004, the Bankruptcy Court fixed July 30, 2004 at 5:00 p.m., as the date and time by which proofs of claim were required to be filed in the Debtors' bankruptcy cases, except that (i) governmental entities had until August 30, 2004 at 5:00 p.m. and (ii) the IRS had until October 29, 2004 at 5:00 p.m. to timely file proofs of claim against the Debtors. In accordance with instructions from the Bankruptcy Court, on or about June 10, 2004, notices informing creditors of the last date to timely file proofs of claims, and a "customized" proof of claim form, reflecting the nature, amount, and status of each creditor's claim as reflected in the schedules of assets and liabilities, were mailed to all creditors listed on the schedules of assets and liabilities. On July 2, 2004, a date at least twenty-five (25) days prior to the Bar Date, the Debtors caused to be published once in *The Wall Street Journal* (National Edition) and *The New York Times* (National Edition), notice of the last date to timely file proofs of claim.

3.    *Omnibus Claims Objections*

Claims in excess of $640 million have been asserted against the Debtors. In an effort to get a more accurate picture of the true nature and extent of the claims, the Debtors commenced objecting to certain categories of claims by filing its First Omnibus Objection to Claims Filed Against the Debtors on October 22, 2004. By order, dated December 7, 2004, the Bankruptcy Court sustained the First Omnibus Objection to Claims with respect nearly all of the proofs of claim identified therein. Pursuant to such order, the Debtors expunged 358 claims in the amount of $324,252,261.00.

On March 11, 2005, the Debtors filed their Second Omnibus Objection to Claims Filed Against the Debtors, objecting to proofs of claim comprised of: (i) duplicate claims, (ii) initial and superseded claims, (iii) late-filed claims, (iv) claims inconsistent with the Debtors' books and records, (v) misclassified claims and (vi) claims the Debtors seek to reduce and allow. By order, dated April 19, 2005, the Bankruptcy Court sustained the Second Omnibus Objection to Claims with respect to the majority of the proofs of claim identified therein. Pursuant to such order 1,080 claims were expunged and 293 claims were reduced.

Continuing with the claims reconciliation process, the Debtors filed on April 1, 2005, the Third Omnibus Objection to Claims Filed Against the Debtors, objecting to proofs of claims comprised of landlord lease rejection damage claims. The hearing on the Third Omnibus Objection has been adjourned. By order, dated October 18, 2005, the Bankruptcy Court granted the Third Omnibus Objection to Claims with respect to a majority of the proofs of claim identified therein.

The Debtors anticipate more objections will be filed shortly. The Debtors are in the process of conducting a comprehensive review and reconciliation of the claims filed against them, which includes identifying particular categories of proofs of claim that the Debtors should target for disallowance and expungement, reduction and allowance, or reclassification and allowance. The Debtors anticipate filing several more omnibus claims objection motions, as well as objections to specific claims, before and after any confirmation of a plan of reorganization.

## VII.

### Governance of Reorganized Footstar

**A.    Board of Directors**

On the Effective Date, the management, control and operation of Reorganized Footstar and the Reorganized Debtors will become the general responsibility of the Boards of Directors of the Reorganized Footstar and the Reorganized Debtors, respectively. The Equity Committee shall select (and is solely responsible for selecting) the initial directors of the Reorganized Debtors on and after the Effective Date; *provided, however,* the Chief Executive Officer of the Reorganized Debtors will be a member of the initial Board of Directors of Reorganized Footstar. Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and the Reorganized Debtors' certificates of incorporation and by-laws.

**B.    Senior Management**

Footstar plans to appoint Jeffrey A. Shepard as its new chief executive officer. Other members of senior management will be disclosed prior to the Confirmation Hearing.

# VIII.

## Other Aspects of the Plan

### A.    Voting of Claims and Interests

Each holder of an allowed claim or equity interest in an impaired class that is entitled to vote on the Plan will be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### B.    Distributions

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the Debtors agree, or if there is a dispute, that the Bankruptcy Court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the Debtors.

Any claim that is not a disputed claim and for which a proof of claim has been filed is an allowed claim. Any claim that has been listed by the Debtors in the Debtors' schedules of assets and liabilities, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an allowed claim in the amount listed in the schedules unless an objection to such claim has been filed. If the holder of such claim files a proof of claim in an amount different than the amount set forth on the Debtor's schedules of assets and liabilities, the claim is an allowed claim for the lower of the amount set forth on the Debtor's schedules of assets and liabilities and on the proof of claim and a disputed claim for the difference. Any claim that has been listed in the Debtor's schedules of assets and liabilities as disputed, contingent or not liquidated and for which a proof of claim has been filed is a disputed claim. Any claim for which an objection has been timely interposed is a disputed claim. For an explanation of how disputed claims will be determined, see section VIII.B.2.

An objection to any claim may be interposed by the Debtors or the Equity Committee within 90 days after the Confirmation Date or such later date as may be fixed by the Bankruptcy Court. Any claim for which an objection has been interposed will be an Allowed Claim if the objection is determined in favor of the holder of the claim pursuant to a final order of the Bankruptcy Court or as otherwise agreed to by the parties.

1.    *Timing and Conditions of Distributions*

a.    Date of Distribution

Except as otherwise provided for in the Plan, distribution on account of allowed claims will be made by the Disbursing Agent on the Effective Date or as soon thereafter as practicable. Disputed claims will be treated as set forth below.

2.    *Procedures for Treating Disputed Claims Under the Plan*

a.    Disputed Claims

A disputed claim is a claim that has not been allowed or disallowed pursuant to an agreement by the parties or an order of the Bankruptcy Court. In addition, all prepetition tort claims not

previously allowed by the Bankruptcy Court are disputed claims. A claim for which a proof of claim has been filed but that is listed on the Debtors' schedules of assets and liabilities as unliquidated, disputed or contingent, and which has not yet been resolved by the parties or by the Bankruptcy Court, is a disputed claim. If a holder of a claim has filed a proof of claim that is inconsistent with the claim as listed on the Debtors' schedules of assets and liabilities, such claim is a disputed claim to the extent of the difference between the amount set forth in the proof of claim and the amount scheduled by the Debtors. Any claim for which the Debtors or any party in interest have interposed (or will interpose) a timely objection is a disputed claim.

      b.    <u>Objections to Claims</u>

The Reorganized Debtors and the Equity Committee will be entitled to object to all claims, including Administrative Expense Claims. Any objections to claims will be served and filed on or before 90 days after the Confirmation Date or such later date as may be fixed by the Bankruptcy Court. Any objections, if any, to the Debtor in Possession Credit Agreement Claims that arise prior to the date of the approval of the Disclosure Statement must be filed prior to the Confirmation Date.

      c.    <u>No Distributions Pending Allowance</u>

If any portion of a claim is a disputed claim, no payment or distribution will be made on account of that claim (or any portion thereof) until it becomes an allowed claim.

      d.    <u>Distributions After Allowance</u>

After the Effective Date, if a disputed General Unsecured Claim becomes an allowed claim, the Disbursing Agent will pay the holder of that claim 20 days after the order allowing the disputed claim becomes a final order, or as soon thereafter as practicable, or such earlier date as agreed to by the Reorganized Debtors, in accordance with the provisions of the Plan. If a disputed claim is disallowed, the amount of property withheld by the Debtors on account of such disputed claim will be retained by the Reorganized Debtors.

      e.    <u>Distributions Relating to Allowed Insured Claims</u>

Distributions made under the Plan in respect of claims for which the Debtors have insurance will be made in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan constitutes a waiver of any cause of action that the Debtors or the Reorganized Debtors may hold against any other entity, including insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

      f.    <u>Minimum Distributions</u>

There will be no distributions of Cash less than $50 will be made under the Plan to any holder of a claim unless a request for such payment is made in writing to the Disbursing Agent.

      g.    <u>Resolution of Claims</u>

On and after the Effective Date, the Reorganized Debtors will be allowed to compromise, settle or otherwise resolve any objections to claims (including Administrative Expense Claims) and compromise, settle or otherwise resolve any objections with respect to disputed claims without seeking approval from the Bankruptcy Court.

h.    Tort Claims

All tort claims are disputed claims.  No distribution will be made on account of any tort claim unless and until such claim is liquidated and becomes an allowed claim.  Any tort claim that has not yet been liquidated prior to the Effective Date and as to which a proof of claim was timely filed will be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal with appropriate jurisdiction.  Any tort claim determined and liquidated (i) pursuant to a judgment obtained in accordance with section 7.03 and applicable nonbankruptcy law that is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as same may be approved by order of a court of competent jurisdiction, will be paid as follows:  (A) to the extent such liquidated claim is, in whole or in part, an Insured Claim, the insured portion shall be paid by the applicable insurer pursuant to the provisions of Section 7.05 of the Plan and (B) to the extent any portion of such liquidated claim is not covered by any of the Debtors' insurance policies, such uninsured portion shall be deemed, to the extent applicable, an allowed General Unsecured Claim in Class 4 and treated in accordance with Section 4.04 of the Plan.  Nothing in the Plan constitutes a waiver of any claim, right or cause of action that the Debtors or Reorganized Debtors may have against any person in connection with or arising out of any tort claim.  Interest will not begin to accrue on any tort claim until such claim has been liquidated and allowed, as set forth in section 7.03 of the Plan.

## C.    Treatment of Executory Contracts and Unexpired Leases

1.    *Treatment in a Reorganization Transaction*

All executory contracts and unexpired leases, except for those expressly rejected or assumed and assigned to a third party by the Plan or by separate motion, are assumed pursuant to the Plan as of the Effective Date.

The Plan provides for the Debtors to reject those executory contracts and unexpired leases specifically designated as a contract or lease to be rejected on Schedule 8.01(A) and 8.01(B) to the Plan.  The Debtors will file Schedule 8.01(A) and 8.01(B) in a supplement to the Plan prior to the Confirmation Hearing to approve the Plan.  Any time prior to the Confirmation Date, the Debtors may amend Schedule 8.01(A) and 8.01(B).  The Debtors will provide notice to the Equity Committee, the Creditors' Committee, the Postpetition Lenders and parties affected by any amendment to Schedule 8.01(A) and 8.01(B).  Any contract or lease that has already been rejected pursuant to a final order of the Bankruptcy Court or by procedures authorized by the Bankruptcy Court or which is the subject of a separate motion to assume or reject such contract or lease filed prior to the filing of Schedule 8.01(A) or 8.01(B) will not be assumed pursuant to the Plan.  Executory contracts and unexpired leases that are listed on Schedule 8.01(A) and 8.01(B) relating to the use or occupancy of real property are broadly defined to include related agreements or supplements and executory contracts or unexpired leases appurtenant to the premises.  The treatment of these other agreements will be the same as for the underlying agreement (i.e., both will be assumed or both will be rejected) unless the Debtors specifically treat the other agreements separately in accordance with the provisions of the Plan.

2.    *Cure of Defaults*

Generally, if there has been a default (other than a default specified in section 365(b)(2) of the Bankruptcy Code) under an executory contract or unexpired lease, the debtor can assume the contract or lease only if the debtor cures the default.  A condition to the assumption of an executory contract or unexpired lease is that any default under an executory contract or unexpired lease that is to be assumed pursuant to the Plan will be cured in a manner consistent with the Bankruptcy Code and as set

forth in the Plan. Accordingly, except as may otherwise be agreed to by the parties, within 30 days after the Effective Date, the Reorganized Debtors shall pay all undisputed cure claims. All disputed defaults that are required to be cured shall be cured either within 30 days of the entry of a final order determining the amount, if any, of the Debtors' liability with respect to such cure claim, or as may otherwise be agreed to by the parties (in consultation with the Equity Committee).

3.       *Rejection Claims*

If an entity with a claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan has not filed a proof of claim for such damages, that claim will be barred and will not be enforceable against the Debtors unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Reorganized Debtors within 30 days after the later of (i) notice of entry of an order of the Bankruptcy Court approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order and (iii) notice of an amendment to Schedule 8.01(A) or 8.01(B). All such claims not filed within such time will be forever barred from assertion against the Debtors and their estates, the Reorganized Debtors, their respective property and their respective successors or assigns.

**D.      Exit Facility**

The Debtors have obtained exit financing under the DIP Credit Agreement, which will be sufficient to pay administrative expenses and provide necessary working capital for operations after the Effective Date. The Debtors' post-Effective Date financing arrangement consists of a revolving credit facility with commitments, to be designated at the sole discretion of the Debtors, of up to $100 million. The Exit Facility will be secured by the same property as presently secures the DIP Facility portion of the DIP Credit Agreement.

**E.      Effect of Confirmation**

1.       *Vesting of Assets*

Upon the Effective Date, all property of the Debtors' estates will vest in the Reorganized Debtors free and clears all claims, liens, encumbrances, charges, and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

2.       *Discharge of Claims*

The rights afforded to claimants and equity holders in the Plan, and the payments and distributions made thereby, will be in exchange for and in complete satisfaction, discharge and release of all existing debts and claims of any kind, nature or description whatsoever against the Debtors. All holders of existing claims against the Debtors will be enjoined from asserting against the Debtors, or any of their assets or properties, any other or further claim based upon any act or omission, transaction or other activity that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim. In addition, on the Effective Date, each holder of a claim against the Debtors will be forever precluded and enjoined from prosecuting or asserting any discharged claim against the Debtors.

3.   *Exculpation*

The Plan exculpates the Debtors, the Postpetition Lenders, the Creditors' Committee and the Equity Committee, the ad hoc committee of equity interest holders and their respective agents for conduct relating to the prosecution of the chapter 11 cases. Specifically, the Plan provides that neither the Debtors, the Reorganized Debtors, the Creditors' Committee, the Equity Committee, the ad hoc committee of equity holders, or their respective members, officers, directors, employees, agents or professionals will have or incur any liability to any holder of any claim or equity interest for any act or omission in connection with or arising out of the chapter 11 cases, the preparation of this Disclosure Statement, the solicitation of votes in support of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or property to be distributed under the Plan, except for willful misconduct or gross negligence. Notwithstanding anything set forth herein or in the Plan, nothing in the Plan shall be deemed to release or exculpate Deloitte & Touche in connection with claims arising out of or related to Deloitte & Touche's alleged failure to detect and/or disclose material weaknesses in internal controls, accounts payable reconciliation procedures, and write-offs of accounts payable for each of the fiscal years 1997 through 2002. The Plan does not limit the liability of the professionals of the Debtors, the Creditors' Committee, the Equity Committee or the Postpetition Lenders to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

**F.    Derivative Claims**

The Plan provides for the release of all derivative claims that the Debtors have against their officers and directors that are officers and directors as of the Confirmation Date. As discussed in section VI.J. above, the Debtors entered into the AIG Settlement with AIG and certain plaintiffs in respect of certain derivative actions brought by third parties on behalf of the Debtors against certain officers and directors of the Debtors. The AIG Settlement releases any and all claims that could be asserted by the Debtors against the Debtors' officers and directors, whether arising prepetition or postpetition, and based on any legal or equitable theory (whether contractual, common law, statutory or otherwise) against these individuals (i) in connection with Footstar's contemplated restatement of its financial statements for 1997-2002 and (ii) related to the derivative actions. The release is limited to claims that could be asserted by the Debtors and only applies to claims against such parties in their representative capacity. This release, however, is not intended and does not constitute a release of any claims for offset or any uninsured claims that Footstar and the other Releasing Parties (as defined in the AIG Settlement) have had or may have against any of the Released Parties (as defined in the AIG Settlement). The Debtors do not believe that they have any other derivative claims than those claims that were settled pursuant to the AIG Settlement.

**G.    Compensation and Retention Programs**

Subject only to the occurrence of the Effective Date, the Compensation and Retention Program annexed as Exhibit A to the Plan will become effective without any further action by the Reorganized Debtors.

**H.    Employment Contracts**

Subject only to the occurrence of the Effective without further action by the Reorganized Debtors, the employment contract annexed as Exhibit B to the Plan executed by Footstar and Jeffrey Shepard will become effective without any further action by the Reorganized Debtors. On or before November 3, 2005, the Debtors will file as Exhibit C to the Plan forms of employment agreements for Vice Presidents and Senior Vice Presidents, which agreements will become effective on the Effective Date without further action by the Reorganized Debtors. Based upon an agreement with the Equity

Committee, such employment agreements will include the compensation set forth in Exhibit A to the Plan (and supporting documentation delivered to and approved by the Equity Committee), the definition of "for cause" termination set forth on Exhibit D of the Plan and will contain other customary terms and conditions reasonably acceptable to the Debtors, the Equity Committee and such individuals.

**I.    Reorganized Director Stock Plan**

Prior to the Effective Date, Footstar will adopt the Reorganized Director Stock Plan. On the Effective Date, the Reorganized Debtors will implement the Reorganized Director Stock Plan. The Reorganized Director Stock Plan will be an equity-based incentive program for the directors of the Reorganized Debtors pursuant to which such directors will receive shares of Reorganized Footstar's common stock. The terms of the Reorganized Director Stock Plan will be contained in the Plan Supplement.

**J.    Retiree Benefits**

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code subject to any future right to amend, modify or discontinue such benefits. In Footstar's annual report on Form 10-K for the year ended January 1, 2005, which was filed with the Securities and Exchange Commission on September 29, 2005, Footstar estimated its total liability for postretirement benefits at January 1, 2005 to be approximately $27.9 million. Applicable financial accounting rules require Footstar to report its postretirement liabilities as if Footstar will not amend, modify or discontinue such benefits. If Footstar were to eliminate this benefit, its liability for post-termination periods would be approximately $750,000. Footstar has the unilateral right to terminate, modify, or amend the applicable plans. For 2005, Footstar estimates making payments of $1.5 million for postretirement benefit claims. The Debtors' projections currently anticipate paying approximately $1,250,000 annually in postretirement benefits through 2008. To the extent the plans are terminated prior to 2008, the amount payable thereunder may be substantially less.

**K.    Survival of Corporate Reimbursement Obligations**

The obligations of the Debtors to defend, indemnify, reimburse or limit the liability of their directors, officers or employees who are directors, officers or employees, respectively, on or after the Confirmation Date, solely in their capacity as directors, officers or employees, against any claims or obligations pursuant to the Debtors' certificates of incorporation or by-laws, applicable state law or specific agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby and not be discharged irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Commencement Date.

**L.    Certificate of Incorporation of Reorganized Footstar**

Reorganized Footstar's Certificate of Incorporation shall contain provisions restricting the direct or indirect transferability of the equity interests of Reorganized Footstar such that (i) no person or "entity" may acquire or accumulate 4.75% or more (as determined under tax law principles governing the application of section 382 of the Tax Code) of the equity interests of Footstar, (ii) no person or entity owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, 4.75% or more of the equity interests of Footstar may acquire additional equity interests, and (iii) no person or "entity" owning 4.75% or more of Reorganized Footstar may dispose of

more than a one percentage point interest in Reorganized Footstar in a single transaction or series of transactions or on a single day, subject, in each instance, to certain exceptions and limitations (including, without limitation, the right of the Board of Directors to waive such restrictions in its reasonable discretion and allowance for certain acquisitions without the need for prior Board of Directors approval, including, without limitation, qualified tender offers for all of Reorganized Footstar's stock). The foregoing restrictions will expire no later than December 31, 2008.

## M.    Violations of the Trading Order

Except as otherwise ordered by the Bankruptcy Court, in the event that any person or group of persons acquired Equity Interests in the Debtors or the Reorganized Debtors after March 16, 2004 in violation of the Trading Order and such person or group of persons, but for the application of the Trading Order or section 5.05 of the Plan, would be a "5% shareholder" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized Footstar as a result of the implementation of the Plan, such person(s) (and, to the extent necessary, any other person whose ownership would be attributed to any such person for purposes of section 382 of the Tax Code) (herein referred to as the "purported holder") will not be entitled to retain its Equity Interest pursuant to the Trading Order and the Plan in excess of an amount that, in the reasonable determination of Reorganized Footstar, would not make such person or group of persons a 5% shareholder. Except as otherwise ordered by the Bankruptcy Court, Reorganized Footstar (or its designee) as agent (i) will use good faith efforts to sell, to the extent practicable (as determined by the agent), and shall only sell for cash to a third-party that is unrelated to the Reorganized Debtors and the purported holder, any Equity Interests that the purported holder was not entitled to retain under section 5.05 of the Plan by reasons of the Trading Order and the provisions herein and (ii) following any such sale, shall distribute to the person (or persons on a proportionate basis) to the purported holder of such Equity Interest an amount equal to the lesser of (A) the sales proceeds in excess of the agent's expenses in connection with the sale and (B) the price paid by the purported holder for the sold Equity Interest. Any proceeds in excess of the expenses of sale and the amount distributable to the purported holder shall be paid to one or more charitable organizations exempt from tax under section 501(c)(3) of the Tax Code (as determined by the agent), and that is unrelated to Reorganized Footstar, the agent and the purported holder. The reasonable determinations of Reorganized Footstar (or its designee) under section 5.05 of the Plan regarding any amounts of Equity Interests that a purported holder is not permitted to retain will be final and binding. Any disputes under section 5.05 of the Plan will be resolved by the Bankruptcy Court.

## N.    Miscellaneous Provisions

The Plan contains provisions relating to the Disbursing Agent, delivery of distributions, avoidance actions, manner of payment, binding effect, retention of causes of action and reservation of rights, term of injunctions or stays, injunction against interference with the Plan, payment of statutory fees, dissolution of the Creditors' Committee and the Equity Committee, retention of jurisdiction by the Bankruptcy Court, expedited tax determinations, exemption from transfer taxes, severability, revocation and amendment of the Plan, governing law, waiver of conditions, failure of conditions, the Plan Supplement, binding effect and timing. For more information regarding this items, see the Plan attached hereto as Exhibit A.

## IX.

### Certain Factors to Be Considered

**A.      Certain Bankruptcy Considerations**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In addition, although the Debtors believe that the Effective Date will occur on March 31, 2005, there can be no assurance as to such timing.

The Bankruptcy Court may confirm the Plan if at least one impaired class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan to be confirmed with respect to each Debtor, one impaired Class, between Class 2 (Secured Tax Claims) and Class 6 (Footstar Equity Interests) must vote to accept the Plan. As to each impaired class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Debtors believe that the Plan satisfies these requirements. For more information, see section X below.

**B.      Risks Relating to the Recoveries under the Plan**

1.      *Variances from Projections*

The projections included herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, Footstar's ability to operate its business consistent with its business plan, comply with the covenants of its financing agreements, emerge from bankruptcy, attract and retain key executives and staffing at its licensed retail centers and respond to adverse regulatory actions taken by the federal government.

2.      *SEC Fine*

In connection with its investigation of Footstar relating to Footstar's need to restate its financial disclosures, the SEC may fine Footstar. Depending on the size and classification of this fine, the SEC's fine may affect the timing of distribution to holders of Class 4 claims and the value of Footstar Equity Interests.

**C.      Risks Associated with the Business**

Presently, Meldisco is Footstar's only continuing business and substantially all of the Debtors' continuing net sales and profits result from Meldisco's business relationship with Kmart. Kmart store closings during its bankruptcy and reduced traffic in the remaining Kmart stores has had, and continues to have, a negative effect on sales and profits of Meldisco. A continued decline in the Debtors' per store sales in Kmart stores will have a material adverse effect on the Debtors' net sales and profits. Although Kmart emerged from bankruptcy in May of 2003, there can be no assurance that Kmart's operations, or Meldisco's operations in Kmart footwear departments, will return to previous levels of sales or profitability.

Aside from the risks associated with Kmart, the success of Footstar's business on a go-forward basis is subject to other risks. Additional discussion of additional risks related to the Company's business are set forth in greater detail in Footstar's 2004 Form 10-K, filed with the Securities and Exchange Commission on September 29, 2005. See the sections entitled: "Risk Factors." Such risks include: (i) Footstar's ability to maintain internal controls over financial reporting; (ii) a more rapid decline in sales; (iii) the highly competitive nature of the family footwear industry, of which Meldisco is a part; (iv) dependency on seasonal weather conditions; (v) an inability to keep up with ever-changing fashion trends and (vi) risks associated with Footstar's importation of footwear and related accessories from foreign countries.

## X.

### Confirmation of the Plan

#### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The confirmation hearing is scheduled for [    ] Eastern Time, on [        ], before the Honorable Adlai S. Hardin, 300 Quarropas Street, White Plains, NY. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon and received no later than [    ] Eastern Time on [     ] by (i) Footstar, Inc., 933 MacArthur Boulevard, Mahwah, New Jersey  07430 (Attn:  Maureen Richards, Senior Vice-President and General Counsel); (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn:  Martin J. Bienenstock, Esq. and Paul M. Basta, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York  10004 (Attn:  Richard Morrissey, Esq.); (iv) Bingham McCutchen LLP, 399 Park Avenue, New York, New York  10022 (Attn:  Tina Brozman, Esq. and Robert Barry, Esq.); (v) Kronish Lieb Weiner & Hellman LLP, 1114 Avenue of the Americas, New York, New York  10036 (Attn:  Jay Indyke, Esq. and Richard Kanowitz, Esq.), and (vi) Kramer Levin Naftalis & Frankel, 1177 Avenue of the Americas, New York, New York  10036 (Attn: David Feldman, Esq. and Matthew Williams, Esq.).

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

#### B.    General Requirements of Section 1129

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied.

1.    *The Plan complies with the applicable provisions of the Bankruptcy Code.*

2.    *The Debtors have complied with the applicable provisions of the Bankruptcy Code.*

3.    *The Plan has been proposed in good faith and not by any means proscribed by law.*

4.    *Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.*

5.    *The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, affiliates of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.*

6.    *With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.*

7.    *Unless the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.*

8.    *Unless the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed undisputed Administrative Expense and Allowed Other Priority Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such claims deferred Cash payments, over a period not exceeding six (6) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.*

9.    *At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.*

10.    *Confirmation of the Plan is not likely to be followed by the liquidation or the need for further of financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.*

11.    *The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established*

*pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.*

**C.    Best Interests Tests/Liquidation Analysis**

As described above, section 1129(a)(7)(A) of the Bankruptcy Code requires that each holder of an impaired claim or equity interests either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

As stated in Section II, the Debtors will pay all creditors in full with interest. Since the Plan provides for such payment and equity interests will be unaltered, the amount proposed to be paid cannot be less than the amount creditors and stakeholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, no liquidation analysis is necessary.

**D.    Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections described in section IV above. Based upon such projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Although the Debtors' Kmart business will be wound down in 2008, the Debtors will have other assets (including, but not limited to, real estate and trademarks) that may enable them to continue in business on and after 2008. In the event that this is not the case, the Reorganized Debtors will likely sell its remaining assets, dissolve the enterprise and make a final distribution to shareholders.

**E.    Section 1129(b)**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.    *No Unfair Discrimination.*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

2.    *Fair and Equitable Test.*

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- *Secured Creditors.* Each holder of an secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred Cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- *Equity Interests.* Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement because of the following: (i) the claims in Class 4 (General Unsecured Claims) are unimpaired and will receive 100% of their allowed claims (plus interest at the Case Interest Rate); (ii) the claims in Class 5 (Subordinated Claims) will be satisfied by the proceeds from the AIG Settlement; (iii) the interests in Class 6 (Footstar Equity Interests) will remain unaltered except by a certain restriction on trading certain shares contained in Reorganized Footstar's charter and (iv) the interests in Class 7 (Subsidiary Equity Interests) will remain unaltered unless by order of the Bankruptcy Court.

## XI.

### Alternatives to Confirmation and Consummation of this Plan

#### A.    Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in section X.D of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to holders of general unsecured claims and no distributions to equity holders than those provided for in the Plan because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

#### B.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a plan of reorganization has expired) could attempt to formulate a

different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets under chapter 11. The Debtors have concluded that the Plan enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors would still incur the expenses associated with closing or transferring to new operation at numerous store locations. The process would be carried out in a more orderly fashion over a greater period of time. Further, if a trustee were not appointed, because such appointment in not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

**XII.**

**Securities Laws Matters**

The Debtors do not believe that any new securities are being issued under the Plan. Holders of Footstar Equity Interests and Subsidiary Equity Interests will continue to hold the same securities after the Effective Date as they held immediately prior to the Effective Date.

As disclosed in Exhibit A to the Plan, shares of restricted common stock of Reorganized Footstar (the "Management Shares") will be issued to certain senior officers of Reorganized Footstar. The Debtors believe that the Management Shares will be exempt from the registration requirements of the Securities Act, pursuant to Section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

**XIII.**

**Certain Federal Income Tax Consequences of the Plan**

**A.    Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of claims and equity interests. This discussion does not address the federal income tax consequences to holders of unimpaired claims (*e.g.,* Priority Tax Claims, Other Priority Claims, Other Secured Claims or General Unsecured Claims), Secured Tax Claims or any claims which would be reinstated or paid in full on the Effective Date or in ordinary course pursuant to the Plan.

The summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. The federal income tax consequences are subject to certain uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding a claim as part of a hedging, integrated constructive sale or straddle, and investors in pass-through entities).

This discussion also assumes that the various debt and other arrangements to which the Debtors are a party are, and will be, respected for federal income tax purposes in accordance with their form.

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a claim or a Footstar Equity Interest.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of claims and Footstar Equity Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this disclosure statement is not intended or written to be used, and cannot be used, by holders of claims or Footstar Equity Interests for the purpose of avoiding penalties that may be imposed on them under the internal revenue code; (b) such discussion is written in connection with the promotion or marketing by the debtors of the transactions or matters.*

## B.    Consequences to the Debtors

For federal income tax purposes, the Debtors are members of an affiliated group of corporations of which Footstar is the common parent (the "Footstar Group"), and join in the filing of a consolidated federal income tax return. The Footstar Group reported consolidated net operating loss ("NOL") carryforwards for federal income tax purposes of approximately $131 million as of the end of taxable year 2003. In addition, the Footstar Group expects to report additional losses with respect to the taxable year 2004. Prior to July 2005, each of the Footstar's Shoemart Subsidiaries filed its own federal income tax return. The Shoemart Subsidiaries had little or no NOL carryforwards through the taxable year 2003 and certain of the Shoemart Subsidiaries incurred an operating loss for the taxable year 2004, all or a portion of which are expected to be carried back to obtain a refund of prior year taxes. On July 2, 2005, the Shoemart Subsidiaries joined the Footstar Group as a result of the Kmart Settlement. The amount of any NOL carryforwards of the Footstar Group, and the potential application of any limitations (whether new or existing) with respect to the use of such amounts, are estimates and remain subject to audit and adjustment by the IRS.

As discussed below, the Debtors do not expect the implementation of the Plan to significantly affect the amount of the Reorganized Debtors' NOL carryforwards and other tax attributes (including current year losses), or the Reorganized Debtors' ability to utilize such tax attributes in the future. Nevertheless, it is possible that subsequent transactions in respect of the stock of Reorganized Footstar (including certain direct and indirect transfers of the stock) could result in the imposition of limitations on the Reorganized Debtor's ability to utilize such tax attributes against future income.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets – by the amount of any cancellation of debt ("COD"). Where the debtor joins in the filing of a consolidated federal income tax return, Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).

Because the Plan contemplates the payment in full of all claims, either on the Effective Date or over time, the Debtors do not anticipate incurring a significant amount of COD, if any. To the extent any COD is incurred, any reduction in tax attributes would not occur for federal income tax purposes until after the Debtors' tax liability for the taxable year in which the COD is incurred is otherwise determined.

2.     *Limitations on NOL Carryforwards and Other Tax Attributes*

The Tax Code imposes limitations on a corporation's use of NOLs and similar attributes where there has been significant shifting in ownership of the corporation. Although the Debtors do not expect implementation of the Plan to result in the application of these limitations on the Reorganized Debtors' ability to utilize their NOL carryforwards and other tax attributes (including current year losses) to offset future taxable income, it is possible that subsequent changes in the stock ownership of Reorganized Footstar following the Effective Date could result in the imposition of limitations on the Reorganized Debtors' ability to utilize such tax attributes.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of the corporation's loss and tax credit carryforwards as well as certain other tax attributes (including current year losses) allocable to periods prior to the ownership change (collectively, "pre-change losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. Such limitation also may apply to certain losses or deductions which are "built-in" (*i.e.,* attributable to periods prior to the ownership change but not yet taken into account for tax purposes) as of the date of the change that are subsequently recognized.

A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). Although the Debtors do not believe that the Footstar Group has undergone an "ownership change" to date or that the implementation of the Plan (even when combined with prior events) would result in an "ownership change," there will have been a substantial change in the stock ownership of the Footstar Group over the relevant three-year period as of the Effective Date. Accordingly, subsequent changes in Reorganized Footstar's stock ownership, depending on the magnitude—including the purchase or sale of common stock by 5% shareholders, changes in the indirect beneficial ownership of such stock, and issuances or redemptions of common stock —could, either alone or taken together with prior changes in its stock ownership, result in an "ownership change" that would trigger the imposition of limitations under section 382.

Prior to the Effective Date, the Trading Order will remain operative. The Trading Order imposes certain notification requirements and restrictions upon the acquisition or disposition of Footstar common stock by persons or "entities" who are, or would become, "Owners" (as such terms are defined in the Trading Order) of 5% or more of Footstar common stock. In addition, Reorganized Footstar's Certificate of Incorporation will contain provisions restricting certain direct or indirect transfer of the equity interests of Reorganized Footstar through December 31, 2008. *See* Section 9.04 in the Plan.

a.     General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation (or a consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the parent corporation) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.2% for ownership changes

occurring during August 2005). A modified annual limitation applies when a corporation (or consolidated group) that is in bankruptcy undergoes an ownership change, but only when the change occurs *pursuant to* a confirmed plan. Accordingly, the modified limitation would not be applicable to the Footstar Group in the event of a later ownership change.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

      b.    <u>Built-In Gains and Losses</u>

As indicated above, section 382 can operate to limit the deductibility of built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as part of the pre-change losses subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that joined the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

      3.    *Alternative Minimum Tax*

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. As discussed above, the Debtors do not believe that the Footstar Group has undergone an "ownership change" to date or that implementation of the Plan would result in an "ownership change;" nevertheless, the Footstar Group will have undergone a substantial change in its stock ownership within the meaning of section 382 as of Effective Date. As a result, Reorganized Footstar's Certificate of Incorporation will contain certain stock transfer restrictions. *See* Section 9.04 of the Plan.

      54

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in any future taxable year when the corporation is no longer subject to the AMT and otherwise becomes subject to regular tax.

4.    *Implementation of Reorganization Transactions*

In connection with the implementation of the Plan, the Debtors may, in their discretion, merge, dissolve, or consolidate any of the Debtors or otherwise transfer assets between or among the Debtors. The Debtors intend to so merge or dissolve certain subsidiaries pursuant to the Plan. However, they do not anticipate such mergers or dissolutions to have material adverse tax consequences to the Debtors.

## C.    Consequences to Holders of Subordinated Claims

Pursuant to the Plan, holders of Subordinated Claims will receive the proceeds of the AIG Settlement in full and complete satisfaction of their claims. The federal income tax consequences of the treatment of Subordinated Claims (which includes claims for asserted violations of the securities law) are complex and depend, in part, upon whether the holder continues to hold the debt or equity underlying such holder's securities' law claim and whether the holder of such claim is the original holder thereof. Each holder of a Subordinated Claim is urged to consult its tax advisor regarding the tax consequences of the treatment of its claim and the treatment of its receipt of payments under the Plan.

## D.    Consequences to Holders of Footstar Equity Interests

The amendment of the Reorganized Footstar's Certificate of Incorporation pursuant to the Plan should constitute a tax-free "recapitalization" of the common stock of Footstar for U.S. federal income tax purposes. Accordingly, no holder of Footstar common stock should recognize any gain or loss upon implementation of the Plan, each holder's tax basis in its recapitalized shares will not change, and the holding period will include the holder's holding period for the Footstar's Equity Interest from the date it was originally acquired.

## E.    Information Reporting and Withholding

All distributions to holders of claims and equity interests under the Plan are subject to any applicable withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

Treasury regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. These categories are very broad; however, there are numerous

exceptions.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only.  All holders of claims and equity interests are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## XIV.

### Conclusion

The Debtors believe the Plan is in the best interests of all creditors and equity holders and urges the holders of impaired claims in Class 2 (Secured Tax Claims) and Class 6 (Footstar Equity Interests) to vote to accept the Plan and to evidence such acceptance by returning their Ballots.

Dated:  New York, New York
           October 28, 2005

                                        Respectfully submitted,

                                        By:  /s/ Maureen Richards
                                             Name:  Maureen Richards
                                             Title:    Senior Vice-President and
                                                       General Counsel

Counsel:

Martin J. Bienenstock, Esq. (MB 3001)
Paul M. Basta, Esq. (PB 4434)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
    Debtors in Possession

# EXHIBIT A
# TO
# DISCLOSURE STATEMENT

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                                                     :
In re                                                :
                                                     :        Chapter 11
FOOTSTAR, INC., *et al.*,                            :        Case No. 04-22350 (ASH)
                                                     :
                                                     :        (Jointly Administered)
                                    Debtors.         :
------------------------------------------------------x


## DEBTORS' FIRST AMENDED JOINT PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE


WEIL, GOTSHAL & MANGES LLP
   Attorneys for Debtors and
   Debtors in Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000


Dated:  New York, New York
        October 28, 2005

# TABLE OF CONTENTS

<strong>Page</strong>

ARTICLE I        DEFINITIONS AND CONSTRUCTION OF TERMS.................................. 1

ARTICLE II       TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
PRIORITY TAX CLAIMS.................................................... 7

2.01.    Administrative Expense Claims.................................................... 7

2.02.    Postpetition Credit Facility Claims.............................................. 7

2.03.    Professional Compensation and Reimbursement Claims ................ 7

2.04.    Priority Tax Claims................................................................ 7

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .................. 8

ARTICLE IV       TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................ 8

4.01.    CLASS 1 - OTHER PRIORITY CLAIMS.................................. 8

(a)      Impairment and Voting................................................ 8

(b)      Distributions............................................................ 8

4.02.    CLASS 2 - SECURED TAX CLAIMS .................................... 9

(a)      Impairment and Voting................................................ 9

(b)      Distributions............................................................ 9

4.03.    CLASS 3 - OTHER SECURED CLAIMS ................................. 9

(a)      Impairment and Voting................................................ 9

(b)      Distributions/Reinstatement of Claims ............................ 9

4.04.    CLASS 4 - GENERAL UNSECURED CLAIMS ....................... 10

(a)      Impairment and Voting.............................................. 10

(b)      Distributions........................................................... 10

4.05.    CLASS 5 - SUBORDINATED CLAIMS................................ 10

(a)      Impairment and Voting.............................................. 10

(b)      Distributions........................................................... 10

4.06.    CLASS 6 - FOOTSTAR EQUITY INTERESTS ....................... 10

(a)      Impairment and Voting.............................................. 10

(b)      Distributions........................................................... 10

4.07.    CLASS 7 - SUBSIDIARY EQUITY INTERESTS..................... 10

(a)      Impairment and Voting.............................................. 10

(b)      Distributions........................................................... 10

i

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE V        IMPLEMENTATION OF THE PLAN ..............................................................11

5.01.    Substantive Consolidation of the Debtors.......................................................11

5.02.    Intercompany Claims.......................................................................................11

5.03.    Merger, Dissolution, or Consolidation of Debtor and Non-Debtor
         Subsidiaries....................................................................................................11

5.04.    Cancellation of Existing Agreements ..............................................................11

5.05.    Violations of Trading Order.............................................................................11

ARTICLE VI       PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
                 UNDER THE PLAN.......................................................................................12

6.01.    Voting of Claims and Interests ........................................................................12

6.02.    Nonconsensual Confirmation...........................................................................12

6.03.    Distributions....................................................................................................12

6.04.    Distributions of Cash ......................................................................................12

6.05.    Timing of Distributions...................................................................................12

6.06.    Delivery of Distributions ................................................................................12

6.07.    Minimum Distributions....................................................................................13

6.08.    Manner of Payment..........................................................................................13

6.09.    Distributions to Holders as of the Distribution Notification Date .................13

6.10.    Unclaimed Distributions .................................................................................13

6.11.    Setoffs .............................................................................................................13

ARTICLE VII      PROCEDURES FOR TREATING DISPUTED CLAIMS ...........................14

7.01.    Objections to Administrative Expense Claims and Claims.............................14

7.02.    No Distributions Pending Allowance ..............................................................14

7.03.    Tort Claims .....................................................................................................14

7.04.    Distributions to Holders of Disputed General Unsecured Claims|
         Following Allowance.......................................................................................14

7.05.    Distributions Relating to Allowed Insured Claims.........................................15

7.06.    Resolution of Administrative Expense Claims and Claims.............................15

ARTICLE VIII     EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....................15

## TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 8.01. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 15 |
| 8.02. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 15 |
| 8.03. | Inclusiveness | 16 |
| 8.04. | Cure of Defaults | 16 |
| 8.05. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 16 |
| 8.06. | Survival of Corporate Reimbursement Obligations | 16 |
| 8.07. | Compensation and Retention Program | 16 |
| 8.08. | Employment Contracts | 16 |
| 8.09. | Reorganized Director Stock Plan | 17 |
| 8.10. | Retiree Benefits | 17 |
| ARTICLE IX | PROVISIONS REGARDING CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 17 |
| 9.01. | General | 17 |
| 9.02. | Directors and Officers of the Reorganized Debtors | 17 |
| | (a)    Reorganized Debtors' Boards of Directors | 17 |
| | (b)    Reorganized Debtors' Officers | 17 |
| 9.03. | Issuance of Non-Voting Securities | 17 |
| 9.04. | Certificate of Incorporation of Reorganized Footstar | 17 |
| ARTICLE X | EFFECT OF CONFIRMATION | 18 |
| 10.01. | Vesting of Assets | 18 |
| 10.02. | Discharge of Claims | 18 |
| 10.03. | Discharge of Debtors | 18 |
| 10.04. | Injunction | 18 |
| 10.05. | Term of Injunctions or Stays | 19 |
| 10.06. | Exculpation | 19 |
| 10.07. | Avoidance Actions | 19 |
| 10.08. | Retention of Causes of Action/Reservation of Rights. | 20 |

iii

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE XI    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...................... 20

11.01.    Effectiveness .................................................................................................. 20

11.02.    Failure of Conditions ..................................................................................... 21

11.03.    Waiver of Conditions ...................................................................................... 21

ARTICLE XII    RETENTION OF JURISDICTION ............................................................. 21

ARTICLE XIII    MISCELLANEOUS PROVISIONS ............................................................ 22

13.01.    Effectuating Documents and Further Transactions ........................................ 22

13.02.    Withholding and Reporting Requirements .................................................... 22

13.03.    Corporate Action ........................................................................................... 23

13.04.    Exemption from Transfer Taxes .................................................................... 23

13.05.    Payment of Statutory Fees ............................................................................ 23

13.06.    Post-Confirmation Date Professional Fees and Expenses ............................ 23

13.07.    Dissolution of the Creditors' Committee and Equity Committee.................. 24

13.08.    Plan Supplement ........................................................................................... 24

13.09.    Amendment or Modification of the Plan ...................................................... 24

13.10.    Revocation or Withdrawal of the Plan .......................................................... 25

13.11.    Severability .................................................................................................... 25

13.12.    Expedited Tax Determination ....................................................................... 25

13.13.    Governing Law .............................................................................................. 25

13.14.    Binding Effect ............................................................................................... 25

13.15.    Exhibits/Schedules ........................................................................................ 25

13.16.    Notices ........................................................................................................... 25

iv

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                            :
**In re**                                    :
                                            :        **Chapter 11**
**FOOTSTAR, INC.,** *et al.,*                :        **Case No. 04-22350 (ASH)**
                                            :
                                            :        **(Jointly Administered)**
                    **Debtors.**             :
--------------------------------------------------------x

## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Footstar, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of title 11 of the United States Code:

## ARTICLE I

DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions.  As used herein, the following terms have the respective meanings specified below:

1.01.    Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any indebtedness or obligations incurred under the Postpetition Credit Facility, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 13.05 of the Plan.

1.02.    AIG Settlement means that certain settlement resolving (i) an insurance coverage dispute, (ii) certain class action lawsuits, and (iii) certain derivative lawsuits between and among the Debtors, AIG Technical Services, Inc., on behalf of Illinois National Fire Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA, and the plaintiffs party to such class action and derivative lawsuits, which settlement was approved by Bankruptcy Court order, dated July 1, 2004.

1.03.    Allowed means, with reference to any Claim against the Debtors, (i) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim allowed hereunder, (iii) any Claim that is compromised, settled, or otherwise resolved

pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.06 of the Plan, or (iv) any Claim that, if Disputed, has been Allowed by Final Order; *provided, however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include (i) interest on such Administrative Expense Claim or Claim from and after the Commencement Date or (ii) any portion of a Claim that is Disputed.

1.04.    Avoidance Actions means any actions as defined in Section 10.07 hereof.

1.05.    Ballot means the form distributed to each holder of an impaired Claim or Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.06.    Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.07.    Bankruptcy Court means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.08.    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.09.    Business Day means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.10.    Case Interest Rate means simple interest at the federal judgment rate of 1.23 % per annum from the Commencement Date through the Effective Date; *provided, however*, that, unless otherwise waived, interest on Claims arising out of the rejection of executory contracts and unexpired leases shall commence accruing from the effective date of rejection of the applicable executory contract or unexpired lease.

1.11.    Cash means legal tender of the United States of America.

1.12.    Causes of Action means any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.13.    Chapter 11 Cases means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled *In re Footstar, Inc., et al.*, Chapter 11 Case No. 04-22350 (ASH), which are currently pending before the Bankruptcy Court.

1.14.    Claim shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.15.    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.16.    Collateral means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.17.    Commencement Date means March 2, 2004 with respect to Footstar and March 3, 2004 with respect to each of the other Debtors.

1.18.    Company means Footstar together with its direct and indirect Debtor and Non-Debtor Subsidiaries.

1.19.    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.20.    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.21.    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall comply with the provisions of the Postpetition Credit Facility.

1.22.    Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.23.    Cure Claim means any Allowed Claim arising as a result of any and all defaults under any executory contract or unexpired lease assumed or assumed and assigned by the Debtors during the Chapter 11 Cases in accordance with section 365 of the Bankruptcy Code.

1.24.    Debtors in Possession means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.25.    Debtors means Footstar, Inc., Footstar Corporation, and Footstar HQ, LLC.

1.26.    Disbursing Agent means any Debtor or Reorganized Debtor or its assign, in its capacity as Disbursing Agent pursuant to Section 6.03 of the Plan.

1.27.    Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.28.    Disputed means, with reference to any Claim, (i) any Claim, proof of which was timely and properly filed, or any Administrative Expense Claim that is disputed under the Plan or as to which a timely objection has been interposed in accordance with section 7.01 of this Plan

and/or request for estimation has been made in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.

1.29.    <u>Distribution Notification Date</u> means the day that is three (3) Business Days from and after the Confirmation Date.

1.30.    <u>Effective Date</u> means the first (1st) Business Day on which the conditions specified in Section 11.01 of the Plan have been satisfied or waived.

1.31.    <u>Equity Committee</u> means the committee of holders of Footstar Equity Interests appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.32.    <u>Equity Interest</u> means any share of common or preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.33.    <u>Exit Facility</u> means the Postpetition Credit Facility, as amended from time to time, on and after the Effective Date.

1.34.    <u>Final Order</u> means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.35.    <u>Footstar</u> means Footstar, Inc., a Delaware corporation.

1.36.    <u>Footstar Equity Interest</u> means an Equity Interest in Footstar.

1.37.    <u>General Unsecured Claim</u> means any Claim other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, or Subordinated Claim.

1.38.    <u>Insured Claim</u> means any Claim arising from an incident or occurrence that is covered under the Debtors' insurance policies.

1.39.    Lien shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.40.    Non-Debtor Subsidiary means any direct or indirect Subsidiary of Footstar that is not a Debtor.

1.41.    Other Priority Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.42.    Other Secured Claim means any Secured Claim, other than a Secured Tax Claim.

1.43.    Plan means this chapter 11 plan of reorganization, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time.

1.44.    Plan Supplement means the document containing the forms of documents specified in Section 13.08 of the Plan.

1.45.    Postpetition Credit Facility means that certain Amended and Restated Debtor in Possession and Exit Credit Agreement, as amended, supplemented, or modified from time to time, by and among Footstar and Footstar Corporation as borrowers and the Postpetition Lenders.

1.46.    Postpetition Lenders means, collectively, the banks and financial institutions that are parties to the Postpetition Credit Facility and their successors and assigns.

1.47.    Priority Tax Claim means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.48.    Reorganized Debtors means, collectively, each of the Debtors on and after the Effective Date.

1.49.    Reorganized Footstar means Footstar on and after the Effective Date.

1.50.    Schedules means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.51.    Secured Claim means any Claim (i) to the extent reflected in the Schedules or upon a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.52.    Secured Tax Claim means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code

(determined irrespective of time limitations), and including any related Secured Claim for penalties.

1.53.    Subordinated Claim means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of shares or any other securities, if any, of any of the Debtors or an affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the forgoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges, or costs incurred on account of the forgoing Claims, or, (iv) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.

1.54.    Subsidiary means (i) any corporation, association, or other business entity of which more than fifty (50%) percent of the total voting power of shares or other voting securities outstanding thereof is at the time owned or controlled, directly or indirectly, by Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) and (ii) any partnership or limited liability company (A) the sole general partner, the managing general partner, or the managing member of which is Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof) or (B) the only general partners or members of which are Footstar or one or more of the other Subsidiaries of Footstar (or any combination thereof).

1.55.    Subsidiary Equity Interest means any Equity Interest in any of the Debtors other than Footstar.

1.56.    Substantive Consolidation Order means the Court's Order Pursuant to Sections 105, 363, and 1112(B) of the Bankruptcy Code and Bankruptcy Rules 1017 and 9014 Granting Substantive Consolidation, dated September 30, 2005.

1.57.    Tax Code means the Internal Revenue Code of 1986, as amended.

1.58.    Tort Claim means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, arising from or relating to personal injury, wrongful death, property damage, products liability, discrimination, employment or similar litigation Claim. A Tort Claim may also be an Insured Claim.

1.59.    Trading Order means, collectively, the Interim and Final Orders Pursuant to Sections 362 and 105(a) of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, dated March 2, 2004 and March 30, 2004, respectively.

Interpretation; Application of Definitions and Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.  Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule

to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, Subsection, or Clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II

### TREATMENT OF ADMINISTRATIVE
### EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.01.    Administrative Expense Claims. Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim, other than Postpetition Credit Facility Claims, shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.02.    Postpetition Credit Facility Claims. On the Effective Date, all Loans (as defined in the Postpetition Credit Facility) or other required payments, including, without limitation, all fees, costs, and expenses due and owing under the Postpetition Credit Facility shall be indefeasibly paid in Cash in full.

2.03.    Professional Compensation and Reimbursement Claims. All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is ninety (90) days after the Confirmation Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Reorganized Debtors.

2.04.    Priority Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the

later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable (but not prior to the date of assessment), through the sixth (6th) anniversary of the date of assessment of such Allowed Priority Tax Claim, or (iii) such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims, Postpetition Credit Facility Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Subordinated Claims | Unimpaired | No (deemed to accept) |
| Class 6 | Footstar Equity Interests | Impaired | Yes |
| Class 7 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.01.   CLASS 1 - OTHER PRIORITY CLAIMS.

(a)   Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

4.02.    CLASS 2 - SECURED TAX CLAIMS.

(a)    <u>Impairment and Voting</u>.  Class 2 is impaired by the Plan.  Each holder of an Allowed Secured Tax Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at a fixed annual rate equal to five (5.0%) percent, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, through the sixth (6th) anniversary of the date of assessment of such Allowed Secured Tax Claim, or (iii) such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

4.03.    CLASS 3 - OTHER SECURED CLAIMS.

(a)    <u>Impairment and Voting</u>.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions/Reinstatement of Claims</u>.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Reorganized Debtors, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

4.04.   CLASS 4 - GENERAL UNSECURED CLAIMS.

(a)   Impairment and Voting. Class 4 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. On the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed General Unsecured Claim shall be paid Cash in an amount equal to the Allowed amount of such holder's General Unsecured Claim plus interest at the Case Interest Rate calculated through the Effective Date in full and complete satisfaction of such holder's General Unsecured Claim.

4.05.   CLASS 5 - SUBORDINATED CLAIMS.

(a)   Impairment and Voting. Class 5 is unimpaired by the Plan. Each holder of an Allowed Subordinated Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Each holder of an Allowed Subordinated Claim shall be paid pursuant to the AIG Settlement in full and complete satisfaction of such holder's Subordinated Claim.

4.06.   CLASS 6 - FOOTSTAR EQUITY INTERESTS.

(a)   Impairment and Voting. Class 6 is impaired by the Plan. Each holder of a Footstar Equity Interest is entitled to vote to accept or reject the Plan.

(b)   Distributions. Except as set forth in Section 9.04 of the Plan, the Equity Interests held by each Footstar Equity Interest holder shall be unaltered.

4.07.   CLASS 7 - SUBSIDIARY EQUITY INTERESTS.

(a)   Impairment and Voting. Class 7 is unimpaired by the Plan. Each holder of a Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Subject to the merger, dissolution, or other consolidation of the Subsidiaries following the Effective Date as set forth in the Substantive Consolidation Order or pursuant to Section 5.03 of the Plan, the Equity Interests held by each Subsidiary Equity Interest holder shall be unaltered.

ARTICLE V

IMPLEMENTATION OF THE PLAN

5.01.    Substantive Consolidation of the Debtors.  The Plan is premised upon the substantive consolidation of the Company pursuant to the Substantive Consolidation Order.

5.02.    Intercompany Claims.  Intercompany Claims held by any Debtor or Non-Debtor Subsidiary against any other Debtor or Non-Debtor Subsidiary shall be treated in accordance with the Substantive Consolidation Order.

5.03.    Merger, Dissolution, or Consolidation of Debtor and Non-Debtor Subsidiaries.  In addition to the authority granted pursuant to Substantive Consolidation Order, on or as of the Effective Date, within the sole and exclusive discretion of the Reorganized Debtors, the Reorganized Debtors may, notwithstanding any other transactions described in the Plan, (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, or (iii) engage in any other transaction in furtherance of the Plan.  Any such transaction shall be effective pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors, the Debtors in Possession, or the Reorganized Debtors.

5.04.    Cancellation of Existing Agreements.  On the Effective Date, any document, agreement, or instrument evidencing any Claim, other than a Claim that is reinstated under the Plan, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims, as the case may be, shall be discharged.

5.05.    Violations of Trading Order.  Except as otherwise ordered by the Bankruptcy Court, in the event that any person or group of persons acquired Equity Interests in the Debtors or the Reorganized Debtors after March 16, 2004 in violation of the Trading Order and such person or group of persons, but for the application of the Trading Order or this Section 5.05, would be a "5% shareholder" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Reorganized Footstar as a result of the implementation of the Plan, such person(s) (and, to the extent necessary, any other person whose ownership would be attributed to any such person for purposes of section 382 of the Tax Code) (herein referred to as the "purported holder") shall not be entitled to retain its Equity Interest pursuant to the Trading Order and the Plan in excess of an amount that, in the reasonable determination of Reorganized Footstar, would not make such person or group of persons a 5% shareholder.  Except as otherwise ordered by the Bankruptcy Court, Reorganized Footstar (or its designee) as agent (i) shall use good faith efforts to sell, to the extent practicable (as determined by the agent), and shall only sell for cash to a third-party that is unrelated to the Reorganized Debtors and the purported holder, any Equity Interests that the purported holder was not entitled to retain under this Section 5.05 by reasons of the Trading Order and the provisions herein and (ii) following any such sale, shall distribute to the person (or persons on a proportionate basis) to the purported holder of such Equity Interest an amount equal to the lesser of (A) the sales proceeds in excess of the agent's expenses in connection with the sale and (B) the price paid by the purported holder for the sold Equity Interest.  Any proceeds in excess of the expenses of sale

and the amount distributable to the purported holder shall be paid to one or more charitable organizations exempt from tax under section 501(c)(3) of the Tax Code (as determined by the agent), and that is unrelated to Reorganized Footstar, the agent and the purported holder.  The reasonable determinations of Reorganized Footstar (or its designee) under this Section 5.05 regarding any amounts of Equity Interests that a purported holder is not permitted to retain shall be final and binding.  Any disputes under this Section 5.05 shall be resolved by the Bankruptcy Court.

ARTICLE VI

PROVISIONS REGARDING VOTING
AND DISTRIBUTIONS UNDER THE PLAN

6.01.    Voting of Claims and Interests.  Each holder of an Allowed Claim or Equity Interest in an impaired Class of Claims or Equity Interests that is entitled to vote on the Plan pursuant to Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

6.02.    Nonconsensual Confirmation.  If any impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.09 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

6.03.    Distributions.  All distributions under the Plan shall be made by the Disbursing Agent.

6.04.    Distributions of Cash.  Any payment of Cash made pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

6.05.    Timing of Distributions.  In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.06.    Delivery of Distributions.  Subject to Bankruptcy Rule 9010, all distributions of Cash under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Notification Date, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim or Claim transfer agreement by such holder that provides an address for such holder different from the address reflected on the Schedules.  In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined

the then current address of such holder, at which time such distribution shall be made to such holder; *provided, however*, that, with respect to any creditor whose distribution is returned as undeliverable, interest shall cease accruing on such creditor(s) Claim(s) on the date that such undeliverable distribution was first distributed; *provided further, however*, that, at the expiration of one (1) year from the date such distribution is first made such distribution shall be deemed unclaimed property and shall be treated in accordance with Section 6.10 of the Plan.

6.07.    <u>Minimum Distributions</u>. No payment of Cash of less than fifty ($50) dollars shall be made to any holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

6.08.    <u>Manner of Payment</u>. All distributions under the Plan shall be made by, or on behalf of Reorganized Footstar. To the extent that Cash is distributed by Reorganized Footstar to holders of Claims against a Debtor (other than Footstar) in exchange for such holders' Claims, the portion of the Claims for which such Cash is distributed shall be treated as acquired by Reorganized Footstar. Immediately thereafter, pursuant to the terms hereof, Reorganized Footstar shall make a capital contribution of such Claims, either directly or indirectly, to the applicable Reorganized Debtor and such Claims shall immediately be cancelled and discharged. Any distributions that revert to any of the Reorganized Debtors or are otherwise cancelled (such as to the extent any distributions have not been claimed within one (1) year or are cancelled pursuant to Section 6.10 of the Plan) shall revest solely in Reorganized Footstar, and any applicable Reorganized Debtor (other than Reorganized Footstar) shall not have (nor shall it be considered to ever have had) any ownership interest in such amounts.

6.09.    <u>Distributions to Holders as of the Distribution Notification Date</u>. As of the close of business on the Distribution Notification Date, the Claims register shall be closed, and there shall be no further changes in the record holder of any Claim. The Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Notification Date. The Disbursing Agent shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Notification Date.

6.10.    <u>Unclaimed Distributions</u>. All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in Reorganized Footstar and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

6.11.    <u>Setoffs</u>. The Disbursing Agent may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim the Debtors or Reorganized Debtors may have against the holder of such Claim.

ARTICLE VII

PROCEDURES FOR TREATING DISPUTED CLAIMS

7.01.    Objections to Administrative Expense Claims and Claims.  The Reorganized Debtors and the Equity Committee shall be entitled to object to Administrative Expense Claims and Claims.  Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) ninety (90) days after the Confirmation Date, and (ii) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date specified in clause (i) above; *provided*, *however*, that objections, if any, to Postpetition Credit Facility Claims that arise prior to the date of the approval of the Disclosure Statement must be filed prior to the Confirmation Date.

7.02.    No Distributions Pending Allowance.  Notwithstanding any other provision of the Plan, if any Claim or portion thereof is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or any portion thereof unless and until such Disputed Claim is Allowed.

7.03.    Tort Claims.  All Tort Claims are Disputed Claims.  No distributions shall be made on account of any Tort Claim unless and until such Claim is liquidated and becomes an Allowed Claim.  Any Tort Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim (i) was properly and timely filed in the Chapter 11 Cases and (ii) was not expunged and disallowed by order of the Bankruptcy Court, shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  Any Tort Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with this Section and applicable nonbankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as same may be approved by order of a court of competent jurisdiction, shall be paid as follows: (A) to the extent such liquidated Claim is, in whole or in part, an Insured Claim, the insured portion shall be paid by the applicable insurer pursuant to the provisions of Section 7.05 of the Plan and (B) to the extent any portion of such liquidated Claim is not covered by any of the Debtors' insurance policies, such uninsured portion shall be deemed, to the extent applicable, an Allowed Claim in Class 4 and treated in accordance with Section 4.04 of the Plan.  Nothing contained in this Section shall constitute or be deemed a waiver of any Claim, right, or Cause of Action that the Debtors or Reorganized Debtors may have against any person in connection with or arising out of any Tort Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.  Notwithstanding any other provision of the Plan, interest shall not commence accruing on any Tort Claim until such Claim has been liquidated and Allowed as set forth in this Section 7.03.

7.04.    Distributions to Holders of Disputed General Unsecured Claims Following Allowance.  Subsequent to the Effective Date, after such time as a Disputed General Unsecured Claim becomes Allowed, the Disbursing Agent shall pay the holder of such Claim in accordance with Section 4.04 of the Plan on the date that is twenty (20) days from the date upon which the order or judgment of the Bankruptcy Court allowing such Disputed General Unsecured Claim

becomes a Final Order or as soon thereafter as is as practicable, or such earlier date as agreed to by the Reorganized Debtors.

7.05.  <u>Distributions Relating to Allowed Insured Claims</u>.  Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or Reorganized Debtors may hold against any other entity, including, without limitation, insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

7.06.  <u>Resolution of Administrative Expense Claims and Claims</u>.  On and after the Effective Date, Reorganized Footstar shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims and Claims and compromise, settle, or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court.

ARTICLE VIII

<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

8.01.  <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.  All executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion or notice for approval of the assumption, assumption and assignment, or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.01(A) (executory contracts) or Schedule 8.01(B) (unexpired leases), which Schedules shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and 8.01(B) to the Postpetition Lenders, Creditors' Committee, the Equity Committee, and parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedule 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.02.  <u>Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption or assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to Section 8.01 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the unexpired leases specified in Section 8.01

of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.01 of the Plan.

8.03.    Inclusiveness.  Unless otherwise specified on Schedules 8.01(A) and 8.01(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.01(A) and 8.01(B) shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) and 8.01(B).

8.04.    Cure of Defaults.  Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors shall pay all undisputed Cure Claims.  All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties (in consultation with the Equity Committee).

8.05.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.01 of the Plan must be filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule 8.01(A) or 8.01(B).  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, the Reorganized Debtors, their respective property, and their respective successors and assigns.

8.06.    Survival of Corporate Reimbursement Obligations.  The obligations of the Debtors to defend, indemnify, reimburse, or limit the liability of their directors, officers, or employees who are directors, officers, or employees, respectively, on or after the Confirmation Date, solely in their capacity as directors, officers, or employees, against any Claims or obligations pursuant to the Debtors' certificates of incorporation or by-laws, applicable state law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before, on, or after the Commencement Date.

8.07.    Compensation and Retention Program.  Subject only to the occurrence of the Effective Date, the Compensation and Retention Program annexed hereto as Exhibit A shall become effective without any further action by the Reorganized Debtors.

8.08.    Employment Contracts.  Subject only to the occurrence of the Effective Date, the Employment Contract annexed hereto as Exhibit B executed by Footstar and Jeffrey Shepard shall become effective without any further action by the Reorganized Debtors.  On or before November 3, 2005, the Debtors will file as Exhibit C hereto employment agreements for Vice-

Presidents and Senior Vice-Presidents, which agreements will become effective on the Effective Date without further action by the Reorganized Debtors. Based upon an agreement with the Equity Committee, such employments agreements will include the compensation for such individuals that is set forth in Exhibit A annexed hereto, the definition of "for cause" termination set forth in Exhibit D annexed hereto, and will contain other customary terms and conditions reasonably acceptable to the Debtors, the Equity Committee, and such individuals.

8.09.    Reorganized Director Stock Plan.  Prior to the Effective Date, Footstar shall adopt the Reorganized Director Stock Plan. On the Effective Date, Reorganized Footstar shall implement the Reorganized Director Stock Plan. The Reorganized Director Stock Plan shall be an equity-based incentive program for the directors of Reorganized Footstar pursuant to which such directors shall receive shares of Reorganized Footstar common stock. The terms of the Reorganized Director Stock Plan shall be contained in the Plan Supplement.

8.10.    Retiree Benefits.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code subject to any future right to amend, modify, or discontinue such benefits.

ARTICLE IX

PROVISIONS REGARDING CORPORATE GOVERNANCE
AND MANAGEMENT OF THE REORGANIZED DEBTORS

9.01.    General.  On the Effective Date, the management, control, and operation of Reorganized Footstar and the Reorganized Debtors shall become the general responsibility of the Boards of Directors of Reorganized Footstar and the Reorganized Debtors, respectively.

9.02.    Directors and Officers of the Reorganized Debtors.

(a)    Reorganized Debtors' Boards of Directors.  The Equity Committee shall select, in their sole discretion, the initial directors of the Reorganized Debtors on and after the Effective Date; provided, however, the Chief Executive Officer of the Reorganized Debtors shall be a member of the initial Board of Directors of Reorganized Footstar. Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and the Reorganized Debtors' Certificates of Incorporation and Reorganized Debtors' By-laws, as the same may be amended from time to time.

(b)    Reorganized Debtors' Officers.  The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with the Reorganized Debtors, and the Reorganized Debtors' Certificates of Incorporation and Reorganized Debtors' By-laws, as the same may be amended from time to time.

9.03.   Issuance of Non-Voting Securities. From and after the Effective Date, the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code so long as it is applicable.

9.04.   Certificate of Incorporation of Reorganized Footstar. Reorganized Footstar's Certificate of Incorporation shall contain provisions restricting the direct or indirect transferability of the equity interests of Reorganized Footstar such that (i) no person or "entity" may acquire or accumulate 4.75% or more (as determined under tax law principles governing the application of section 382 of the Tax Code) of the equity interests of Footstar, (ii) no person or entity owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, 4.75% or more of the equity interests of Footstar may acquire additional equity interests, and (iii) no person or "entity" owning 4.75% or more of Reorganized Footstar may dispose of more than a one percentage point interest in Reorganized Footstar in a single transaction or series of transactions or on a single day, subject, in each instance, to certain exceptions and limitations (including, without limitation, the right of the Board of Directors to waive such restrictions in its reasonable discretion and allowance for certain acquisitions without the need for prior Board of Directors approval, including, without limitation, qualified tender offers for all of Reorganized Footstar's stock). The foregoing restrictions shall expire not later than December 31, 2008.

ARTICLE X

EFFECT OF CONFIRMATION

10.01.   Vesting of Assets. Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided herein. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.02.   Discharge of Claims. Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.

10.03.   Discharge of Debtors. Upon the Effective Date, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a

Claim shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, including rights of setoff and recoupment, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Reorganized Debtors or any of their assets or properties.

10.04. Injunction. Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Reorganized Debtors with respect to any Claim, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Reorganized Debtors on account of any Claim, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Reorganized Debtors, or against the property or interests in property of the Reorganized Debtors on account of any Claim, (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan, and (v) taking any actions to interfere with the implementation or consummation of the Plan.

10.05. Term of Injunctions or Stays. Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, including, but not limited to, the Trading Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

10.06. Exculpation. None of the Debtors, the Reorganized Debtors, the Postpetition Lenders, the Creditors' Committee, or the Equity Committee, the *ad hoc* committee of equity interest holders, or their respective employees, officers, directors, current or former members, or professionals shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the preparation or negotiation of the Disclosure Statement, the solicitation of votes in connection with the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence; *provided, however,* notwithstanding the foregoing, nothing in the Plan shall be deemed to release or exculpate Deloitte & Touche in connection with claims arising out of or related to Deloitte & Touche's alleged failure to detect and/or disclose material weaknesses in internal controls, accounts payable reconciliation procedures, and write-offs of accounts payable for each of the fiscal years 1997 through 2002. Nothing in this Section 10.06 shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the Postpetition Lenders, the Creditors' Committee, or the Equity Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

10.07.  Avoidance Actions.  From and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 546, 548(a)(1)(A), 549 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.  The Reorganized Debtors shall not retain the right to prosecute any Avoidance Actions under sections 547 or 548(a)(1)(B) of the Bankruptcy Code.

10.08.  Retention of Causes of Action/Reservation of Rights.

(a)     Except as limited by Section 10.07 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of the estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Reorganized Debtors, their officers, directors, or representatives, (ii) the turnover of any property of the Debtors' estates, and (iii) Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, or auditors relating to acts or omissions occurring prior to the Commencement Date; *provided, however,* that the Reorganized Debtors shall not retain the right to prosecute any Causes of Action against any of the officers, directors, or employees of the Debtors that are officers, directors, or employees of the Debtors as of the Confirmation Date and such Causes of Action shall be, and shall be deemed to be, extinguished pursuant to the Plan.

(b)     Except as limited by Section 10.07 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted by the Reorganized Debtors after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

ARTICLE XI

CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.01.  Effectiveness.  The Plan shall not become effective unless and until the following conditions shall have been satisfied (*provided* that the determination to become effective on any date prior to March 31, 2006 shall be subject to the consent of the Equity Committee) or waived pursuant to Section 11.03 of the Plan:

(a)     The Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered, and there shall not be a stay or injunction in effect with respect thereto;

(b)    All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(c)    The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, audited financial statements, and documents that are necessary to implement the Plan and that are required by law, regulation, or order; and

(d)    On or prior to March 31, 2006, the Debtors shall have sufficient Cash on hand (after establishing appropriate reserves as determined by the management of Footstar, in consultation with the Equity Committee) to pay Allowed Claims in accordance with Article 4 of the Plan.

11.02.    Failure of Conditions.  In the event that one or more of the conditions specified in Section 11.01 of the Plan have not occurred or otherwise been waived pursuant to Section 11.03, (i) the Confirmation Order shall be vacated, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

11.03.    Waiver of Conditions.  Footstar, with the consent of the Equity Committee and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.01 of the Plan.

ARTICLE XII

RETENTION OF JURISDICTION

12.01.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure Claims and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)    To hear and determine any and all adversary proceedings, applications, and contested matters;

(c)    To hear and determine any objection to Administrative Expense Claims or Claims or otherwise resolve any Disputed Claims;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(i)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)    To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(m)    To hear any other matter not inconsistent with the Bankruptcy Code; and

(n)    To enter a final decree closing the Chapter 11 Cases.

ARTICLE XIII

MISCELLANEOUS PROVISIONS

13.01. Effectuating Documents and Further Transactions. The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.02. Withholding and Reporting Requirements. In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any

instrument or making any distribution under the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.03. <u>Corporate Action</u>. On the Effective Date, all matters provided for under the Plan that may otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) the effectiveness of the Reorganized Footstar Certificate of Incorporation, (ii) the implementation of the Reorganized Director Stock Plan or issuance of shares of Reorganized Footstar common stock thereunder, (iii) the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors, and (iv) the effectiveness of the Compensation and Retention Program annexed to the Plan as Exhibit B and the Employment Agreements annexed to the Plan as Exhibit C shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors and the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized Footstar shall, if required, file its amended certificate of incorporation with the Secretary of State in accordance with the applicable general corporation law.

13.04. <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. Any sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

13.05. <u>Payment of Statutory Fees</u>. On the Effective Date, and thereafter as may be required, the Disbursing Agent shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.06.  <u>Post-Confirmation Date Professional Fees and Expenses</u>.  From and after the Confirmation Date, the Disbursing Agent shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Footstar, the Reorganized Debtors, the Creditors' Committee, and/or the Equity Committee, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

13.07.  <u>Dissolution of the Creditors' Committee and Equity Committee</u>.  The Creditors' Committee and Equity Committee shall terminate upon the Effective Date and their respective members and employees or agents (including attorneys, financial advisors, accountants, and other professionals) shall be released and discharged from any further authority, duties, responsibilities, and obligations relating to, arising from, or in connection with their service on such committees, except that the Creditors' Committee and Equity Committee may evaluate, object to (if necessary), and appear at the hearing to consider (i) applications for final allowances of compensation and reimbursement of expenses, including applications for compensation or reimbursement under section 503 of the Bankruptcy Code, and support or prosecute any objections to such applications and appeals therefrom, if appropriate, and (ii) any post-Confirmation Date modifications to, or motions seeking the enforcement of, this Plan or the Confirmation Order.  The post-Confirmation Date professional fees of the Creditors' Committee and Equity Committee for the services set forth in the preceding sentence shall be paid pursuant to Section 13.06 of the Plan.

13.08.  <u>Plan Supplement</u>.  The Plan Supplement shall contain (i) Reorganized Footstar's certificate of incorporation, if amended, (ii) Reorganized Footstar's by-laws, if amended, (iii) Schedules 8.01(A) and 8.01(B) referred to in Section 8.01 of the Plan, (iv) the Reorganized Director Stock Plan, and (v) any other appropriate documents; *provided, however,* that such forms of documents shall be subject to the consent of the Equity Committee.  The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the last day upon which holders of Claims and Equity Interests may vote to accept or reject the Plan; *provided, however,* the Debtors (with the consent of the Equity Committee) may amend Schedules 8.01 (A) and 8.01 (B) through and including the Confirmation Date and each of the other documents identified in (i), (ii), (iv), and (v) in the first sentence of this Section 13.08 through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Footstar in accordance with Section 13.16 of the Plan.

13.09.  <u>Amendment or Modification of the Plan</u>.  Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the

circumstances warrant such alterations, amendments, or modifications. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

13.10. <u>Revocation or Withdrawal of the Plan</u>. The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

13.11. <u>Severability</u>. If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.12. <u>Expedited Tax Determination</u>. The Disbursing Agent or Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for all taxable periods through the Effective Date.

13.13. <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.14. <u>Binding Effect</u>. The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

13.15. <u>Exhibits/Schedules</u>. All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.16. <u>Notices</u>. All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

FOOTSTAR, INC.
933 MacArthur Blvd.
Mahwah, NJ 07430
Attn: Maureen Richards, Esq.
Senior Vice-President
and General Counsel
Telephone: (201) 934-2000
Facsimile: (201) 934-2770

-and-

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Martin J. Bienenstock, Esq.
        Paul M. Basta, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Dated: New York, New York
      October 28, 2005

Respectfully submitted,

FOOTSTAR, INC., *et al.*
(for itself and on behalf of each of the
   Debtors)

By:     /s/ Maureen Richards
Name:     Maureen Richards
Title:      Senior Vice-President and
           General Counsel

Counsel:

Martin J. Bienenstock, Esq. (MB 3001)
Paul M. Basta, Esq. (PB 4434)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
   Debtors in Possession

# EXHIBIT A
# TO
# PLAN

# **INTRODUCTION**

Footstar and the Equity Committee have agreed to the Footstar Compensation Plan 2006-2008 (the "Retention Plan") to enable Reorganized Footstar to retain certain key employees through December 31, 2008, the date on which the Kmart Agreement expires. The Retention Plan also includes a performance bonus incentive (the "Incentive Plan"). Additionally, the parties have agreed to honor all programs previously approved by the Bankruptcy Court, except as modified by the Retention Plan, including (i) the Meldisco Compensation Program (as defined in the Disclosure Statement), which includes retention and performance incentive bonuses for 2005, revised severance and continuation of the Debtors' Senior Employee Retirement Plan (the "SERP") and (ii) the Key Employee Retention Plan (as defined in the Disclosure Statement). Footstar's board of directors approved the Retention Plan and the Incentive Plan on October 27, 2005. Detailed summaries of the Incentive Plan, the Retention Plan and the SERP are set forth below.

Officers will execute employment agreements detailing the elements of compensation and benefits package contemplated by the Retention Plan and Incentive Plan. The following chart illustrates the approximate annual cost of each of the Incentive Plan and the Retention Plan:

| PLANS | 2006-2008 (ANNUAL COST) |
|---|---|
| Incentive Plan<br>(at target) | $2,900,000 |
| Retention Plan<br>(for Officers, including severance) | $3,314,000 |
| Retention Plan<br>(below Officer level, excluding severance) | $2,735,000 |
| Discretionary Retention Pool | $100,000 |

## SUMMARY OF INCENTIVE PLAN

The following is a summary of the Incentive Plan.

- The Incentive Plan for 2006 through 2008 will remain unchanged from the performance incentive plan that is currently in place and was approved by the Bankruptcy Court. All rules currently in effect will apply to the Incentive Plan for 2006 through 2008. The interpretation and administration of the Incentive Plan shall be consistent with the provisions of the 1996 Incentive Compensation Plan.

- Plan participants include officers, directors, buyers, planners, district managers and other key merchandising executives (i.e., approximately 140 total participants).

- Target is calculated by multiplying base salary by bonus percentage in effect as of September 1, 2005 and multiplying the result by 1.00 (or .50 at the Director level and below). For example, if base pay is $100,000 and the target bonus percentage is 20%, the target bonus would be $20,000 (or $10,000 if the employee is at the Director level or below).

- Plan performance targets will be approved by the compensation committee of the board of directors of Reorganized Footstar (as defined in the Plan).

- Goals are set seasonally based on the financial calendar and half of the target may be earned based on achievement of goals in each season. The spring season is January through June and the fall season is July through December. Goal metrics vary by position between Company Goals and/or one or more Individual Goals.

    o Company Goals – Free Cash Flow

    o Individual Goals – Gross Margin Dollars, Inventory Turnover, Initial Mark Up, Sales, Payroll, Shrinkage

- Payouts under the Incentive Plan will be made as soon as practicable after each seasonal period assuming performance goals are achieved (July for the spring season and January for the fall season). Payouts are based upon the actual results achieved against the seasonal financial goals established for each season. At target performance, half of the Incentive Plan described above is earned. Awards above and below Target can be earned as follows:

    o Maximum – 200% payout (the highest award payout which can be earned);

    o Target – 100% payout (when the "plan" is achieved); and

- o Threshold – 50% payout (the minimum standard where an award payout can still be earned).

- o There will be no award payout for performance that falls below the Threshold level. Performance that falls between Threshold and Target and Target and Maximum will be interpolated to the nearest whole percent unless otherwise specified.

- Should an employee experience a leave of absence greater than three months, the earned incentive will be prorated based on the actual number of months worked during the performance period. Should an employee be terminated involuntarily as a result of a job elimination or reduction in force, a portion of the award will be paid to the Associate pro-rated based on the number of days worked to the date of termination. Voluntary resignation or termination for "cause" would result in no additional payments other than what has already been paid prior to the termination date.

## SUMMARY OF RETENTION PLAN

The following is a summary of the Retention Plan.

- Senior Vice Presidents and above will receive compensation as set forth in the schedule that has been provided to the Equity Committee.[1]  The employment agreement of Jeff Shepard is attached to the Plan as Exhibit B.  On or before November 3, 2005, the Debtors will file as Exhibit C to the Plan forms of employment agreements for Vice Presidents and Senior Vice Presidents, which agreements will become effective on the Effective Date without further action by the Reorganized Debtors.  Based upon an agreement with the Equity Committee, such employment agreements will include the compensation set forth herein (and supporting documentation delivered to and approved by the Equity Committee), the definition of "for cause" termination set forth on Exhibit D of the Plan and will contain other customary terms and conditions reasonably acceptable to the Debtors, the Equity Committee and such individuals.

- Total payments over the three-year period including retention and severance for Senior Vice Presidents and above will range from $1,950,000 to $311,497 (the "Total Payments") and total $5,335,885.  Retention payments will be made semi-annually (July 1 and January 1 of each year) throughout the three-year period.  Upon involuntary termination of employment other than for Cause, the executive will receive a severance payment equal to the Total Payments minus any cash awards already paid out under the plan.  If the executive accepts employment with the acquiring entity, no lump sum severance payment is due.  Four senior officers will receive 328,953 restricted stock shares ranging from 4,500 to 130,000 shares for each of the executives.  Such stock will vest on involuntary termination other than for Cause.

- Vice Presidents will receive awards as set forth in their employment agreements.  Total payments over the three-year period, including severance and retention, for Vice Presidents will range from $159,797 to $507,000 and total $2,960,524.  Payments will be made semi-annually (July 1 and January 1 of each year).  Upon involuntary termination other than for Cause, Vice Presidents will receive a lump sum payment plus a pro-rata share of the semi-annual payment through the date of termination.  If a Vice President accepts employment with an acquiring entity, no Lump Sum payment is due.

- If a retention eligible associate below the Vice President level is involuntarily terminated for reasons other than for Cause, a pro-rata share of the full three-year award will be paid minus any awards already received under the plan.

---

[1] Specific information regarding the Retention Plan has been provided to and approved by the Equity Committee.

- Associates below the Vice President level will be eligible for severance upon involuntary termination for reasons other than for Cause under the existing Severance Pay Plan; however, no severance will be due if an Associate accepts employment with the acquiring entity.

- Awards for Associates below Vice President level will be determined using 2005 incentive targets and base salary in effect on September 1, 2005.

- Approximately 275 associates below the Vice President level will participate in the retention plan.

- Associates below the Vice President level will receive quarterly retention payments throughout the three-year period with a lump sum payment due December 31, 2008.

- The Total cost of the Retention Plan for Associates below the Vice President level will be $8,205,000 over the three-year period. Individual awards over the three-year period range from $7,500 to $114,210.

- A special discretionary retention pool will be established, which will provide for a $100,000 annual discretionary pool to be used by the CEO to retain key associates. Any forfeited retention dollars resulting from turnover will be added back to the pool and used for additional retention as required.

## <u>SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN (SERP)</u>

- Four executives shall receive benefits under the SERP upon involuntary termination of employment other than for cause or in connection with an approved early retirement or normal retirement.  The benefit to be paid is the "lump sum value" payable under article 7 of the SERP as if the executive's employment termination occurred on the day after a change in control (as defined in the SERP document).  The estimated liability is $5.3 million as of December 31, 2005.

# EXHIBIT B
# TO
# PLAN

# FOOTSTAR

---

## Employment Agreement for Jeffrey Shepard

---

# FOOTSTAR

---

## Employment Agreement for Jeffrey Shepard

---

Page

1.    Definitions.................................................................................................. 1

2.    Term of Employment.................................................................................. 2

3.    Position, Duties and Responsibilities........................................................... 2

4.    Base Salary............................................................................................... 3

5.    Annual Incentive Awards .......................................................................... 3

6.    Long-Term Stock Incentive Programs......................................................... 3

7.    Employee Benefit Programs ...................................................................... 3

8.    Reimbursement of Business and Other Expenses....................................... 4

9.    Termination of Employment....................................................................... 4

10.   Confidentiality; Cooperation with Regard to Litigation ............................ 11

11.   Non-competition ..................................................................................... 12

12.   Non-solicitation of Employees ................................................................ 13

13.   Remedies................................................................................................ 14

14.   Resolution of Disputes............................................................................ 14

15.   Indemnification ...................................................................................... 14

16.   Excise Tax Gross-Up .............................................................................. 15

17.   Deferred Compensation .......................................................................... 17

18.   Effect of Agreement on Other Benefits ................................................... 17

19.   Assignability; Binding Nature ................................................................. 17

20.   Representation......................................................................................... 17

21.   Entire Agreement .................................................................................... 17

22.   Amendment or Waiver............................................................................. 17

23.   Severability ............................................................................................ 18

FOOTSTAR

---

Employment Agreement for Jeffrey Shepard

---

|  |  | Page |
|---|---|---|
| 24. | Survivorship | 18 |
| 25. | Beneficiaries/References | 18 |
| 26. | Governing Law/Jurisdiction | 18 |
| 27. | Notices | 18 |
| 28. | Headings | 19 |
| 29. | Counterparts | 19 |

## EMPLOYMENT AGREEMENT

AGREEMENT, made and entered into as of the __ day of October, 2005 by and between Footstar, Inc., a Delaware corporation and Footstar Corporation, a Texas Corporation (together with its successors and assigns permitted under this Agreement, the "Company"), and Jeffrey Shepard (the "Executive").

## WITNESSETH:

WHEREAS, the Company desires to employ the Executive pursuant to an agreement embodying the terms of such employment (this "Agreement") and the Executive desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt of which is mutually acknowledged, the Company and the Executive (individually a "Party" and together the "Parties") agree as follows:

1.    Definitions.

    (a)    "Approved Early Retirement" shall have the meaning set forth in Section 9(g) below.

    (b)    "Base Salary" shall have the meaning set forth in Section 4 below.

    (c)    "Board" shall mean the Board of Directors of the Company.

    (d)    "Cause" shall have the meaning set forth in Section 9(c) below.

    (e)    "Confidential Information" shall have the meaning set forth in Section 10(c) below.

    (f)    "Constructive Termination Without Cause" shall have the meaning set forth in Section 9(d) below.

    (g)    "Effective Date" shall have the meaning set forth in Section 2 below.

    (h)    "1996 ICP" shall have the meaning set forth in Section 5(a) below.

    (i)    "Kmart Agreement" shall mean the Amended and Restated Master Agreement made and entered into as of August 24, 2005 by and between Kmart Corporation , the Company and related entities.

    (j)    "Normal Retirement" shall have the meaning set forth in Section 9(g) below.

    (k)    "Plan of Reorganization" shall mean the "Debtors First Amended Joint Plan of Reorganization" as it may be amended from time to time, filed in connection with the Company's cases under Chapter 11 of the U.S. Bankruptcy Code.

(l)  "Restriction Period" shall have the meaning set forth in Section 11 below.

(m)  "SERP" shall mean the Supplemental Retirement Plan for Senior Management of Footstar, Inc., effective October 14, 1996, as amended and restated effective June 19, 2002, as amended from time to time.

(n)  "Severance Period" shall mean the period of 24 months following the termination of the Executive's employment.

(o)  "Subsidiary" shall have the meaning set forth in Section 10(d) below.

(p)  "Term of Employment" shall have the meaning set forth in Section 2 below.

2.      Term of Employment.

        The term of the Executive's employment under this Agreement shall commence on the date this agreement is fully executed subject only to the Company's emergence from bankruptcy pursuant to its Plan of Reorganization (the "Effective Date") and end on December 31, 2008 (the "Original Term of Employment") or, if sooner, the date Executive's employment is terminated pursuant to Section 9.  Thereafter the Original Term of Employment shall be automatically renewed for successive one-year terms ("Renewal Terms") unless at least 90 days prior to the expiration of the Original Term of Employment or any Renewal Term, either Party notifies the other Party in writing that he or it is electing to terminate this Agreement at the expiration of the then current Term of Employment.  "Term of Employment" shall mean the Original Term of Employment and all Renewal Terms.  If the Executive elects not to renew this Agreement, his employment termination following the expiration of the Term of Employment shall be treated as a voluntary termination pursuant to Section 9(e) below.  If the Company elects not to renew this Agreement, the Executive's employment termination following the expiration of the Term of Employment shall be treated as a termination without Cause under Section 9(f) below.

3.      Position, Duties and Responsibilities.

        (a)     Generally.  Executive shall serve as an Executive Vice President to the Company as well as Chief Executive Officer and President of the Company's Meldisco Division until such date as Dale Hilpert shall no longer serve as the Company's Chief Executive Officer and President whereupon Executive shall cease to hold such positions and replace Mr. Hilpert as the Company's Chief Executive Officer and President.  Executive shall have and perform such duties, responsibilities, and authorities as shall be specified by the Company from time to time and as are customary for a Chief Executive Officer and President of a publicly held corporation (or prior to the date he holds such positions, as are customary of an executive vice president and chief executive officer and president of a significant operating division of a publicly held corporation) of the size, type, and nature of the Company as they may exist from time to time and as are consistent with such position and status.  Executive shall devote all of his business time and attention (except for periods of vacation or absence due to illness), and his best efforts, abilities, experience, and talent to his position and the businesses of the Company.

        (b)     Other Activities.  Anything herein to the contrary notwithstanding, nothing in this Agreement shall preclude the Executive from (i) engaging in charitable activities and community affairs and (ii) managing his personal investments and affairs, provided that such

activities do not materially interfere with the proper performance of his duties and responsibilities under this Agreement.  Unless approved in writing by the Board, the Executive may not serve on the board of directors of any corporation or the board of any association and/or charitable organization.

4.    Base Salary.

The Executive shall be paid an annualized salary, payable in accordance with the regular payroll practices of the Company, of not less than $650,000, subject to annual review for increase at the discretion of the Compensation Committee of the Board ("Base Salary").

5.    Other Awards.

(a)    Incentive Awards.  The Executive shall participate in the Company's 1996 Incentive Compensation Plan (the "1996 ICP") under which he shall be afforded the opportunity to earn no less than 100% of Base Salary per year if targets are achieved or in a successor plan to the 1996 ICP that provides the Executive with an equivalent opportunity.  Measurement of Company performance and payment of incentive awards shall be done seasonally and in accordance with the Company's practice with respect to the incentive awards for other senior-level executives.

(b)    Retention Bonuses.  The Executive shall receive $158,437.50 on each July 1st and December 31st of 2006, 2007 and 2008 if the Executive continues to be employed by the Company through the date such payments are due.

(c)    Emergence Payments.  The Executive shall receive the payments approved and not yet paid  under the Order entered in the U.S. Bankruptcy Court on May 6, 2004, immediately upon the Company's emergence from bankruptcy pursuant to its Plan of Reorganization.

6.    Long-Term Stock Incentive Programs.

(a)    General.  The Executive shall be eligible to participate in and to receive stock incentive awards under the 1996 ICP and any successor plan.

(b)    Effective Date Award.  On the Effective Date, the Company shall grant Executive a restricted stock grant of 130,000 shares of the Company's common stock, which restrictions shall lapse only upon certain terminations of the Executive's employment as provided in Section 9 below.  Prior to the Effective Date, the Executive may elect that the Company grant him restricted stock units with comparable vesting terms in lieu of the restricted stock provided for herein.

7.    Employee Benefit Programs.

(a)    General Benefits.  During the Term of Employment, the Executive shall be entitled to participate in such employee pension and welfare benefit plans and programs of the Company and such perquisite programs as are made available to the Company's senior-level executives or to its employees generally, as such plans or programs may be in effect from time to time, including, without limitation, health, medical, dental, long-term disability, travel accident and life insurance plans, participation in executive health, tax preparation and financial planning programs.

(b)    SERP.    The Executive, or in the event of Executive's death, his beneficiary, shall be entitled to accrue benefits under the supplemental executive retirement plan ("SERP"), in accordance with the terms of such Plan.

8.    Reimbursement of Business and Other Expenses.

The Executive is authorized to incur reasonable expenses in carrying out his duties and responsibilities under this Agreement, and the Company shall promptly reimburse him for all such expenses, subject to documentation in accordance with the Company's policy.

9.    Termination of Employment.

(a)    Termination Due to Death.    In the event the Executive's employment with the Company is terminated due to his death, his estate or his beneficiaries, as the case may be, shall be entitled to and their sole remedies under this Agreement shall be:

(i)    Base Salary through the date of death which shall be paid in a single lump sum not later than 15 days following the Executive's death;

(ii)    pro rata incentive award for any incomplete performance period of the year in which the Executive's death occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his death;

(iii)    lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his death;

(iv)    immediate vesting of any matching grant under the Company's Switch to Equity Program ("STEP") and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of death;

(v)    immediate vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following death (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

(vi)    immediate vesting of all outstanding awards under the Company's "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) after his death;

(vii)    the balance of any incentive awards earned as of the date of death (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's death;

(viii)    the "lump sum value" payable under Article 7 of the SERP as if the Executive's death occurred on the day after a "change in control" as defined in the SERP; and

(ix)    other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(b)     Termination by the Company due to Disability.

The Company shall provide the Executive with at least fifteen (15) days advance written notice that it is terminating Executive's employment on account of Disability. For purposes of this Agreement, "Disability" means a condition that qualifies the Executive to receive benefits under the Company's Long-Term Disability Plan. In the event the Executive's employment with the Company is terminated due to his Disability, then the Executive shall be entitled to and his sole remedies under this Agreement shall be:

(i)     Base Salary through the date of employment termination, which shall be paid in a single lump sum not later than 15 days following the employment termination;

(ii)     $1,950,000 payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment less the aggregate of any payments made to the Executive under Section 5(b) above;

(iii)     pro rata incentive award for any incomplete performance period of the year in which the Executive's employment termination occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his employment termination;

(iv)     lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

(v)     immediate vesting of any matching grant under STEP and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of employment termination;

(vi)     immediate vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following his date of employment termination (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

(vii)     immediate vesting of all outstanding awards under the Company's "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) after his employment termination;

(viii)     the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the date of the Executive's employment termination;

(ix)     continuation of medical, dental and life insurance coverage for two years on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but if, during such two year period, the Executive is precluded from continuing his participation in any Company plan or program or, if no such plan or program exists due to the Company's (or a successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant

period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage. Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due. If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance. The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph. For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein;

(x)    the "lump sum value" payable under Article 7 of the SERP as if the Executive's employment termination occurred on the day after a "change in control" as defined in the SERP; and

(xi)    other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(c)    <u>Termination by the Company for Cause</u>.

(i)    "<u>Cause</u>" shall mean:

(A)    the Executive's willful and material breach of Sections 3, 10, 11 or 12 of this Agreement;

(B)    the Executive is convicted of a felony; or

(C)    the Executive engages in conduct that constitutes willful gross neglect or willful gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in material harm to the financial condition or reputation of the Company.

For purposes of this Agreement, an act or failure to act on Executive's part shall be considered "willful" if it was done or omitted to be done by him not in good faith, and shall not include any act or failure to act resulting from any incapacity of Executive.

(ii)    A termination for Cause shall not take effect unless the provisions of this paragraph (ii) are complied with. The Executive shall be given written notice by the Company of its intention to terminate him for Cause, such notice (A) to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination for Cause is based and (B) to be given within 180 days of the Company's learning of such act or acts or failure or failures to act. The Executive shall have 10 days after the date that such written notice has been given to him in which to cure such conduct, to the extent such cure is possible. If he fails to cure such conduct, the Executive shall then be entitled to a hearing before the Compensation Committee of the Board at which the Executive is entitled to appear. Such hearing shall be held within 21 days of such notice to the Executive, provided he requests such hearing within 10 days of the written notice from the Company of the intention to terminate him for Cause. If, within five days following such hearing, the Executive is furnished written notice by the Board confirming that, in its judgment, grounds for Cause on the basis of the original notice exist, he shall thereupon be terminated for Cause. Such hearing shall not limit any other review as set forth in this Agreement on a <u>de novo</u> basis.

(iii)    In the event the Company terminates the Executive's employment for Cause, he shall be entitled to and his sole remedies under this Agreement shall be:

    (A) Base Salary through the date of the termination of his employment for Cause, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

    (B) any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment; and

    (C) other or additional benefits then due or earned in accordance with applicable plans or programs of the Company including but not limited to the STEP and Career Equity program.

   (d) "<u>Constructive Termination Without Cause</u>" shall mean a termination of the Executive's employment at his initiative following the occurrence, without the Executive's written consent, of one or more of the following events (except as a result of a prior termination):

    (A) an assignment of any duties to Executive which are materially inconsistent with his status as a senior executive of the Company, that is not cured within 10 days of Executive's advance written notice of such occurrence;

    (B) a decrease in annual Base Salary or in the target incentive award annual opportunity below 100% of Base Salary, that is not cured within 10 days of Executive's advance written notice of such occurrence;

    (C) any other failure by the Company to perform any material obligation under, or breach by the Company of any material provision of, this Agreement that is not cured within 30 days of Executive's advance written notice of such occurrence;

    (D) any failure to secure the agreement of any successor corporation to the Company or successor to the Company's business (whether by sale of stock or assets) to fully assume the Company's obligations under this Agreement, that is not cured within 10 days of Executive's advance written notice of such occurrence;

    (E) a termination of the Executive's employment at his initiative as provided in this Section following the relocation of his principal place of employment outside a 35-mile radius of his principal place of employment as of the Effective Date; or

    (F) a termination of the Executive's employment at his initiative following the acquisition, by any person or entity, the business of the Company, whether by virtue of the sale of the stock or assets of the Company; provided that the Executive does not accept an offer of comparable employment from such person or entity. For purposes of this subsection "<u>comparable employment</u>" shall mean employment (i) where the Executive performs substantially the same duties performed by the Executive immediately prior to the acquisition and no duties that are inconsistent with the Executive's then status as an executive (except that employment shall not fail to be considered "comparable employment" merely because the Company becomes a freestanding division of a larger corporation); (ii) Executive receives at least the same salary rate and bonus in effect immediately prior to the acquisition; (iii) Executive receives an equivalent target annual bonus opportunity; (iv) Executive is eligible for substantially comparable employee benefits in the aggregate to the employee benefits applicable immediately prior to the acquisition, including, without limitation, equivalent severance benefits offered under this Agreement, life insurance, retirement benefits and supplemental retirement

benefits; and (v) Executive's principal place of employment that is not more than 35 miles from Executive's principal place of employment on the Effective Date.

(e) <u>Voluntary Termination</u>. In the event of a termination of employment by the Executive on his own initiative after delivery of 10 business days advance written notice (or if the Company elects to extend such termination date, in the event of an employment termination no later than 30 days beyond the termination date specified by the Executive in his notice), other than a termination due to death, Disability, a Constructive Termination Without Cause, or Approved Early Retirement or Normal Retirement pursuant to Section 9(g) below, the Executive shall have the same entitlements as provided in Section 9(c)(iii) above for a termination for Cause. In the event the Company elects to extends the Executive's employment beyond the ten business day notice period, the Company shall provide Executive with the following in a single lump sum not later than 15 days following the Executive's termination of employment (i) a pro rata incentive award for the performance period in which the Executive's employment terminates for the additional period employed as a result of such extension assuming that the Executive would have incentive awards for the entire year equal to 100% of Base Salary for such year (or such higher percentage of Base Salary as is payable for achievement of targeted performance during the relevant period); and (ii) a pro rata retention bonus, calculated by multiplying the next scheduled retention bonus payable under Section 5(b) by a fraction the numerator of which is the number of additional days the Executive is employed as a result of such extension and the denominator of which is the number of days between the last retention bonus payment and the next scheduled bonus payment.

(f) <u>Termination Without Cause or Constructive Termination Without Cause</u>. In the event the Executive's employment with the Company is terminated without Cause (which termination shall be effective as of the date specified by the Company in a written notice to the Executive), other than due to death or Disability, or in the event there is a Constructive Termination Without Cause (as defined above), then subject to Sections 9(k) and 17 below, the Executive shall be entitled to and his sole remedies under this Agreement shall be:

(i) Base Salary through the date of termination of the Executive's employment, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(ii) $1,950,000 payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment less the aggregate of any payments made to the Executive under Section 5(b) above;

(iii) pro rata incentive award for any incomplete performance period of the year in which the Executive's employment termination occurs, assuming that the Executive would have received award(s) equal to 100% of the target award for such performance period for any incomplete performance period, which shall be payable in a lump sum promptly (but in no event later than 15 days) after his employment termination;

(iv) lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

(v) immediate vesting of any matching grant under STEP and distribution of all deferred shares and matching shares, without restrictions, that are credited to Executive as of the date of employment termination;

(vi)    immediate vesting of all outstanding stock options and the right to exercise such stock options during the Severance Period or for the remainder of the exercise period, if less;

(vii)    immediate vesting of all outstanding awards under the "Career Equity" program, payable in a cash lump sum promptly (but in no event later than 15 days) following the Executive's termination of employment;

(viii)    the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(ix)    continuation of medical, dental and life insurance coverage for the Severance Period (or if shorter until the Executive is covered under plans and programs of an employer providing comparable coverage) on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but if, during the Severance Period, the Executive is precluded from continuing his participation in any Company plan or program or, if no such plan or program exists due to the Company's (or successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage.  Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due.  If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance.  The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph.  For purposes of this clause, coverage shall not be comparable unless affords the Executive (or his dependents) coverage for any condition for which he or such dependent are being treated and covered under this Agreement.  For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein; and

(x)    the "lump sum value" payable under Article 7 of the SERP as if the Executive's employment termination occurred on the day after a "change in control" as defined in the SERP;

(xi)    other or additional benefits then due or earned in accordance with applicable plans and programs of the Company.

(g)    Approved Early Retirement or Normal Retirement.  Upon the Executive's Approved Early Retirement or Normal Retirement, then subject to Sections 9(k) and 17 below, the Executive shall be entitled to and his sole remedies under this Agreement shall be:

(i)    Base Salary through the date of termination of the Executive's employment, which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(ii)    pro rata incentive award for the period in which termination occurs, based on the performance valuation at the end of such period and payable in a cash lump sum promptly after results are determined (but in no event later than 15 days after such determination);

(iii)     lapse of all restrictions on any restricted stock award and restricted stock unit awards (including any performance-based restricted stock or restricted stock units) outstanding at the time of his employment termination;

(iv)     continued vesting (as if the Executive remained employed by the Company) of any outstanding deferred shares as of the date of termination of employment, including any matching grant, under the Company's STEP program:

(v)     continued vesting of all outstanding stock options and the right to exercise such stock options for a period of one year following the Executive's termination of employment (or such longer period as may be provided in stock options granted to other similarly situated executive officers of the Company) or for the remainder of the exercise period, if less;

(vi)     continued vesting (as if Executive remained employed by the Company) of all outstanding awards under the "Career Equity" program payable in a cash lump sum promptly following such vesting (but in no event later than 15 days thereafter);

(vii)     the balance of any incentive awards earned (but not yet paid), which shall be paid in a single lump sum not later than 15 days following the Executive's termination of employment;

(viii)     the "lump sum value" payable under Article 7 of the SERP as if the Executive retired on the day after a "change in control" as defined in the SERP;

(ix)     settlement of all deferred compensation arrangements in accordance with the Executive's duly executed Deferral Election Forms or the terms of any mandatory deferral;

(x)     continuation of medical, dental and life insurance coverage for two years (or if shorter until the Executive is covered under plans and programs of an employer providing comparable coverage) on the same terms and conditions as described in this Agreement, by the same or equivalent medical, dental and life insurance coverages as in effect for the Executive immediately prior to the date employment terminates but only to the extent that the Executive is not participating in the Company's retiree medical program and has not obtained comparable coverage from a subsequent employer. If, during the two year period, the Executive is precluded from continuing his participation in any Company plan or program (including any retiree medical program) or, if no such plan or program exists due to the Company's (or successor's) failure to maintain any such plan or program, then the Company shall pay to the Executive a cash amount on an after-tax basis sufficient to pay the cost to the Executive of obtaining such coverage for the relevant period, as long as the Executive provides evidence to the Company that he has actually obtained such coverage. Such cash amount shall be paid to the Executive quarterly in advance of the date the premiums are due. If the Company is providing comparable coverage, it shall be acceptable for the Company to convert group life insurance coverage to portable term insurance. The Executive shall complete such paperwork and obtain such physical examinations as shall be necessary for the Company to obtain any coverage under this paragraph. For purposes of this clause, coverage shall not be deemed comparable unless it affords the Executive (or his dependents) coverage for any condition for which he or such dependents are being treated and covered under the terms of this Agreement. For purposes of calculating COBRA eligibility, the COBRA period shall be deemed to run concurrently with the continuation of coverage provided herein; and

(xi)   other or additional benefits then due or earned in accordance with applicable plans and programs of the Company including, if the Executive is eligible to participate in such program, any retiree health plan.

"Approved Early Retirement" shall mean the Executive's voluntary termination of employment with the Company at or after attaining age 55 with at least 10 years of service but prior to attaining Normal Retirement age, if such termination is approved in advance by the Compensation Committee.

"Normal Retirement" shall mean the Executive's voluntary termination of employment with the Company at or after the later of (i) the expiration of the Original Term of Employment (or if earlier, the date the Kmart Agreement is terminated) and (ii) the date the Executive attains age 60 with 10 years of service.

(h)   No Mitigation; No Offset.  In the event of any termination of employment under this Section 9, the Executive shall be under no obligation to seek other employment; amounts due the Executive under this Agreement shall not be offset by any remuneration attributable to any subsequent employment that he may obtain.

(i)   Nature of Payments.  Any amounts due under this Section 9 are in the nature of severance payments considered to be reasonable by the Company and are not in the nature of a penalty.

(j)   Exclusivity of Severance Payments.  Upon termination of the Executive's employment during the Term of Employment, he shall not be entitled to any severance payments or severance benefits from the Company or any payments by the Company on account of any claim by him of wrongful termination, including claims under any federal, state or local human and civil rights or labor laws, other than the payments and benefits provided in this Section 9.

(k)   Release of Employment Claims.  The Executive agrees, as a condition to receipt of the termination payments and benefits provided for in this Section 9, that he will execute a release agreement, in a form reasonably satisfactory to the Company, releasing any and all claims arising out of the Executive's employment (other than enforcement of this Agreement, the Executive's rights under any of the Company's incentive compensation and employee benefit plans and programs to which he is entitled under this Agreement, and any claim for any tort for personal injury not arising out of or related to his termination of employment).

(l)   Resignation as Officer or Director.  The Executive shall be deemed to resign as an officer of the Company and as a director from the Board (and as an officer or director of any Subsidiary of the Company) effective as of the date of any employment termination, without any further action on his part.  The Executive agrees to execute any documents confirming such resignation.

10.   Confidentiality; Cooperation with Regard to Litigation.

(a)   During the Term of Employment and thereafter, the Executive shall not, without the prior written consent of the Company, disclose to anyone except in good faith in the ordinary course of business to a person who will be advised by the Executive to keep such information confidential or make use of any Confidential Information, except when required to do so by legal process, by any governmental agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee

thereof) that requires him to divulge, disclose or make accessible such information. In the event that the Executive is so ordered, he shall give prompt written notice to the Company in order to allow the Company the opportunity to object to or otherwise resist such order.

(b)    During the Term of Employment and thereafter, Executive shall not disclose the existence or contents of this Agreement beyond what is disclosed in the proxy statement or documents filed with the government unless and to the extent such disclosure is required by law, by a governmental agency, or in a document required by law to be filed with a governmental agency or in connection with enforcement of his rights under this Agreement. In the event that disclosure is so required, the Executive shall give prompt written notice to the Company in order to allow the Company the opportunity to object to or otherwise resist such requirement. This restriction shall not apply to such disclosure by him to members of his immediate family, his tax, legal or financial advisors, any lender, or tax authorities, or to potential future employers (but in the case of disclosure to future employers disclosure shall be limited to what is necessary to inform the employer of the scope of this covenant to the extent this document is not publicly available), each of whom shall be advised not to disclose such information.

(c)    "Confidential Information" shall mean all information that is not known or available to the public concerning the business of the Company or any Subsidiary relating to any of their products, product development, trade secrets, customers, suppliers, finances, and business plans and strategies. For this purpose, information known or available generally within the trade or industry of the Company or any Subsidiary shall be deemed to be known or available to the public. Confidential Information shall include information that is, or becomes, known to the public as a result of a breach by the Executive of the provisions of Section 10(a) above.

(d)    "Subsidiary" shall mean any corporation controlled directly or indirectly by the Company and any affiliate of the Company.

(e)    The Executive agrees to cooperate with the Company, during the Term of Employment and thereafter (including following the Executive's termination of employment for any reason), by making himself available to testify on behalf of the Company or any Subsidiary or affiliate of the Company, in any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, and to assist the Company, or any Subsidiary or affiliate of the Company, in any such action, suit, or proceeding, by providing information and meeting and consulting with the Board or its representatives or counsel, or representatives or counsel to the Company, or any Subsidiary or affiliate of the Company, as requested. The Company agrees to reimburse the Executive, on an after-tax basis, for all reasonable expenses actually incurred in connection with his provision of testimony or assistance.

11.    Non-competition

(a)    During the Restriction Period (as defined in Section 11(b) below), the Executive shall not engage in Competition with the Company or any Subsidiary. "Competition" shall mean engaging in any activity, except as provided below, for a Competitor of the Company or any Subsidiary, whether as an employee, consultant, principal, agent, officer, director, partner, shareholder (except as a less than one percent shareholder of a publicly traded company) or otherwise; provided, however, that this provision shall not apply if the Company ceases to do business (including through a sale of all or substantially all of the assets of the Company to Kmart as contemplated by the Company's Master Agreement with Kmart Corporation) and there is no successor to the Company otherwise. A "Competitor" shall mean (i) Payless ShoeSource, Wal-Mart, Foot Locker, Lady Foot Locker, Kids' Foot Locker, Kohl's, Rite Aid, Target, and J.

C. Penney (and any successor or successors thereto), or (ii) the portion of any other corporation or other entity or start-up corporation or entity that is engaged in the Discount Retail Footwear Business within fifty (50) miles of any Discount Retail Footwear Business outlet in the United States of the Company or any Subsidiary, provided that a corporation or entity described in clause (ii) above shall not be deemed to be a Competitor if the Executive shall not either directly or indirectly oversee or manage the activities of such corporation or entity's division or unit engaged in the Discount Retail Footwear Business. If the Executive commences employment or becomes a consultant, principal, agent, officer, director, partner, or shareholder of any entity that is not a Competitor at the time the Executive initially becomes employed or becomes a consultant, principal, agent, officer, director, partner, or shareholder of the entity, future activities of such entity shall not result in a violation of this provision unless (x) such activities were contemplated at the time the Executive initially became employed or becomes a consultant, principal, agent, officer, director, partner, or shareholder of the entity (and the contemplation of such activities was known to the Executive) or (y) the Executive commences directly or indirectly overseeing or managing the activities which are competitive with the activities of the Company or Subsidiary. The Executive shall not be deemed indirectly overseeing or managing the activities which are competitive with the activities of the Company or Subsidiary so long as he does not regularly participate in discussions with regard to the competing business. For purposes of the foregoing, "Discount Retail Footwear Business" shall mean a group of four or more stores which primarily sells discount footwear.

(b)    For the purposes of this Section 11 and Section 12 below, "Restriction Period" shall mean the period beginning with the Effective Date and ending with:

(i)    in the case of a termination of the Executive's employment without Cause or a Constructive Termination Without Cause, the end of the Severance Period;

(ii)    in the case of a termination of the Executive's employment for Cause or voluntary termination of employment, the first anniversary of such termination;

(iii)    in the case of Approved Early Retirement or Normal Retirement pursuant to Section 9(g) above, the remainder of the Term of Employment.

(c)    Separate Covenants. The covenants contained in this Sections 10, 11 and 12, collectively, are separate and independent of the covenants contained in the Confidentiality and Non-Competition Agreement between the Company and the Executive attached hereto as Exhibit A, which agreement shall remain in full force and effect except that the reference therein to the Master Agreement between the Company and Kmart Corporation shall mean the Amended and Restated Master Agreement made and entered into as of August 24, 2005. In the event that Section 10, 11 and 12 of this Agreement and the Confidentiality and Non-Competition Agreement shall conflict, the Company shall get the benefit of the provision that affords it the greatest protection.

12.    Non-solicitation of Employees.

During the portion of the Restriction Period following the termination of the Executive's employment, the Executive shall not induce employees of the Company or any Subsidiary to terminate their employment. During the portion of the Restriction Period following the termination of the Executive's employment, the Executive shall not directly or indirectly hire any employee of the Company or any Subsidiary or any person who was employed by the Company or any Subsidiary within 180 days of such hiring. This covenant shall cease to apply if the Company ceases to do business (including through a sale of all or

substantially all of the assets of the Company to Kmart as contemplated by the Company's Master Agreement with Kmart Corporation) and there is no successor to the Company otherwise.

13.   Remedies.

   In addition to whatever other rights and remedies the Company may have at equity or in law, if the Executive breaches any of the provisions contained in Sections 10, 11 or 12 above, the Company (a) shall have the right to immediately terminate all payments and benefits due under this Agreement and (b) shall have the right to seek injunctive relief. The Executive acknowledges that such a breach would cause irreparable injury and that money damages would not provide an adequate remedy for the Company.

14.   Resolution of Disputes.

   Any disputes arising under or in connection with this Agreement, other than seeking injunctive relief under Section 13, shall be resolved by binding arbitration, to be held at an office closest to the Company's principal offices in accordance with the rules and procedures of the American Arbitration Association, except that disputes arising under or in connection with Sections 10, 11 and 12 above shall be submitted to the federal or state courts in the State of New Jersey. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. In the event the Executive prevails as to a material aspect of his action, the Company shall pay or reimburse the Executive all reasonable costs and expenses (including fees and disbursements of counsel) incurred by the Executive in seeking to enforce rights pursuant to this Agreement.

15.   Indemnification.

   (a)   Company Indemnity. The Company agrees that if the Executive is made a party, or is threatened to be made a party, to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he is or was a director, officer or employee of the Company or any Subsidiary or is or was serving at the request of the Company or any Subsidiary as a director, officer, member, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether or not the basis of such Proceeding is the Executive's alleged action in an official capacity while serving as a director, officer, member, employee or agent, the Executive shall be indemnified and held harmless by the Company to the fullest extent legally permitted or authorized by the Company's certificate of incorporation or bylaws or resolutions of the Company's Board of Directors or, if greater, by the laws of the State of Delaware, against all cost, expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Executive in connection therewith, and such indemnification shall continue as to the Executive even if he has ceased to be a director, member, officer, employee or agent of the Company or other entity and shall inure to the benefit of the Executive's heirs, executors and administrators. The Company shall advance to the Executive all reasonable costs and expenses incurred by him in connection with a Proceeding within 20 days after receipt by the Company of a written request for such advance. Such request shall include an undertaking by the Executive to repay the amount of such advance if it shall ultimately be determined that he is not entitled to be indemnified against such costs and expenses.

   (b)   No Presumption Regarding Standard of Conduct. Neither the failure of the Company (including its board of directors, independent legal counsel or stockholders) to

have made a determination prior to the commencement of any proceeding concerning payment of amounts claimed by the Executive under Section 15(a) above that indemnification of the Executive is proper because he has met the applicable standard of conduct, nor a determination by the Company (including its board of directors, independent legal counsel or stockholders) that the Executive has not met such applicable standard of conduct, shall create a presumption that the Executive has not met the applicable standard of conduct.

(c)    Liability Insurance.    The Company agrees to continue and maintain a directors and officers' liability insurance policy covering the Executive to the extent the Company provides such coverage for its other executive officers.

16.    Excise Tax Gross-Up.

If the Executive becomes entitled to one or more payments (with a "payment" including, without limitation, the vesting of an option or other non-cash benefit or property), whether pursuant to the terms of this Agreement or any other plan, arrangement, or agreement with the Company or any affiliated company (the "Total Payments"), which are or become subject to the tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code") (or any similar tax that may hereafter be imposed) (the "Excise Tax"), the Company shall pay to the Executive at the time specified below an additional amount (the "Gross-up Payment") (which shall include, without limitation, reimbursement for any penalties and interest that may accrue in respect of such Excise Tax) such that the net amount retained by the Executive, after reduction for any Excise Tax (including any penalties or interest thereon) on the Total Payments and any federal, state and local income or employment tax and Excise Tax on the Gross-up Payment provided for by this Section 16, but before reduction for any federal, state, or local income or employment tax on the Total Payments, shall be equal to the sum of (a) the Total Payments, and (b) an amount equal to the product of any deductions disallowed for federal, state, or local income tax purposes because of the inclusion of the Gross-up Payment in the Executive's adjusted gross income multiplied by the highest applicable marginal rate of federal, state, or local income taxation, respectively, for the calendar year in which the Gross-up Payment is to be made.

For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax:

(i)    The Total Payments shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, unless, and except to the extent that, in the written opinion of independent compensation consultants, counsel or auditors of nationally recognized standing ("Independent Advisors") selected by the Company and reasonably acceptable to the Executive, the Total Payments (in whole or in part) do not constitute parachute payments, or such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered within the meaning of Section 280G(b)(4) of the Code in excess of the base amount within the meaning of Section 280G(b)(3) of the Code or are otherwise not subject to the Excise Tax;

(ii)    The amount of the Total Payments which shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of the Total Payments or (B) the total amount of excess parachute payments within the meaning of Section 280G(b)(1) of the Code (after applying clause (i) above); and

(iii) The value of any non-cash benefits or any deferred payment or benefit shall be determined by the Independent Advisors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.

For purposes of determining the amount of the Gross-up Payment, the Executive shall be deemed (A) to pay federal income taxes at the highest marginal rate of federal income taxation for the calendar year in which the Gross-up Payment is to be made; (B) to pay any applicable state and local income taxes at the highest marginal rate of taxation for the calendar year in which the Gross-up Payment is to be made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes if paid in such year (determined without regard to limitations on deductions based upon the amount of the Executive's adjusted gross income); and (C) to have otherwise allowable deductions for federal, state, and local income tax purposes at least equal to those disallowed because of the inclusion of the Gross-up Payment in the Executive's adjusted gross income. In the event that the Excise Tax is subsequently determined to be less than the amount taken into account hereunder at the time the Gross-up Payment is made, the Executive shall repay to the Company at the time that the amount of such reduction in Excise Tax is finally determined (but, if previously paid to the taxing authorities, not prior to the time the amount of such reduction is refunded to the Executive or otherwise realized as a benefit by the Executive) the portion of the Gross-up Payment that would not have been paid if such Excise Tax had been applied in initially calculating the Gross-up Payment, plus interest on the amount of such repayment at the rate provided in Section 1274(b)(2)(B) of the Code. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder at the time the Gross-up Payment is made (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-up Payment), the Company shall make an additional Gross-up Payment in respect of such excess (plus any interest and penalties payable with respect to such excess) at the time that the amount of such excess is finally determined.

The Gross-up Payment provided for above shall be paid on the 30th day (or such earlier date as the Excise Tax becomes due and payable to the taxing authorities) after it has been determined that the Total Payments (or any portion thereof) are subject to the Excise Tax; provided, however, that if the amount of such Gross-up Payment or portion thereof cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined by the Independent Advisors, of the minimum amount of such payments and shall pay the remainder of such payments (together with interest at the rate provided in Section 1274(b)(2)(B) of the Code), as soon as the amount thereof can be determined. In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth day after demand by the Company (together with interest at the rate provided in Section 1274(b)(2)(B) of the Code). If more than one Gross-up Payment is made, the amount of each Gross-up Payment shall be computed so as not to duplicate any prior Gross-up Payment. The Company shall have the right to control all proceedings with the Internal Revenue Service that may arise in connection with the determination and assessment of any Excise Tax and, at its sole option, the Company may pursue or forego any and all administrative appeals, proceedings, hearings, and conferences with any taxing authority in respect of such Excise Tax (including any interest or penalties thereon); provided, however, that the Company's control over any such proceedings shall be limited to issues with respect to which a Gross-up Payment would be payable hereunder, and the Executive shall be entitled to settle or contest any other issue raised by the Internal Revenue Service or any other taxing authority. The Executive shall cooperate with the Company in any proceedings relating to the determination and assessment of any Excise Tax and shall not take any position or action that would materially increase the amount of any Gross-Up Payment hereunder.

17.    Deferred Compensation.

Notwithstanding anything to the contrary in this Agreement, payments hereunder will be deferred until 6 months after employment terminates to the extent necessary to satisfy Section 409A of the Code.

18.    Effect of Agreement on Other Benefits.

Except as specifically provided in this Agreement, the existence of this Agreement shall not be interpreted to preclude, prohibit or restrict the Executive's participation in any other employee benefit or other plans or programs in which he currently participates.

19.    Assignability; Binding Nature.

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs (in the case of the Executive) and permitted assigns. No rights or obligations of the Company under this Agreement may be assigned or transferred by the Company except that such rights or obligations may be assigned or transferred in connection with the sale or transfer of all or substantially all of the assets of the Company, provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company and such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. The Company further agrees that in the event of a sale or transfer of assets as described in the preceding sentence, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder. No rights or obligations of the Executive under this Agreement may be assigned or transferred by the Executive other than his rights to compensation and benefits, which may be transferred only by will or operation of law, except as provided in Section 25 below.

20.    Representation.

The Parties represent and warrant that each are fully authorized and empowered to enter into this Agreement and that the performance of their respective obligations under this Agreement will not violate any agreement between such Party and any other person, firm or organization.

21.    Entire Agreement.

This Agreement contains the entire understanding and agreement between the Parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Parties with respect thereto.

22.    Amendment or Waiver.

No provision in this Agreement may be amended unless such amendment is agreed to in writing and signed by the Executive and an authorized officer of the Company. No waiver by either Party of any breach by the other Party of any condition or provision contained in this Agreement to be performed by such other Party shall be deemed a waiver of a similar or dissimilar condition or provision at the same or any prior or subsequent time. Any waiver must

be in writing and signed by the Executive or an authorized officer of the Company, as the case may be.

23.    <u>Severability</u>.

The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision.  In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

24.    <u>Survivorship</u>.

The respective rights and obligations of the Parties hereunder shall survive any termination of the Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

25.    <u>Beneficiaries/References</u>.

The Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following the Executive's death by giving the Company written notice thereof.  In the event of the Executive's death or a judicial determination of his incompetence, reference in this Agreement to the Executive shall be deemed, where appropriate, to refer to his beneficiary, estate or other legal representative.

26.    <u>Governing Law/Jurisdiction</u>.

This Agreement shall be governed by and construed and interpreted in accordance with the laws of New Jersey without reference to principles of conflict of laws, except insofar as the Delaware General Corporation Law, federal laws and regulations may be applicable.  Subject to Section 14, the Company and the Executive hereby consent to the jurisdiction of any or all of the following courts for purposes of resolving any dispute under this Agreement:  (i) the United States District Court for New Jersey, (ii) any of the courts of the State of New Jersey, or (iii) any other court having jurisdiction.  The Company and the Executive further agree that any service of process or notice requirements in any such proceeding shall be satisfied if the rules of such court relating thereto have been substantially satisfied.  The Company and the Executive hereby waive, to the fullest extent permitted by applicable law, any objection which it or he may now or hereafter have to such jurisdiction and any defense of inconvenient forum.

27.    <u>Notices</u>.

Any notice given to a Party shall be in writing and shall be deemed to have been given when delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested, duly addressed to the Party concerned at the address indicated below or to such changed address as such Party may subsequently give such notice of:

|  |  |
|---|---|
| If to the Company: | Footstar, Inc.<br>933 MacArthur Boulevard<br>Mahwah, New Jersey  07430<br>Attention:  General Counsel |
| If to the Executive: | Jeffrey Shepard<br>14 Bramshill Road<br>Mahwah, NJ  07430 |

28.  <u>Headings</u>.

The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

29.  <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts.  Once executed this Agreement shall be in full force and effect without further corporate action subject only to the Company's emergence from bankruptcy pursuant to its Plan of Reorganization.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

FOOTSTAR, INC

By:  /s/ Dale Hilpert
Name:  Dale Hilpert
Title:  Chief Executive Officer


FOOTSTAR CORPORATION

By:   /s/ Dale Hilpert
Name:  Dale Hilpert
Title:  Chief Executive Officer


EXECUTIVE

/s/ Jeffrey Shepard
Jeffrey Shepard

# EXHIBIT C
## TO
## PLAN

## TO BE FILED NO LATER
## THAN NOVEMBER 3, 2005

# EXHIBIT D
# TO
# PLAN

## Cause Definition

(i)        "Cause" shall mean:

(A)        the Executive's willful and material breach of the provisions of his or her employment agreement that address the following issues: Position, Duties and Responsibilities; Confidentiality; Cooperation with Regard to Litigation; Non Competition and Non-Solicitation

(B)        the Executive is convicted of any felony or a misdemeanor involving moral turpitude; or

(C)        the Executive engages in conduct that constitutes gross neglect or gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in a substantial loss to the Company or substantial damage to its reputation.

# EXHIBIT B
## TO
# DISCLOSURE STATEMENT

# Financial Projections: 2006-2008

Financial projections for Footstar

| Income Statement ($ million) | 2006 | 2007 | 2008 |
|---|---|---|---|
| Same Store Sales (Shoemart) | -3.0% | -3.0% | -3.0% |
| Store Closings (Shoemart) | (100) | (100) | (100) |
| Sales | 625.6 | 562.4 | 503.4 |
| Gross Margin | 187.5 | 171.5 | 151.0 |
| SG&A | 156.2 | 144.2 | 132.0 |
| Bankruptcy Related Expenses (a) | 2.5 | - | - |
| Depreciation/Amortization | 9.3 | 8.8 | 7.9 |
| Operating Profit | 19.5 | 18.5 | 11.1 |
| Interest | 0.2 | 0.2 | 0.2 |
| Earnings before Taxes | 19.3 | 18.3 | 10.9 |
| Taxes (b) | 1.4 | 1.3 | 0.8 |
| Net Income | 17.9 | 17.0 | 10.1 |

| Income Statement (%) | 2006 | 2007 | 2008 |
|---|---|---|---|
| Gross Margin | 30.0% | 30.5% | 30.0% |
| SG&A | 25.0% | 25.6% | 26.2% |
| Operating Profit | 3.1% | 3.3% | 2.2% |
| Net Income | 2.9% | 3.0% | 2.0% |

| Balance Sheet | 2006 | 2007 | 2008 |
|---|---|---|---|
| Accounts Receivable | 14.5 | 13.6 | 12.3 |
| Inventory | 89.6 | 80.9 | 54.0 |
| Merchandise Payables | 46.2 | 45.7 | 20.2 |
| Net Working Capital (Excluding Cash) | 57.8 | 48.7 | 46.0 |

| Free Cash Flow Calculation: | 2006 | 2007 | 2008 (c) |
|---|---|---|---|
| Net Income | 17.9 | 17.0 | 10.1 |
| Add: Depreciation/Amortization | 9.3 | 8.8 | 7.9 |
| Less: Capex | 3.0 | 3.0 | 3.0 |
| Less: Capital Payout for Closed Stores | 1.1 | 1.1 | 1.1 |
| Less: Cure Claim | - | - | - |
| Add: Net Working Capital Changes (d) | 3.3 | 9.1 | 2.7 |
| Free Cash Flow | 26.4 | 30.8 | 16.7 |

**Notes to Projections:**

(a) This model includes projected expenses through February 2006, if emergence is delayed this cost will increase.
(b) This model assumes a 7% combined federal and state tax rate utilizing the NOL in 2006-2008, the loss of NOL would result in substantially higher taxes.
(c) The projections do not include the proceeds from the sales of inventory, trademarks, corporate office building, and other wind down events at the end of 2008.
(d) This model assumes prepaids/accrued are flat year to year.
(e) The model includes projected 2005 year-end balances as follows:

| ($ Million) | |
|---|---|
| Cash | $163.1 |
| Accounts Receivable | 16.3 |
| Inventory | 99.2 |
| Merchandise Payable | 54.4 |

**Other Disclosure:**

Revenues: The projections are based upon assumptions of -3% comparable-store sales and 100 store closings per year in 2006 – 2008. Each +/-1% in comparable sales performance results in approximately $36 million in cumulative sales from 2006 – 2008.

Tax Refund: Footstar will be filing amended tax returns requesting tax refunds of approximately $17 million to $18 million. These estimated refunds are included on the July 2, 2005 balance sheet as an asset. It is expected that the refund filings will be completed by year-end 2005 and that the refunds will be received during 2006. While Footstar and its advisors believe that they are entitled to these refunds, there can be no assurance as to the timing or determination the IRS or state and local tax authorities will make in this regard. The refunds would not be included in the three year operating cash flow projections.

Severance Costs: These projections do not include severance and other related personnel costs that would be paid if, upon expiration of the Kmart Agreement, Reorganized Footstar ceases to operate as a going concern. The maximum amount of these costs are approximately $29.4 million, which figure includes, among other things, payouts under the Debtors' senior executive retirement benefit plan.

Net Operating Loss Carry-forwards (NOLs): Footstar has approximately $164 million of tax loss carry-forwards on January 1, 2005, which will be available to reduce future taxable income. At the end of the projection period (*i.e.*, year-end 2008), the NOL is not expected to significantly change as the projected future taxable income will be offset by real estate rejection claims and certain other costs which were accrued in prior years will be taken for tax purposes when paid. The utilization of the NOLs may be subject to change of control limitations as codified in Section 382 of the Internal Revenue Code. Footstar will seek to implement certain charter restrictions to attempt to minimize the occurrence of change in control limitations, although there can be no assurance that a change in

control will not occur.  For a more detailed discussion of Footstar's NOLs, please see section XIII of the Disclosure Statement, entitled "Certain Federal Income Tax Consequences of the Plan."

Trademarks:  Under the terms of the settlement with Kmart, Footstar retains full ownership of its trademarks (including but not limited to Thom McAn , Cobbie Cuddlers, Texas Steer and Safetrax). The company includes royalty costs as part of cost of goods for all items that utilize these company-owned trademarks and offsets these costs as part of the corporate financial statement consolidation. The book value of these trademarks was $10.3 million as of July 2, 2005.

Corporate Office Building:  Footstar retains ownership of a 129,000 square foot corporate office building in Mahwah, NJ.  In October 2004, Footstar engaged an outside firm to conduct an appraisal of the property, which reflected a market value of $20.6 million, and an orderly liquidation value of $13.0 million.  Although Footstar received a preliminary expression of interest from a buyer at a price of $17 million, Footstar is not pursuing a sale of the building at this time.  As of August 2005, the balance owed on the mortgage, including accrued interest totaled approximately $8.2 million.  A pre-payment penalty, as stipulated in the mortgage note, is required if the mortgage is terminated prior to maturity in May 2010.  The pre-payment penalty is estimated at approximately $1.7 million as of August 2005 and reduces over time as the mortgage balance is paid down.

Management Compensation:  The projections provide for performance bonuses for management and other employees throughout the organization and the retention plan set forth in the Plan.

Other Revenue and Cost Opportunities:  Footstar intends to pursue other revenue opportunities, as well as additional cost savings opportunities.  The projections do not include any benefit from such additional revenue or additional cost savings, if any.

# EXHIBIT C
# TO
# DISCLOSURE STATEMENT

<u>Agreement re: Settlement of Kmart Assumption and Conversion Issues</u>

Footstar, Inc., as debtor-in-possession ("Footstar"), and Kmart Corporation ("Kmart"), by their signatures below, hereby agree to be bound by the following agreement with respect to the assumption, interpretation and amendment of the Master Agreement, dated as of June 9, 1995, between them. The parties acknowledge and agree that this Agreement shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York and of the boards of directors of the respective parties. The parties anticipate that a more formal agreement based upon this Agreement will be developed and submitted to the Bankruptcy Court. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Master Agreement.

| | |
|---|---|
| **CURE** | The cure amount will be fixed at $45 million (inclusive of all claims of Kmart, including, without limitation, capital, retained earnings, and retained deficit of all stores that were no longer in operation as of January 1, 2005 and any dividend/excess fee), to be paid upon entry of the order approving the settlement described herein (the "Approval Date"). |
| **APPROVAL DATE** | The Approval Date shall occur no later than September 1, 2005. |
| **TRIAL DATE** | The parties will jointly notify the Court on Tuesday, July 5, 2005 that the trial will not proceed on July 18, 2005. In the event either party does not obtain board approval of this Agreement by July 8, 2005, the parties will jointly request from the Court the first available trial date after August 8, 2005. In the event the Court declines to approve the final agreement reflecting this Agreement (the "Disapproval Date"), the parties will jointly seek the first available trial date that is at least thirty (30) days after the Disapproval Date.<br><br>If the Approval Date does not occur by September 1, 2005 and the parties do not mutually agree to extend such date (the "Expiration Date"), the parties will seek the first available trial date that is at least 30 days after the Expiration Date.<br><br>All appellate proceedings between the parties shall be adjourned consistent with the foregoing schedule. |

| | |
|---|---|
| **CONSOLIDA-TION OF STORE SUBSIDIARIES** | The Meldisco subsidiaries will be consolidated. |
| **ELIMINATION OF EQUITY INTERESTS** | Kmart's equity interests in the Meldisco subsidiaries will be eliminated effective as of January 2, 2005. The Meldisco subsidiaries shall be wholly owned by Footstar, and Kmart will not share in the profits or losses of these subsidiaries from and after that date. Kmart will no longer have the right to borrow against profits. Kmart will have no claim or right to return of capital, nor any obligation in respect of a capital deficiency, for stores in existence as of the Approval Date (the "Existing Stores"). Notwithstanding the foregoing, Kmart shall have one claim (each a "Capital Claim") against Footstar in respect of each of the Existing Stores that is operating as of the Approval Date[1] in an amount equal to $11,000 per store. The Capital Claim relating to each Existing Store shall be due and payable upon the closing or conversion of such Existing Store; provided, however, that Capital Claims not yet due and payable as of the time a Termination Event (as defined below) occurs or at the time a Buy-Out (as defined below) occurs shall be waived in their entirety upon the occurrence of such Termination Event or Buy-Out. Kmart shall have the right to offset amounts due and owing in respect of the Capital Claims against the Weekly Sales Remittance. |

---

[1] For avoidance of doubt, there shall be no Capital Claim in respect of stores that have closed or have commenced conversion prior to the Approval Date.

| FEES | Retain Miscellaneous Expense Fee ("MEF") but fix MEF at $23,500 per store per year; MEF payable in monthly installments of $1,958.33 per store by deduction from Weekly Sales Remittance.

Eliminate all other fees and replace with a single fee (the "Adjusted License Fee") equal to 14.625% of Gross Sales. The Adjusted License Fee shall be withheld from each Weekly Sales Remittance.

Kmart may deduct and withhold the Adjusted License Fee from its Weekly Sales Remittance to Meldisco. In addition, on or prior to the Approval Date, the parties will calculate the difference between (a) the Adjusted License Fee, as the same would have been calculated if in effect from January 2, 2005 until the Reference Date (as defined below), and (b) the amount Footstar actually paid to Kmart through Kmart's deductions from the Weekly Sales Remittance (other than deductions in respect of the MEF) from January 2, 2005 through the date of the last Weekly Sales Remittance on or prior to the Approval Date (the "Reference Date"). If the amount Footstar actually paid is less than the Adjusted License Fee, as the same would have been calculated if in effect from January 2, 2005 until the Approval Date, Footstar shall pay the difference on the Approval Date. If the amount Footstar actually paid is greater than the Adjusted License Fee, as the same would have been calculated if in effect from January 2, 2005 until the Approval Date, Footstar shall be entitled to offset the difference against the cure amount payable on the Approval Date.

Kmart's audit and books and records inspection rights will be limited to those records related to inventory values in connection with any purchase of inventory. |
|------|------|

| TERMINATION RIGHTS | The performance standards will be replaced by a minimum sales test (the "Sales Test"), whereby either Kmart or Footstar shall have the right to terminate the Master Agreement in the event that Gross Sales (as defined in the Master Agreement) fall below $550 million/year (the "Sales Threshold"); provided, however, that the Sales Threshold shall be reduced by $400,000 for each store that is closed or converted after the Approval Date.  The Sales Test shall be calculated quarterly and measured by sales in the 4 quarters immediately preceding the date of calculation.<br><br>In addition, Footstar shall have the unilateral right to terminate the Master Agreement in the event that either a) the number of Kmart stores falls below 900, or b) Gross Sales fall below $450 million calculated quarterly and measured by sales in the four quarters immediately preceding the date of calculation.<br><br>In the event the Master Agreement is terminated under any of the foregoing termination provisions (such event, a "Termination Event"), Footstar will vacate the remaining stores within 7 days.  The date that Footstar actually vacates the stores subsequent to termination shall be the "Termination Date".<br><br>In the event the Master Agreement is terminated under any of such termination provisions,<br><br>(i) provided that (w) Footstar shall provide to Kmart a complete set of pricing files for the prior 6-month period, (x) Footstar shall not have, in the 90 days prior to the Termination Date, purchased or transferred any goods into or out of inventory, other than in the ordinary course, or marked up any inventory, (y) the inventory mix at each store as of the date of termination shall be comparable to the average mix at such store during the same time period for the prior three years and shall reflect ordinary course practice, and (z) all inventory markdowns shall have been taken in the ordinary course (and the pricing files shall reflect such markdowns), Kmart shall purchase all Shoemart inventory (including inventory that is on order but excluding damaged, unsaleable and Seasonal inventory) from Footstar at the Book Value of such inventory as of the Termination Date; |
| --- | --- |

|   | (ii) at Kmart's sole option, the parties shall enter into a transition services agreement for up to 6 months during which time Footstar will assist in the operation of the footwear business for which Kmart shall pay to Footstar a service fee in an amount that will cover all costs of providing such services;<br><br>(iii) Footstar will otherwise lend such reasonable assistance as requested by Kmart to assist in the transition of the footwear business to Kmart; and<br><br>(iv) with respect to any stores in which a footwear department shall continue to be operated by Kmart (or an affiliate) following the Termination Date and in which the footwear department will be staffed by persons not already employees of Kmart (or an affiliate) prior to the Termination Date, Kmart shall consider the employees of Footstar prior to the Termination Date in the staffing of such footwear department in a manner consistent with the consideration that Sears gives to Kmart employees upon the conversion of a Kmart store to Sears Essentials.<br><br>As used herein, "Seasonal" means that Kmart shall not be required to purchase inventory more than four months post-season. |
|---|---|

| | |
|---|---|
| **LIMITATION ON STORE DISPOSITIONS** | As used herein, the term "Disposition" shall mean, with respect to any Kmart store: (i) the sale to a third party of such store; (ii) the closing of such store for any reason, including, without limitation, if the lease at such store expires and/or is not renewed for any reason; (iii) the conversion of such store to any nameplate or format that results in the loss of the right of Footstar to operate a footwear department in such store (see "Extent of License," below) including, without limitation, by way of sale, merger, or business combination. The terms "Dispose" and "Disposed" shall have corollary meanings.<br><br>Footstar will vacate stores that shall be Disposed of by Kmart within 7 days after receipt of notice (the "Vacate Date") of the applicable Disposition. Provided that (x) Footstar shall not have, in the 90 days prior to the Vacate Date, purchased or transferred any goods into or out of inventory of the applicable store(s), other than in the ordinary course, or marked up any such inventory, (y) the inventory mix of the Disposed of store(s) as of the Vacate Date shall reflect ordinary course practice, and (z) all inventory markdowns at the Disposed of store(s) shall have been taken in the ordinary course, Kmart shall, on the Vacate Date, purchase all inventory at such Disposed of store(s), other than damaged, unsaleable and Seasonal inventory, from Footstar for an amount equal to the Book Value of such inventory (such purchase, the "Inventory Buyout").<br><br>Kmart will agree not to Dispose of more than 85 existing Kmart stores in 2005, 150 existing Kmart stores in 2006, and 160 Kmart stores per calendar year in 2007 and 2008; provided, that Kmart will be permitted to exceed such numbers of Dispositions in any year subsequent to 2005 to the extent that the actual number of Dispositions in the years prior is less than the number of Dispositions permitted in such years; provided, further, that Kmart will not Dispose of more than 550 stores in the aggregate during the remaining term of the Master Agreement. Notwithstanding any of the foregoing limitations, Kmart will be permitted to Dispose of any number of stores at any time to the extent that it pays to Footstar, in addition to the proceeds of the Inventory Buyout, the Stipulated Loss Value of the incremental stores Disposed of above the annual or aggregate numbers permitted herein; the payment of such Stipulated Loss Value shall be nonrefundable, regardless of the number of Dispositions that take place in subsequent periods. For the avoidance of doubt, stores as to which the Stipulated Loss Value is paid shall not be considered in the calculation of the 550 store limitation. |

|  | For purposes hereof, the "Stipulated Loss Value" of a store shall mean an amount equal to $100,000 in 2005, $60,000 in 2006, $40,000 in 2007, and $20,000 in 2008.  The Stipulated Loss Value shall not be payable in the event the agreements are terminated in accordance with the above-referenced termination rights.<br><br>With respect to any stores Disposed of and in which a footwear department shall continue to be operated by Kmart (or an affiliate) following the date of Disposition and in which the footwear department will be staffed by persons not already employees of Kmart (or an affiliate) prior to the date of Disposition, Kmart shall consider the employees of Footstar prior to the date of Disposition in the staffing of such footwear department in a manner consistent with the consideration that Sears gives to Kmart employees upon the conversion of a Kmart store to Sears Essentials. |
|--|--|

| | |
|---|---|
| **BUY-OUT** | On and as of December 31, 2008, Kmart shall purchase the inventory in all remaining Existing Stores (including inventory that is on order but excluding damaged, unsaleable and Seasonal inventory) from Footstar for an amount equal to the Book Value of such inventory (the "Buy-Out") as of such date, which shall become immediately due and payable; provided, that (w) Footstar shall provide to Kmart a complete set of pricing files for the prior 6-month period, (x) Footstar shall not have, (i) at any time prior to the Buy-Out, purchased or transferred any goods into inventory in contemplation of the Buy-Out, other than in the ordinary course, (ii) purchased inventory for or otherwise stocked any store at a level disproportionately greater than the average level of such store at the same time period for the prior three years, or (iii) prior to the Buy-Out, marked up any inventory, (y) the inventory mix at each store as of the date of termination shall be comparable to the average mix at such store during the same time period for the prior three years and shall reflect ordinary course practice, and (z) all inventory markdowns shall have been taken in the ordinary course (and the pricing files shall reflect such markdowns),<br><br>Footstar will vacate the remaining stores and the Master Agreement shall be terminated in its entirety (other than those sections relating to indemnities and choice of law) within 7 days of the Buy-Out.<br><br>Upon the occurrence of the Buy-Out, with respect to any stores in which a footwear department shall continue to be operated by Kmart (or an affiliate) following December 31, 2008, Kmart shall consider the employees of Footstar prior to December 31, 2008 in the staffing of such footwear department. |
| **GENERAL PROVISIONS WITH RESPECT TO KMART INVENTORY PURCHASES** | With respect to any purchase of inventory by Kmart, Kmart and Footstar shall each have the right to require an actual physical count and determination of the quantity of such inventory and the qualification (e.g., damaged) of such inventory for purchase, such count and determination to be performed by RGIS or any other mutually acceptable third party and paid for equally by the parties.<br><br>As used herein with respect to inventory, the term "Book Value" shall mean the book value of such inventory calculated in accordance with GAAP, applied on a consistent basis, but excluding Footstar distribution and delivery costs. |

| | |
|---|---|
| **EXTENT OF LICENSE** | Footstar will acknowledge and agree that, subject to the terms hereof, the Master Agreement does not apply to any store, whether owned, leased, or operated by Kmart, Sears, Roebuck and Co. or any affiliate of either, to the extent such store (with the exception of the pharmacy) is operated under any nameplate, whether now existing or hereafter created, other than a nameplate incorporating the mark "Kmart" in whole or in part.  Without limitation, Footstar will stipulate that stores operated under the nameplates "Sears," "Sears Grand" and "Sears Essentials" are not subject to the Master Agreement so long as the Kmart service mark is not used therein (other than with respect to the pharmacy and, as to the pharmacy, only until the applicable Sears entity obtains its own license).<br><br>Kmart will acknowledge that the expiration, renewal or renegotiation of an existing lease will be without prejudice to the right of Footstar to remain in a continuing Kmart-branded store. |
| **STAFFING** | Footstar shall spend a minimum of 10% of Gross Sales on staffing for the stores; provided, that in no event shall the staffing in any store fall below 40 hours per week. |
| **ADVERTISING** | Kmart shall allocate at least 52 square tab weekend Roto pages per year to Footstar products. |
| **RULES AND REGULATIONS** | Rules and regulations under the Master Agreement will not be modified in a manner inconsistent with this term sheet; provided, that the Master Agreement shall, to the extent not modified hereby, remain in full force and effect, including without limitation section 13.1. |
| **MUTUAL RELEASE** | Kmart agrees that the payments as set forth herein are in full and complete satisfaction of any and all claims Kmart has under the Master Agreement through the date of assumption of the Master Agreement. Each party agrees to release the other party and its officers, directors, employees, and professionals (and the officers, directors, employees, and professionals of each party's subsidiaries and affiliates) from any claims or causes of action. |
| **COOPERATION** | The parties agree to cooperate in seeking prompt approval of the Bankruptcy Court of the transaction contemplated herein.  Kmart agrees not to object or otherwise interfere in Footstar's disclosure statement approval process and Footstar's plan of reorganization confirmation process provided the foregoing is consistent with the terms herein. |

In witness whereof, the parties have executed this Agreement on this 2nd day of July, 2005.

FOOTSTAR, INC.

_____

Dale W. Hilpert

KMART CORPORATION

_____

William C. Crowley

Jul 02 05 10:22a       Sharon and Dale Hilpert       (307) 734-1822          p.1


In witness whereof, the parties have executed this Agreement on this 2nd day of July, 2005.

FOOTSTAR, INC.

Dale W. Hilpert

KMART CORPORATION

_____
William C. Crowley

TOTAL P.01

JUL-02-2005  13:54                                                P.02/02
07/02/2005   13:52   WACHTELL LIPTON → 912123108007              NO.214   ❏02

          Received 07/02/2005 01:50PM in 01:04 on line [16] for CRSKC * Pg 2/2
07/02/2005  13:48   6315377229              HAMPTON LIBRARY       PAGE  02

07/02/2005   13:47   WACHTELL LIPTON → 916315377229              NO.213   ❏01

In witness whereof, the parties have executed this Agreement on this 2nd day of July, 2005.

FOOTSTAR, INC.

_____

Dale W. Hilpert

KMART CORPORATION

_____

William C. Crowley

# EXHIBIT D
# TO
# DISCLOSURE STATEMENT

## AMENDED AND RESTATED MASTER AGREEMENT

This Amended and Restated Master Agreement (this "Agreement") is made and entered into as of August 24, 2005 by and between KMART CORPORATION, a corporation organized and existing under the laws of the State of Michigan with a principal address at 3100 West Big Beaver Road, Troy, Michigan 48084 ("Kmart"), the affiliates of Kmart listed on the signature pages hereto (such affiliates, together with Kmart, "Licensor"), SEARS HOLDINGS CORPORATION, a corporation organized and existing under the laws of the State of Delaware with a principal address at 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("Sears"), solely with respect to Article XX below, and FOOTSTAR, INC., a corporation organized and existing under the laws of the State of Delaware, with a principal address at 933 MacArthur Blvd., Mahwah, New Jersey 07430 ("Footstar"). All capitalized terms used herein which are not otherwise defined, shall have the meanings set forth in Article II.

WHEREAS, Footstar and Kmart are party to a Master Agreement dated as of June 9, 1995 and effective as of July 1, 1995 (as amended prior to the date hereof, the "Existing Master Agreement"), pursuant to which the parties agreed to terms and conditions with respect to the operation of the footwear departments in certain of Licensor's stores by certain partially and wholly owned subsidiaries of Footstar (the "Shoemart Corporations");

WHEREAS, pursuant to the Existing Master Agreement, each of the Shoemart Corporations is party to a license agreement with Kmart (collectively, the "License Agreements");

WHEREAS, pursuant to the Existing Master Agreement, Footstar and Kmart are party to a Shareholders Agreement with respect to each of the Shoemart Corporations (collectively, the "Shareholders Agreements");

WHEREAS, pursuant to a license agreement (the "Kmart IP License Agreement"), Kmart of Michigan, Inc. ("KMI") has granted to Kmart the exclusive right, license and privilege to use the Marks in the Territory (each as defined below), including the right to sublicense use of the Marks within the Territory, subject to KMI's written consent;

WHEREAS, on March 2, 2004, Footstar, the Shoemart Corporations and certain of their respective affiliates (collectively, the "Footstar Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bank-ruptcy Court");

WHEREAS, by motion, dated August 12, 2004 (the "Assumption Motion"), the Footstar Debtors sought to assume the Existing Master Agreement and the License Agreements pursuant to section 365 of the Bankruptcy Code;

WHEREAS, the Assumption Motion gave rise to litigation in the Bankruptcy Court be-tween Kmart and the Footstar Debtors with respect to, *inter alia*, the assumption by Footstar and the Shoemart Corporations of the Existing Master Agreement, the License Agreements and the Shareholders Agreements (the "Assumption Litigation"); and

WHEREAS, the parties hereto desire to amend and restate the Existing Master Agree-ment in the form of this Agreement in conjunction with the settlement of the Assumption Litiga-tion.

NOW THEREFORE, in consideration of the mutual promises, undertakings and cove-nants herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree:

ARTICLE I

PURPOSES OF THE AGREEMENT

1.1    Purpose.  The purpose of this Agreement is to establish uniform terms and conditions and uniform procedures for the operation of Footwear Departments in the Stores in the Territory.

1.2    Prior Agreements.  This Agreement supersedes the Existing Master Agreement, which is hereby amended and restated as of the Effective Date hereof.  The Shareholders Agreements and License Agreements are hereby terminated as of the Effective Date hereof and, as of such date, shall be null and void and of no further force and effect.  Article XV of the Existing Master Agreement, which shall survive the Effective Date and is incorporated by reference herein, shall apply to causes of action that were or could have been commenced prior to the Effective Date.  Article XVIII hereof shall apply to causes of action that are or may be commenced on or after the Effective Date.  To the extent any causes of action that may be commenced on or after the Effective Date also could have been commenced prior to the Effective Date, such causes of action are governed by Article XVIII hereof.

1.3    Structure.  From and after the Effective Date, each Footwear Department licensed under this Agreement shall be operated by Footstar or a direct or indirect wholly-owned subsidiary of Footstar.  Effective as of January 2, 2005 (but subject to the occurrence of the Effective Date), Kmart shall no longer have any interest in the Shoemart Corporations or any of their respective affiliates, except as provided herein or in the Assumption Order.

ARTICLE II

TERMS AND DEFINITIONS

2.1    _Definitions_.  For purposes of this Agreement, the following terms shall have the

meanings expressed after each term:

"Approval Date"          shall mean the date of entry by the Bankruptcy Court of the As-

sumption Order.

"Assumption Order"       shall mean an order of the Bankruptcy Court, in form and sub-

stance satisfactory to Kmart and Footstar, each in their reasonable

discretion, (i) approving this Agreement and effectuating the as-

sumption thereof by Footstar, (ii) authorizing the payment by Foot-

star to Kmart of the amounts set forth in Article 8.1(b), and

(iii) providing for mutual general releases of and by Kmart and

Footstar (and their respective officers, directors, employees, pro-

fessionals, affiliates and subsidiaries (and the officers, directors,

employees, and professionals of the affiliates and subsidiaries))

with respect to the Existing Master Agreement (except as pre-

served pursuant to Section 1.2), License Agreements, Shareholders

Agreements, and the Assumption Litigation and all claims of either

thereunder through the Approval Date.

"Book Value"             shall mean, with respect to any inventory owned by any Licensee,

the book value of such inventory calculated in accordance with

GAAP, applied on a consistent basis, but in any event excluding a)

distribution and delivery costs incurred by Footstar and/or its af-

filiates after receipt of such merchandise from suppliers at a Foot-

star Distribution Center, and b) any intercompany royalty or other intercompany charges between and among Footstar and its affiliates (other than charges that reflect an out-of-pocket cost incurred by Footstar or an affiliate and that do not result in a book value with respect to the applicable inventory greater than the book value of such inventory that would have existed had Footstar and its affiliates been consolidated into a single entity).

"Buy-Out Date"    shall mean December 31, 2008

"Business Day"    shall mean a day, excepting Saturday, upon which banks in Chicago, Illinois are open for business.

"Designated Purchaser"    shall mean Kmart and/or another entity designated by Kmart in its discretion.

"Disposition"    with respect to any Store, shall mean the occurrence of any of the following: (i) the real property interest (whether fee or leasehold) of Licensor in such Store shall be sold to an unrelated or unaffiliated third party and the applicable real property shall no longer be operated as a Store; (ii) such Store shall be permanently closed for any reason, including, without limitation, if the lease at such Store expires and/or is not renewed for any reason; (iii) the conversion of such Store to a format that does not satisfy the criteria of the definition of "Store(s)," including, without limitation, by way of sale, merger, or business combination; or (iv) the termination of this Agreement with respect to any Store pursuant to section 4.3(a)(iii)

in connection with a cumulative reduction (relative to the Effective Date) in the aggregate square footage of the Footwear Department in such Store of 25% or more. The terms "Dispose" and "Disposed" shall have corollary meanings.

"Excluded Footwear"    shall mean:

(a)    sports shoes with cleat attachments affixed to the soles or bowling shoes, ice skates, roller skates, in-line skates, football shoes, golf shoes and track shoes (not including non-cleated running or jogging shoes or shoes with cleat attachments molded to the soles or to the shoes);

(b)    waders and hip boots;

(c)    ski boots;

(d)    all knit and crib booties (sizes 0-5) (excluding infant soft sole shoes and infant pre-walk hard sole shoes (sizes 0-4));

(e)    slipper socks without licensed character designs;

(f)    slippers and/or slipper socks which are packaged, attached to and sold as a unit with sleepwear or robes; and

(g)    waterproofing preparations for athletic, hunting, fishing and recreational footwear sold in Licensor's sporting goods departments.

"Existing Store"    shall mean any Store which, as of the Approval Date, is open for business to the public and as to which Licensor has not provided Footstar with notice that such Store will be Disposed of, it being

understood that the Stores listed on <u>Schedule I</u> hereto are not Existing Stores.

"Fee Reference Date"        shall mean August 27, 2005.

"Fee True-Up Amount"        shall mean the amount by which (a) 14.625% of Gross Sales from January 2, 2005 through and including the Fee Reference Date, exceeds (b) the amount Footstar actually paid to Kmart pursuant to the Existing Master Agreement in respect of any fees and minority interests (other than the Miscellaneous Expense Fee) accrued from January 2, 2005 to and including the Fee Reference Date (whether or not paid through Kmart's deductions from the Weekly Sales Remittance).

"Fees"        shall mean collectively the "License Fee" and the "Miscellaneous Expense Fee."

"Footwear Department(s)"        shall mean the area(s) within Store(s) in the Territory designated by Licensor in which retail sales of Licensed Footwear shall take place.

"Gross Sales"        with respect to any period, shall mean the total revenues generated by retail sales of Licensed Footwear in all of the Footwear Departments in the aggregate during such period, whether for cash, credit or deferred payment, without diminution for credit losses, except that the following shall be excluded in calculating Gross Sales:  (a) the amounts allowed for goods subsequently returned

|  |  |
|---|---|
|  | for refund or credit; and (b) sales, use or excise taxes passed on to the customer, excluding, without limitation, any withholding taxes. |
| "Licensee" | shall mean Footstar or any direct or indirect wholly-owned subsidiary of Footstar in its capacity as an operator of a Footwear Department. |
| "Licensed Footwear" | shall mean any footwear except Excluded Footwear and shall also mean shoe care items (including, without limitation, laces, polishes, waxes, oils, dyes, brushes, daubers, shoe trees, shoe cleaning and waterproofing preparations, heel plates or taps and gift kits containing any of the foregoing). |
| "Marks" | shall mean the trademarks and service marks KMART, SUPER KMART CENTER, and BIG KMART, in block letters or design format, and any service mark adopted in the future that incorporates the mark KMART in whole or in part, together with registrations therefor, all as more specifically described in Exhibit A attached and incorporated herein. |
| "Materials" | shall mean interior store signs, print and broadcast advertising pieces, store employee manuals and employee uniforms and badges on or in connection with which Licensee may use the Marks as permitted hereunder. |
| "Sales Threshold" | shall mean $550 million, less an amount equal to the product of a) $400,000 and b) the number of Dispositions from and after the Approval Date; provided, that the Sales Threshold shall (without |

duplication) also be reduced by $400,000 for each Store as to which this Agreement is terminated pursuant to section 4.3(a)(ii) or (iii) hereof.

"Seasonal Inventory"    shall mean inventory that is more than four months post-season. Specifically, Licensees shall have four months from the end of a season to sell that season's inventory. If an obligation of Kmart to purchase inventory arises during such four-month period, the preceding season's inventory shall not be "Seasonal Inventory" as defined herein. If an obligation of Kmart to purchase inventory arises more than four months after the end of a season, such season's inventory shall be "Seasonal Inventory" as defined herein.

"Services"    shall mean Licensee's services relating to the operation of the applicable Footwear Department, including stocking and supplying of Licensed Footwear.

"Stipulated Loss Value"    shall mean an amount per Store equal to: $100,000 with respect to each Store Disposed of in 2005; $60,000 with respect to each Store Disposed of in 2006; $40,000 with respect to each Store Disposed of in 2007; and $20,000 with respect to each Store Disposed of in 2008.

"Store(s)"    shall mean discount retail outlet(s) consisting (currently) of approximately 30,000 to 120,000 square feet of gross indoor floor space operated by Licensor under the service mark KMART or BIG KMART (or some other service mark incorporating KMART

in whole or in part) and primarily devoted to the sale of a broad as-sortment of general merchandise, or a discount retail outlet consis-ting (currently) of approximately 120,000 to 250,000 square feet of gross indoor floor space operated by Licensor under the service mark SUPER KMART CENTER or BIG KMART (or some other service mark incorporating KMART in whole or in part) and de-voted to the sale of a broad assortment of general merchandise as well as a broad assortment of fresh foods and grocery products; provided, that the term "Store" does not incorporate, and the li-cense granted by this Agreement does not extend to, any store, whether owned, leased, or operated by Licensor, Sears, Roebuck and Co., Sears or any affiliate of any of them, to the extent such store (with the exception of the pharmacy) is operated under any nameplate, whether now existing or hereafter created, other than a nameplate incorporating the mark "Kmart" in whole or in part. Without limitation, the parties agree that stores operated under the nameplates "Sears," "Sears Grand" and "Sears Essentials" are not subject to the license granted hereunder so long as the Kmart ser-vice mark is not used therein (other than with respect to the phar-macy and, as to the pharmacy, only until the applicable Sears en-tity obtains a license in its own name in accordance with the Deci-sion on Kmart's Motion to Lift the Automatic Stay with Respect to Certain Stores issued by the Bankruptcy Court on May 10, 2005).

Licensor acknowledges that, subject to Section 4.3(c), the expiration, renewal or renegotiation of an existing lease will be without prejudice to the right of Footstar to remain in a store that continues to be operated under any of the Marks.

"Term"                          shall mean the period commencing on the Effective Date and continuing until the Termination Date.

"Termination Date"              shall mean the earlier to occur of (a) December 31, 2008, and (b) the termination of the Agreement in accordance with any provision of Article 4.2.

"Territory"                     shall mean the United States of America, its territories and possessions, including Puerto Rico, Guam and the U.S. Virgin Islands.

2.2    <u>Definition References</u>.  The definitions of certain other terms that are not defined in Section 2.1 hereof but that are used herein are found in the following sections:

| Defined Term | Section Reference |
|---|---|
| "Assumption Litigation" | Recitals |
| "Assumption Motion" | Recitals |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Capital Claim" | 7.1 |
| "Chapter 11 Cases" | Recitals |
| "Confidential Information" | 17.1 |
| "Disposition Notice" | 4.3(a)(i) |
| "Effective Date" | 8.1 |

| | |
|---|---|
| "Employer Action" | 12.1 |
| "Existing Master Agreement" | Recitals |
| "Footstar" | Preamble |
| "Footwear Department Employees" | 12.1 |
| "Kmart" | Preamble |
| "Kmart IP License Agreement" | Recitals |
| "KMI" | Recitals |
| "License Agreements" | Recitals |
| "License Fee" | 6.1(b) |
| "Licensee" | Preamble |
| "Licensor" | Preamble |
| "Miscellaneous Expense Fee" | 6.1(b) |
| "Pricing Files" | 4.1(b) |
| "Removal Cost" | 4.2(c)(v) |
| "Shareholders Agreements" | Recitals |
| "Shoemart Corporations" | Recitals |
| "Staffing Costs" | 12.2 |
| "Vacate Date" | 4.3(b)(i) |
| "Weekly Sales Remittance" | 6.2 |

ARTICLE III

LICENSE

3.1    Grant of License.  Licensor grants to Licensee and Licensee accepts from Licen-

sor, for the Term and upon the terms and conditions specified herein, (1) the non-transferable

exclusive right and license to operate a Footwear Department in each Store in the Territory (whether such Stores are now existing or are hereafter opened), and (2) the non-transferable and non-exclusive right to use the Marks (a) on and in connection with the operation of the applicable Footwear Department, and (b) on and in connection with authorized Materials if and only if such use complies with the terms and conditions of this Agreement, including, without limitation, Licensor's quality standards as set forth herein and the authorization and approval process set forth below. All use of the Marks by Licensee as permitted hereunder shall conform to the requirements of Exhibit A and to the quality control requirements of the Kmart IP License Agreement. Licensor shall be entitled to change Exhibit A by giving Licensee not less than 30 days' advance written notice of any such change; however, to the extent Licensee cannot reasonably change any use of the Marks on authorized Materials by the end of such 30-day period, Licensor shall reasonably extend such date until Licensee can comply with such new requirements. Licensor may notify Licensee in writing of any uses of the Marks by Licensee which are not in accordance with Exhibit A and Licensee shall promptly make any required change. No other, further or different license is granted or implied and no assignment of any right or interest in the Marks is made or intended herein. In particular, no license is granted to permit any third party to use the Marks, and Licensee may only use the Marks as set forth above. Licensor and KMI represent, warrant and agree that Licensor is and shall be authorized to grant Licensee such right to use the Marks during the Term.

3.2    Certain Restrictions. The parties acknowledge that the success of each Footwear Department is dependent upon, among other things, the Licensee's compliance with common standards hereinafter referred to as "Rules and Regulations" for the conduct of the business (set

forth in <u>Exhibit B</u>, attached and incorporated herein), as established from time to time by Licensor, subject to the terms of this Agreement.

      3.3    <u>Other Merchandise and Activities</u>.  Licensee shall have the right to sell only the Licensed Footwear specified in this Agreement in the Footwear Departments, and shall sell or furnish no other merchandise or services in the Stores without the prior written permission of Licensor.  Licensee shall promptly remove from sale any merchandise not within the definition of "Licensed Footwear" contained in this Agreement.  Licensee shall retain title to Licensee's merchandise until sale.  Licensor shall not be responsible for any loss or damage to any of Licensee's merchandise, including while it is on Store premises or in transit to or from Store premises or otherwise.  Further, Licensee shall conduct no promotions (philanthropic or otherwise) in the Stores (other than orderly sales as provided in sections 4.2(b), (c) and 4.3(e)) or which require the use of Licensor's resources or the services of Licensor's employees without obtaining Licensor's prior written approval.

      3.4    <u>Marking, Samples and Inspection</u>.

      (a)    Licensee agrees that on each item of Materials which uses the Marks it shall mark such Materials in a manner complying with the provisions of <u>Exhibit A</u>.

      (b)    In advance of the first purchase or production by Licensee of each type of Material or the first use, publication or broadcast by Licensee of each particular item of Material on or in connection with which any Mark is used, whichever is earlier, Licensee shall furnish to Licensor for its approval a sample thereof, including the trademark or copyright notice thereon and any other label or marking.  Licensor shall use its best efforts to communicate its approval or disapproval in writing as soon as practicable after receiving any such sample.  In no event shall Licensee use the Material until written approval of the subject sample is granted by Licensor;

provided that if Licensor has not communicated approval in writing within 30 days of receipt of same, it shall be deemed to have disapproved the sample. Licensee specifically agrees to amend to the satisfaction of Licensor any Material which is not approved by Licensor. A further sample shall be provided to Licensor for its approval if any subsequent change is made in any approved Material.

(c)     To assure compliance with KMI's and Licensor's standards and instructions relating to any Licensed Footwear and/or Materials bearing the Marks, Licensor, at its expense, directly or through representatives, may inspect the Footwear Departments in Stores and may inspect and/or test such Licensed Footwear and Materials from time to time. Further, KMI and/or Licensor may periodically request from Licensee samples of such Licensed Footwear and/or Materials. Licensee shall cooperate and aid Licensor in making such inspections or tests and in furnishing such samples.

3.5     Authority. Unless with Licensor's prior written consent, Licensee shall conduct its sales at the Stores exclusively and solely within the designated Footwear Department premises of the Stores. Neither Licensee nor any of its affiliates shall pledge, incur any obligation or liability, hire any employees, nor purchase any merchandise or services in or under the name of the Licensor or any of its affiliates, it being understood that no party to this Agreement shall act as the agent, servant or employer of the other party.

3.6     No Challenge. Licensor represents and warrants that it or KMI has the exclusive right, title and interest in and to the Marks in the Territory and has the right to license the Marks to Licensee as provided in this Agreement. Based on such representation and warranty, Licensee acknowledges the exclusive right, title and interest of Licensor and KMI in and to the Marks. Licensee agrees not to attack or impair or challenge said right, title or interest or any of Licen-

sor's or KMI's registrations therefor, nor assist anyone else in doing so; and Licensee agrees not

to apply to register the Marks or any confusingly similar service marks, trademarks, trade names,

trade dress, copyrights, industrial models or designs, or any derivations thereof, during the Term

or forever thereafter, anywhere in the world. Any and all use of and goodwill associated with the

Marks shall inure to the benefit of Licensor and KMI.

   3.7    <u>Business Planning</u>. Footstar and Licensor shall meet and consult with each other

at least once each fiscal year in good faith (and may, in their discretion, meet further at the re-

quest of the other party) to discuss the annual business plan for the operation of the Footwear

Departments. Licensee shall at such time present its annual business plan for the Footwear De-

partments to Licensor. Among others, one goal of such consultations shall be to discuss increas-

ing the amount of name brand footwear being sold in the Footwear Departments. Licensor shall

share those aspects of its own business plan for the operation of the Stores which affect or inter-

act with the operation of the Footwear Departments.

ARTICLE IV

TERM AND TERMINATION

   4.1    <u>Buy-Out</u>. If this Agreement is not terminated earlier in accordance with section

4.2 below:

   (a)    This Agreement shall be terminated in its entirety (other than those sec-

tions relating to indemnities, choice of law and post-termination Store exit procedures) on the

Buy-Out Date;

   (b)    On and as of the Buy-Out Date, Licensor shall, or shall cause a Designated

Purchaser to, purchase from Licensee (with payment to be made within 5 business days of the

Buy-Out Date) all inventory of the Footwear Departments in all remaining Stores (the "<u>Buy-</u>

<u>Out</u>"), including any inventory that is on order pursuant to Kmart's written request and excluding

damaged, unsaleable and Seasonal Inventory, for an amount equal to the Book Value of such inventory as of such date plus one million five hundred thousand dollars ($1,500,000); provided, that (w) Licensee shall provide to Licensor a complete set of files that will support determination of Book Value ("Pricing Files") for the six-month period prior to the Buy-Out Date (and the Pricing Files shall reflect all permanent markdowns of the applicable inventory), (x) Licensee shall not have, (i) at any time prior to the Buy-Out, purchased or transferred any goods into inventory outside of the ordinary course in contemplation of the Buy-Out, (ii) purchased inventory for or otherwise stocked any Store at a level disproportionately greater than the average level of such Store at the same time of year for the prior three years, unless Gross Sales at such Store during the prior six months support such increased stocking, or (iii) prior to the Buy-Out, marked up any inventory; (y) the inventory mix at each Footwear Department as of the date of termination shall be reasonably comparable to the average mix at such Footwear Department during the same time period for the prior three years and shall reflect ordinary course practice; and (z) all inventory markdowns shall have been taken in the ordinary course (and the Pricing Files shall reflect all permanent markdowns).

(c)    No later than seven days following the Buy-Out Date, the Licensee shall remove from the remaining Stores all fixtures, furnishings, equipment or other property belonging to Licensee (including, without limitation, any damaged, unsaleable, and Seasonal Inventory not purchased by Licensor) and surrender occupancy and possession of all Footwear Department premises in the same condition as received, ordinary wear and tear excepted. Any of Licensee's property remaining on any such premises one year after such termination, through no fault of Licensor, shall become the property of Licensor. Licensee shall reimburse Licensor for the reasonable cost of removal or disposal of such property within 30 days of receipt of an in-

voice setting forth such charges, and shall pay to Licensor all Fees accruing hereunder through the Buy-Out Date.

(d)    Upon the occurrence of the Buy-Out, with respect to any Stores in which a footwear department shall continue to be operated by Licensor (or an affiliate of Licensor) following the Buy-Out Date and in which the footwear department will be staffed by persons not already employees of Licensor (or an affiliate) prior to the Buy-Out Date, Licensor shall consider the employees of Licensee prior to the Buy-Out Date for employment in staffing such footwear department in a manner consistent with the consideration that Sears, Roebuck and Co. gives to Licensor's (or its affiliates') employees upon the conversion of a Kmart Store to a Sears Essentials store.

4.2    Termination of Agreement.

(a)    During the Term of this Agreement, this Agreement may be terminated (other than with respect to indemnities, choice of law and post-termination Store exit procedures) only:

(i)    upon written notice by one party, if the other party shall fail to make any material payments when due or in the event of a material breach or material failure of any covenant, representation or warranty of the other party set forth herein, including, without limitation, the Weekly Sales Remittance as set forth in section 6.2 hereof and the Staffing requirements set forth in section 12.2 hereof or Licensee's material failure to follow Licensor's instructions regarding the nature and quality of the Services or Materials and/or appropriate use of the Marks, or material failure to comply with the Rules and Regulations established by Licensor for the conduct of

the business within the applicable Store(s); provided, however, the party charged with the breach or failure shall have the opportunity to cure said breach or failure within 60 days of receipt of written notice from the charging party (except as set forth in Section 6.2 with respect to the Weekly Sales Remittance) (the "Notice Period"). If the breach or failure is not cured to the satisfaction of the charging party within the Notice Period, the charging party shall be entitled to exercise any remedies it may have hereunder or under applicable law, including but not limited to termination of this Agreement; provided, however, that if such material breach or failure is capable of being cured but is only incapable, by reason of its nature, of being cured within the Notice Period, the charging party shall delay exercising such remedies so long as the party charged with the breach shall have begun in good faith to cure such breach within the Notice Period and shall thereafter proceed diligently to complete the cure of the breach and such breach shall be cured within a reasonable time period (the "Extended Notice Period"); but in no event shall such time period be longer than 180 days from the date of first notice to the party charged with such breach;

(ii)      upon 30 days' written notice by one party, if the other party shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against such party seeking to adjudicate it a bankrupt or insolvent, or

seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors (including, without limitation, a voluntary petition under chapter 11 of title 11 of the United States Code), or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 30 days, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or Licensor or Licensee shall take any corporate action to authorize any of the actions set forth above in this subsection.

(iii)    at the option of the non-selling or non-transferring party, upon 30 days' written notice by one party to the other, in the event of a sale or transfer of a majority of the outstanding shares (a "Change in Control") of the other party to a single person or entity or to an affiliate group under common control; provided, with respect to Licensee, a) this termination provision shall apply only to a Change in Control of Footstar and not to a Change in Control of any other Licensee (which other Licensees shall be subject to Section 4.3(a)(iv)), and b) this termination provision shall not apply to a "going-private" transaction (A) in which a financial institution,

hedge fund or other "financial" buyer, with the consent of Kmart (such consent not to be unreasonably withheld), becomes the majority share-holder of Footstar and (B) in connection with which the employment of no more than two of the top five and no more than one of the top two senior officers of Footstar is involuntarily terminated;

(iv)    at the option of either Licensee or Licensor upon seven days' written notice, in the event that Gross Sales for the four-quarter period ending as of the last date of any fiscal quarter of Licensee fall below the Sales Threshold as of such date; or

(v)    at the sole option of Licensee upon seven days' written notice, in the event that either (y) the number of Stores falls below 900, or (z) Gross Sales for the four-quarter period ending as of the last date of any fiscal quarter of Licensee shall be less than $450 million.

(b)    If this Agreement is terminated by Licensor pursuant to section 4.2(a)(i), (subject to any applicable cure provisions), then Licensee shall remove all fixtures, furnishings, equipment or other property belonging to Licensee and surrender occupancy and possession of all Footwear Department premises in the same condition as received, ordinary wear and tear excepted, within six months of receipt of notice of termination, or upon expiration of the applicable cure period, whichever is later.  During such six-month period, Licensee may conduct an orderly sale of Footwear Department inventory, subject to the Rules and Regulations and the other provisions of this Agreement in respect of operation of the Footwear Departments.  Any of Licensee's property remaining, through no fault of Licensor, on any such premises at the end of such six-month period shall become the property of Licensor.  Licensee shall reimburse Licensor for

the reasonable cost of removal or disposal of such property within 30 days of receipt of an in-

voice setting forth such charges, and shall pay to Licensor all Fees accruing hereunder through

the date upon which Licensee surrenders occupancy and possession of the Footwear Department

premises.

(c)      If this Agreement is terminated pursuant to section 4.2(a)(ii) or (iii), then

Licensee shall, within 90 days of the Termination Date, remove from the remaining Stores all

fixtures, furnishings, equipment or other property belonging to Licensee and surrender occu-

pancy and possession of the Footwear Department premises in the same condition as received,

ordinary wear and tear excepted.  During such 90-day period, Licensee may conduct an orderly

sale of Footwear Department inventory, subject to the applicable Rules and Regulations and the

other provisions of this Agreement in respect of operation of the Footwear Departments.  Any of

Licensee's property remaining on any such premises after such 90-day period, through no fault

of Licensor, shall become the property of Licensor.  Licensee shall reimburse Licensor for the

reasonable cost of removal or disposal of such property within 30 days of receipt of an invoice

setting forth such charges, and shall pay to Licensor all Fees accruing hereunder through the date

upon which Licensee surrenders occupancy and possession of the Footwear Department prem-

ises.

(d)      If the Agreement is terminated pursuant to section 4.2(a)(iv), or (v) or by

Licensee pursuant to section 4.2(a)(i), then:

(i)      within 5 business days of the Termination Date, Licensor shall, or

shall cause a Designated Purchaser to, purchase and make payment for all

Footwear Department inventory including inventory that is on order but

excluding damaged, unsaleable and Seasonal Inventory, for an amount

equal to the Book Value of such inventory as of such date plus one million five hundred thousand dollars ($1,500,000); <u>provided</u>, that (w) Licensee shall provide to Licensor a complete set of Pricing Files for the six-month period prior to the Termination Date, (x) Licensee shall not have, (i) in the 90 days prior to the Termination Date, purchased or transferred any goods into or out of inventory, other than in the ordinary course, (ii) purchased inventory for or otherwise stocked any Store at a level disproportionately greater than the average level of such Store at the same time of year for the prior three years, unless Gross Sales at such Store during the prior six months support such increased stocking, or (iii) prior to the Termination Date, marked up any inventory; (y) the inventory mix at each Footwear Department as of the Termination Date shall be reasonably comparable to the average mix at such Footwear Department during the same time period for the prior three years and shall reflect ordinary course practice; and (z) all inventory markdowns shall have been taken in the ordinary course (and the Pricing Files shall reflect all permanent markdowns);

(ii)      at Licensor's sole option, the parties shall enter into a transition services agreement for up to six months, during which time Licensee will assist in the operation of the footwear business and for which Licensor shall pay to Licensee a service fee in an amount that will cover all costs of providing such services;

(iii)    at Licensor's cost, Licensee will otherwise lend such reasonable assistance as requested by Licensor to assist in the transition of the footwear business to Licensor;

(iv)    with respect to any Stores in which a footwear department shall continue to be operated by Licensor (or an affiliate of Licensor) following the Termination Date and in which the footwear department will be staffed by persons not already employees of Licensor (or an affiliate) prior to the Termination Date, Licensor shall consider the employees of Licensee prior to the Termination Date for employment in staffing such footwear department in a manner consistent with the consideration that Sears, Roebuck and Co. gives to Licensor's (or its affiliates') employees upon the conversion of a Kmart store to a Sears Essentials store; and

(v)    Licensee shall, within seven days of the Termination Date, remove from the remaining Stores all fixtures, furnishings, equipment or other property belonging to Licensee (including, without limitation, any damaged, unsaleable and Seasonal Inventory not purchased by Licensor) and surrender occupancy and possession of the Footwear Department premises in the same condition as received, ordinary wear and tear excepted. Any of Licensee's property remaining on any such premises after such seven-day period, through no fault of Licensor, shall become the property of Licensor. Licensee shall reimburse Licensor for the reasonable removal cost, if any, (the "Removal Cost") of such property within 30 days of re-

ceipt of an invoice setting forth such charges, and shall pay to Licensor all Fees accruing hereunder through the Termination Date.

4.3    <u>Termination of License With Respect to Particular Stores</u>.

(a)    The license to operate a Footwear Department and the other terms and provisions of this Agreement may be terminated with respect to any particular Store(s):

(i)    subject to Section 4.3(d) below, upon seven days' written notice from Licensor to Licensee that the Disposition of such Store will occur within 97 days of such notice (a "<u>Disposition Notice</u>");

(ii)    upon 30 days' written notice by Licensor or Licensee to the other, with respect to any affected Store(s), in the event any Footwear Department premises become unfit for use and occupancy by reason of material damage or destruction, or as a result of condemnation;

(iii)    as specified in Section 5.1; or

(iv)    immediately, to the extent such Store shall be operated by a Licensee (other than Footstar), in the event that such Licensee shall not be directly or indirectly wholly-owned and controlled by Footstar.

(b)    If the license granted herein and the other terms of this Agreement are terminated with respect to a particular Store or Stores pursuant to Article 4.3(a)(i) (or, solely to the extent such termination qualifies as a Disposition, pursuant to Article 4.3(a)(iii)):

(i)    Licensee shall remove from such Store(s) all fixtures, furnishings, equipment or other property (including any damaged, unsaleable and Seasonal Inventory not purchased by Licensor) belonging to Licensee and surrender occupancy and possession of the Footwear Department premises in

such Store(s) in the same condition as received, ordinary wear and tear ex-cepted, within seven days after receipt of notice of the applicable Disposi-tion (the "Vacate Date"). Any of Licensee's property remaining on any such premises after the Vacate Date through no fault of Licensor, shall be-come the property of Licensor. Licensee shall reimburse Licensor for the reasonable cost of removal or disposal of such property within 30 days of receipt of an invoice setting forth such charges;

(ii)     provided that (x) Footstar shall not have, in the 90 days prior to the Vacate Date, purchased or transferred any goods into or out of inventory of the applicable Store(s) other than in the ordinary course, or marked up any such inventory, (y) the inventory mix of the Disposed of store(s) as of the Vacate Date shall reflect ordinary course practice, and (z) all inventory markdowns at the Disposed of Store(s) shall have been taken in the ordi-nary course, Licensor shall, or shall cause a Designated Purchaser to, on the Vacate Date, purchase from Footstar and make payment for all inven-tory at such Disposed of Store(s), other than inventory that is damaged or unsaleable or that constitutes Seasonal Inventory, for an amount equal to the Book Value of such inventory; and

(iii)     with respect to any Stores in which a footwear department shall continue to be operated by Licensor (or an affiliate of Licensor) following the Disposition of such Store(s) and in which such footwear department will be staffed by persons not already employees of Licensor (or an affili-ate) prior to such Disposition, Licensor shall consider the employees of

Licensee prior to the Disposition for employment in staffing such footwear department in a manner consistent with the consideration that Sears, Roebuck and Co. gives to Licensor's (or its affiliates') employees upon the conversion of a Kmart store to a Sears Essentials store;

(c)      In the event that a Disposition noticed pursuant to section 4.3(a) does not occur within 97 days of such notice:

(i)      subject to subsection (ii) below, provided that each party shall have acted in good faith with respect to such Disposition, neither Kmart nor Footstar shall have any liability to the other whatsoever, nor shall either have any remedy whatsoever; without limitation of the foregoing, and subject to subsection (ii) below, the purchase and sale of inventory pursuant to paragraph 4.3(b)(ii) shall not be unwound nor the price thereof adjusted in any manner;

(ii)      subject to section 4.3(d) below, in the event that the noticed Disposition is cancelled (as determined by Kmart in good faith) for any reason, then Licensee shall have a right of reentry with respect to the applicable Store and, at Licensee's option, this Agreement shall remain in effect with respect to such Store; provided, that such right of reentry shall be contingent upon, in addition to the cancellation of the Disposition, at Licensee's option, either (A) the passage of 180 days from the date of the applicable Disposition Notice, or (B) the repurchase by Licensee from Licensor of all inventory from the applicable Store purchased in accordance with section 4.3(b)(ii) and not yet sold by Licensor to a subsequent purchaser. For any

Store for which the cancelled Disposition was in respect of a conversion as described in subsection (iii) of the definition of "Disposition" herein, in the event Licensee chooses to reenter, Licensor shall cover Licensee's reasonable out-of-pocket costs associated with reentry up to a maximum of $5,000 per Store.

(d)    Solely in connection with a Disposition of any of the Stores set forth on <u>Schedule II</u> hereto, Licensee shall have the option, exercisable by notice to Kmart within seven days of delivery of a Disposition Notice with respect to such Store, to (A) continue operating the Footwear Department in such Store(s) for as long as such Store(s) shall be operated by Kmart or (B) invoke the inventory buy-out and other provisions set forth in section 4.3(b); <u>provided</u>, <u>however</u>, that Licensee shall have no right to reenter any of the Stores set forth on <u>Schedule II</u> hereto should Licensee invoke section 4.3(b) with respect to such Store(s) and the noticed Disposition of such Store(s) be cancelled.  In the event that Kmart shall not have received notice of Licensee's election pursuant to this section 4.3(d) within seven days of delivery to Licensee of an applicable Disposition Notice, Licensee shall be conclusively deemed to have elected the provisions of Section 4.3(b).

(e)    If the License with respect to a particular Store or Stores is terminated pursuant to Article 4.3(a)(ii), (iii) (other than in the case of a termination pursuant to Article 4.3(a)(iii) that qualifies as a Disposition), or (iv), then Licensee shall, within 90 days of such termination, remove from the applicable Store(s) all fixtures, furnishings, equipment or other property belonging to Licensee and surrender occupancy and possession of the Footwear Department premises in the same condition as received, ordinary wear and tear excepted.  During such 90-day period, Licensee may conduct an orderly liquidation of the applicable Footwear Department inventory,

subject to the Rules and Regulations and the other provisions of this Agreement in respect of operation of the Footwear Departments. Any of Licensee's property remaining on any such premises after such 90-day period, through no fault of Licensor, shall become the property of Licensor. Licensee shall reimburse Licensor for the reasonable cost of removal or disposal of such property within 30 days of receipt of an invoice setting forth such charges.

ARTICLE V

FOOTWEAR DEPARTMENTS

5.1     Footwear Departments.  The area to be occupied by Licensee within each Store shall be defined by computer aided drawings produced by Licensor's Store Planning Department. Licensor may at any time and from time to time change the location and size of a Footwear Department within a Store, in which event, Licensor shall pay all cost and expense of moving the Footwear Department. In the event that Licensor shall decrease the square footage of a Footwear Department by more than 5%, then the Miscellaneous Expense Fee payable with respect to such Footwear Department shall be reduced proportionately. Licensor may not increase the square footage of a Footwear Department by more than 5% without Licensee's written consent. To the extent Licensee consents to such an increase and the square footage of any Footwear Department is increased by more than 5%, then the Miscellaneous Expense Fee payable with respect to such Footwear Department shall be increased proportionately. Should Licensee not consent to the relocation or change in size of any Footwear Department, it may terminate the Agreement as to such Footwear Department by immediately giving Licensor written notice of its intention so to do, such termination to be subject to the provisions of section 4.3(e).

ARTICLE VI

FEES

6.1    Fees.

(a)    All Fees and other amounts due and owing from one party to the other hereunder shall be paid in U.S. Dollars in immediately available funds and shall be calculated and reported on a per Footwear Department basis. Fees provided for herein shall accrue from and after the day immediately following the Fee Reference Date.

(b)    Licensee shall pay Fees to Licensor (which fees shall be apportioned by Licensor among the Kmart affiliates in Licensor's sole discretion) at the following rates and upon the following terms and conditions throughout the Term:

(i)    License Fees. Each week during the Term, in consideration of the license granted to Licensee hereunder, Licensee shall pay a "License Fee" to Licensor at the rate of 14.625% of the Gross Sales of all Footwear Departments made during the preceding week. Licensor may deduct and withhold such License Fee from its Weekly Sales Remittance to Licensee.

(ii)    Miscellaneous Expense Fees. Commencing on the Effective Date (as defined herein) and subject to Section 5.1 hereof, a "Miscellaneous Expense Fee" equal to $23,500 per year per Footwear Department open and operated by Licensee shall be payable by Licensee to Licensor in monthly installments of $1,958.33 per Footwear Department. The monthly installment with respect to a given month shall be deducted by Licensor from the Weekly Sales Remittance made in the second week of such month. The Miscellaneous Expense Fee for a particular Store shall be payable only with respect to the month(s) during which such Store is

open and Licensee has the right to operate the Footwear Department in such Store. The Miscellaneous Expense Fee with respect to any Footwear Department as to which Licensee ceases to have the right to operate shall be pro rated for the month in which Licensee's right to operate such Foot-wear Department terminates. Licensor shall refund any overpayment of the Miscellaneous Expense Fee, whether resulting from the mid-month termination of Licensee's right to operate a Footwear Department or otherwise, by increasing the amount of the first Weekly Sales Remittance following the ascertainment of such overpayment by the amount of such overpayment.

    6.2    <u>Weekly Sales Remittance and Fee Statements</u>. Once each week Licensor shall remit to Licensee a) the proceeds of Gross Sales of the Footwear Departments during the preceding week, net of any Fees or other set-offs specifically permitted by this Agreement (the "<u>Weekly Sales Remittance</u>"), and b) shall furnish to Licensee a "Statement of Fees" with respect to each Footwear Department in each Store. Such Statement of Fees shall set forth the permitted Fees and any permitted deductions or set-offs taken by Licensor as set forth herein. Licensor shall make all reasonable efforts to remit the Weekly Sales Remittance within two Business Days of the last day of Licensor's accounting week. Licensor's failure to remit the Weekly Sales Remittance within twelve days after the last day of Licensor's applicable accounting week shall constitute a material breach of this Agreement without requirement of notice by Licensee to Licensor. In the event this Agreement is terminated on any grounds, Licensor shall continue to remit the Weekly Sales Remittance through the Termination Date or Buy-Out Date, whichever is applicable.

6.3    <u>Right of Setoff</u>.  Licensor shall deduct from each Weekly Sales Remittance the License Fee and the Miscellaneous Expense Fee as may be due at the time of such remittances. Additionally, Licensor may deduct from the Weekly Sales Remittance any other amounts owing from Licensee to Licensor, including, without limitation, any Capital Claims due and owing, any expenses (including payroll advances) of Licensee paid for by Licensor pursuant to Section 12.3, Section 21.14 or otherwise, and any rental payment owing by Licensee to Licensor in respect of office space allocated to Licensee at Licensor's or Sears' headquarters pursuant to Section 21.14.

6.4    <u>Inventory</u>.

(a)    Licensor acknowledges that Licensee has advised Licensor that Licensee owns all of the inventory in the Footwear Departments and has pledged the proceeds thereof to its secured lenders.

(b)    Licensee represents that any inventory purchased by Licensor or a Designated Purchaser pursuant to section 4.1(b), 4.2(d)(i), or 4.3(b)(ii) shall be delivered to Licensor or such Designated Purchaser free and clear of any and all liens, security interests or encumbrances of any kind or nature.

ARTICLE VII

CAPITAL CLAIMS

7.1    <u>Capital Claims</u>.  Subject to section 7.3 hereof, Licensor shall have one claim (each, a "Capital Claim") against Footstar in respect of each Existing Store in an amount equal to $11,000 per Existing Store, for an aggregate claim against Footstar equal to $15,730,000 (the parties acknowledging that there are 1430 Existing Stores as of the Effective Date).

7.2    <u>Payment of Capital Claims</u>.  Except as set forth below, the Capital Claim relating to each Existing Store shall be due and payable upon the sooner to occur of (A) the termination of the license with respect to the applicable Existing Store pursuant to Section 4.3 and (B) sub-

ject to section 7.3 below, the Termination Date. Capital Claims which are due and payable may

be offset by Licensor against contemporaneous Weekly Sales Remittances or against other

amounts owing by Licensor to Footstar

    7.3    <u>Waiver of Capital Claims</u>.  Licensor shall waive in their entirety all Capital

Claims which are not yet due and payable as of the Termination Date or as of the date of the

Buy-Out; <u>provided</u>, that, notwithstanding the foregoing, Licensor shall not waive the Capital

Claims in whole or in part in conjunction with a termination by Licensor pursuant to section

4.2(a)(i), 4.2(a)(ii) or 4.2(a)(iii).

ARTICLE VIII

CONDITIONS TO EFFECTIVENESS

    8.1    <u>Conditions Precedent to Effectiveness</u>.  This Agreement shall become effective on

and as of the first date on which each of the following conditions precedent have been satisfied

(such date, the "<u>Effective Date</u>"):

    (a)    the Assumption Order shall have been entered by the Bankruptcy Court;

and

    (b)    Footstar shall have paid to Kmart an amount equal to the sum of $45 mil-

lion and the Fee True-Up Amount; <u>provided</u>, that in the event that the Effective Date shall not

have occurred by September 1, 2005, or such later date as the parties may agree, then the parties

shall seek the first available trial date in the Bankruptcy Court that is after September 30, 2005

and this Agreement shall be null and void and of no further force and effect and shall not be

deemed to have amended and restated the Existing Master Agreement or superseded or termi-

nated the License Agreements or the Shareholders Agreements; <u>provided further</u>, that Kmart

agrees not to object or otherwise interfere in Footstar's disclosure statement approval process

and Footstar's plan of reorganization confirmation process, provided that the foregoing is consis-

33

tent with the terms herein and the terms in the Agreement re Settlement of Assumption and Conversion Issues, dated July 2, 2005, between the parties.

ARTICLE IX

DISPOSITIONS

9.1    <u>Limitation on Dispositions</u>.  Licensor shall be permitted to Dispose of any number of Stores at any time; <u>provided</u>, that in the event that either a) the total number of Dispositions during the Term exceeds 550, or b) the number of Dispositions in any calendar year exceeds the limit set forth in the table below, then Licensor shall, within one business day of the Vacate Date, pay to Footstar the Stipulated Loss Value with respect to each Store Disposed of in excess of the applicable limit; <u>provided</u>, <u>further</u>, that Stores as to which the Stipulated Loss Value is paid shall not be considered in the calculation of the 550 store limitation.

| Calendar Year | Number of Dispositions per Calendar Year |
|:---:|:---|
| 2005 | 85 |
| 2006 | 150, plus 85 less the actual number of Dispositions in 2005 (provided that the actual number of Dispositions in 2005 is less than 85) |
| 2007 | 160, plus 235 less the actual number of Dispositions in 2005 and 2006 (provided that the actual number of Dispositions in 2005 and 2006 is less than 235) |
| 2008 | 160, plus 395 less the actual number of Dispositions in 2005, 2006 and 2007 (provided that the actual number of Dispositions in 2005, 2006, and 2007 is less than 395) |

9.2    <u>Stipulated Loss Value Nonrefundable</u>.  The payment of Stipulated Loss Value in any period shall be nonrefundable, regardless of the number of Dispositions that take place in subsequent periods.

ARTICLE X

BOOKS AND AUDITS

10.1    <u>Books</u>.

(a)    Footstar shall keep full, true and accurate books of account containing all particulars which may be necessary for the purpose of disclosing and determining the computation of a) the Book Value of any inventory purchased by Licensee for sale in the Footwear Departments, and b) the total amount expended by Footstar on Staffing Costs.  Such books of account shall be kept at Footstar's principal place of business and maintained by Licensees until six months following the Termination Date.  All of the information within such books and records which is relevant for purposes of determining the computation and amount of the Book Value of inventory and/or the expenditures on Staffing Costs shall be available for inspection by Licensor or its designated certified public accountant upon reasonable notice.

(b)    Licensor shall keep full, true and accurate books of account regarding Gross Sales, Weekly Sales Remittances, Miscellaneous Expense Fees and payroll transactions pursuant to Section 12.3.  All such information shall be available for inspection by Licensee or its designated certified public accountant upon reasonable notice.

(c)    To the extent either party alters its information systems, such party shall take reasonable measures, at its expense, to ensure that such systems continue to interface with and be compatible with the counterparty's information systems in a manner sufficient to permit the parties to operate under this Agreement in a manner reasonably consistent with past practice, including, without limitation, past practice with respect to the generation of information used in the conduct of business in the Footwear Departments.

10.2    <u>Audits</u>.  During the Term and through and including the date that is six months following the Termination Date, Kmart or its designated agent, upon reasonable notice to Foot-

star and during normal business hours, may audit all books, statements of account, records and reports relating to any inventory purchased or to be purchased by Kmart (or another Designated Purchaser) pursuant to any provision of this Agreement or relating to the Staffing Costs. Footstar shall make available to Kmart or its agent any and all records reasonably necessary to the verification of the Book Value of such inventory or the amount of such expenditures. The expense of any and all such audits and verification shall be borne by Kmart.

10.3   Staffing Reports. Each year, within 90 days of the end of Footstar's fiscal year, a financial officer of Footstar shall provide to Kmart a certificate attesting to the amount expended by Footstar for Staffing Costs for the prior year.

ARTICLE XI

TAXES

11.1   Taxes. Licensees shall pay all occupational fees, taxes, licenses and permits required in connection with or incident to their operation of the applicable Footwear Departments, and shall pay all taxes levied on their personal property, payrolls or income.

11.2   Sales Tax and Certain Gross Receipts Taxes. As an accommodation to Footstar, for so long as permitted under law and for so long as Licensor's systems reasonably permit, Licensor shall file and remit sales tax receipts on Licensees' behalf to the appropriate taxing jurisdictions. In addition, for so long as permitted under law and for so long as Licensor's systems reasonably permit, Licensor shall file on behalf of Licensees gross receipts tax returns in Guam, the Virgin Islands, and Hawaii, and remit amounts owed to the applicable taxing jurisdiction. Licensor shall withhold sales taxes and gross receipts taxes paid on Licensees' behalf from its Weekly Sales Remittance and account for the same in its fee statements to Licensee.

11.3   Tax Indemnity. In consideration of the services described in Section 11.2, and to the extent that Licensor is not guilty of gross negligence in the performance of such services, Li-

censee shall indemnify and hold harmless Licensor from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Licensor sustains or incurs as a result or consequence of the failure by Licensee to promptly pay when due taxes to the proper taxing authorities and/or the failure by Licensee to promptly file when due with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.

ARTICLE XII

FOOTWEAR DEPARTMENT EMPLOYEES

12.1    Employer Action. Notwithstanding section 12.3 or any other provision of this Agreement, personnel working in each Footwear Department (the "Footwear Department Employees") shall be employees of Licensee and Licensee shall exercise control over such employees, including hiring, firing, promoting, determining wages and work procedures and the like ("Employer Action"), which control shall be at Footstar's direction subject to (i) any applicable employment or union contracts, (ii) Licensor's Rules and Regulations and (iii) applicable laws. Footstar shall be responsible for all Employer Actions and shall reimburse, indemnify, defend and hold Licensor and its subsidiaries and affiliates and their respective officers, directors and employees harmless from and against any and all loss, damage, cost, expense or penalty, or any claim or action therefor, arising out of any such Employer Action.

12.2    Staffing. Footstar shall spend, in the aggregate and on an annual basis, a minimum of 10% of Gross Sales on salaries, payroll taxes, moving and travel expenses, worker's compensation, incentives and other employee benefits for the Footwear Department Employees (the "Staffing Costs"); provided, that in no event shall Footstar schedule staffing in any individual Footwear Department for fewer than 40 hours per week.

12.3    Employee Pay.  Licensor will advance the necessary cash for payroll relative to the Footwear Department Employees upon receipt of proper documentation, in form to be agreed upon from time to time by Kmart and Footstar, from Licensee or its designated representative. Footstar shall be unconditionally liable to reimburse Licensor for all amounts so advanced, and Licensor may set off such amounts against any subsequent Weekly Sales Remittance.  Footstar shall be responsible for and hereby covenants to, or to cause another Licensee to, make all re-quired payments to all applicable taxing and other governmental authorities in respect of the Footwear Department Employees, including without limitation social security, medicare, state and local income tax and other payroll taxes, as applicable.

ARTICLE XIII

FURNITURE AND FIXTURES

13.1    Furniture and Fixtures.  Licensor shall maintain and update all shelving, counters, display cases and other trade fixtures which shall be agreed upon by Licensee and Licensor as necessary for the proper operation of the Footwear Departments by Licensee.  Licensee may fur-nish and install at its expense in the applicable Footwear Department such other furniture, fix-tures and equipment as it may desire, subject to the prior written approval of Licensor.  No Li-censee may install or maintain electrical equipment (the "Electrical Equipment") which may in-terfere with the operation of radios, televisions or other appliances or communications or security systems sold or in use in the Stores.  To the extent Licensee installs such Electrical Equipment, Licensee shall promptly correct or remove such Electrical Equipment at its expense.  Licensee agrees to submit for prior approval by Licensor all proposed signs and sign fixtures.  Licensee agrees to follow Licensor's instructions as to such signs and sign fixtures.

ARTICLE XIV

ADVERTISING

14.1    <u>Advertising</u>.  Licensor shall have the sole and exclusive control over all advertis-
ing and promotions relating to all business conducted on the Store premises, including on and in
connection with the Footwear Departments.  Licensees shall not, and shall not permit any sub-
sidiary or affiliate to, engage in advertising or promotional activity of any Footwear Department
or any business conducted on Store premises without the prior review and written approval of
Licensor.

14.2    <u>Minimum Roto Pages</u>.  Licensor shall allocate and provide, at its own expense, no
fewer than 52 square tab weekend roto pages per year to Footwear Department products.

ARTICLE XV

CASH REGISTERS, UTILITIES AND TELEPHONE

15.1    <u>Cash Registers</u>.  Licensor shall provide at its expense all cash registers necessary
for the operation of each Store and all cash in registers shall be at the risk of Licensor.  Licensor
shall permit Licensee, upon reasonable notice and during normal business hours, to take readings
from such registers.  Licensee shall have no obligation to contribute monies to balance out such
registers.

15.2    <u>Utilities</u>.  Licensor shall provide at its expense utilities consisting of light, heat,
power, gas, water and air conditioning as it may deem necessary, but shall not be responsible for
any loss or damage of any nature resulting from the interruption or failure of such utilities.

15.3    <u>Telephones</u>.  Licensor shall provide at its expense telephone service and facilities
for incoming calls under the general business listing of "Kmart Store No. _____" or the like.
Except to the extent any separate voice telephone lines of telephone listings exist as of Approval

Date, ro Footwear Department shall maintain any separate voice telephone lines or telephone

listings.

## ARTICLE XVI

## RULES AND REGULATIONS

16.1    <u>Rules and Regulations</u>.  Licensor shall from time to time, for the benefit of the

common enterprise, establish, amend, modify or revise uniform Rules and Regulations consistent

with this Agreement which shall govern but not be limited to the following subjects:  order and

appearance of the Store, methods for handling of cash and cash registers, credit, will-call and

layaway sales, payments made by Licensor for account of Licensee, refunds, pricing policies,

inventory requirements, disposal of old merchandise, overlap in merchandise carried by various

Footwear Departments, products liability insurance, receiving of merchandise and store security.

Licensor agrees to furnish Footstar with a written copy of such Rules and Regulations and Licen-

see agrees that it and its employees and agents shall comply with such Rules and Regulations.

The current version of the Rules and Regulations is set forth at <u>Exhibit B</u>.

16.2    <u>Limitation on Amendment</u>.  None of the Rules and Regulations shall be modified

in a manner inconsistent with this Agreement.

## ARTICLE XVII

## CONFIDENTIAL INFORMATION

17.1    <u>Confidential Information</u>.  Footstar acknowledges that in the course of performing

this Agreement, it may learn, and Licensor may disclose to it, certain information and data,

whether written or oral, that is not in the public domain or otherwise available from third parties

except on a confidential basis ("<u>Confidential Information</u>") concerning Kmart, its affiliates, their

business and their properties, including, without limitation, confidential information and data

concerning sales within Stores, new locations of Stores, closing and/or conversions of Stores,

and other information relating to business plans or retailing and merchandising strategies for Stores as a whole or for departments within the Stores.  Licensor acknowledges that as a result of, or in connection with this Agreement, it may learn and Licensee may disclose to Licensor certain Confidential Information concerning Footstar, its affiliates, their business and their properties.  During the Term and for a period of three years thereafter, except as otherwise required by law, neither Licensor nor Licensee shall disclose any of the other party's Confidential Information to third parties or to affiliate, subsidiary or parent companies or their respective officers, directors, employees or representatives, except as mutually agreed upon in writing by Licensee and Licensor; provided, that Confidential Information may be disclosed to affiliate, subsidiary or parent companies or their respective officers, directors, employees or representatives, to the extent necessary to effectuate the purposes of this Agreement, so long as such persons are informed of the confidential nature of the Confidential Information and agree to maintain the confidentiality thereof in accordance with this Agreement.  Further, all Confidential Information shall remain the sole and exclusive property of the party from which it has emanated and the recipient of Confidential Information shall not use such Confidential Information in furtherance of its own business other than for performance under this Agreement.

## ARTICLE XVIII

## INDEMNIFICATION

18.1   General; Insurance.  Licensee shall reimburse, indemnify, defend and hold harmless Licensor and its subsidiaries and affiliates and their respective officers, directors and employees, from and against any and all damage, loss, cost, expense or penalty, or any claim or action therefor, by or on behalf of any person, arising out of Licensee's performance or failure to perform under this Agreement and/or the Existing Master Agreement, including, but not limited to, personal injury and death claims, false labeling or failure to correctly label any merchandise

under any statutory obligation or rules and regulations having the force of law, and all claims of employees or agents of Licensee whether for injury, death, compensation, social security, pension, unemployment compensation, etc.  Licensor agrees to obtain and keep in force appropriate insurance for Licensee and Licensor for liabilities for personal injuries (including death) and property damage arising out of or relating to the use of the Footwear Department premises with limits of not less than $5,000,000 for injury to one person and $5,000,000 for injury to more than one person and not less than $5,000,000 for property damage, and at Licensor's option Licensor may self insure all or any portion of these limits.  Licensees agree to maintain through and including the Buy-Out Date or Termination Date, as applicable, appropriate workers' compensation and employer's liability insurance as required by all applicable federal, state or other laws, and, at Licensor's option, to name Licensor as an "alternate employer" on such policies.  Licensee agrees to obtain and keep in force through and including the Buy-Out Date or Termination Date, as applicable, appropriate insurance for claims against Licensor and Licensee for personal injury (including death) and property damage arising out of or relating to the goods and services provided pursuant to this Agreement and/or the Existing Master Agreement (other than for liabilities for which Licensor has agreed to insure in this Section 15.1), with the same limits and self insurance options as agreed to above by Licensor.  Licensee or Licensor, as the case may be, shall provide evidence of all of the aforesaid insurance at the request of the other party, and shall name the other party as an additional insured on such policies.

18.2    Intellectual Property & Employee Payment Indemnification. Licensee shall reimburse, indemnify, defend and hold harmless Licensor and its subsidiaries and affiliates and their respective officers, directors and employees from and against all third-party claims asserted against Licensor (a) alleging that any Licensed Footwear, Services, trade fixtures, furnishings,

merchandise, advertisements or promotions furnished by Licensee under this Agreement or the Existing Master Agreement infringe any patent, copyright, trademark, trade dress, design or other proprietary right or constitute a misuse of any trade secret information or violate any third-party contractual right, or (b) arising from the payment (or non-payment) by Kmart of any amount to any Footwear Department Employee or to any third party (including any taxing or other governmental authority) relating to any payment (or non-payment) by Kmart of any amount to any Footwear Department Employee, and shall pay all losses, costs, attorneys fees, expenses, settlement payments, fines and damages arising in connection with any such claims under the foregoing subsections (a) and (b).  Notwithstanding the provisions set out in the pre-ceding sentence, Licensor shall reimburse, indemnify, defend and hold harmless Licensee and its subsidiaries and affiliates and their respective officers, directors and employees from and against all third party claims asserted against Licensee alleging that any use of the Marks by Licensee that was authorized by Licensor pursuant to this Agreement infringes any trademark or trade dress of a third party and shall pay all losses, costs, attorneys' fees, expenses, settlement pay-ments, fines and damages arising in connection with any such claims.

18.3    <u>General</u>.  Licensor or Licensee, as the case may be, agree to timely advise the other party of any lawsuit, claim or proceeding for which an indemnity is provided pursuant to this Agreement and to cooperate with the other in the defense or settlement of such lawsuit, claim or proceeding.  Licensor or Licensee, as the case may be, shall keep the other party advised at all times concerning the handling of such matters and shall furnish for the other party's prior review and approval all proposed settlement, release or similar documents or agreements dispos-ing of a given matter if such matter involves the other party or affects its interests.

ARTICLE XIX

NO ASSIGNMENT OR SUBLICENSE

19.1    <u>No Assignment or Sublicense</u>.  Neither party shall assign or sublicense its rights and/or duties under this Agreement without the prior written consent of the other party given at the other party's sole option, except that either party may assign its rights, but not its duties, under this Agreement to a subsidiary or affiliate which is and shall remain wholly owned and controlled by or under common control with such party, upon written notice to the other party.  Any other attempted assignment or sublicense shall be void.

ARTICLE XX

GUARANTEES

20.1    <u>Sears Guarantee</u>.  Sears hereby irrevocably and unconditionally guarantees to Footstar that any amounts owing by Kmart to Footstar and/or Licensees hereunder shall be paid in full when due.  Sears hereby agrees that its obligations with regard to such guarantee shall be unconditional, irrespective of any circumstances which might otherwise constitute a legal or equitable defense of a guarantor, including, without limitation, as a result of any amendment of this Agreement of any nature.

20.2    <u>Footstar Guarantee</u>.  Footstar hereby irrevocably and unconditionally guarantees to Kmart that any amounts owing by any Licensee to Kmart hereunder shall be paid in full when due.  Footstar hereby agrees that its obligations with regard to such guarantee shall be unconditional, irrespective of any circumstances which might otherwise constitute a legal or equitable defense of a guarantor, including, without limitation, as a result of any amendment of this Agreement of any nature.

ARTICLE XXI

MISCELLANEOUS

21.1    Inventory Counts.  With respect to any purchase of inventory by  Licensor (or a

Designated Purchaser) under this Agreement (including pursuant to Article IV),  Licensor and

Footstar shall each have the right to require an actual physical count and determination of the

quantity of such inventory and the qualification (i.e., damaged, unsaleable or Seasonal Inventory)

of such inventory for purchase, such count and determination to be performed by RGIS Inven-

tory Services or any other mutually acceptable third party and paid for equally by the parties.

The price paid by Licensor in connection with any such purchase of the applicable inventory

shall be adjusted in accordance with the result of such physical count and determination.

21.2    Maintenance of Premises and Security Service.  Licensor shall maintain and pro-

vide janitor service at its cost for the Footwear Departments.  Licensee shall be responsible for

janitor service in any storage area occupied by it under this Agreement.  Licensor may from time

to time provide such security service as it may deem necessary.

21.3    Credit Sales.  Licensor may provide credit facilities consisting of credit card, debit

card or deferred payment plans for the sale of Licensee's goods.  No Licensee may install or

promote its own credit card, debit card or deferred payment plans without prior written approval

of Licensor.

21.4    Risk of Loss; Damage, Destruction or Disappearance of Property.  Except in the

event of gross negligence or willful misconduct, the risk of loss, damage, destruction or disap-

pearance of any property on the Store premises, as between Licensor and any Licensee, shall be

exclusively that of the party having title to such property.  Further, except in the event of gross

negligence or willful misconduct, Licensee relieves Licensor, and Licensor relieves Licensee, of

liability for any loss caused by fire or explosion arising out of any act of omission or commission, negligent or otherwise, of the agents, servants or employees of the other party.

21.5    Rights and Remedies.  The rights and remedies given herein are not exclusive, but are cumulative, and are in addition to all rights and remedies allowed by law, except that neither party shall be liable to the other party for incidental, consequential, punitive or exemplary damages arising in connection with this Agreement or the performance, omission of performance or termination hereof, even if the said party has been advised of the possibility of such damages and without regard to the nature of the claim or the underlying theory or cause of action (whether in contract, tort or otherwise).

21.6    Independent Contractor.  Neither party is nor shall be the agent of the other party in any matter.  Each party is and at all times shall be an independent contractor in the performance of this Agreement, and neither party is authorized to bind the other party to any agreement or contract, in any manner, with any third party.  The parties do not intend this Agreement to constitute a joint venture, partnership or lease and nothing herein shall be construed to create such a relationship.  Subject to the provisions hereof, this Agreement shall bind the successors and permitted assigns of the parties.

21.7    CHOICE OF ILLINOIS LAW AND FORUM.  THIS AGREEMENT AND ALL ASPECTS OF THE BUSINESS RELATIONSHIP BETWEEN LICENSOR AND LICENSEE SHALL BE DEEMED TO HAVE BEEN EXECUTED AND DELIVERED IN CHICAGO, ILLINOIS, AND SHALL BE CONSTRUED, INTERPRETED AND ENFORCED UNDER AND IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS. LICENSEE AGREES TO EXERCISE ANY RIGHT OR REMEDY IN CONNECTION WITH THIS AGREEMENT OR OTHERWISE ARISING OUT OF SAID BUSINESS RELA-

RELATIONSHIP(S), EXCLUSIVELY IN, AND HEREBY SUBMITS TO THE JURISDICTION OF, THE STATE OF ILLINOIS COURTS OF COOK COUNTY, ILLINOIS OR THE UNITED STATES DISTRICT COURT AT CHICAGO, ILLINOIS.

21.8   Waiver.  Silence, acquiescence or inaction shall not be deemed a waiver of any right.  A waiver shall only be effective if it is in writing and signed by an authorized officer of the party to be charged.  Any such waiver shall not be construed as a continuing waiver or as a waiver of any other breach of a same or similar nature.

21.9   Severability.  In the event that any part or portion of this Agreement shall be deemed to be invalid or illegal, then such invalid or illegal portion shall, so far as possible, not affect the validity or legality of the remainder of this Agreement.  Further, the parties agree that they shall attempt to arrive at a modification of any illegal or invalid part so as to render the same legal and valid and within the keeping of the original tenor and spirit of the Agreement.

21.10   Entire and Exclusive Agreement.  This Agreement and the Exhibits hereto shall constitute the entire exclusive agreement between the parties with respect to operation of the Footwear Departments and use and licensing of the Marks in the Territory, and shall supersede all prior negotiations, understandings and agreements, if any, between the parties, whether oral or written.  Except as otherwise provided herein, this Agreement may only be amended or modified by written instrument signed by authorized officers of the parties.

21.11   Headings for Convenience Only.  The headings, titles or captions used in this Agreement are provided solely for the convenience of the parties and shall not be considered relevant in any construction of this Agreement or be interpreted to define, expand or limit the provisions of this Agreement.

21.12  Authority.  Each party represents, covenants and warrants that it has the full legal right, power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein, subject, in the case of Footstar, to approval of the Bankruptcy Court.

21.13  Notices.  Any notices should be delivered by certified mail return receipt request or a nationally recognized overnight delivery service and addressed if to Footstar to:

| | |
|---|---|
| If to Licensee to: | Maureen Richards, Esq.<br>Sr. Vice President & General Counsel<br>Footstar, Inc.<br>933 MacArthur Blvd.<br>Mahwah, NJ 07430 |
| and if to Licensor to: | General Counsel<br>Sears Holdings Corporation<br>3333 Beverly Road<br>Hoffman Estates, IL 60179 |

21.14  Certain Payments & Expenses.

(a)    As an accommodation to Licensee, Kmart, may, from time to time during the Term, in its discretion and at Licensee's request, assume or pay freight charges with respect to Licensee's merchandise.

(b)    Kmart shall, or shall cause an affiliate to, grant to Footstar a license, for the Term only and solely for the purpose of facilitating the operation of the Footwear Departments in accordance with the terms and intent of this Agreement, for up to 3 employees of Footstar to enter into its headquarters facility in Hoffman Estates, Illinois and will provide to Footstar space at its headquarters in Hoffman Estates, Illinois comparable to the space enjoyed by Footstar at Kmart's headquarters in the period immediately prior to the commencement of the Chapter 11 Cases.  Footstar shall pay to Kmart an amount equal to $125,000.00 per year, payable quarterly in arrears, in respect of such license (inclusive of telephone, computer, and other office machine usage), which license is not intended by the parties to be a lease, it being understood

that Kmart (or its affiliate) shall have complete discretion and control over the space allocated to Footstar pursuant to this Agreement.

(c)    Kmart shall be entitled to set off any amounts owing by Footstar and/or Licensee for amounts owing pursuant to this Article XXI against any Weekly Sales Remittance.

21.15   <u>Meet and Confer</u>.  The parties agree that, prior to commencing any action arising out of or in connection with this Agreement, senior business representatives from each party shall meet and confer two times in person in a good-faith effort to resolve any such dispute.

[Signature Pages to Follow]

04-22350-ash   Doc 2890   Filed 10/28/05   Entered 10/28/05 23:53:33   Main Document
Pg 197 of 206
P.02/02
AUG-24-2005  16:06
08/24/2005   14:59   MELDISCO EXECUTIVE → 912123108007
NO.392   P002

IN WITNESS WHEREOF, the parties by their duly authorized officers set their hands as

follows:

*Licensee*

**Footstar, Inc.**

By: _____
    Jeffrey A. Shepard
    President & Chief Executive Officer - Meldisco

*Licensor*

**Kmart Corporation**

By:_____
    [name]
    [title]

**IN WITNESS WHEREOF,** the parties by their duly authorized officers set their hands as follows:

*Licensee*

**Footstar, Inc.**

By:_____
    Name:
    Title:

*Licensor*

**Kmart Corporation**

By:_____
    Name:
    Title:

**Kmart of North Carolina LLC**

By:_____
    Name:
    Title:

**Kmart of Pennsylvania LP,** by
    Kmart Corporation, its General Partner

By:_____
    Name:
    Title:

**Kmart of Texas LP,** by
    Kmart Corporation, its General Partner

By:_____
    Name:
    Title:

50

**Kmart Stores of Illinois LLC**

By: _____
    Name:
    Title:

**Kmart of Michigan, Inc.**

By: _____
    Name:
    Title:

**Kmart of Washington LLC**

By: _____
    Name:
    Title:

**Kmart Stores of Texas LLC**

By: _____
    Name:
    Title:

**Sears Holding Corporation, solely with respect to Article XX**

By: _____
    Name:
    Title:

51

## EXHIBIT A

1.      The Marks are:

**KMART**

**SUPER KMART CENTER**

**BIG KMART**

2.      In using the Marks, Licensee shall affix or display the appropriate trademark (®,

™, SM) or copyright notice (©) according to Licensor's instructions from time to time.

EXHIBIT B

RULES AND REGULATIONS

RESTRICTIONS ON THE USE OF THE REGISTERED SERVICE MARK "Kmart". Retail services offered the consumer under the registered service mark of "Kmart" must be under uniform operating conditions established by Kmart Corporation and Kmart of Michigan, Inc. and equally applicable to all who operate under the mark in order to preserve the legal rights of Kmart of Michigan, Inc., as the registered owner of the mark, and to afford appropriate legal protection to the Licensee. The limited license granted herein requires that all sales to the public in Kmart Stores be offered exclusively under the service mark of "Kmart," and prohibits the use of the mark in any other manner.

OTHER USES PROHIBITED. The use of "Kmart" by a Licensee in conjunction with bank accounts, checks, or on order forms, purchase orders or contracts with manufacturers, vendors, or suppliers, or with governmental agencies, or public utilities is prohibited by the terms of this license Agreement.

INCORPORATION. The adoption of "Kmart," or any simulation thereof in any corporate name is prohibited.

ASSUMED NAME STATUTES. If the registration under any assumed name statute is required, such registration shall clearly indicate that operations under the "Kmart" name are subject to and by virtue of a license agreement between Kmart Corporation and Kmart of Michigan, Inc., the registered owner of the mark.

ADVERTISING AND DISPLAY SIGNS. The use in advertising logotype or display signs or in any other manner of other service names, service marks, or service insignia, alone, or in conjunction with the service mark "Kmart" (other than on price tags in accordance with past practice), is in derogation of the requirement that all sales to the public be exclusively under the mark "Kmart" and is prohibited by the terms of this Agreement.

USE OF THE REGISTERED TRADEMARK "Kmart" ON PRODUCTS. The limited license granted herein is solely for the use of the registered mark "Kmart" in conjunction with retail services, and the unauthorized application of the registered trademark "Kmart" to products is in violation of this agreement.

EMPLOYMENT. All hiring and terminations, so far as they apply to each Licensee, will be under the supervision of the Licensee's management. The Kmart personnel supervisor will take applications of persons desiring employment. Upon request, these applications will be made available to Licensee's management.

PURSES AND EXTRA CLOTHING. Purses and extra clothing of employees shall be kept as directed by the Licensor. Under no circumstances are purses to be kept at the Licensee's department, provided that Licensor makes available a secure area for purses.

EMPLOYEE PURCHASES. All store purchases by employees, including all Licensee's employees, must be taken unsealed to a supervisor designated by the Licensor. Such

purchases will be sealed with the register tape and be available to be detached by the person who approves packages taken from the store. Employees may not keep packages in the department.

REFUNDS, COMPLAINTS. All refunds except tires, batteries and similar merchandise involving performance guarantees, are to be made at the Kmart Service Desk. Complaints are to be cleared through the Kmart Service Desk. Any disputes over refunds or complaints shall be resolved by Licensor.

SHOPLIFTING. Persons suspected of shoplifting shall only be questioned or apprehended by the Store loss prevention associate or the Licensor's Store Manager.

LOST ARTICLES. Customer's change left at the counter should be turned over to the Licensor's cashier with the employee's name, date, amount of money tendered, and quantity of merchandise purchased. If money is not called for within two days, the cash office will report the money as a receipt on the office balance form.

Money or valuables found by a customer or store employee are to be held in the office for a period of sixty days, after which, if they have not been claimed, they will be returned to the person finding them.

SMOKING. Smoking in the department, or anywhere on the sales floor, except in designated areas, is prohibited. Employees smoking in the stockroom area will be dismissed.

GREETINGS OF CUSTOMERS. Each customer shall receive a "Friendly" or "Cheery" greeting and close all sales with "Thank You for Shopping at Kmart".

SUPPLIES. Licensor will furnish, at its expense, wrapping supplies, paper, bags, twine, and forms which shall be used by all Licensees for the conduct of the business pertaining to cash transactions, refunds, layaways, will-calls, credit and reports to Licensor. Licensee shall furnish at its expense such other special boxes or wrappings as it believes necessary or desirable to enhance the salability or the security of its merchandise.

SIGNS. Licensee may purchase all signs for display and promotional selling, including string tags, senso labels, clips and other signs as may be required, from Licensor at cost of production and material.

PRICE MARKING. Licensee shall individually price all merchandise where required by law and such merchandise shall be identifiable by a UPC unique to Footstar and Footstar's unique five-digit style number.

STORAGE. Licensee shall observe the following practices regarding storage area:

- Keep clean.

- Lock, if possible, and have lights out if only for Licensee's storage area when not in use.

- Permit no condition to exist which might create a fire hazard.

- Check for hazards at the close of each day.

INCOMING – OUTGOING MERCHANDISE.  Licensee shall be responsible for receiving its merchandise into Licensee's storage area (such area to be specified by Licensor from time to time) unless Licensor performs this service at Licensee's expense.  All incoming and outgoing merchandise shall be under the supervision of Licensor.

FREIGHT DOOR.  The freight door shall be closed except during receipt of merchandise under the supervision of Licensor.

EMERGENCY EXITS.  Licensee shall observe the following practices regarding emergency exits:

- Keep closed at all times except in emergencies.

- Not used for receipt or removal of merchandise unless under supervision of Licensor.

- Unauthorized use shall be cause for dismissal.

- No emergency exit is to be padlocked while the store is open for business.

GENERAL OPERATION OF STORE.  Licensee agrees to do the following:

- Keep open for business its departments during hours established by Licensor, it being understood that a department need not be staffed every hour that the applicable Store is open in order to be "open and ready for business."

- Not permit its department to be closed for any period without Licensor's written consent.

- Not permit the continuance of a labor dispute involving its department which materially affects the sales or threatens the operation of other Licensee or Licensor.

- Licensee must promptly remove all cardboard and other residue from unpacked merchandise, from entire area occupied by the Licensee.

- Maintain clean, attractive, well-filled displays of its merchandise, in adequate assortments, in sufficient depth, in suitable price range, and competitive in price with the same or similar goods offered for sale in the trading area.

- Discontinue the sale of any merchandise or service which Licensor shall deem not within the agreed classification.

- Not to make a fair trade agreement affecting any item sold in the department.

- To offer first-quality merchandise, including branded merchandise where possible.  Carry no seconds, irregulars or inferior items.  Top value, close-out merchandise offering special promotional possibility is permitted.

- The height of displays from the floor level shall not be in excess of those heights set from time to time by Licensor's store planning department, _provided_ Licensor shall provide Licensee with reasonable notice of any changes to the height of displays.

ADVERTISING AND PROMOTION BY LICENSOR.  Licensee shall work closely with Licensor in planning sufficiently in advance for a coordinated advertising program based on budget to make available in sufficient dept and suitability, merchandise which will produce maximum sales.  Licensee shall plan suitable display of such advertised merchandise.

SALES MEETINGS.  Licensee's manager and key personnel shall attend meetings as determined by Licensor from time to time to discuss operating procedures, formulate plans, review results and other pertinent information necessary for the successful operation of the business.

Licensee's employees shall attend briefing and training sessions to familiarize themselves with store policies and regulations pertaining to the conduct of the business in their department as well as the entire operation.

AISLE SPACE.  Licensee shall not obstruct or alter aisle space, as provided in the layout of licensed area, without approval of the Licensor.

FIRE RULES.  Licensee shall not permit any condition to exist that will create a fire hazard.

EMPLOYEE CARS.  Employees shall park their cars in an area designated by Licensor's Manager that ensures that customers will have the preferred parking space in front of the store.

# Schedule I
## Stores that are Not Existing Stores

| Store # | Location |
|---------|----------|
| 7707 | Warrenton, VA |
| 3973 | Stuart, FL |
| 3630 | Nashua, NH |
| 7282 | Clinton, MD |
| 4887 | Port St. Lucie, FL |
| 4776 | San Diego-Carmel, CA |
| 3399 | S. Plainfield, NJ |
| 7422 | Tustin, CA |
| 9406 | Peoria, AZ |
| 4384 | Palatine, IL |
| 4767 | N. Hialeah, FL |
| 3920 | El Monte, CA |
| 4446 | Bethlehem, PA |
| 4241 | East Ridge, TN |
| 4180 | Louisville, KY |
| 4488 | Rochestser, MI |
| 3076 | Spring Valley, CA |
| 4260 | San Diego-Mesa, CA |
| 4290 | San Diego-University, CA |
| 4484 | St. Petersburg, FL |
| 3638 | Tewksbury, MA |
| 3760 | N. Ft. Myers, FL |
| 3825 | Parsippany, NJ |
| 3985 | Lakeland, FL |
| 4496 | Keene, NH |
| 7427 | Londonderry, NH |
| 3124 | Corona, CA |
| 3988 | Putnam, CT |
| 7772 | Noblesville, IN |
| 4206 | Warren, MI |
| 3559 | Homer Glen, IL |
| 4224 | Denver, CO |
| 7092 | San Clemente, CA |
| 7678 | Mission Valley, CA |
| 4039 | South Bend, IN |
| 4869 | Deland, FL |
| 3476 | Clearwater, FL |
| 9395 | Lawnside, NJ |
| 4343 | W. Palm Beach, FL |
| 7277 | Cape Coral, FL |
| 4464 | Loves Park, IL |
| 9433 | Elmhurst, IL |
| 7081 | Brighton, MI |
| 4797 | Mobile, AL |
| 7640 | Mobile, AL |
| 7330 | Saraland, AL |
| 7760 | Linden, NJ |
| 3193 | Marlton, NJ |

## Schedule II
## Stores with No Right of Reentry

| Store No | City | ST |
|---|---|---|
| **Leases Expiring in 2005** | | |
| 3521 | Binghamton | NY |
| 4201 | El Paso | TX |
| 4269 | Phoenix | AZ |
| 7795 | Abilene | TX |
| 9287 | Atlantic | IA |
| 9573 | Rhinelander | WI |
| **Leases Expiring in 2006** | | |
| 4041 | Sioux Falls | SD |
| 4121 | Denver | CO |
| 4263 | Eastlake | OH |
| 4271 | Scottsdale | AZ |
| 3491 | El Paso | TX |
| 4264 | Stow | OH |
| 9335 | Peoria | IL |
| 9393 | Philadelphia | PA |
| 4986 | Virginia Beach | VA |
| 3960 | Bryan | OH |
| 4244 | Knoxville | TN |
| 4151 | Sparks | NV |
| 4191 | Harbor City | CA |
| 4277 | Stockton | CA |
| 4298 | Miami | FL |
| 7375 | Endicott | NY |
| **Leases Expiring in 2007** | | |
| 4728 | Miami | FL |
| 4282 | Industry | CA |
| 4176 | Cheektowaga | NY |
| 4285 | Ventura | CA |
| 4257 | Middleburg Heights | OH |
| 4303 | Billings | MT |
| 4199 | Amherst | NY |
| 4301 | Lima | OH |
| 9521 | Madawaska | ME |
| 4330 | Oxnard | CA |
| 4291 | Simi | CA |
| 4306 | Chula Vista | CA |
| 4341 | Fairfield | CA |
| 4314 | Cedar Rapids | IA |
| 4315 | Iowa City | IA |
| **Leases Expiring in 2008** | | |
| 4340 | Santa Rosa | CA |
| 4233 | Boardman | OH |
| 4344 | Allentown | PA |
| 9320 | Seneca | SC |
| 4240 | Northridge | CA |
| 4273 | Salt Lake City | UT |