UNITED STATES BANKRUPTCY COURT                    **NOT FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

FOOTSTAR, INC., *et al.*,

                  Debtors.

Chapter 11

Case No. 04-22350 (ASH)
(Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**BUTLER, FITZGERALD, FIVESON & McCARTHY**
**Attorneys for Debtors**
**By:  Raymond Fitzgerald**
**350 Fifth Avenue, Suite 6215**
**New York, New York 10118**

**GREENE & ZINNER, P.C.**
**Attorneys for Claimant**
**By:  Stanley S. Zinner**
**202 Mamaroneck Avenue**
**White Plains, New York 10601**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### DECISION SUSTAINING OBJECTION TO CLAIM

        Before me is Footstar's objection to an untimely claim filed by claimant John Kulacz after the bar date. The matter was tried to the Court on July 2. The following constitutes the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### Jurisdiction

        The Court has jurisdiction of this contested matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a). It is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

**Background**

John Kulacz ("Kulacz") has an impressive curriculum vitae. Before his employment at Footstar, Kulacz was Head of the Tax Shelter Group (1980-1986), Group Head of Commercial Banking in the Commercial Banking Department of Bankers Trust Company in New York (1986-1989), Vice President and Director of Licensing, and later President, for CHK BY H.I.S., a publicly traded company, and Chief Financial Officer of St. Clare's Hospital & Health Center in New York, NY (1999-2000).

**The 2001 Employment Agreement**

In February 2001, Kulacz proposed to Footstar that it create a licensing position at Footstar for Kulacz to fill. On April 24, 2001 Footstar and Kulacz entered into an employment agreement (the "2001 Employment Agreement") through which Footstar offered, and Kulacz accepted, the position of Director of Licensing effective the following day. The 2001 Employment Agreement contained a compensation package that provided a $3,846 bi-weekly base pay ($100,000 annualized), with incentives of a base salary increase to $4,807 bi-weekly ($125,000 annualized) contingent on Kulacz's implementation of a licensing program generating two million in wholesale volume, and a base salary increase to $5,769.23 bi-weekly ($150,000 annualized) contingent on Kulacz's implementation of a major licensing program generating five million in wholesale volume. The 2001 Employment Agreement also provided for an annual bonus of $20,000 guaranteed draw and an additional incentive based upon 10% of royalties, agency fees or other agreed upon sources of income paid above the $20,000 draw. The 2001 Employment Agreement also provided for 2,000 stock options, coverage of the cost of Kulacz's current portable life insurance policy at a maximum cost of $3,000 annually, and four weeks vacation.

Page 2 of the 2001 Employment Agreement also stated in relevant part: "Please keep in mind that this summary of compensation is not intended to be an express or implied contract of employment or a guarantee of benefits or compensation. Upon acceptance of this job offer, you acknowledge that your employment is at-will, and can be terminated with or without cause or notice at any time by you or the Company."

It was Kulacz's understanding of the 2001 Employment Agreement that he would receive 10% of any royalties that Footstar received only with respect to agreements that he negotiated or in which he was involved, and that he would only get 10% of revenues that were actually received by Footstar. It was also Kulacz's understanding of the 2001 Employment Agreement that he was to be paid his 10% bonus at the normal bonus time for Footstar, sometime between February and April of the following year.

### The Licensing Agreements Negotiated by Kulacz

Kulacz was successful in his three-and-a-half year tenure at Footstar, negotiating seven licensing agreements with royalties to which he was entitled to the 10% annual bonus negotiated in the 2001 Employment Agreement. Six of the licensing agreements Kulacz negotiated—the Clayson Texas Steer Agreement, dated July 1, 2001; the Clayson Thom McAn Agreement, dated October 1, 2003; the American Belt Agreement, dated July 16, 2001; the Implus Shoemart Agreement, dated August 13, 2003; the Implus Other Agreement, dated August 13, 2001; and the Millenium Agreement, dated August 1, 2004—were subsequently amended, cancelled or superceded. The seventh licensing agreement, dated March 3, 2004, involved Footstar Corporation and Everlast Worldwide, Inc.

In addition to the two licensing agreements with Implus, Kulacz also negotiated a vendor agreement between the Meldisco Division of Footstar and Implus (the "Implus Vendor

- 3 -

Agreement") on August 13, 2003, which was subsequently cancelled and superceded twice by two amending agreements, first on April 1, 2004 (the "Second Implus Vendor Agreement") and then on June 25, 2004 (the "Third Implus Vendor Agreement").

Finally, in 2003 Kulacz was asked by his superiors at Footstar to assist in negotiations with Land Rover, the British vehicle maker which had been acquired by Ford. On June 8, 1998, prior to Kulacz's employment by Footstar, Apache Minnesota Thom McAn, Inc. ("Apache"), a subsidiary of Footstar Corporation, entered into a trademark agreement with Rover Group Limited to sell to Rover Group Limited Apache's interest in certain trademarks for a minimum price of $5 million (the "Land Rover Trademark Agreement"). Apache and Rover Group Limited also entered into a license agreement (the "Land Rover License Agreement") and a trademark security interest agreement (the "Security Interest Agreement"). All three agreements were amended over time. The Land Rover Trademark Agreement and the Land Rover License Agreement were further amended by Amendment to Trademark Agreement and License Agreement dated August 15, 2003 (the "Final Land Rover Amendment Agreement").

Kulacz was only involved in the negotiation of this Final Land Rover Amendment Agreement, which provided, *inter alia*, that Land Rover, as successor of Rover Group Limited, would pay to Apache the minimum payment of $5 million plus $400,000 for certain other rights, $2.7 million payable on or before August 15, 2003 and the remaining $2.7 million payable on or before January 2, 2004. Land Rover paid to Apache $2.7 million in 2003 and $2.7 million in 2004.

### The Annual Bonus Provision

Kulacz functioned independently and effectively as Director of Licensing. His annual salary increased from $100,000 to $125,000 and then from $125,000 to $150,000 per

- 4 -

year.  Kulacz received his 10% bonus for the year 2001 in 2002.  No part of Kulacz's current claim involves 10% of any royalties received by Footstar in the years 2001, 2002, or 2003.

Within months after entering into his 2001 Employment Agreement with Footstar, Kulacz's 10% annual bonus provision began to be a source of controversy.  No other official or employee of Footstar had such a bonus entitlement.  For the calendar year 2003, Kulacz's bonus was in the range of $96,500, equating to over 64% of his contract salary of $150,000 and over 60% of his actual salary of $160,000.  Kulacz's unique and generous bonus was the subject of many conversations between Kulacz and his supervisors over many months.

### The 2004 Employment Agreement

Finally, in early January 2004, as Footstar was slipping inexorably toward its bankruptcy filing two months later, management terminated Kulacz's 2001 Employment Agreement and presented him with a new employment agreement dated January 6, 2004 (the "2004 Employment Agreement"), effective January 1, 2004.

Kulacz was told unambiguously, and he understood, that he had a simple choice—either accept the new agreement, or quit, or be fired.  Kulacz did not quit.  He did not sign the 2004 Employment Agreement, but he continued to work at his job at Footstar and he accepted the economic and other benefits under the 2004 Employment Agreement, specifically, the increase in salary reflected in his bi-weekly paychecks and the $30,420 paid to him in September 2004.  At no time did Kulacz reject the 2004 Employment Agreement, or tell Footstar management in words or substance that he regarded his right to the 10% annual incentive bonus under the 2001 Employment Agreement a continuing right, or that he was otherwise reserving his right to the 10% annual incentive bonus, undoubtedly because he knew he would be fired, and he did not have another job.  Kulacz acknowledged at the trial that his immediate boss, Steve

Wilson, told him in January 2004 that he could quit and sue Footstar if he did not want to accept the new contract.

### Footstar Bankruptcy; Kulacz's Claims

Footstar filed its voluntary petition under Chapter 11 in this Court on March 2, 2004.  A Chapter 11 debtor in possession ("DIP") can only pay pre-petition debts in accordance with established procedures, including the requirement that pre-petition creditors file claims if not listed in the Debtor's schedules.  A bar date of July 30, 2004 was established in the Footstar case.

On July 27, 2004, Kulacz filed two proofs of claim, each dated July 13, 2004.  The first was in the amount of $30,400, based on his right to a cash performance incentive award in that amount due September 2004 under the 2004 Employment Agreement.  The other was in the amount of $52,150 being the unpaid portion of Kulacz's 2003 bonus under the 2001 Employment Agreement.  Both of Kulacz's July claims were paid.

In September 2004, Footstar, as a Chapter 11 DIP, undertook a massive reduction in force ("RIF") as part of a cost-cutting program.  Kulacz's job was eliminated and his employment was terminated on September 24, 2004 as part of the RIF.

In the following month, Kulacz filed a proof of claim dated October 18, 2004 in the amount of $2,000,000 plus.  It is this claim which is the subject of this contested matter. First, Kulacz claims that pursuant to the 2001 Employment Agreement, he is entitled to receive 10% of royalties, agency fees and other agreed upon sources of income of Footstar in connection with services performed by him, which entitle him to no less than $1.3 million and to such greater sum as may be determined by an appropriate computation of funds generated in the

future.  Second, Kulacz claims he is entitled to severance compensation of no less than $150,000, consistent with that of the President of a profitable division at Footstar.

## Discussion

### I. The Implus Vendor and Land Rover Agreements

Neither the Implus Vendor Agreement nor the Land Rover Agreement is a license agreement.  The only language into which either might fit under the 10% annual bonus provision of the 2001 Employment Agreement is "other agreed upon sources of income."  There is no evidence that anyone in Footstar management agreed that Kulacz should receive a 10% bonus for his work on either contract, and Kulacz concedes that he never discussed the subject of such a bonus with Footstar management.  Kulacz made no claim for any such bonus in his request for a bonus for 2003, even though $2,700,000 was paid to Footstar by Land Rover in 2003.  Accordingly, Kulacz has no contract right to a 10% bonus with respect to either the Implus Vendor or Land Rover contract.

### II. The Claim That the 10% Annual Bonus Payments Were Everlasting

Kulacz argues that the January 2004 termination of the 2001 Employment Agreement and the termination of his employment in September 2004 could not divest him of his "right" to continue to receive the 10% bonus for license royalties paid to Footstar which he "earned" during his tenure at Footstar.  The argument must be rejected because nothing in the 2001 Employment Agreement grants Kulacz a vested, everlasting right to receive 10% of all license royalties paid on license agreements he negotiated whether or not he continued to be employed at Footstar.  With regard to Kulacz's claim to the annual bonus payments, the 2001 Employment Agreement states in relevant part:

> "$20,000 **per annum bonus**-guaranteed draw. Will receive additional **annual incentive** based on 10% of royalties, agency fees or other agreed upon sources of income paid above the $20,000 draw." (emphasis added).

In common parlance and understanding, an annual bonus is designed as an incentive to induce key employees to remain employed. An annual bonus is an incentive to the employed to stay with the company and work hard so that he or she can earn another annual bonus next year, and so that the company can retain his or her services for another year.

The traditional concept of an employee's annual incentive bonus conditioned on another year of employment is entirely different from a vested conveyance to Kulacz of a 10% property interest in all future license royalty payments received in future years on all licensing contracts he negotiated regardless of whether he remained an employee of Footstar.

Footstar did not grant Kulacz an indefeasible 10% property interest in all its future licensing royalty payments. The 2001 Employment Agreement granted Kulacz an annual incentive bonus and when his employment terminated, so did his right to the next annual bonus. Any doubt on this conclusion is laid to rest by the at will provision on the second page of the 2001 Employment Agreement, which states in relevant part:

> "Please keep in mind that this summary of compensation **is not intended to be** an express or implied contract of employment or **a guarantee of benefits or compensation**." (emphasis added).

Such a provision is ultimately incompatible with the concept of an everlasting property interest in 10% of payments in future agreements.

### III. <u>The "At Will" Provision</u>

With respect to the at will nature of Kulacz's contract, the second page of the 2001 Employment Agreement states in relevant part:

> "Upon acceptance of this job offer, you acknowledge that your employment is **<u>at-will</u>**, and **<u>can be terminated with or without cause or notice at any time by</u>** you or **<u>the Company</u>**." (emphasis added).

Aside from re-confirming that the annual bonus provision cannot possibly be construed as a conveyance of a 10% interest in all future license royalties in all future years irrespective of future employment, this provision makes perfectly clear that Footstar had the absolute right to terminate Kulacz's 2001 Employment Agreement and all rights associated with it, at any time, without costs.

Under this provision, Footstar had the absolute right to terminate the 2001 Employment Agreement and impose new contract terms on Kulacz on a take-it-or-leave-it basis, which is what Footstar did. It is well established that an employer's right to terminate at will includes the right to change the material terms of a contract, at any time, for any reason. *Hanlon v. MacFadden Publications*, 302 N.Y. 502, 505 (1951). It has also been held that when an employer exercises this right to terminate an at will employee's contract by changing that employee's terms of compensation and the employee chooses to remain in the employer's employ after being advised of that change, that employee is deemed to have acquiesced to the new terms of employment and cannot later claim compensation based on the terms of the original contract. See, e.g. *Dwyer v. Burlington Broadcasters Inc.*, 295 A.D.2d 745, 745-746; *Bottini v. Lewis & Judge Co., Inc.*, 211 A.D. 2d 1006, 1007-8; *Moseley v. Island Computer Prods., Inc.*, 2006 WL 318815, at *2-4 (E.D.N.Y. Feb. 9, 2006).

I reject Kulacz's argument that because he did not sign the 2004 Employment Agreement, he retained his rights to the 10% annual bonus under the 2001 Employment Agreement. Footstar had the right to terminate the 2001 Employment Agreement, and when Footstar said it had terminated the agreement, it was terminated. Kulacz's choice in January 2004 was to accept continued employment under the terms of the 2004 Employment Agreement or quit or be fired. As Kulacz acknowledged, his boss, Steve Wilson, made clear that he was free to quit and sue. But he was not free to accept the benefit of the 2004 Employment Agreement and retain the right to sue under the 2001 Employment Agreement.

Kulacz chose to accept the benefits of the 2004 Employment Agreement, including his right to an increase in salary to $175,000 a year, and his right to a $30,420 bonus payable in September, both of which he received. He did not reject the 2004 Employment Agreement or manifest any interest to preserve whatever right he thought he had under the 2001 Employment Agreement, and if he had done that, he would have been terminated forthwith. By his actions he must be deemed to have accepted the 2004 Employment Agreement and waived any claim under the 2001 Employment Agreement.

## IV. The Severance Claim

Kulacz claims that although his title was Director of Licensing, he had responsibilities similar to employees holding the position of President of a division of Footstar, and he therefore is entitled to a greater severance consistent with the severance payments they received. This claim also fails on two counts.

First, there is no evidence that Kulacz's job responsibilities were in any way analogous to those of senior management at Footstar or someone representing a separate subsidiary of the company. In fact, Kulacz occupied a single employment slot that was created

solely for him to negotiate license royalty contracts, and in three-and-a-half years he successfully negotiated seven.  But he supervised no employees, had no one reporting to him, and had no responsibilities beyond this narrowly defined task.  In fact, his duties in no way resembled the duties of senior management in a corporate enterprise.  His job occupied a very small niche at Footstar, with extremely limited responsibilities, that did not exist before his employment and did not exist after his termination.

Second, the Court has already passed upon and entered an order relating to the severance payable to several categories of employees of Footstar, including Kulacz.  He had an opportunity to object to that May 6, 2004 order, and he never did so.

### Conclusion

Footstar's objection to Kulacz's claim for over $2 million—including $1.3 million derived from a 10% share in royalties, agency fees, and other agreed upon sources of Footstar income derived from his services, and $150,000 in severance payments—is hereby sustained.  Counsel for Footstar is directed to submit an order consistent with this Decision.

Dated: White Plains, NY
       July 6, 2007

                                                            /s/Adlai S. Hardin, Jr.
                                                                 U.S.B.J.